**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ELIZABETH SCOTT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:06CV01661 |
| | ) | (CKK/AK) |
| OFFICE OF RODNEY ALEXANDER, | ) | |
| Member, U.S. House of Representatives, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S MOTION TO DISMISS COUNT III AND FOR SUMMARY
JUDGMENT AS TO COUNTS I AND IV OF PLAINTIFF'S
SUPPLEMENTAL COMPLAINT**

Defendant Office of Congressman Rodney Alexander, Member, United States

House of Representatives ("the Office" or "Defendant"), through undersigned counsel

and pursuant to this Court's Minute Order of June 8, 2007, Fed.R.Civ.P. 1, 12(b)(1), and

56, and Article I, Section 6 of the United States Constitution, hereby files this Motion to

Dismiss Count III of Plaintiff's Supplemental Complaint and for Summary Judgment as

to Counts I and IV of Plaintiff's Supplemental Complaint. In support of this Motion,

Defendant also files an accompanying Memorandum of Points and Authorities and a

separate Statement of Material Facts Not In Dispute.

As further explained in Defendant's attached Memorandum, Defendant seeks

dismissal for the following reasons:

1

First, this Court does not have subject matter jurisdiction of Plaintiff's retaliation claim (Count III) pursuant to Article I, Section 6 of the United States Constitution ("the Speech or Debate Clause") and Fed.R.Civ.P. 12(b)(1). Count III cannot be adjudicated without inquiring into the legislative acts of a Member of Congress and/or his motivation for such legislative acts. Because the Speech or Debate Clause precludes the Judicial Branch from overseeing or adjudicating such matters, Count III should be dismissed.

Second, the undisputed material facts as evidenced exclusively by Plaintiff's testimony at her May 21, 2007 deposition, establish that she cannot set forth even a prima facie case of hostile work environment harassment (Count I). Specifically, the conduct which Plaintiff claims she experienced and upon which she seeks to predicate her harassment claim is not, as a matter of law, severe or pervasive. Further discovery will do nothing to enhance Plaintiff's memory of the conduct she claims to have experienced. Therefore, regardless of other issues that might be further explored in additional discovery (such as whether Plaintiff utilized a complaint procedure or whether the Defendant is potentially vicariously liable for the alleged actions of the alleged harasser), Plaintiff's testimony regarding the conduct she allegedly experienced cannot change with further discovery. Because this testimony confirms that Plaintiff cannot establish an essential element of a prima facie case of hostile work environment harassment, summary judgment should be granted on this claim at this time.

Third, the undisputed material facts as evidenced exclusively by Plaintiff's deposition testimony entirely negates her constructive discharge claim (Count IV) because she cannot establish that she perceived her working conditions as so intolerable that she had no choice but to quit. Specifically, Plaintiff testified unequivocally that she

"most definitely" wanted and expected to return to work at Defendant at the same time she contends her working conditions were intolerable. It was not until she received a job offer for "a lot more" money and a hefty signing bonus that she decided to quit employment with Defendant. Irrespective of additional discovery, this deposition testimony makes it impossible for Plaintiff to establish the key element of intolerability that is essential to state a constructive discharge claim.

Therefore, Count III should be dismissed, summary judgment should be granted to Defendant on Counts I and IV of Plaintiff's Supplemental Complaint, and this Court should enter an Order precluding Plaintiff from seeking discovery by any means and of *any witness* regarding any dismissed claim, and regarding any matter that is barred by the Speech or Debate Clause.

Respectfully submitted,

By _____

Russell H. Gore, D.C. Bar # 449231
Gloria J. Lett, D.C. Bar # 293365
Kimberly Carey Williams, VSB # 41325[1]
U.S. House of Representatives
Office of House Employment Counsel
1036 Longworth House Office Building
Washington, D.C. 20515
(202) 225-7075
Attorneys for Defendant
Office of Rep. Rodney Alexander

DATED: July 12, 2007

---

[1]    Appearing by LCvR 83.2(e) and 2 U.S.C. § 1408(d).

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................... 1

II.   BACKGROUND ........................................................................ 3

      A.    The Parties and the Complaint............................................ 3
      B.    Procedural Posture of This Motion...................................... 4

III.  STATEMENT OF FACTS .......................................................... 5

      A.    Facts Relevant to Defendant's Request for Dismissal of Count III ............ 6
      B.    Facts Relevant to Defendant's Request for Summary
            Judgment (Counts I and IV) ................................................ 7

            1.   Plaintiff's Employment And Position With The Office ....................... 7
            2.   Plaintiff's Allegations that Royal Sexually Harassed Her.................... 7
            3.   Plaintiff's Removal As Scheduler on May 12 and Her May 14
                 Complaint ................................................................ 8
            4.   Plaintiff's May 15 "Most Definite" Intent to Return to Work and
                 Her May 24 Request to Discuss Her Return To The Office and
                 The Commencement of Her Paid Administrative Leave........................ 8

IV.   ARGUMENT ........................................................................... 9

      A.    The Speech or Debate Clause Bars Plaintiff's Retaliation Claim
            (Count III)................................................................. 9

            1.   The D.C. Circuit's Opinions In *Fields* ............................... 10

                 a.   Synopses of the Four Opinions in *Fields*........................ 11
                 b.   *Fields'* Unresolved Questions Regarding The
                      Reach of the Clause's Immunity Component in
                      CAA Cases ..................................................... 13
                 c.   The Discernable Rules from *Fields* ........................... 14

            2.   Because Congressman Alexander's Decision to Remove
                 Plaintiff As Scheduler Was A Legislative Act, It Is
                 Immune From Challenge Under the Speech or
                 Debate Clause................................................... 15

                 a.   Congressman Alexander's Affidavit Establishes
                      The Legislative Motivations For His Decision
                      To Remove Plaintiff As Scheduler .............................. 16

       *1.     Appropriations and Subcommittee*
            *Meetings and Mark-up*.............................................16
       *2.     The Position of Scheduler*......................................17
       *3.     Congressman Alexander's Perceptions*
            *Regarding Plaintiff's Performance, Its*
            *Impact on His Ability to Fullfill His*
            *Legislative Duties, His Decision To Remove*
            *Plaintiff, And the Motivations Therefore*...............17

    b.    Speech or Debate Clause Jurisprudence
          Establishes That Congressman Alexander's
          Decision To Remove Plaintiff As Scheduler Was
          A Legislative Act And Therefore Immune From
          Judicial Oversight or Adjudication....................................18

  3.    Alternatively, Congressman Alexander's *Fields*
       Affidavit Shows That Plaintiff Cannot Prove Her Claim
       For Retaliation Without Inquiring Into Legislative Acts
       or the Motivations for Legislative Acts And Count
       III Must Be Dismissed Pursuant to the Evidentiary
       Component of the Speech or Debate Clause .................................22

B.    Summary Judgment Must Be Granted With Respect To
    Counts I and IV.................................................................................27

  1.    Plaintiff's Deposition Testimony Confirms That The Alleged
       Conduct By Royal She Allegedly Experienced Was Not
       Severe or Pervasive And, Therefore, Summary Judgment
       Should Be Granted To Defendant As to Her Hostile Work
       Environment Claim (Count I).........................................................28

    a.    *The Conduct Which Plaintiff Contends Constitutes*
          *Harassment At Items 1-2 is Not "Severe"*.........................31

    b.    *The Conduct Which Plaintiff Contends Constitutes*
          *Harassment At Items 3-5 Is Not "Pervasive"* ..................34

  2.    Plaintiff's Deposition Testimony Confirms That She Cannot
       Establish That She Was Constructively Discharged And,
       Therefore, Summary Judgment Should Be Granted To
       Defendant As To Count IV.............................................................38

    a.    *Plaintiff's Constructive Discharge Claim Fails For the*
          *Same Reasons As Does Her Hostile Environment Claim*
          *And For the Additional Reason That The Alleged Conduct*

*Is Not The Type of "Worst Case" Harassment that Is Required For Such A Claim*..............................................39

b.   *Plaintiff's Testimony Confirms That Plaintiff Did Not Actually Perceive Royal's Behavior As So Intolerable That She Had No Choice But To Quit*.............41

c.   *Plaintiff's Deposition Testimony Shows That Her Constructive Discharge Claim Is An Afterthought – Added To Her Complaint In An Effort To Deflect From The Fact That She Had Found Other Employment* ...................................................................43

V.     CONCLUSION ...................................................................45

# TABLE OF AUTHORITIES

**_Constitutional Provisions and Statutes_**

U.S. CONST. art I, § 6 .......................................................................................... 2, 9

U.S. CONST. art I, § 9 ........................................................................................ 2, 16

2 U.S.C. §§ 1301-1438 ............................................................................................. 3

2 U.S.C. § 1317............................................................................................... 23

2 U.S.C. § 1402.................................................................................................. 9

2 U.S.C. § 1403.................................................................................................. 9

2 U.S.C. § 1408............................................................................................ 9, 45

42 U.S.C. § 2000e-3(a) .................................................................................... 23

**_Cases_**

*Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir.1998) ......................... 33-34

*Akonji v. Unity Healthcare, Inc.*, No. Civ. A. 05-2101,
    2007 WL 1207194 (D.D.C. Apr. 24, 2007) ................................................. 32

*Al-Mahdi v. District of Columbia Public Schools*, No. Civ. A. 01-1014,
    2005 WL 3272075 (D.D.C. Dec. 2, 2005) .................................................. 41

*Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006) ............................... 23

*Brown & Williamson Tobacco Corp. v. Williams*,
    62 F.3d 408 (D.C. Cir. 1995) ...................................................... 22, 24, 26

*Browning v. Clerk, United States House of Representatives*,
    789 F.2d 923 (D.C. Cir. 1986) ............................................................. 10, 11

*Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000) ..................................... 33

*Burton v. Batista*, 339 F. Supp. 2d 97 (D.D.C. 2004) ..................................... 28

*Buttron v. Sheehan*, No. 00-C-4451,
    2003 WL 21801222 (N.D. Ill. Aug. 4, 2003) ............................................. 35

*Carter v. Greenspan*, 304 F. Supp. 2d 13 (D.D.C. 2004) ............................ 32-33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 28

*Clay v. District of Columbia*, No. Civ. A. 03-466, 2005 WL 641750 (D.D.C. Mar. 17, 2005) *vacated on other grounds*, 208 F. App'x 6 (D.C. Cir. 2006) ............................. 28

*Davis v. Passman*, 442 U.S. 228 (1979) ..................................................................... 12, 19

*Dayes v. Pace Univ.*, No. 98CIV3675, 2000 WL 307382 (S.D.N.Y. Mar. 24, 2000) *aff'd* 2 F. App'x 204 (2d Cir. 2001) ......................................................................... 38

*Dombrowski v. Eastland*, 387 U.S. 82 (1967). ................................................................... 19

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975). ............................................. 19

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ..................................................... 33

*Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006) .................. passim

*Fitzer v. Chevron Corp.*, No. 2:05-CV-507, 2006 WL 462552 (E.D. Cal. Feb. 27, 2006) ..................................................................... 37

*Fox v. Giaccia*, 424 F. Supp. 2d 1 (D.D.C. 2006) ............................................................ 23

*Glenn v. Williams*, No. Civ. A. 98-1278, 2006 WL 401816 (D.D.C. Feb. 21, 2006) ................................................................ 44

*Gravel v. United States*, 408 U.S. 606 (1972) ............................................... 20, 21, 26, 27

*Griffin v. Ambika Corp.*, 103 F. Supp.2d 297 (S.D.N.Y. 2000) ...................................... 35

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ......................................................... 28-29

*Hilt-Dyson v. City of Chicago*, 282 F.3d 456 (7th Cir. 2002) .......................................... 33

*Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55 (D.D.C. 2006) .............................................. 44

*Kelley v. Billington*, 370 F.Supp.2d 151 (D.D.C. 2005) .............................................. 36-37

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). .............................................. 24

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). ............................................ 39

*Murray v. City of Winston-Salem*, 203 F. Supp. 2d 493 (M.D.N.C. 2002) ...................... 33

*Office of Sen. Mark Dayton v. Hanson*, 127 S.Ct. 2018 (2007) ................................... 4, 5

*Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004) .................................. 39, 40, 41

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .................................. 23

v

*Sessions v. Univ. of South Carolina*, No. 3:04-0634,
  2006 WL 2543051 (D.S.C. Aug. 31, 2006). ............................................................. 38

*United States v. Gillock,* 445 U.S. 360 (1980) .................................................................. 2

*United States v. Helstoski,* 442 U.S. 477 (1979) ............................................................ 24

*United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) ...................................... 22

*Vigil v. City of Las Cruces,* No. 96-2059,
  1997 WL 265095 (10th Cir. May 20, 1997) ................................................................ 37

*Wada v. Tomlinson,* No. Civ. A. 03-1488,
  2007 WL 1378516 (D.D.C. May 9, 2007) ............................................................ 29, 36

*Washington v. Thurgood Marshall Acad.,* No. Civ. A. 03-2570,
  2006 WL 1722332 (D.D.C. June 19, 2006) ................................................................ 23

*Williams v. Chertoff,* No. Civ. A. 05-211,
  2007 WL 1830815 (D.D.C. June 27, 2007) ................................................................ 29

*Woodruff v. Peters,* 482 F.3d 521 (D.C. Cir. 2007) .................................................. 23, 24

### *Rules*

Fed.R.Civ.P. 1 ................................................................................................................ 3, 28

Fed.R.Civ. P. 12(b)(1) ......................................................................................................... 2

Fed.R.Civ.P. 56 ................................................................................................... 2, 27, 28, 31

LCvR 7(h) ............................................................................................................................ 7

LCvR 56.1 ............................................................................................................................ 7

LCvR 83.2(e) ..................................................................................................................... 45

### *Other Authorities*

Congressman Alexander's Official House of Representatives Website
(http://www.house.gov/alexander/content/biography) ...................................................... 4

S. Streeter, *The Congressional Appropriations Process: An Introduction* (September 8,
  2006) (U.S. House of Representatives Committee on Appropriations Official Website,
  http://appropriations.house.gov/pdf/appfacts.pdf) ........................................................ 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELIZABETH SCOTT<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF RODNEY ALEXANDER,<br>Member, U.S. House of Representatives,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:06CV01661<br>)  (CKK/AK)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS COUNT III AND FOR SUMMARY
JUDGMENT AS TO COUNTS I AND IV OF PLAINTIFF'S
SUPPLEMENTAL COMPLAINT**

Defendant Office of Congressman Rodney Alexander, Member, United States

House of Representatives ("the Office" or "Defendant"), through undersigned counsel

and pursuant to this Court's Minute Order of June 8, 2007, Fed.R.Civ.P. 1, 12(b)(1) and

56, and Article I, Section 6 of the United States Constitution, hereby files this

Memorandum of Points and Authorities in Support of its Motion to Dismiss Count III of

Plaintiff's Supplemental Complaint and for Summary Judgment as to Counts I and IV of

Plaintiff's Supplemental Complaint.

## I.    INTRODUCTION

The Speech or Debate Clause is a fundamental component of the separation-of-

powers upon which our system of government is based.   It ensures that each member of

the Legislative Branch may fulfill his or her duties as a legislator free from inquiry,

question, oversight, intimidation, or harassment by the Executive or Judicial Branches

1

and "avoid[s] intrusion by the Executive or Judiciary into the affairs of" the Legislative Branch. *United States v. Gillock,* 445 U.S. 360, 369 (1980). Although this case involves, ostensibly, a run-of-the-mill employment dispute, if its core claim of retaliation is permitted to proceed, the legislative acts of a Member of Congress and his motivation for such legislative acts would be subject to oversight and adjudication by the Judicial Branch. Because this is forbidden by the Speech or Debate Clause, this Court does not have subject matter jurisdiction of Plaintiff's retaliation claim pursuant to Article I, Section 6 of the Constitution and Fed.R.Civ.P. 12(b)(1).

Moreover, Plaintiff's testimony at her May 21, 2007 deposition conclusively establishes that she cannot set forth even a prima facie case of hostile work environment harassment (Count I). Specifically, the conduct which Plaintiff claims she experienced and upon which she seeks to predicate her harassment claim is not, as a matter of law, severe or pervasive. Further discovery will do nothing to enhance Plaintiff's memory of the conduct she claims to have experienced. Therefore, regardless of other issues that might be further explored in additional discovery (such as whether Plaintiff utilized a complaint procedure or whether the Defendant is potentially vicariously liable for the alleged actions of the alleged harasser), Plaintiff's testimony regarding the conduct she allegedly experienced cannot change with further discovery. Because this testimony confirms that Plaintiff cannot under any circumstances establish an essential element of a prima facie case of hostile work environment harassment, summary judgment should be granted on this claim at this time.[1]

---

[1] Under Fed.R.Civ.P. 56(c), this Court should consider the summary judgment arguments made herein at this time because they demonstrate that Plaintiff cannot establish essential elements of Counts I and IV. Summary judgment as to Counts I and

Plaintiff's deposition testimony also entirely negates her constructive discharge claim (Count IV) because she cannot establish that she perceived her working conditions as so intolerable that she had no choice but to quit. Specifically, Plaintiff testified unequivocally that she "most definitely" wanted and expected to return to work with Defendant – even after she complained of alleged harassment. She also testified that it was not until after she received and accepted a job offer for "a lot more" money and a hefty signing bonus that she decided not to return to work with Defendant. Irrespective of additional discovery, this deposition testimony makes it impossible for Plaintiff to establish the key element of intolerability that is essential to state a constructive discharge claim.

## II.     BACKGROUND

### A.     The Parties and the Complaint

This employment case is brought by Elizabeth Scott (hereinafter "Scott" or "Plaintiff") against Defendant pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1301-1438 ("CAA").[2] Congressman Alexander is a Member of the United States House of Representatives, who represents the people of the Fifth District of

---

IV (along with dismissing Count III on Speech or Debate grounds) would significantly streamline the future litigation of this case, leaving only the two discrete claims at Counts II and V for discovery and further litigation. This would fulfill the goal of Fed.R.Civ.P. 1 by "secur[ing] the just, speedy, and inexpensive determination of" this action. Moreover, if the Court were not to consider whether to grant summary judgment as to Counts I and IV at this time and thereby permit them to remain in this case subject to further discovery, it will be necessary for the Court to *now* consider and rule upon the scope of appropriate discovery as to those claims under the Speech or Debate Clause.

[2]     The CAA extends portions of several federal labor and employment statutes to the Legislative Branch and provides Congressional employees, *inter alia*, with a right to adjudicate alleged violations of such statutes in federal court. *See generally Fields v. Office of Eddie Bernice Johnson,* 459 F.3d 1, 4-5 (D.C. Cir. 2006).

Louisiana.[3]  He was first elected to Congress in 2002.  Defendant is Congressman

Alexander's personal office.  Plaintiff was an employee of the Office from the fall of

2005 until June 2006, first as an intern and then as Scheduler.

Plaintiff's Complaint seeks to hold the Office liable in five counts.  Plaintiff

contends that the Office's former Chief of Staff Royal Alexander sexually harassed her

(Count I);[4] that her compensation was set lower than that of a male employee (Count II);

that the Office retaliated against her when she purportedly complained about Royal's

alleged harassment (Count III); that the Office constructively discharged her by allegedly

making her working conditions intolerable after she allegedly complained (Count IV);

and that the Office retaliated against her when the House of Representative's Office of

the Chief Administrative Officer recouped an overpayment it had inadvertently made to

Plaintiff in her final paycheck (Count V).[5]

## B.    Procedural Posture of This Motion

This Court held the Initial Scheduling Conference on March 16, 2007.  At that

time, Defendant advised the Court that the Supreme Court was expected to hear argument

in *Office of Senator Mark Dayton v. Brad Hanson,* – which was an appeal of the D.C.

Circuit's recent decision discussing the impact of the Constitution's Speech or Debate

---

[3]    *See* Congressman Alexander's Official House of Representatives Website
http://www.house.gov/alexander/content/biography (last visited July 9, 2007).

[4]    Royal Alexander is not related to Congressman Rodney Alexander.  For ease of
reference, rather than refer to him as "Mr. Alexander" in this brief, Defendant will refer
to him as "Royal."

[5]    Plaintiff's initial Complaint, filed on September 27, 2006, contained four counts.
The Supplemental Complaint was filed on January 4, 2007 and added Count V.  The two
complaints are otherwise identical and all further references in this brief to the Complaint
refer to the Supplemental Complaint (also referred to as "Compl.").

4

Clause on CAA litigation involving a Member of Congress. *Fields v. Office of Eddie Bernice Johnson,* 459 F.3d 1 (D.C. Cir. 2006).[6] Defendant advised the Court that the Supreme Court's resolution of *Hanson* might directly impact this case. The Court indicated that the parties should advise the Court after *Hanson* was decided and, if necessary, the Court would ask for briefing as to its impact on this matter.[7]

On May 21, 2007, Defendant took Plaintiff's deposition. That same day, the Supreme Court decided *Hanson,* determining that it did not have jurisdiction of the appeal, denying certiorari, and "express[ing] no opinion on the merits." 127 S.Ct. 2018, 2021 (2007). Congressman Alexander thereafter asserted the Speech or Debate Clause before this Court and requested a briefing schedule on this motion. Per the agreement of the parties, the Court stayed discovery in the interim.

## III.    STATEMENT OF FACTS

The nature of the evidence required for dismissal of a claim under the Speech or Debate Clause differs from that needed to support a request for summary judgment under Fed.R.Civ.P. 56. For instance, it is not necessary, nor would it be appropriate, for Defendant to identify the facts asserted by Congressman Alexander in his *Fields* affidavit as undisputed because the very nature of the Speech or Debate Clause precludes Plaintiff from disputing the *Fields* affidavit. Accordingly, Defendant states the material facts

---

[6]    *Fields* involved two cases the D.C. Circuit had consolidated – *Fields. v. Office of Eddie Bernice Johnson* and *Hanson v. Office of Senator Mark Dayton.* The employing office in the *Fields* case did not appeal or seek certiorari review of the D.C. Circuit's decision.

[7]    Discovery began the same day as the Initial Scheduling Conference, with the parties immediately exchanging document requests and interrogatories. The interrogatories have been responded to and the parties have exchanged nearly 2,000 pages of documents. Additionally, Defendant propounded Requests for Admission to Plaintiff, to which she has largely responded.

5

separately for its request for Speech or Debate dismissal of Count III from its request for summary judgment as to Counts I and IV.

### A.    Facts Relevant to Defendant's Request for Dismissal of Count III

Plaintiff was hired to work as an intern in the Office in the fall of 2005 and began working full-time as the Office's Scheduler shortly thereafter.  Compl. at ¶¶ 5-6.  At that time, and throughout 2006, Congressman Alexander was a member of the Appropriations Committee and several of its subcommittees and was responsible for introducing, debating, and voting on legislation to appropriate funds from the United States Treasury.  *See* Affidavit of Congressman Alexander (hereinafter "Alex. Aff.") ¶¶ 5-7 (attached hereto as Exhibit A).  As Scheduler, Plaintiff was responsible for coordinating the Congressman's schedule, which included interacting with other legislative offices and arranging meetings in such a manner as to ensure that the Congressman was able to attend Appropriations Committee and subcommittee hearings and votes in a timely manner.  *Id.* ¶ 4.  As of late April and early May of 2006, the appropriations "mark-up" season was beginning.  *Id.* ¶¶ 8-9.  Based on his assessment that Plaintiff had committed numerous errors as Scheduler, Congressman Alexander concluded that Plaintiff's sub-standard job performance impacted his ability to timely attend (and thereby participate in and vote in) Appropriations Committee and subcommittee hearings.  *Id.* ¶¶ 10, 12.  Congressman Alexander decided that Plaintiff was to be removed from her position as Scheduler and communicated this decision to Royal.  *Id.* ¶ 12.

6

**B.     Facts Relevant To Defendant's Request for Summary Judgment (Counts I and IV)**

In accordance with this Court's orders and Local Rules 7(h) and 56.1, each of the facts identified below is supported by reference to a specific citation to the separate Statement of Material Facts Not In Dispute ("SMF").

### 1.     Plaintiff's Employment And Position With The Office

Plaintiff began working as an intern for the Office in the fall of 2005. SMF ¶ 1. Shortly thereafter, Congressman Alexander personally offered the position of Scheduler to Plaintiff. SMF ¶ 2. Plaintiff began working as the Office's Scheduler in late 2005, making $30,000 per year. SMF ¶ 3. The Scheduler is based in the Washington, D.C. office and is responsible for coordinating the Congressman's schedule. SMF ¶ 4.[8]

### 2.     Plaintiff's Allegations that Royal Sexually Harassed Her

During Plaintiff's employment with the Office, the Chief of Staff was Royal Alexander. SMF ¶ 5.[9] In her Complaint, Plaintiff alleges that Royal engaged in "a course of misconduct with respect to Plaintiff that included, among other things, inappropriate sex-based comments, ogling and touching." Compl. at ¶ 7. This is the full extent of the Complaint's identification of the sexually-harassing conduct allegedly

---

[8]     Shortly before or shortly after the end of her employment with the Office, Plaintiff received a Master's Degree in Business Administration at Loyola University. (Plaintiff could not specify definitively whether she received her degree in May or July 2006.) Pltf's Dep. at 242-244; 298:22-25; 301. (Referenced portions of Plaintiff's deposition are located at Attachment 1 to Defendant's separate Statement of Material Facts Not in Dispute.)

[9]     Royal is no longer employed by the Office. He now lives in Louisiana and is running for Louisiana Attorney General.

7

engaged in by Royal.  Accordingly, at Plaintiff's deposition, Defendant questioned her

extensively regarding the purported facts underlying this succinct allegation.

Plaintiff testified that Royal was the only person in the Office who allegedly

engaged in sexually harassing behavior.  SMF ¶ 7.  The specific conduct Plaintiff

testified that Royal engaged in that she believed was harassing is identified in detail at

Section IV.B.1 of this brief and paragraphs 8(a)-8(e) of the separate Statement of

Material Facts Not In Dispute.

### 3.    Plaintiff's Removal As Scheduler on May 12 and Her May 14 Complaint

On Friday, May 12, 2006, Royal informed Plaintiff that she was being removed

from the position as Scheduler.  SMF ¶ 10.  Two days later – on Sunday, May 14, 2006

– Plaintiff advised Congressman Alexander by email that she believed Royal had

sexually harassed her, discriminated against her based on her sex, and retaliated against

her.  SMF ¶ 11.  This was the first time Plaintiff had advised Congressman Alexander

personally that Royal had allegedly engaged in this behavior.  SMF ¶ 12.[10]  Plaintiff

called in sick the following week, beginning on Monday, May 15, 2006.  SMF ¶ 13.

### 4.    Plaintiff's May 15 "Most Definite" Intent To Return to Work and Her May 24 Request to Discuss Her Return To The Office And The Commencement of Her Paid Administrative Leave

On May 15, 2006, Plaintiff sent an email to the Office's information technology

assistant inquiring about the ability to restore files she had recently deleted.  SMF ¶ 14.

Plaintiff testified that, at the time she sent this email on May 15, she "most definitely"

---

[10]    Plaintiff claims that at some indeterminate time in 2006, she spoke with the
district representatives in Defendant's Louisiana offices regarding Royal's alleged
behavior.  For purposes of this motion only, Defendant assumes Plaintiff can establish
that she did so and that such communications constituted complaints of alleged sexual
harassment.

intended to return to work in the Office.  SMF ¶ 15.  Additionally, on Wednesday, May 24, Plaintiff contacted the Office, by email to Royal containing the subject line "hey" and asked "Please call me so we can arrange for my return to the office tomorrow." SMF ¶16.  In response, Plaintiff was advised that she should not return on Thursday, May 25 but, instead, she would be placed on paid administrative leave for two weeks while the investigation of her allegations was completed.  SMF ¶ 17.[11]

On June 1, 2006, after the investigation, Defendant asked Plaintiff to return to work.  SMF ¶ 18.  Plaintiff accepted a position as Administrative Assistant at JBG Companies at a salary of $42,000 (plus a $5,000 signing bonus) and declined the Office's request that she return to work.  SMF ¶¶ 19, 21.[12]

## IV.    ARGUMENT

### A.    The Speech or Debate Clause Bars Plaintiff's Retaliation Claim (Count III)

Article I, Section 6 of the United States Constitution – the Speech or Debate Clause – provides that "for any Speech or Debate in either House, they [Members of Congress] shall not be questioned in any other Place."  Count III alleges that Defendant removed Plaintiff from her position as Scheduler and transferred her to a lesser position

---

[11]    Plaintiff testified that she had been advised that Congressman Alexander had commissioned an outside law firm to conduct an investigation of her allegations after he received her May 14, 2006 complaint.  Pltf's Dep. at 320:9-18.  The adequacy of that investigation and Plaintiff's refusal to participate in it is not relevant to the instant motion.

[12]    Prior to initiating a federal court lawsuit under the CAA, a plaintiff must complete counseling and mediation.  2 U.S.C. §§ 1402-1403, 1408; *Fields,* 459 F.3d at 5. Defendant expressly reserves the right to seek dismissal of any claims that survive this motion on the grounds that they are untimely and/or that the counseling and/or the mediation process was not properly exhausted with respect to them.

9

as Staff Assistant in retaliation for Plaintiff's having resisted Royal's alleged behavior and complaining. Compl. at ¶¶ 10, 22. As set forth in Congressman Alexander's attached affidavit, Congressman Alexander decided to remove Plaintiff as Scheduler based, *inter alia,* on his assessment that Plaintiff's scheduling errors were interfering with his ability to timely attend Appropriations Committee and subcommittee meetings and thus to fulfill his legislative duties. This decision was a legislative act and, therefore, is immune from challenge under the Clause and must be dismissed on jurisdictional grounds. Alternatively, if the Court does not dismiss Count III on jurisdictional grounds, the claim must nonetheless be dismissed because Plaintiff will be required to inquire into legislative acts, and Congressman Alexander's motivations for legislative acts, to establish her claim of retaliation. Such inquiries are barred by the Speech or Debate Clause.

### 1.     The D.C. Circuit's Opinions In *Fields*

In *Browning v. Clerk, United States House of Representatives,* 789 F.2d 923 (D.C. Cir. 1986), the D.C. Circuit held that the Speech or Debate Clause protects from judicial inquiry personnel decisions undertaken by Members of Congress with respect to employees whose duties are "directly related to the due functioning of the legislative process." 789 F.2d at 931. *Browning* thus established the presumption that a personnel decision is a legislative act immune from challenge under the Clause whenever it *affects an employee who performs legislatively-related duties*.

In *Fields,* the employing offices had argued – consistent with *Browning*'s presumption – that the plaintiffs' duties were legislative and, accordingly, the personnel decisions the plaintiffs were challenging were immune legislative acts under the Clause's

immunity component.  The D.C. Circuit disagreed, expressly rejecting *Browning*'s

employee-duties test as "over-inclusive" and stating that "[w]e now see that an

employee's duties are too crude a proxy for protected activity."  459 F.3d at 11.  While

all eight judges sitting en banc in *Fields* agreed that *Browning*'s employee-duties test

presumption should be overruled, and also that the Clause had a role to play in CAA

litigation, consensus largely ended there.[13]

### a.    Synopses of the Four Opinions in *Fields*

The plurality opinion authored by Judge Randolph, joined in full by Judges

Ginsburg, Henderson and Tatel, held that, in the two cases before the Court, the pleadings

did not expressly predicate liability on legislative acts; therefore, those two lawsuits were

not precluded by the immunity component of the Speech or Debate Clause.  459 F.3d at

13.

Judge Randolph expressly noted that the parties had asked the Court to decide

whether "a personnel decision [is] *always* an administrative act" not immune under the

Clause, or whether "a personnel decision [could] be a legislative act [and therefore

immune under the Clause] in certain circumstances." 459 F.3d at 9 (emphasis in original).

Judge Randolph concluded that "*some* personnel decisions would not qualify . . . [as] 'an

integral part of the deliberative and communicative processes' in which Members engage

as legislators." 459 F.3d at 10 (emphasis added).  The choice of the modifier "some" in

the statement – "*some* personnel decisions" – necessarily means that Judge Randolph

recognized that there are *some* personnel decisions that *would qualify*.  Agreeing that

---

[13]    Significantly, although the *Fields* Court rejected the "over-inclusive" test
established in *Browning*, it did not opine on whether *the personnel decision* that had been
at issue in *Browning* was itself nonetheless properly held to be immune from challenge.

these were "perplexing questions," Judge Randolph declined to issue a definitive rule
regarding when personnel decisions might be legislative acts beyond the specific facts of
the two cases before the Court.[14]

Judge Randolph expressly recognized that, in addition to the immunity
component, the Clause also contains an evidentiary component and that the Clause's
evidentiary component might have a significant role to play in CAA cases when properly
invoked. 459 F.3d at 14. Judge Randolph further explained that the evidentiary
component of the Clause could lead in "many cases" to dismissal of CAA claims. 459
F.3d at 15. He also provided an analytical framework by which district courts are to
assess whether such dismissal is required. 459 F.3d at 15-16.

Judge Tatel issued a concurring opinion in which he "agree[d] with Judge
Randolph" with respect to the main issues, *i.e.,* the immunity issue analysis; the rule that
the evidentiary component of the Clause had the potential to "preclude[] litigation" in
certain CAA claims; and, generally, with regard to how that framework should operate.
*See Fields*, 459 F.3d at 20 (concurring opinion of Tatel, J.).

Judge Rogers agreed with Judge Randolph regarding the Clause's immunity
component, although she concluded that a personnel decision is not a legislative act.
*Fields*, 459 F.3d at 17. Judge Rogers also agreed that the Clause's evidentiary privilege
could apply, but believed it was "unclear" how the latter might occur and, thus, she

---

[14]     The Supreme Court has not definitively spoken as to whether personnel decisions
by a Member of Congress with respect to his or her employees are legislative acts
shielded by the Speech or Debate Clause. In *Davis v. Passman*, 442 U.S. 228 (1979), a
former deputy Administrative Assistant to a Member of Congress alleged that her
discharge was based on her gender in violation of the Fifth Amendment. The Court
seemed to recognize that the personnel decision was "taken in the course of his [the
Member's] official conduct." 442 U.S. at 246. However, the Court did not decide
whether the Member's conduct in discharging the employee was protected by the Clause.

would have preferred to leave it for a future case to assess. *Fields*, 459 F.3d at 17-18
(concurring opinion of Rogers, J.).

To the contrary, the opinion of Circuit Judge Brown, in which Circuit Judges
Sentelle and Griffith joined, would have adopted a much more constrictive view of a
CAA defendant's ability to invoke the Clause and would have held that, because the
defendant in a CAA suit is not a Member of Congress, but instead the defendant is a
fictitious entity created by the CAA – the "employing office" – such an entity could not
invoke the Clause. 459 F.3d at 28-30 (concurring opinion of Brown, J.). Therefore,
Judges Brown, Sentelle and Griffith would have held that immunity under the Clause was
never appropriate in CAA cases. They also did "not reach the subsequent questions of
whether" personnel decisions are legislative acts. *Fields*, 459 F.3d at 30 n.3.

### b. *Fields's* Unresolved Questions Regarding The Reach of the Clause's Immunity Component in CAA Cases

To be sure, Judge Randolph's decision and its two concurrences could be clearer
regarding the impact of the Clause's immunity component in future CAA lawsuits. To
the extent Judge Randolph's decision could be read to say that – henceforth – a CAA
claim can *never* be dismissed on immunity grounds, except when the complaint clearly
challenges a legislative act on its face, Defendant submits that such a holding is limited to
the specific facts and context of *Fields*.

First, the *Fields* plurality went out of its way to emphasize that it was addressing
the very specific facts before it. *See* 459 F.3d at 9 (plurality opinion noting that the Court
was "confin[ing itself]" to deciding only what is necessary to the disposition of the
immediate cases"); 459 F.3d at 21 (concurring opinion of Judge Tatel noting that "it is

appropriate that we announce no blanket rule today . . . [and that o]nce the district courts develop the factual records, the issues that divide this court may become clearer").

Second, it makes no sense that the *Fields* plurality would have held that the immunity component of the Clause could *never* be invoked except when the plaintiff's complaint on its face expressly predicated liability on a legislative act. Clearly, as the opinion of Judge Brown intimates, a Member should be able to assert immunity under the Clause when the defense necessarily implicates legislative acts. [15] Otherwise, the immunity component of the Clause would be eviscerated because any lawyer with a modicum of scrivening ability could prevent its invocation by preemptive artful pleading.

### c.    The Discernable Rules from *Fields*

In sum, what can be divined from the four opinions issued in *Fields* is the following:

- All eight en banc judges adhered to the rule that when a lawsuit predicates liability on a legislative act, and when an individual eligible to invoke the Speech or Debate Clause does so, absolute immunity requires dismissal of the claim.

- With the exception of Judge Rogers, all of the judges declined to issue a definitive answer to the "perplexing question" of whether a personnel decision can be a legislative act.

- All eight en banc judges agreed that the evidentiary component of the Clause might be invoked in CAA lawsuits.

---

[15]    "[I]f the defendants here could assert the Speech or Debate Clause, I believe the jurisdictional application of the clause might be broader than Judge Randolph suggests. For the purposes of the Speech or Debate Clause to be fulfilled, it arguably ought to bar as a jurisdictional matter not only lawsuits in which the complaints are predicated on legislative acts, but also suits that will inevitably necessitate an inquiry into such acts and motivations, even where such inquiry would arise due to an affirmative defense." *Fields*, 459 F.3d at 30 n.3 (opinion of Judge Brown).

14

- A plurality (Judges Randolph, Ginsburg, Henderson, and Tatel) provided a detailed framework for district courts to assess when the evidentiary component compels dismissal of a CAA claim.

Against this lively jurisprudential backdrop, Defendant now explains why the Clause precludes Count III from proceeding. First – positing the answer that was left undetermined by *Fields* – Defendant explains that because Congressman Alexander's decision to remove Plaintiff as Scheduler was inextricably intertwined with his concerns about his past and future ability to perform legislative acts, the decision was a legislative act and is therefore *immune* from challenge under the Speech or Debate Clause. Alternatively, Defendant explains, that Count III cannot proceed under the Clause's evidentiary component as explicated by the *Fields* plurality, because Plaintiff cannot establish her retaliation claim without inquiring into or introducing evidence relating to legislative acts or the motivations for such acts.

### 2. Because Congressman Alexander's Decision to Remove Plaintiff As Scheduler Was A Legislative Act, It Is Immune From Challenge Under the Speech or Debate Clause

One of the "perplexing questions" left unanswered by the plurality in *Fields* is when, post-*Browning*, a personnel decision effectively a legislative act that is *immune* from suit under the Speech or Debate Clause? In this case, Plaintiff asserts that her removal as Scheduler was motivated by Defendant's desire to retaliate against her for having complained regarding Royal's alleged behavior.[16] Defendant submits that

---

[16]    Plaintiff's retaliation claim states, *in toto,* that the "misconduct referenced above in paragraphs 10 and 11 constitutes unlawful retaliation in violation of the CAA, 2 U.S.C. § 1317(a)." Compl. at ¶ 22. Paragraph 10 contains the allegation regarding Defendant's removing her from the Scheduler position. Paragraph 11 contains the substantive allegations regarding Plaintiff's constructive discharge claim and alleges that Defendant made Plaintiff's working conditions so intolerable after she allegedly complained that Plaintiff felt compelled to quit. *Id.* at ¶ 11. As explained below in Section IV.B.2,

Congressman Alexander's decision to remove Plaintiff as Scheduler was a legislative act because it was, in part, legislatively motivated and was made as part of the due functioning of the legislative process. This "perplexing question" left unanswered by *Fields* is now directly presented.

### a. Congressman Alexander's Affidavit Establishes The Legislative Motivations For His Decision To Remove Plaintiff As Scheduler

#### 1. *Appropriations and Subcommittee Meetings and Mark-up*

In 2006, Congressman Alexander was a member of the House Committee on Appropriations, as well as three of its subcommittees (Agriculture; Science, State, Justice and Commerce; and Military Quality of Life). Alex. Aff. ¶ 5. The Appropriations Committee is the House Committee responsible for crafting the appropriations bills which, when passed by the full House and Senate and signed by the President, are the mechanisms by which funds from the federal treasury are authorized each fiscal year. *Id.* ¶ 6.[17] This is one of Congress's most important functions under Article I, Section 9 of the Constitution (providing that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). As part of the appropriations process, the full Committee and each of its subcommittees have frequent meetings at which appropriations legislation is considered, debated, amended, and passed. *Id.* ¶ 7.

---

Plaintiff's deposition testimony conclusively forecloses her from proving the allegations of paragraph 11. Accordingly, Defendant addresses Plaintiff's retaliation claim in this section without reference to its incorporation of paragraph 11.

[17]     *See generally* S. Streeter, *The Congressional Appropriations Process: An Introduction* (September 8, 2006) at pages CRS-1 and CRS-6 - CRS-9 (U.S. House of Representatives Committee on Appropriations Official Website, http://appropriations.house.gov/pdf/appfacts.pdf) (last accessed June 21, 2007).

16

Each year, typically in the late Spring, the Appropriations Committee and its subcommittees begin the legislative process known as "mark-up." *Id.* ¶ 8. Mark-up season is a time of increased activity for the Committee and the subcommittees as they debate, revise and vote on the appropriations bills to fund the federal government for the next fiscal year. *Id.* Mark-up is often extremely time-sensitive; votes occur frequently and often occur relatively unexpectedly and quickly. *Id.* Failure to be present at a Committee or subcommittee meeting on time can mean missing a vote on legislation or limiting a Member's ability to debate or offer amendments to legislation. *Id.* Thus, a Member's timely presence at these meetings is crucially important to his ability to vote on and influence appropriations legislation. *Id.*

### 2. *The Position of Scheduler*

Most Members of Congress have extremely busy schedules that require the undivided attention and dedication of a full-time Scheduler. Congressman Alexander is no exception. He expects his Scheduler to not only administratively note his schedule on a calendar, but also to arrange his schedule, speak with other offices in coordinating his schedule, and exercise independent judgment regarding his attendance at often-conflicting meetings and events. *Id.* ¶ 4. Moreover, he expects his Scheduler to perform these functions with due regard to ensuring that he is present and on time for key Committee meetings and votes, particularly during appropriations mark-up. *Id.* ¶ 4, 10.

### 3. *Congressman Alexander's Perceptions Regarding Plaintiff's Performance, Its Impact on His Ability to Fulfill His Legislative Duties, His Decision To Remove Plaintiff, And the Motivations Therefore*

In late April and early May 2006, Congressman Alexander was directly impacted by several scheduling errors that he attributed to Plaintiff. *Id.* ¶ 9. These included, *inter*

*alia*, her scheduling him to attend Committee meetings at the wrong starting times and/or with the wrong location identified; scheduling him to leave a Committee meeting that was underway to attend another meeting, only to arrive at the location Plaintiff had designated to find the room empty; and scheduling him at multiple locations at the same time. *Id.* ¶ 9. Congressman Alexander perceived Plaintiff as having a lack of attention to detail. *Id.* He also perceived her as having a lack of appropriate concern for the importance of his timely attendance at Committee meetings. *Id.* These errors caused Congressman Alexander great concern about Plaintiff's ability to be able to adequately coordinate his schedule during mark-up. *Id.* ¶ 10. He was worried that these errors would cause him to miss important votes. *Id.* Congressman Alexander's concerns about Plaintiff's performance were inextricably intertwined with his concerns about their effect on his ability to perform his legislative duties.[18]

**b.    Speech or Debate Clause Jurisprudence Establishes That Congressman Alexander's Decision To Remove Plaintiff As Scheduler Was A Legislative Act And Therefore Immune From Judicial Oversight or Adjudication**

The Supreme Court has made abundantly clear that the Clause's immunity component applies – and litigation is absolutely barred – when the challenged action is a

---

[18]    Of course, Congressman Alexander performed other duties, such as communicating and meeting with constituents. Alex. Aff. ¶ 11. Plaintiff was responsible for scheduling these matters as well and her errors spilled over into these activities. *Id.* On one occasion, for instance, Plaintiff had scheduled the Congressman to meet constituents supposedly at an event in the Capitol rotunda in Washington, D.C., however, the event was actually taking place in the rotunda in the capitol building in Baton Rouge, LA. *Id.* Because the *Fields* court reiterated that the Clause protects legislative activities, not purely political or purely constituent service activities, 459 F.3d at 12, Defendant does not substantively rely on the non-legislative errors for purposes of this motion. That said, the fact that Plaintiff's errors also extended into these other areas confirmed Congressman Alexander's lack of confidence regarding Plaintiff's abilities with respect to legislative matters.

18

legislative act. Indeed, the "applicability of the Clause to private civil actions is supported by the absoluteness of the terms 'shall not be questioned,' and the sweep of the term 'in any other Place.'" *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). A "private civil action . . . creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Id.* "Moreover, whether a criminal action is instituted by the Executive Branch, or a civil action is brought by private parties, judicial power is still brought to bear on Members of Congress and legislative independence is imperiled." *Id.* Therefore, "[l]egislators engaged 'in the sphere of legitimate legislative activity' . . . should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967). Further, "[d]efenses based upon the Clause should thus ordinarily be given priority, since federal legislators *should be exempted from litigation* if their conduct is in fact protected by the Clause." *Davis*, 442 U.S. at 236 n.11 (emphasis added). And, "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." *U.S. Servicemen's Fund*, 421 U.S. at 503 (citations omitted).

 *Fields* reaffirmed that the Speech or Debate "Clause obviously covers core legislative acts – 'how a Member spoke, how he debated, how he voted, or anything he did in the chamber or in committee.'" 459 F.3d at 10 (internal citations omitted).

> It protects acts that are 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. . .

The legislative process at least includes 'delivering an opinion, uttering a speech, or haranguing in debate'; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and 'introducing material at Committee hearings.'

[And, the Clause protects more than actual speech or actual debate; it also protects]:

'anything a Member did in the chamber or in committee'. . . 'the act of voting, whether it is done vocally or by passing between the tellers' . . . and 'every other act resulting from the nature, and in the execution of the office.'

*Fields,* 459 F.3d at 10, 11 & nn.15, 16 (internal citations omitted).

Congressman Alexander's attendance at Appropriations Committee and subcommittee hearings, his being on time – or present – to vote on bills, and his involvement in the intense mark-up process, are exactly the type of core legislative acts that the Speech or Debate Clause covers. *Gravel v. United States*, 408 U.S. 606, 616, 624 (1972) (Clause protected Senator "either in terms of questions or in terms of defending himself from prosecution – for the events that occurred at the subcommittee meeting;" "voting by Members and committee reports are protected . . . [and] a Member's conduct at legislative committee hearings . . . is within the 'sphere of legitimate legislative activity'") (internal citations omitted).

The Clause does more than protect core legislative acts; it also protects conduct that is "part of, or integral to, the due functioning of the legislative process." *Fields,* 459 F.3d at 12. Congressman Alexander's affidavit demonstrates that he expected Plaintiff to properly schedule his attendance at Committee and subcommittee meetings and other events during the mark-up season. Alex. Aff. ¶ ¶ 4, 10. Congressman Alexander submits that an aide's arranging his schedule accurately and conscientiously so that he can be present for important Committee hearings, so that he gets to the meeting at the correct

20

location and on time, and so that he is not called away from such meetings to entertain an empty room is certainly a part of the due functioning of the legislative process. Indeed, "it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Gravel,* 408 U.S. at 616. Therefore, the Clause is implicated when "the day-to-day work of such aides is so critical to the Member's performance. . . ." *Id.* at 616-617.[19]

The *Fields'* plurality expressly held that "interactions with legislative staff (which may form part of the basis for personnel actions) are often part of the due functioning of the legislative process." *Fields,* 459 F.3d at 14. In doing so, the plurality expressly recognized that Members' reliance on their aides to assist them in competently performing their legislative activities are often legislative acts. Because Congressman Alexander's decision to remove Plaintiff as Scheduler is so tethered to his perceptions and motivations regarding his ability to perform core legislative acts, this personnel decision was "part of the due functioning of the legislative process" and, therefore, a legislative act.

Count III is therefore barred by the immunity component of the Speech or Debate Clause and should be dismissed.[20]

---

[19]    The quoted text from *Gravel* discussed the extension of the Clause's protections to a Member's aides as his or her alter ego. The principles emanating from this discussion show that, in the modern Congress, interactions with and the actions of staff can clearly be "legislative" and implicate Speech or Debate concerns.

[20]    In the event this Court finds that there is no absolute immunity with respect to Count III, such a ruling is immediately appealable, *Fields,* 459 F.3d at 4 n.1, and

3. **Alternatively, Congressman Alexander's *Fields* Affidavit Shows That Plaintiff Cannot Prove Her Claim for Retaliation Without Inquiring Into Legislative Acts or the Motivations for Legislative Acts And Count III Must Be Dismissed Pursuant to the Evidentiary Component of the Speech or Debate Clause**

In the event the Court finds that Count III should not be dismissed outright based on the immunity component of the Clause discussed above, the Court should dismiss Count III under the *Fields*'s plurality's evidentiary framework.

The *Fields* plurality held that "even if the challenged personnel decisions are not legislative acts, inquiry into the motivation for those decisions may require inquiry into legislative acts." 459 F.3d at 14. Accordingly, the plurality held, the Member (or other qualified individual) should submit an affidavit identifying into what legislative matters the plaintiff's claim would inquire. *Id.* at 16. District courts should then consider the affidavit and the evidentiary burden-shifting requirements relevant to the particular employment claim at issue in assessing whether the Clause requires that the claim "must be dismissed" and thereby "precludes litigation." *Id.* at 16 (opinion of Randolph, J); *Id.* at 20 (opinion of Tatel, J.).[21]

---

Defendant requests that the Court maintain the stay of this case to allow Defendant to appeal. "Because the Speech or Debate Clause protects a Member of Congress 'not only from the consequences of litigation's results but also from the burden of defending [himself],' . . . post-trial review of an order denying a claim of immunity under that Clause is insufficient to vindicate the rights that the Clause is meant to protect." *United States v. Rostenkowski*, 59 F.3d 1291, 1297 (D.C. Cir. 1995) (internal citations omitted).

[21]    The D.C. Circuit has previously suggested that the evidentiary component of the Clause appears textually in the Constitution ("shall not be questioned") and is the basis for the immunity component. *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418 (D.C. Cir. 1995). Disapproving of the assertion that "the testimonial privilege is weaker than congressional immunity from suit," the D.C. Circuit held that "[b]ased on the text of the Constitution, it would seem that the immunity from suit derives from the testimonial privilege, not the other way around." *Id.*

22

To establish a prima facie case of retaliation, a plaintiff must show that she engaged in protected activity, that the employer took an adverse action, and that there is a causal nexus between the protected activity and the adverse action. *See Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007); *Broderick v. Donaldson*, 437 F.3d 1226, 1231-1232 (D.C. Cir. 2006); *Fox v. Giaccia*, 424 F. Supp. 2d 1, 9 (D.D.C. 2006). The defendant must then "articulate some legitimate, non-retaliatory reason for the adverse action." *Woodruff*, 482 F.3d at 529; *Washington v. Thurgood Marshall Acad.*, No. Civ. A. 03-2570, 2006 WL 1722332, at *15 (D.D.C. June 19, 2006). "Once the defendant proffers the requisite explanation, the plaintiff must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for retaliation.'" *Woodruff*, 482 F.3d at 529 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).[22]

Assuming *arguendo* that Plaintiff could establish a prima facie case of retaliation,[23] Defendant has articulated the legitimate, non-retaliatory reason for Congressman Alexander's decision to remove Plaintiff as Scheduler: "I decided to remove Elizabeth Scott as Scheduler because, among other things, I believed she was interfering with my ability to attend Committee and subcommittee meetings in a timely

---

[22]    The anti-retaliation provision of the CAA differs in some respects from the anti-retaliation provisions of Title VII. *Compare* 2 U.S.C. § 1317 *with* 42 U.S.C. § 2000e-3(a) (CAA prohibits an employing office from intimidating, taking reprisal against, or otherwise discriminating against employee who engages in protected activity whereas Title VII prohibits an employer from discriminating). This difference is not material to this motion.

[23]    Should this case proceed, Defendant reserves the right to show that most of the communications Plaintiff contends were complaints were not in fact protected activity and/or did not bear a causal relationship to her removal as Scheduler.

23

manner and I could not afford to risk missing such meetings or votes during the busy mark-up period." Alex. Aff. ¶ 12. Defendant's articulation of this legitimate reason negates any inference of retaliation.[24]

For Plaintiff "to carry her burden of persuasion, she must 'demonstrate that the proffered reason was not the true reason for the employment decision.'" *Fields,* 459 F.3d at 15. In a typical case, a plaintiff would be permitted to discover and present evidence in an effort to challenge the defendant's articulated reason. Ultimately, the court would decide whether the plaintiff's evidence was sufficient to call the defendant's reason into question or whether the defendant's reason stood and the retaliation claim should be dismissed. Where the Speech or Debate Clause is invoked, however, a plaintiff's efforts to challenge the defendant's articulated reason is barred because the Clause precludes evidence from being obtained – nay, even from being *requested* – in the first instance. "The Clause does not simply state, 'No proof of a legislative act shall be *offered'*; the prohibition of the Clause is far broader. It provides that Members 'shall not be *questioned* in any other Place.'" *United States v. Helstoski*, 442 U.S. 477, 489 (1979) (emphasis in original); *Brown & Williamson,* 62 F.3d at 420. Thus, the "*very inquiry*" by which Plaintiff would attempt to establish evidence to rebut Congressman Alexander's legitimate articulated reason "*would be unconstitutional.*" *Fields*, 459 F.3d at 16 (emphasis added).

Plaintiff cannot challenge Congressman Alexander's asserted rationale for her discharge "without 'drawing in question' the legislative activities and the motivations for

---

[24]     As the D.C. Circuit has recently reiterated, Defendant's articulation of its legitimate reason is "presumptively valid." *Woodruff*, 482 F.3d at 529 (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805 (1973)).

those activities asserted by the affiant [Congressman Alexander] – matters into which the Speech or Debate Clause prohibits judicial inquiry." *Fields,* 459 F.3d at 15-16  And, her inability to establish pretext without inquiring into such matters means that "the action most likely must be dismissed, as the failure to rebut a defendant's evidence . . . normally is fatal to a plaintiff's discrimination [retaliation] allegations." *Id.* at 16.

The *Fields* plurality noted, for instance, that if a Member fired an employee because the speeches the employee wrote did not accurately reflect the Member's legislative objectives, "the Speech or Debate Clause would preclude the employee from proving her case by demonstrating that the speeches she wrote did in fact accurately reflect the [Member's] legislative objectives." *Id.* at 16.  Similarly, in order for Plaintiff to challenge Congressman Alexander's asserted reason for her removal, Plaintiff would presumably attempt to show that she did not fail to accurately schedule him to attend Committee and other legislative meetings or that his perceptions of her performance were not warranted.

For instance, Plaintiff might attempt – either through direct questioning of the Congressman, his aides, or otherwise – to demonstrate that the schedule she maintained was accurate and did not in fact impact the Congressman in his ability to attend any hearings and thus that his concerns were not justified.  Her efforts to challenge Congressman Alexander's reason for her removal would likely involve questioning and evidence of core legislative acts (Committee hearings, the Congressman's attendance or non-attendance at such hearings, the Congressman's schedule, votes the Congressman did or did not cast, whether votes not cast coincided with the schedule Plaintiff maintained, and the like).

Such discovery, whether issued to Congressman Alexander, his Office, or any other party, are the exact types of inquiry that the Clause absolutely precludes. *See, e.g.,* *Gravel*, 408 U.S. at 628-629 (Clause precluded inquiry of "*any witness*" regarding "Senator's conduct, or the conduct of his aides, at . . . . meeting of the subcommittee . . . concerning the motives and purposes behind the Senator's conduct, or that of his aides, at that meeting . . . [and] concerning communications between the Senator and his aides during the term of their employment and related to said meeting or any other legislative act of the Senator." (emphasis added)).  "[A]ny probing of legislative *acts* is sufficient to trigger the [Clause's] immunity." *Brown & Williamson*, 62 F.3d at 419 (emphasis in original).

But beyond her inability to *discover* let alone *introduce* evidence of legislative acts, Plaintiff is precluded from establishing pretext at an even more basic level.  Plaintiff might seek to quarrel with the legitimacy or reasonableness of Congressman Alexander's concerns or judgments about the impact of Plaintiff's performance on his ability to attend Committee and other hearings (and perform the legislative functions of voting, debating, and considering appropriations legislation).  This would require the Congressman to justify his concerns about prompt attendance at Committee and subcommittee meetings and to discuss the importance of and obligations imposed on a Member during the appropriations mark-up process.  Further, Plaintiff would then presumably attempt to discredit the conclusions Congressman Alexander drew regarding the potential impact of these concerns on his ability to attend or vote in committee hearings.  Such inquiries into the motivations for legislative acts is also forbidden.

26

In sum, Count III is based on Plaintiff's removal as Scheduler and the motivation for that removal. This claim must be dismissed under the immunity and/or evidentiary components of the Speech or Debate Clause.[25]

Finally, because Count II (alleged unequal pay) and Count V (alleged post-employment retaliation) will proceed regardless of how the Court resolves this motion, this Court should also issue an order precluding Plaintiff from seeking discovery or otherwise inquiring about Plaintiff's removal as Scheduler or her performance, to the extent such discovery might relate to legislative acts or the motivations for them.

### B.    Summary Judgment Must Be Granted With Respect To Counts I and IV

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith" when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Further, when the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[25]    A contrary holding would have a chilling effect inconsistent with the Clause. For instance, permitting Count III to proceed could, henceforth, cause Members of Congress to retain poor performing employees – regardless of the effect such continued employment might have on the Members' abilities to perform their legislative functions competently – solely to avoid the prospect of having to defend the legislative motivations for their decisions in litigation. That the prospect of civil litigation could so impact a Member of Congress's freedom to make necessary decisions to allow him or her to perform his or her legislative function is exactly the type of circumstance the Clause was designed to preclude. *See Gravel*, 408 U.S. at 625 (the Clause has been extended to prevent "indirect impairment" of legislative acts).

which that party will bear the burden of proof at trial," summary judgment is required.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986).[26]

>    1.    **Plaintiff's Deposition Testimony Confirms That The Alleged Conduct By Royal She Allegedly Experienced Was Not Severe or Pervasive And, Therefore, Summary Judgment Should Be Granted To Defendant As to Her Hostile Work Environment Claim (Count I)**

In order to establish a prima facie case of a hostile work environment, a plaintiff

must produce evidence that "the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter conditions

of the victim's employment and create an abusive working environment." *Harris v.*

---

[26]    Defendant recognizes that, while some significant discovery has taken place in this case, the discovery period is not over. Defendant further recognizes that a request for summary judgment would be premature at this point with respect to certain claims and/or defenses because the parties have not yet had a chance to obtain information and testimony regarding such issues. Defendant does not, therefore, seek summary judgment on any issue requiring further discovery. However, Fed.R.Civ.P. 56(b) provides that a party may "at any time" move for summary judgment and that the "judgment sought shall be rendered forthwith" if the standards for summary judgment are established. Accordingly, the two issues upon which Defendant seeks summary judgment involve matters that are within the exclusive knowledge of Plaintiff such that additional discovery would not impact their resolution. *See Burton v. Batista*, 339 F. Supp. 2d 97, 115 n.2 (D.D.C. 2004) (granting summary judgment despite request for discovery when the "grounds upon which the Court has ruled in rejecting the sexual harassment and retaliation claims would not be impacted by discovery"); *Clay v. District of Columbia*, No. Civ. A. 03-466, 2005 WL 641750, at *5 n.4 (D.D.C. Mar. 17, 2005), *vacated on other grounds*, 208 F. App'x 6 (D.C. Cir. 2006) (further discovery unnecessary, particularly in light of the fact that summary judgment motion relies "almost exclusively" on non-movant's deposition testimony). Specifically, Plaintiff has testified at length regarding the conduct engaged in by Royal that she allegedly experienced and which she contends is severe and pervasive. Additional discovery will not supplement Plaintiff's memory regarding the behavior she claims to have experienced. Similarly, Plaintiff has also testified regarding her "most definite" desire and expectation of returning to work at a time when the working conditions were allegedly intolerable. Additional discovery will not alter Plaintiff's recollection of this "most definite" intent. Because Plaintiff's inability to establish essential elements of Counts I and IV is already irreversibly clear, allowance of further discovery on these counts is pointless and inconsistent with Fed.R.Civ.P. 1 and 56(c).

28

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted ). "Title VII does not mandate workplace *civility* . . . [and m]ere abusive behavior in itself is not actionable." *Williams v. Chertoff*, No. Civ. A. 05-211, 2007 WL 1830815, at *15 (D.D.C. June 27, 2007) (internal citations omitted) (emphasis in original). "Nor may an employee's complaint plead only ordinary workplace tribulations, such as 'the sporadic use of abusive language, [ ] jokes, and occasional teasing' . . . [because] Title VII does not prohibit all verbal or physical harassment in the workplace." *Id.* (internal citations omitted).

 "In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look . . . [at] 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Wada v. Tomlinson,* No. Civ. A. 03-1488, 2007 WL 1378516, at *57 (D.D.C. May 9, 2007) (internal citations omitted); *Chertoff*, 2007 WL 1830815, at *15. And, of particular significance to this case and the posture of this motion, while a "plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim." *Wada,* 2007 WL 1378516, at *57.

 The only factual allegations regarding sexual harassment in the Complaint are at paragraph 7 and under the heading Count I where Plaintiff alleges that Royal "engaged in a course of misconduct with respect to Plaintiff that included, among other things, inappropriate sex-based comments, ogling and touching . . . [that was] severe or pervasive and rendered Plaintiff's work environment hostile and/or abusive." *See* Compl.

at ¶¶ 7, 16. During her seven hour deposition on May 21, 2007, Defendant questioned

Plaintiff at length regarding the specific conduct that she claimed formed the foundation

for these allegations. Plaintiff identified the following conduct as the bases for her

harassment claim:

(1) On one occasion, when Plaintiff was standing on a chair to retrieve items
from a shelf, Royal allegedly placed his hands around her middle and
proceeded to move them up and down, touching the underwire of her bra in
the vicinity of her breasts, while helping her step down off a chair. SMF ¶
8(a).

(2) On one occasion, Royal allegedly looked at the work schedule on Plaintiff's
computer screen and, in so doing, leaned his arms on the desk and kissed the
top of her head. SMF ¶ 8(b).

(3) Royal would hug Plaintiff and call her "Sweet Elizabeth." SMF ¶ 8(c).

(4) Royal would leer/stare at Plaintiff and asked Plaintiff out to lunch. SMF ¶
8(d).

(5) Royal would comment on Plaintiff's clothing, tell her and a co-worker that
they were sexy, and told her sisters that they were sexy. SMF ¶ 8(e).

The foregoing is the *full extent* of the conduct allegedly engaged in by Royal that

Plaintiff found offensive. SMF ¶ 9.

Plaintiff testified that the chair incident identified at item 1 above and the

computer screen incident identified at item 2 occurred only one time *See* SMF ¶¶ 8(a),

8(b) and Pltf's Dep. at 172-174; 270-271. Obviously then, Plaintiff is not contending that

the conduct identified at items 1-2 constituted "pervasive" conduct amounting to

harassment. In section (a) below, Defendant explains that – assuming that Plaintiff's

testimony regarding what she alleges occurred with respect to items 1-2 is true – this

conduct is not "severe" as a matter of law.

As for the conduct identified at items 3-5, in her deposition, Plaintiff could not, for the most part, recall any specifics regarding when any of this allegedly occurred, who was present when it occurred, or even whether this conduct occurred more than once. As explained in section (b) below, Plaintiff's testimony regarding the conduct identified at items 3-5 demonstrates that the conduct was not "pervasive" as a matter of law.

Defendant herein seeks summary judgment on Count I solely on the basis that Plaintiff's testimony regarding the alleged harassing conduct establishes conclusively that she cannot state a prima facie claim for hostile environment harassment. Plaintiff has been fully deposed and testified at length regarding the conduct she claims to have experienced that supports her harassment claim. No further discovery would enhance her memory of what she allegedly experienced. Defendant submits therefore that Fed.R.Civ.P. 56's directive that summary judgment be granted "forthwith" is applicable here.[27]

### a.    *The Conduct Which Plaintiff Contends Constitutes Harassment At Items 1-2 is Not "Severe"*

Case law is quite clear that conduct which occurs once, even when it has a physical component, is generally not "severe" enough to establish a hostile environment unless it is particularly egregious. Viewing her testimony in a light most favorable to Plaintiff, the two incidents Plaintiff described at items 1-2 fall far short of the level of "severity" that the cases typically require. Specifically, Plaintiff testified that Royal

---

[27]    For purposes of this motion only, Defendant assumes that Plaintiff can establish that the conduct identified at items 1-5 was unwelcome and, further, that she can establish that Defendant is vicariously liable for Royal's alleged conduct. Should the Court not dismiss Count I at this time, Defendant expressly reserves the right to seek summary judgment on the grounds that the undisputed evidence shows that the conduct at issue was not unwelcome and/or that Defendant is not liable for Royal's alleged conduct pursuant to, *inter alia*, the *Faragher* affirmative defense.

31

helped her down from a chair that she was standing on to retrieve items and, in doing so, he touched her midsection. Pltf's Dep. at 172-173; 184; 185. She further testified that his fingers and/or hands touched the underwire of her bra in the vicinity of the sides of her breasts. Pltf's Dep. at 172; 273-274. She could not recall whether this entire event lasted for more than two or three seconds. Pltf's Dep. at 185:25; 186:1-2. Plaintiff also testified that, on one occasion, Royal was looking at the work schedule on her computer monitor and leaned over, putting his arm(s) on the desk. Plaintiff testified that on this one occasion, she felt "trapped" and that Royal kissed her forehead. Pltf's Dep. at 269; 270:22-25; 271:1-4. Taking Plaintiff's testimony as true, this conduct, even if it occurred, does not, as a matter of law, constitute "severe" conduct sufficient to state a claim for hostile environment harassment.

The district courts in this Circuit routinely grant summary judgment regarding allegations that are more severe than those Plaintiff claims occurred here. For instance, in *Akonji v. Unity Healthcare, Inc.*, No. Civ. A. 05-2101, 2007 WL 1207194 (D.D.C. Apr. 24, 2007), the plaintiff contended that her supervisor had touched her buttocks, hugged her and attempted to kiss her on two occasions, touched her thigh during a performance review, told her she was beautiful, stared at her, and asked her out on a weekend trip. *Akonji,* 2007 WL 1207194, at *11. The court granted summary judgment, concluding that the "acts of alleged harassment, although by no means ideal workplace conduct . . . comprised of five discrete acts over a two-year period as well as infrequent inappropriate comments and staring . . . [and] do not reach the level of 'severe' or 'extremely serious' conduct that is required by the Supreme Court to state a claim for hostile-work-environment discrimination." *Id.* Similarly, in *Carter v. Greenspan*, the

32

plaintiff alleged that his coworker "caressed him on his knee," "placed her breast on his arm," and "placed her fingers on his buttocks." 304 F. Supp. 2d 13, 25 (D.D.C. 2004). The court determined that these three incidents were not sufficiently severe in quantity or quality to create a hostile work environment. *Id.* "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). Royal's alleged touching of Plaintiff's midsection while helping her down off of a chair and his alleged kissing the top of her head while looking over her at the computer screen is certainly less severe than placing one's fingers on another's buttocks or placing one's breasts on another's arm.

Moreover, a personnel manager's placing a pack of cigarettes inside an employee's tank top and brassiere strap, telling the employee she had "lost her cherry," and making other crude sexually-oriented comments does not rise to the level of "severe or pervasive." *Burnett v. Tyco Corp.,* 203 F.3d 980, 981, 985 (6th Cir. 2000). Neither are allegations that a supervisor twice rubbed a plaintiff's back and shoulders and stared at her inappropriately sufficient to establish a hostile work environment. *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 463-64 (7th Cir. 2002); *see also Murray v. City of Winston-Salem,* 203 F. Supp. 2d 493, 498-99 (M.D.N.C. 2002) (allegations that supervisor made a suggestive comment to the plaintiff, put his arm around her, touched her thigh twice, and inappropriately stared at her were insufficient to establish a hostile work environment); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357, 361-362 (7th Cir.1998) (allegations that supervisor and co-workers teased plaintiff, stared at her chest, attempted to make eye contact with her in flirtatious or suggestive manner, and on four occasions "briefly

33

touched her arm, fingers, or buttocks," amount only to isolated incidents and were not actionable under Title VII).

While the two incidents Plaintiff identifies at items 1-2 above – if they occurred in the context and manner that Plaintiff described – would not be appropriate behavior and are certainly not condoned by Congressman Alexander, they are not, as a matter of law, the type of severe, humiliating and threatening behavior that is required for a hostile work environment claim.

> **b.    The Conduct Which Plaintiff Contends Constitutes Harassment At Items 3-5 Is Not "Pervasive"**

Plaintiff testified that Royal's hugging her "was frequent." Pltf's Dep. at 168. At the same time, she was not able to say whether, in the entire time she worked for the Office, Royal hugged her more than five times. Pltf's Dep at 168-169.[28] Plaintiff also testified that "on occasions" Royal would ask her to go to lunch, that there were times that he stared at her, and that he leered at her "day after day" – but she was unable to provide any examples or specificity of these allegations or how often or when they occurred. Pltf's Dep at 151; 153; 251. Finally, Plaintiff testified that Royal commented about her being sexy "on numerous occasions," but could only recall one occasion when he had done so. Pltf's Dep at 163; 165-166. That one occasion allegedly occurred in Louisiana in December 2005 after a Christmas Party where Royal allegedly told Plaintiff and her sisters that they were the "sexiest sisters" he had ever seen, that they must have

---

[28]    One of the times Royal hugged Plaintiff and called her "Sweet Elizabeth" may have been after her grandfather died. Pltf's Dep. at 167-168. Plaintiff agreed that she would not have perceived his hugging her in that circumstance as offensive. Pltf's Dep. at 168. Plaintiff also testified that Royal hugged others in the office (including males). Pltf's Dep. at 174.

come from "good genes" and he walked them back to the driveway of their hotel. Pltf's Dep. at 163-164.

When a plaintiff's evidence that she was subjected to a hostile work environment "is so devoid of particularization that, after excluding the wholly conclusory assertions, there remains competent admissible evidence of only a very few incidents," the plaintiff does not have "sufficient facts for any reasonable jury to begin to gauge how frequently the allegedly discriminatory conduct occurred." *Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, 314 (S.D.N.Y. 2000) (internal citations omitted). "The specificity needed in sexual harassment cases includes an identification of the harassing party, along with the 'when, where, or how often this alleged conduct occurred . . . . Those details are necessary to evaluate the severity and pervasiveness of the conduct.'" *Buttron v. Sheehan*, No. 00-C-4451, 2003 WL 21801222, at *3 (N.D. Ill. Aug. 4, 2003) (internal citations omitted).

At her deposition, Plaintiff was questioned at length regarding evidence supporting her claims that Royal had harassed her. Yet, other than the alleged conversation with her sisters after the holiday party in Louisiana, at no time in her deposition could Plaintiff recall when the incidents alleged at items 3-5 occurred, how often they occurred, who else was present, or what was said. Pltf's Dep. at 165; 166; 168. Her typical response when asked if she could remember any other specific event or whether the conduct at issue manifested itself more than once or less than five times was "I don't recall." The following exchange is typical of Plaintiff's testimony regarding her "recollection" of the frequency of the alleged acts she claims constituted hostile work environment:

> A....[H]is sexual behavior was nonconsensual and so frequent that it made working very intolerable.

35

Q   How frequent was it?
A   Very, very frequent.
Q   How often did it happen?
A   I don't recall specifically.
Q   More than once?
A   I don't recall specifically.
Q   Less than five times?
A   I don't – I didn't count.
Q   Was it less than five times?
A   I didn't count.
Q   Was it more than five times?
A   I didn't count.
Q   Do you know, sitting here today, whether it was more than five times?
A   At this time, I don't remember.

Pltf's Dep. at 265-266. [29]

Devoid of any specific facts or recollection, Plaintiff apparently hopes to establish

pervasiveness by repeating the conclusory mantras that such conduct nonetheless

occurred "day after day" or "frequently" or "on numerous occasions." However, it is

well-established that simply stating that alleged improper conduct occurred "frequently,"

or on a "daily basis," or with other similar conclusory terms, is not enough to survive

summary judgment. *Wada*, 2007 WL 1378516, at *59 (plaintiff's allegation that she

suffered verbal abuse "several times" not credited when, during her deposition, plaintiff

was only able to recall one incident with specificity); *Kelley v. Billington*, 370 F. Supp.

2d 151, 156 n.2 (D.D.C. 2005) (allegations that employee was "harassed on a daily

basis . . . and the harassment continued for years," *inter alia*, are "conclusory allegations"

---

[29]     Plaintiff's repeated inability to recall in her deposition was striking.  It included
an inability to recall the circumstances of *her* signing *under oath* – three days prior to her
deposition – *her* verification of her supplemental interrogatories.  ("I don't know what I
did three days ago, I'm sorry.  I don't recall what I did.  I read a lot of documents
everyday, so this [Plaintiff's interrogatory responses served three days prior to her
deposition] could have been one of them.  I don't recall at this time.")  Pltf's Dep. at
69:11-14.  It also included not recalling whether turkey had been on the menu at the prior
Thanksgiving dinner.  Pltf's Dep. at 140-141.

36

and "will not be credited by the Court as independent facts, or as sufficient to create a genuine issue in dispute"); *Vigil v. City of Las Cruces,* No. 96-2059, 1997 WL 265095 (10th Cir. May 20, 1997) (plaintiff's statement that her supervisor "frequently" referred to Hispanic individuals in derogatory terms such as "wetbacks" is insufficient to survive summary judgment on harassment claim because plaintiff is making "only conclusory allegations regarding the frequency of such harassment").[30]

Specific evidence regarding frequency is essential in order for a plaintiff to be able to establish pervasiveness. In *Fitzer v. Chevron Corp.,* for example, the plaintiff argued she was subjected to a hostile work environment when her supervisor "yelled at her, nitpicked, assigned her certain work duties, applied different rules and standards to her, and subjected her to racial slurs . . . [and] spoke to her in a rude tone of voice, 'slammed stuff,' and requested she re-do work that had already been completed." No. 2:05-CV-507, 2006 WL 462552 at *5 (E.D. Cal. Feb. 27, 2006). The plaintiff asserted that this conduct was frequent because it occurred "on a daily basis, during shift overlaps." *Id.* The court granted summary judgment to the defendant on this claim, finding that, despite the allegation that this conduct occurred "on a daily basis, during shift overlaps," the plaintiff did "not provide any specific facts regarding the frequency of the conduct in support of her allegations." *Id.* "Consequently," the court held, "although 'the alleged number of . . . incidents is greater than one . . . [the conduct] cannot be said to constitute a pervasive pattern.'" *Id.* (internal citations omitted).

---

[30]     In *Vigil,* the plaintiff had also alleged, *inter alia,* that "her supervisor *regularly* requested that she go flying with him." 1997 WL 265095, at *1 (emphasis added). The court noted that the plaintiff could not state a harassment claim, *inter alia,* "given the lack of specificity in the record regarding the nature and frequency of her supervisor's invitations to go flying." *Id.* at *2.

Similarly, a plaintiff's "general and conclusory testimony at his deposition" and in interrogatory responses that co-workers and supervisors used racial epithets and told racial jokes "all the time" and "for many years" is "not sufficient in and of itself to establish that Plaintiff asserted a hostile work environment claim." *Sessions v. Univ. of South Carolina*, No. 3:04-0634, 2006 WL 2543051, at *3-4 (D.S.C. Aug. 31, 2006). *See also Dayes v. Pace Univ.*, No. 98CIV3675, 2000 WL 307382, at *5 (S.D.N.Y. Mar. 24, 2000), *aff'd*, 2 F. App'x, 204 (2d. Cir. 2001) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected . . . occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record . . . [and] therefore is afforded no weight in opposition to defendant's summary judgment motion").

For purposes of summary judgment, Defendant recognizes that Plaintiff's factual allegations regarding the conduct she allegedly experienced must be taken as true. Even so, the conduct is not severe or pervasive as a matter of law. Plaintiff has affirmatively testified under oath that she "does not recall" any other conduct, except in the most conclusory of fashions. For the reasons and based on the authorities discussed above, when the facts one can recall clearly fail to state a prima facie case of hostile work environment harassment, and when the plaintiff otherwise recalls no other facts, but instead makes wholly conclusory legal conclusions, summary judgment is warranted.

### 2. Plaintiff's Deposition Testimony Confirms That She Cannot Establish That She Was Constructively Discharged And, Therefore, Summary Judgment Should Be Granted To Defendant As To Count IV

Count IV of Plaintiff's Complaint, entitled "Constructive Discharge," alleges that "Defendant made Plaintiff's working conditions so intolerable after she complained of

unlawful discrimination that Plaintiff reasonably felt compelled to quit her job." Compl.,

¶¶ 11, 23. No other specific information is provided in the Complaint. Plaintiff's

deposition testimony, however, confirms that her constructive discharge claim is simply a

regurgitation of her hostile environment claim and it therefore fails for the same reasons

as Count I. Alternatively, if Count I survives this motion, the constructive discharge

claim must nonetheless be dismissed because Plaintiff's deposition shows that the

conduct that is allegedly "intolerable" is by no means the type of "worst case" harassment

required to state a constructive discharge claim based on hostile work environment.

Plaintiff also testified that – at the time when the alleged intolerable working conditions

had reached their zenith – they were not so intolerable to her that she felt she had to quit

her job; rather, she testified that she wanted and intended to continue to work for

Defendant.

      **a.** ***Plaintiff's Constructive Discharge Claim Fails For the Same***
***Reasons As Does Her Hostile Environment Claim And For the***
***Additional Reason That The Alleged Conduct Is Not The Type of***
***"Worst Case" Harassment that Is Required For Such A Claim***

      To establish a claim of constructive discharge based on a hostile environment

claim, a plaintiff must first establish a hostile environment case by showing that the

offending behavior is so "sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Pennsylvania State*

*Police v. Suders,* 542 U.S. 129, 146-147 (2004) (*citing Meritor Savings Bank, FSB v.*

*Vinson,* 477 U.S. 57, 67 (1986)). Then, she must show "something more: A plaintiff

who advances such a compound claim must show working conditions so intolerable that

a reasonable person would have felt compelled to resign." *Suders,* 524 U.S. at 147. In

other words, for harassment to give rise to constructive discharge, the claim must involve

"aggravated" or "worse case" sexual harassment. *Id.* at 146-147.

At her May 21, 2007 deposition, Defendant asked Plaintiff to identify explicitly

what constituted the alleged intolerable working conditions identified in paragraph 11 of

the Complaint.  Plaintiff testified as follows:

> Q  [After examining counsel directed Plaintiff explicitly to paragraph 11 of
> the Complaint.] Okay.  What working conditions were made so intolerable
> after you complained?
> . . .
> A  I had been complaining for months [referring to her allegedly having
> complained to district representatives Tommie Seaton and Linda Blount in
> Louisiana]
> . . .
> Q  What working conditions were made so intolerable?
> A  The unnecessary comments, the leering that went on day after day, coming
> behind my desk, trapping me at my desk, kissing my head, putting – when
> I make these comments, it's in reference to all from Royal.  Touching me
> up to the point of putting his hands near my breasts and enjoying it,
> making reference to my being sexy.
> Q  Anything else?
> A  Not that I can remember at this time.
> Q  Okay.  Now, you said those were the working conditions that were made
> so intolerable after you complained.  So I guess the first thing I'm going to
> say is that you mentioned that this was all engaged in by Royal.  Is that
> your testimony?
> A  Yes.
> Q  Did anyone else engage in this behavior towards you?
> A  No.

Pltf's Dep. at 151-152.

This testimony confirms that Plaintiff's constructive discharge claim consists

solely of Royal's alleged inappropriate workplace behavior and is simply a regurgitation

of the hostile work environment claim.  As explained in section IV.B.1 above, Royal's

alleged behavior towards Plaintiff was not severe or pervasive and, therefore, not

actionable harassment.  Since Plaintiff cannot establish that the conduct is severe or

pervasive under Count I, she cannot establish that it is *more than* severe or pervasive to meet the even higher standard for constructive discharge.

### b. *Plaintiff's Testimony Confirms That Plaintiff Did Not Actually Perceive Royal's Behavior As So Intolerable That She Had No Choice But To Quit*

To establish a constructive discharge claim, a plaintiff must show that the alleged actionable conduct was so intolerable that a "reasonable person would be forced to quit." *Suders*, 542 U.S. at 147 (internal quotations omitted). Unless "conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Suders*, 542 U.S. at 147 (internal quotations omitted). Plaintiff thus has the burden of proving not only that the intolerable working conditions occurred, but that those intolerable conditions did in fact cause her, and would cause a reasonable person, to feel they had no choice but to quit.[31]

Plaintiff's admission that she did not return to the workplace after May 14 (SMF ¶ 23) – combined with her testimony that it was Royal's alleged conduct in the workplace that created the "intolerable working conditions" – means that the alleged intolerable working conditions must have existed on or before May 14, 2006 (*i.e.,* if it was Royal's alleged behavior that created the intolerable *working* conditions, and if Plaintiff did not *return to work* after May 14, then such intolerable working conditions

---

[31] "A finding of constructive discharge [also] requires that 'the employer *deliberately made* working conditions intolerable. . . .'" *Al-Mahdi v. District of Columbia Public Schools*, No. Civ. A. 01-1014, 2005 WL 3272075, at *5 (D.D.C. Dec 2, 2005) (emphasis added). For purposes of this motion, Defendant asserts that the constructive discharge claim fails because Plaintiff's deposition testimony precludes her from establishing that *she believed* her working conditions were so intolerable that she had no choice but to quit. Defendant's motivation is not relevant to this motion's request for dismissal of this claim. Should this claim not be dismissed, Defendant reserves the argument that Plaintiff cannot establish the necessary deliberate motivation on the part of Defendant and/or that such an assertion is barred by the Speech or Debate Clause.

41

could not have been created after May 14, 2006).  Whether those "intolerable working

conditions" actually rose to the high level that caused Plaintiff to feel she had no choice

but to resign would thus have been established *no later than* May 14, 2006.

Plaintiff testified, however, that for at least the next two weeks after May 14,

2006, she "most definitely" intended to return to work.  That Plaintiff held a definite

intent to return to work –at a time when the alleged intolerable conditions had reached

their worst –makes it impossible for Plaintiff to claim, let alone prove, that those very

same intolerable conditions actually compelled her to quit.  Plaintiff's testimony shows

that her statement that she intended to return to work was not an ethereal statement, but

that she clearly wanted and expected to return to work.  For example, when shown an

email dated May 15, 2006 that she wrote to the Office's information technology assistant,

Plaintiff was asked why would she be asking on May 15 about emails she had deleted if,

at that time, she had already decided not to return to work.   Plaintiff testified:

> Q    So why were you interested at this time in knowing about folders you had
>       deleted from your –
> A    I had intentions of returning to work.
> Q    Oh, you did?
> A    ***Yes, most definitely.***  [emphasis added].
> Q    And when did those intentions switch to not returning to work?
> A    During the course of the two weeks that I was on paid administrative
>       leave. . . .

Pltf's Dep. at 233.

Similarly, on Wednesday, May 24, Plaintiff wrote an email to the Office asking:

"Please call me so we can arrange for my return to the office tomorrow."  SMF ¶ 16.

Plaintiff testified that she was being truthful when she asked to return to work in this

email and that the purpose of this email was, in fact, "to arrange for my return to work."

Pltf's Dep. at 41-42.  One does not "most definitely" intend to return to work on May 15,

42

and one does not ask her employer to call to discuss returning to work the very next day, if she actually perceived the working conditions as so intolerable that she had no choice but to quit her job.

      **c.   *Plaintiff's Deposition Testimony Shows That Her Constructive Discharge Claim Is An Afterthought – Added To Her Complaint In An Effort To Deflect From The Fact That She Had Found Other Employment***

There is no factual support for the allegation that *the working conditions* at Defendant had somehow become more intolerable since Plaintiff's May 15 definite intent to return or her May 24 request to the Office to return. Neither is there any allegation that some other cataclysmic event occurred after her May 24 email that *made the workplace so intolerable* that she now had no choice but to resign. So, what caused Plaintiff to change 180 degrees from "most definitely" wanting to return to work on May 15 and May 24, to her allegedly feeling compelled to resign?

Plaintiff admits that on Thursday, June 1, 2006 – at the conclusion of the Office's investigation into Plaintiff's May 14, 2006 allegations – the Office advised her that it expected her to return to work on Thursday, June 8, 2006. SMF ¶18.[32] Plaintiff had, however, found another job which provided for an annual salary of $42,000 ($12,000 more than she was making with Defendant) and a $5,000 signing bonus. SMF ¶ 19. She thus had to choose between returning to work at Defendant – which she claims she had "most definitely" intended to do just days earlier – or accepting a new job at a

---

[32]     Plaintiff concedes that the Office advised her attorney that it had completed the investigation of her May 14 allegations and changed her reporting relationship so that she would no longer be reporting to Royal Alexander. Pltf's Dep. at 235-236. The adequacy or appropriateness of the Office's investigation and the Plaintiff's new reporting arrangement is not relevant to this motion.

significantly higher salary along with a healthy signing bonus. Plaintiff chose the latter and, on Monday, June 5, 2006, she signed the offer letter from her new employer, JBG Companies. SMF ¶ 19.

Constructive discharge "does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior causes the unpleasantness." *Glenn v. Williams*, No. Civ. A. 98-1278, 2006 WL 401816, at *37 (D.D.C. Feb. 21, 2006) (internal citations omitted). Plaintiff's testimony confirms that, at least as of May 15 and May 24, she perceived her job as "unpleasant but objectively tolerable." There is no testimony whatsoever that her purported change of heart in June was based on any alleged increased "intolerability" of her "working conditions." Rather, Plaintiff testified that it was not until at least Tuesday, June 6, 2006 or Wednesday, June 7, 2006 that she actually made the decision *not* to return to work at Defendant. SMF ¶ 21. And, then, she stated that the reason for this decision was because Defendant had changed her return-to-work date from June 8 to June 12, had allegedly not given her an explanation for doing so, and that the Office had not expressed sufficient concern for how she was doing. Pltf's Dep. at 237-238. Such factors – even if they were the real reasons Plaintiff did not return to work at Defendant – fail as a matter of law to support a claim of constructive discharge. *See Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 79-80 (D.D.C. 2006) (distasteful personnel decisions must essentially be "career-ending" in order to give rise to a constructive discharge claim). Accordingly, because Plaintiff's deposition testimony affirmatively establishes that she

did not perceive the working conditions as so intolerable at Defendant that she had no choice but to quit, summary judgment should be granted to Defendant on this claim.[33]

## V.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Count III, grant summary judgment to Defendant with respect to Counts I and IV, and issue an order precluding Plaintiff from inquiring about her removal as Scheduler, legislative acts, or any other matters relevant to Counts I, III and IV in the future discovery and litigation of this case.

Respectfully submitted,

By _Russell H. Gore_

Russell H. Gore, D.C. Bar # 449231
Gloria J. Lett, D.C. Bar # 293365
Kimberly Carey Williams, VSB # 41325[34]
U.S. House of Representatives
Office of House Employment Counsel
1036 Longworth House Office Building
Washington, D.C.  20515
(202) 225-7075
Attorneys for Defendant
Office of Rep. Rodney Alexander

DATED:  July 12, 2007

---

[33]    On June 6 and 7, 2006, Plaintiff was advised that her exact return to work date with Defendant was extended to June 12, 2006.  SMF ¶ 20.  When asked at her deposition how it was possible for her to have committed to a new job at a new employer on June 5, 2006, but not to have made the decision *not* to return to work at Defendant until June 6 or June 7, Plaintiff testified:  "Because I could always not show up for the job offer I'd taken and returned to the Congressman's office."  SMF ¶ 22.

[34]    Appearing by LCvR 83.2(e) and 2 U.S.C. § 1408(d).

45

# EXHIBIT A

*Fields* Affidavit of Congressman Rodney Alexander

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELIZABETH SCOTT | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) Civil Action No. 1:06CV01661 |
|  | ) (CKK) |
| OFFICE OF RODNEY ALEXANDER, | ) |
| Member, U.S. House of Representatives | ) |
|  | ) |
| Defendant. | ) |

### *FIELDS* AFFIDAVIT OF CONGRESSMAN RODNEY ALEXANDER

I, Rodney Alexander, make this affidavit solely for the purposes of invoking the Speech or Debate Clause contained in Article I, Section 6 of the United States Constitution. I do so pursuant to the directives of the D.C. Circuit in the case of *Fields* v. *Office of Eddie Bernice Johnson,* 459 F.3d 1 (D.C. Cir. 2006) and for the limited and exclusive purposes identified in that case.[1]

Subject to the foregoing, I do hereby state and declare, pursuant to 28 U.S.C. § 1746:

1.    I have personal knowledge of the matters identified herein.

2.    I am a Member of the United States House of Representatives, and I represent the people of the Fifth District of Louisiana. I was first elected to Congress in 2002.

---

[1]    By making this affidavit, I do not waive the argument that the *Fields* requirement that a Member of Congress submit an affidavit in order to invoke the Speech or Debate Clause is itself inconsistent with both the text and the purpose of the Speech or Debate Clause. I further do not waive, but expressly assert, that much of this affidavit contains information about which the Speech or Debate Clause precludes inquiry. But for the *Fields* decision, I would not be providing this information nor would I be required to do so in order to invoke the Clause. Therefore, it is my position that this affidavit is itself a matter immune from discovery or question under the Speech or Debate Clause.

3.      Elizabeth Scott began working in my Office in the fall of 2005, initially as an intern. I offered the Scheduler job to Elizabeth and she accepted. The Scheduler is based in my Washington, D.C. Capitol Hill office.

4.      I expect the person who works as Scheduler to not only administratively note my schedule on a calendar, but also to arrange my schedule, speak with other offices in coordinating my schedule, exercise independent judgment regarding my attendance at often-conflicting meetings and events, and to notify me in a timely manner of any changes or updates to the time, date or venue of Committee meetings, legislative meetings, and other meetings and events. I expect the Scheduler to perform these functions with due regard to ensuring that I am present and on time for Committee meetings and votes. In addition, I expect the Scheduler to be integral to the functioning of the daily activities of my office, as other employees rely on the schedule to fulfill their roles in supporting me in my legislative and other activities. These are my expectations now for the position of Scheduler in my Office, and these were my expectations at the time Elizabeth became my Scheduler.

5.      In 2006, I was a member of the House Committee on Appropriations, as well as three of its subcommittees: Agriculture; Science, State, Justice and Commerce; and Military Quality of Life.

6.      The Appropriations Committee is the House Committee responsible for crafting the appropriations bills which, when passed by the full House and Senate and signed by the President, are the mechanisms by which funds from the federal treasury are authorized each fiscal year. As a member of the Appropriations Committee, I am and was responsible for introducing, debating and voting on legislation to appropriate funds from the United States Treasury.

2

7.    As part of the appropriations process, the full Committee and its subcommittees have frequent meetings at which appropriations legislation is considered, debated, amended, and passed.

8.    Each year, typically beginning in the late spring, the Appropriations Committee and its subcommittees are engaged in the legislative process known as "mark-up."  Mark-up season is a time of increased activity for the Committee and the subcommittees as they debate, revise and vote on the appropriations bills to fund the federal government for the next fiscal year. Mark-up is often extremely time-sensitive; votes occur frequently and often occur relatively unexpectedly and quickly.   Failure to be present at a Committee or subcommittee meeting on time can mean missing a vote on legislation or limiting a Member's ability to debate or offer amendments to legislation.  A Member's timely presence at these meetings is crucially important to his ability to vote on and influence appropriations legislation.

9.    In April and early May 2006, I was directly impacted by several scheduling errors that I attributed to Elizabeth Scott.   These included my being scheduled to attend Committee meetings at the wrong starting times and/or with the wrong location identified, my being scheduled to leave a Committee meeting that was underway to attend another meeting, only to arrive at the location to find no one present, and my being scheduled at multiple locations at the same time.   I perceived these and other similar errors were the result of Elizabeth's lack of attention to detail and a lack of appropriate concern for the importance of my timely attendance at Committee meetings and other events.

10.    These errors caused me great concern about Elizabeth's ability to adequately coordinate my schedule, particularly during the mark-up season.   I was worried that if Elizabeth

remained my Scheduler, she would make similar errors going forward and that I might miss important votes and fail to ensure that key provisions of the appropriations legislation, such as earmarks, were maintained. My concerns about Elizabeth's performance were inextricably intertwined with my concerns about their effect on my ability to perform my legislative duties.

11.     I performed other duties, such as communicating and meeting with constituents, and Elizabeth was responsible for scheduling these matters as well. I perceived her errors as spilling over into these activities. On one occasion, Elizabeth had scheduled me to meet constituents at an event in the Capitol rotunda in Washington, D.C., however, the event was actually taking place in the rotunda in the capitol building in Baton Rouge, LA. That Elizabeth would make such a blatant error in this area also caused me to be concerned about her making such errors regarding Committee meetings.

12.     I decided to remove Elizabeth Scott as Scheduler because, among other things, I believed she was interfering with my ability to attend Committee and subcommittee meetings in a timely manner and I could not afford to risk missing such meetings or votes during the busy mark-up period. I instructed my then-chief of staff, Royal Alexander, to remove Elizabeth Scott as Scheduler.

I declare under penalty of perjury that the foregoing is true and correct.

_7- 12 - 0 7_                        _Rodney Alexander_

Executed on                        Rodney Alexander

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELIZABETH SCOTT | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 1:06CV01661 |
| | ) (CKK/AK) |
| OFFICE OF RODNEY ALEXANDER, | ) |
| Member, U.S. House of Representatives, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Defendant Employing Office of United States Congressman Rodney Alexander ("the

Office" or "Defendant"), pursuant to Rules 7(h) and 56.1 of the Local Rules of the United States

District Court for the District of Columbia, hereby submits this Statement of Material Facts Not

in Dispute.

     1.    Elizabeth Scott began working for Defendant in the fall of 2005, initially as an

intern. Pltf's Dep. at 18:6-12.[1]

---

[1]    Relevant excerpts of the transcript of Plaintiff's May 21, 2007 deposition are attached to this Statement of Material Facts Not in Dispute as Attachment 1. Citations to Plaintiff's May 21, 2007 deposition are referenced herein according to the following format: "Pltf's Dep. at A:B-C." ("A" identifies the page number, whereas "B" and "C" identify the specific lines on that page). For example, the citation "Pltf's Dep. at 50:3-5; 52; 53:15-25" would refer to lines 3-5 of page 50 of Plaintiff's deposition, the entire page 52 of the deposition, and lines 15 through 25 of page 53 of the deposition. Additionally, some portions of the deposition transcript are subject to the Court's Stipulated Protective Order entered on April 24, 2007. That Order provides restrictions on and procedures for the filing of confidential material. None of the confidential portions of the transcript are relevant or necessary to the issues identified in Defendant's current motion. However, to the extent references to confidential material are alluded to in the attached portions of the transcript or exhibits, they have been redacted. The matters designated as confidential pursuant to the Order are those matters identified by Judge Kay in the May 16, 2007 conference

2.    Shortly after Plaintiff began working for the Office, Congressman Alexander personally offered Plaintiff the job of Scheduler. Pltf's Dep. at 240:15-21; 241:17-19.

3.    Plaintiff began work as the Office's Scheduler in the Congressman's Washington, D.C. Capitol Hill Office in late 2005, making $30,000 per year. Pltf's Dep. at 239:23-25; 240:1, 15-21.

4.    One of Plaintiff's primary responsibilities as Scheduler was "to ensure that the meetings for the Congressman in D.C. and in the district were on his calendar and that he was kept informed of where he needed to be in session and out of session." Pltf's Dep. at 284:9-12.

5.    Royal Alexander was the Chief of Staff during the time of Plaintiff's employment with the Office. Compl. at ¶ 7.[2]

6.    Plaintiff contends that Royal Alexander sexually harassed her. Compl. at ¶ 7.

7.    Plaintiff testified that Royal Alexander was the only person in the Office who allegedly engaged in sexually harassing behavior. Pltf's Dep. at 152:7-13; 285:19-23.

8.    The conduct Royal Alexander allegedly engaged in that Plaintiff contends was sexual harassment is:

   (a)    On one occasion, when Plaintiff was standing on a chair to retrieve items from a shelf, Royal allegedly placed his hands around her middle and proceeded to move them up and down, touching the underwire of her bra in the vicinity of her breasts, while helping her step down off a chair. Pltf's Dep. at 196:11-25; 197:1-2; 171-173; 182, 184:16-19; 185-186, 189-190; 272-275.

   (b)    On one occasion, Royal allegedly looked at the work schedule on Plaintiff's computer screen and, in so doing, leaned his arms on the desk and kissed the top of Plaintiff's head. Pltf's Dep. at 269:11-16.

---

with counsel, as well as those matters identified at Plft's Dep. at 334 and in Defendant's counsel's May 24, 2007 email to Plaintiff's counsel. Should the Court wish to review any of the confidential portions of the transcript or exhibits, Defendant will provide them in camera or pursuant to such other method as the Court directs.

[2]    "Compl." refers to the Supplemental Complaint filed in this matter.

    (c)     Royal would hug Plaintiff and call her "Sweet Elizabeth." <u>Pltf's Dep. at 154:11-17; 168:10-25</u>.

    (d)     Royal would leer/stare at Plaintiff and asked Plaintiff out to lunch. <u>Pltf's Dep. at 151:21; 153:2-7; 251:12</u>.

    (e)     Royal would comment on Plaintiff's clothing, tell her and a co-worker that they were sexy, and told her sisters that they were sexy. <u>Pltf's Dep. at 153:7; 154:23-24; 157:8-25; 158; 163-164</u>.

9.     Plaintiff testified that the alleged conduct identified at paragraph 8(a)-8(e) of this Statement of Material Facts Not in Dispute is the full extent of the alleged conduct Plaintiff claims constituted sexual harassment. <u>Pltf's Dep. at 158:25; 159:1-9</u>; *see also* <u>Pltf's Dep at 153-159; 285-288</u>.

10.     On Friday, May 12, 2006, Royal Alexander informed Plaintiff that she was being removed from the position as Scheduler. <u>Plaintiff's May 14, 2006 email to Congressman Alexander, page 1, third paragraph (attached hereto as Attachment 2 (also identified as an exhibit to Plaintiff's deposition)); Plaintiff's Responses to Defendant's Requests for Admissions Nos. 2, 3, 4 (attached hereto as Attachment 3 (also identified as an exhibit to Plaintiff's deposition))</u>.

11.     Two days after being informed of her removal as Scheduler -- on Sunday, May 14, 2006 -- Plaintiff advised Congressman Alexander by email that she believed Royal Alexander had sexually harassed her, discriminated against her based on sex, and retaliated against her. <u>*Id*</u>; <u>Pltf's Dep. at 20-21</u>.

12.     The May 14, 2006 email referred to in paragraph 11 was the first time Plaintiff advised Congressman Alexander personally that Royal Alexander had acted in a manner she believed was sexually-harassing, discriminatory or retaliatory. <u>Plaintiff's Responses to Defendant's Requests for Admissions Nos. 2, 3, 4 (attached hereto as Attachment 3 (also identified as an exhibit to Plaintiff's deposition)); Pltf's Dep. at 21:16-23</u>.

13.    After sending the May 14, 2006 email to Congressman Alexander, Plaintiff called in sick the following week. Pltf's Dep. at 32:22-25; 33:7-19; 38:20-25; 39:1-16.

14.    On Monday, May 15, 2006, Plaintiff sent an email to the Office's information technology assistant inquiring about the ability to restore files she had recently deleted. Pltf's Dep. at 233; May 15, 2006 Email from Plaintiff (attached hereto as Attachment 4) (also identified as an exhibit to Plaintiff's deposition).

15.    Plaintiff testified that, at the time she sent the May 15 email referred to in paragraph 14, she "most definitely" intended to return to work in the Office. Pltf's Dep. at 233:21.

16.    On Wednesday, May 24, 2006, Plaintiff contacted the Office by an email to Royal Alexander containing the subject line "hey," and asked "Please call me so we can arrange for my return to the office tomorrow." Pltf's Dep. at 40-42; Plaintiff's May 24, 2006 Email (attached hereto as Attachment 5) (also identified as an exhibit to Plaintiff's deposition). Plaintiff testified that the purpose of her May 24 email was "to arrange for my return to work." Pltf's Dep. at 41:16-17; see also Pltf's Dep. at 42:12-17.

17.    In response, the Office communicated to Plaintiff that she should not return on Thursday, May 25 but, instead, she would be placed on paid administrative leave for two weeks while the investigation of her allegations could be completed. Pltf's Dep. at 42:18-25; 43:1-16.

18.    On June 1, 2006, the Office advised Plaintiff that it expected her to return to work on June 8, 2006. Plaintiff's Responses to Defendant's Requests for Admissions No. 10 (Attachment 3).

19.    On or before June 5, 2006, Plaintiff signed a letter stating that she "accept[s] this offer of employment" as Administrative Assistant at JBG Companies at a salary of $42,000 (plus

a $5,000 signing bonus), with a start date of June 12, 2006. <u>Pltf's Dep. at 100-101; Copy of offer letter signed by Plaintiff (attached hereto as Attachment 6) (also identified as an exhibit to Plaintiff's deposition)</u>.

20.     On June 6 and 7, 2006, the Office advised Plaintiff that her exact return to work date with Defendant was being extended to June 12, 2006. <u>Plaintiff's Responses to Defendant's Requests for Admissions No. 10 (Attachment 3)</u>.

21.     It was not until at least June 6 or June 7 that Plaintiff decided not to return to work at Defendant. <u>Pltf's Dep. at 238; 239:5-16</u>.

22.     When asked at her deposition how it was possible for her to have committed to a new job at a new employer on Monday, June 5, 2006, but to have waited until at least June 6 or June 7 to decide not to return to work with Defendant, Plaintiff testified: "Because I could always not show up for the job offer I'd taken and returned to the Congressman's office." <u>Pltf's Dep. at 239:14-16</u>.

23.     Plaintiff did not return to work after she sent the May 14, 2006 email to Congressman Alexander. <u>Plaintiff's Responses to Defendant's Requests for Admissions No. 11 (Attachment 3)</u>.

<div style="margin-left:40%">

Respectfully submitted,

By _Russell H. Gore_

Russell H. Gore, D.C. Bar # 449231
Gloria J. Lett, D.C. Bar # 293365
Kimberly Carey Williams, VSB # 41325
U.S. House of Representatives
Office of House Employment Counsel
1036 Longworth House Office Building
Washington, D.C.  20515
(202) 225-7075
Attorneys for Defendant
Office of Rep. Rodney Alexander

</div>

DATED:  July 12, 2007

# ATTACHMENT 1

**(Excerpts of Plaintiff's May 21, 2007 Deposition)**

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3              Civil Action No. 1:06CV01661 (CKK)

4       _____

5    ELIZABETH SCOTT,                                    )

6                    Plaintiff,                          )

7          v.                                            )

8    OFFICE OF RODNEY ALEXANDER, U.S. House              )

9    of Representatives,                                 )

10                   Defendant.                          )

11      _____         )

12

13                C O N F I D E N T I A L

14             Deposition of ELIZABETH SCOTT

15                   May 21, 2007

16                   Washington, DC

17

18

19    Reported by:  Mary Ann Payonk, RPR, RMR, CRR, RDR

20

21

22

23

24

25

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

Page 2

1   Deposition of ELIZABETH SCOTT taken on May 21, 2007,
2   held at the offices of:
3       Office of House Employment Counsel
4       U.S. House of Representatives
5       1036 Longworth House Office Building
6       Washington, DC 20515
7
8   Pursuant to Notice before Mary Ann Payonk, CSR, RPR,
9   RMR, RDR, Certified Realtime Reporter and Notary
10  Public.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1               W I T N E S S E S
2   WITNESS                          PAGE
3       ELIZABETH SCOTT
4           By Mr. Gore              6, 355
5           By Mr. Hoare             350
6               E X H I B I T S
7   NO.         DESCRIPTION          PAGE
8   1       Supplemental Responses dated      16
9           May 18, 2007
10  2       Calendar              17
11  3       Responses             19
12  4       E-mail dated May 14, 2006      22
13  5       Collection of e-mails, the      23
14          first dated May 15, 2006
15  6       Supplemental Responses to      62
16          Interrogatories
17  7       E-mail string             73
18  8       Offer letter             76
19  (Exhibits 9 and 10 were marked
20          during the confidential portions
21          of the deposition.)
22  11      Letter dated June 5, 2006      100
23  12      Form from JBG Companies      103
24  13      Two-page document with e-mail      115
25          string

Page 3

1           A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF:
3       MICHAEL J. HOARE, ESQUIRE
        Michael J. Hoare, P.C.
4       11101 14th Street, N.W.
        Suite 710
5       Washington, D.C. 20005
        (202) 408-7901
6
    ON BEHALF OF DEFENDANT:
7
        RUSSELL H. GORE, ESQUIRE
8       Associate Counsel
        Office of House Employment Counsel
9       U.S. House of Representatives
        1036 Longworth House Office Building
10      Washington, DC 20515
        (202) 225-7075
11          and
        GLORIA LETT, ESQUIRE
12      Counsel for Office of Employment Counsel
        House Employment Counsel
13
    ALSO PRESENT:
14
        Congressman Rodney Alexander
15      Mr. Adam Terry
        Mary Ann Payonk, court reporter
16
17
18
19
20
21
22
23
24
25

Page 5

1   NO.         DESCRIPTION          PAGE
2   14      E-mail string             117
3   15      Document produced in discovery      125
4           Bates stamped P383 through
5           P390
6   16      Complaint             139
7   17      E-mail dated may 16, 2006      232
8   18      E-mail from Scott to Sauers      233
9   19      Copy of diploma             244
10  20      Blackberry message dated      257
11          March 7
12  21      Copies of instant messages      262
13
14              *** *** ***
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

**Page 6**

|   |   |
|---|---|
| 1 | PROCEEDINGS |
| 08:49 2 | ELIZABETH SCOTT |
| 08:49 3 | was sworn and testified as follows: |
| 09:02 4 | EXAMINATION |
| 09:02 5 | BY MR. GORE: |
| 09:03 6 | Q   Good morning, Ms. Scott. My name is |
| 09:03 7 | Russell Gore, and I'm an attorney with the Office of |
| 09:03 8 | House Employment Counsel. And with me is Gloria |
| 09:03 9 | Lett, who is the counsel for the Office of |
| 09:03 10 | Employment Counsel, House Employment Counsel. We |
| 09:03 11 | represent the Office of Representative Alexander in |
| 09:03 12 | the lawsuit of Elizabeth Scott versus the Office of |
| 09:03 13 | Representative Alexander. |
| 09:03 14 | You're here today for your deposition. |
| 09:03 15 | Let me introduce who's in the room. We have |
| 09:03 16 | Congressman Alexander. We have Adam Terry. Then, |
| 09:03 17 | of course, we have the court reporter and your |
| 09:03 18 | attorney. |
| 09:03 19 | Before we begin, let me ask you, have you |
| 09:03 20 | ever had your deposition taken before? |
| 09:03 21 | A   No. |
| 09:03 22 | Q   Have you ever testified in a court |
| 09:03 23 | proceeding before? |
| 09:03 24 | A   No. |
| 09:03 25 | Q   Let me talk to you a little bit about the |

**Page 7**

|   |   |
|---|---|
| 09:03 1 | ground rules here. First of all, most importantly, |
| 09:03 2 | the court reporter just swore you in, which meant |
| 09:03 3 | that you are testifying here under oath, which means |
| 09:03 4 | that you have an obligation to tell the truth and |
| 09:04 5 | that today's proceeding is just like we were in |
| 09:04 6 | court. |
| 09:04 7 | Your testimony -- excuse me. Anything I |
| 09:04 8 | say while we're on the record is being transcribed. |
| 09:04 9 | Anything you say while on the record or your |
| 09:04 10 | attorney says while we're on the record is being |
| 09:04 11 | transcribed. It will be placed into a transcript |
| 09:04 12 | format which you will then see, which will then be |
| 09:04 13 | used as evidence in this case. But it is important |
| 09:04 14 | you understand that this is for purposes of this |
| 09:04 15 | testimony, it's just like you're in court today. Do |
| 09:04 16 | you understand that? |
| 09:04 17 | A   Yes. I'm a little nervous, so -- |
| 09:04 18 | Q   I can appreciate that, and it's |
| 09:04 19 | understandable. I think anytime someone's in a |
| 09:04 20 | deposition, that's an understandable feeling. |
| 09:04 21 | A   I'll do my best to remember all that. |
| 09:04 22 | Q   And I appreciate that. |
| 09:04 23 | If there's anything I say today that |
| 09:04 24 | you don't understand or is unclear to you, please |
| 09:05 25 | ask me to rephrase it. |

**Page 8**

|   |   |
|---|---|
| 09:05 1 | It's my goal to ask clear, concise |
| 09:05 2 | questions. I don't always succeed at that, but I |
| 09:05 3 | try. But if you don't understand something I say, |
| 09:05 4 | before you answer, I'd ask that you would ask me to |
| 09:05 5 | rephrase it. Will you agree to do that? |
| 09:05 6 | A   I'll do my best. |
| 09:05 7 | Q   And if I ask you a question and you answer |
| 09:05 8 | it and haven't asked me to rephrase it, I will |
| 09:05 9 | assume that that means you understood the question. |
| 09:05 10 | Are you agreeable with that? |
| 09:05 11 | A   I'm nervous, so I can't -- I can't say |
| 09:05 12 | what I might say or what I might not say. |
| 09:05 13 | Q   Okay. And I understand that you're |
| 09:05 14 | nervous, and -- but with that, I want to just |
| 09:05 15 | emphasize how important it is for you to listen to |
| 09:05 16 | what I say and answer my questions. |
| 09:05 17 | A   I'm going to do my best. |
| 09:05 18 | Q   And despite being nervous, it's important |
| 09:05 19 | if you need to take some time to think about a |
| 09:05 20 | response or think about my question that you do |
| 09:05 21 | that, because it's extremely important, because the |
| 09:06 22 | purpose of our being here today is to get your |
| 09:06 23 | testimony under oath in this lawsuit. So it's |
| 09:06 24 | extremely important that you listen and that you |
| 09:06 25 | respond. |

**Page 9**

|   |   |
|---|---|
| 09:06 1 | MR. HOARE: Let me interrupt you. |
| 09:06 2 | (Discussion held off the record.) |
| 09:06 3 | Q   Another thing that's important is that we |
| 09:06 4 | try to -- it's been fine so far -- that we try not |
| 09:06 5 | to speak over one another when we are in this |
| 09:06 6 | process. And the reason I say that is in everyday |
| 09:06 7 | conversation, it's typical when human beings |
| 09:07 8 | interact that someone will use part of a sentence or |
| 09:07 9 | will start a sentence and somebody else may think |
| 09:07 10 | they know what they're saying and will go on to |
| 09:07 11 | finish the way they thought the other person would |
| 09:07 12 | finish. That's the typical way human beings |
| 09:07 13 | communicate on a day-to-day basis, but that doesn't |
| 09:07 14 | work for this process. I ask that you allow me to |
| 09:07 15 | finish my question before you answer. Even if you |
| 09:07 16 | think you know what I might be saying, wait and |
| 09:07 17 | allow me to finish before you answer. And I will |
| 09:07 18 | try to do the same with you. I will try to wait and |
| 09:07 19 | allow you to finish your response before I ask my |
| 09:07 20 | next question. |
| 09:07 21 | I'd also say that it's important that you |
| 09:07 22 | speak verbally. Again, in everyday conversation |
| 09:07 23 | there are times when we're having communications |
| 09:07 24 | with one another and we might respond by nodding the |
| 09:07 25 | head one way or the other to indicate agreement or |

3 (Pages 6 to 9)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                     Taken on May 21, 2007

---

**Page 10**

09:07  1   disagreement.  That doesn't work in this process
09:07  2   because it's difficult for the court reporter to
09:07  3   take down those kinds of gestures, so I would ask
09:08  4   that you respond verbally to each of my questions.
09:08  5   That would include saying "yes" as opposed to
09:08  6   "yeah," or "no" as opposed to something that is less
09:08  7   definitive.
09:08  8          With that, I would also say that if you
09:08  9   need breaks throughout the day, we will be taking
09:08 10   breaks, and if you need a break, I'm more than happy
09:08 11   to accommodate you.  The only thing that I would say
09:08 12   is that if I've asked you a question and you ask for
09:08 13   a break, I would ask that you answer my question
09:08 14   before we go on the -- we take the break.  But if
09:08 15   you need a break, I would encourage to do that at
09:08 16   the end of a question before I ask the next
09:08 17   question.
09:08 18          Are you taking any medication or any other
09:08 19   substance that would interfere with your ability to
09:08 20   hear and understand my questions today?
09:08 21      A   No.
09:08 22      Q   Is there any reason why you would be
09:08 23   unable to hear and understand my questions today?
09:08 24      A   Not that I can think of.
09:09 25      Q   Okay.

---

**Page 11**

09:09  1          MR. HOARE:  Have you asked Mary Ann to
09:09  2   record our time as we proceed?
09:09  3          MR. GORE:  Yes.
09:09  4          MR. HOARE:  Okay.
09:09  5      Q   Are you taking any medication or other
09:09  6   substance that would interfere with your ability to
09:09  7   testify truthfully and fully to my questions today?
09:09  8      A   No.
09:09  9      Q   And is there any other reason you're aware
09:09 10   of that would interfere with your ability to testify
09:09 11   truthfully and fully to my questions today?
09:09 12      A   I'm just nervous, so I'm going to do the
09:09 13   best I can.
09:09 14      Q   Okay.  Did you -- also, I will try to make
09:09 15   this clear when it happens, but throughout the day I
09:09 16   will be asking questions such as to identify or
09:09 17   discuss communications that you may have had.  When
09:09 18   I talk about your communications with others, I just
09:09 19   want to make it clear -- and I will attempt to do
09:09 20   this in the individual circumstance, but when I ask
09:09 21   if you communicated with someone, I'm talking about
09:09 22   verbally, I'm talking about in writing, I'm talking
09:09 23   about IM, I'm talking about e-mail, nonverbally.
09:10 24   Any way that we as human beings in the modern 21st
09:10 25   century communicate is what I mean when I ask about

---

**Page 12**

09:10  1   communications.  So I will try to be precise when I
09:10  2   get to those questions, but I just want you to keep
09:10  3   in your mind that when I ask if you communicated
09:10  4   with someone or convey information to someone or
09:10  5   someone conveyed information to you, I mean that in
09:10  6   the broad sense.  Do you understand that?
09:10  7      A   Yes.
09:10  8      Q   Okay.  Did you review any documents in
09:10  9   preparation for your deposition today?
09:10 10      A   Yes, just my -- my time line.  I can't
09:10 11   recall all of what I reviewed.
09:10 12      Q   I understand you can't recall all of what
09:10 13   you reviewed.  Do you recall anything else other
09:10 14   than your time line?
09:11 15      A   Maybe some of the legal correspondence
09:11 16   between the counsels.
09:11 17      Q   Do you recall anything else other than
09:11 18   those two items?
09:11 19      A   There's a lot of information, so --
09:11 20      Q   That, I understand.  But do you recall
09:11 21   sitting here today?
09:11 22      A   Not specifics.
09:11 23      Q   Did you review any e-mails?
09:11 24      A   It's possible, yes.
09:11 25      Q   Okay.  When you said "my time line," what

---

**Page 13**

09:11  1   are you referring to?
09:11  2      A   I said -- I don't know how to describe it.
09:11  3          MR. HOARE:  This would be calling for a
09:11  4   privileged communication.  Let me confer with her
09:11  5   and tell you whether or not it does.
09:11  6          MR. GORE:  All right.  Let's go off the
09:11  7   record.
09:11  8          (Discussion held off the record.)
09:13  9          MR. GORE:  Back on the record.
09:13 10          MR. HOARE:  You'll find it's a privileged
09:13 11   communication, the time line is, from her to me.
09:13 12          MR. GORE:  I'm going to explore that.
09:13 13      Q   Without at this point asking you for the
09:13 14   substance of what's in this time line, can you tell
09:13 15   me how many pages this document is?
09:13 16      A   I don't recall.
09:13 17      Q   Was it more than one page?
09:13 18      A   I'm not certain.
09:13 19      Q   And did you generate this?
09:13 20      A   Yes.
09:13 21      Q   Did you generate it with the assistance of
09:13 22   anyone?
09:13 23      A   No.
09:13 24      Q   When did you generate it?
09:13 25      A   I don't recall the exact time.

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 14

09:13 1    Q   Was it before this lawsuit was filed?
09:13 2    A   I'm not certain. Don't know the exact
09:13 3    date.
09:13 4    Q   I understand that you don't know the exact
09:13 5    date, but just so that we're clear, there's a
09:13 6    difference between not knowing the exact date and
09:13 7    knowing if it was before the lawsuit was filed,
09:14 8    so --
09:14 9    A   I don't recall.
09:14 10   Q   And again, I -- I appreciate that. You
09:14 11   need to wait for me to finish before you respond.
09:14 12   A   I'll do my best.
09:14 13   Q   You don't remember -- this is your
09:14 14   testimony -- whether this time line was generated
09:14 15   prior to the beginning of this litigation?
09:14 16   A   Correct. I don't remember.
09:14 17   Q   Do you remember when this litigation
09:14 18   began?
09:14 19   A   Yes.
09:14 20   Q   When did it begin?
09:14 21   A   I -- I think I do. Last fall.
09:14 22   Q   So you don't remember whether this time
09:14 23   line was generated prior to last fall?
09:14 24   A   No, I do not.
09:14 25   Q   Why was this time line generated?

---

Page 15

09:14 1    A   Something I did for myself, then I gave it
09:14 2    to my attorney.
09:14 3    Q   How soon after you generated the document
09:14 4    was it that you gave to it your attorney?
09:14 5    A   I don't recall.
09:14 6    Q   Was it a week?
09:14 7    A   It -- I don't know.
09:14 8    Q   Was there an elapse of time between when
09:14 9    you generated this document for yourself and when
09:14 10   you gave it to your attorney?
09:14 11   A   I don't know.
09:14 12        MR. GORE: I'm not going to belabor this
09:14 13   at this point, Michael, but I do believe that she
09:14 14   said she reviewed this document in preparation for
09:14 15   her deposition. And I don't believe that this
09:14 16   testimony has definitively established any kind of a
09:15 17   privilege that would apply, so I'm going to make a
09:15 18   request for the document because I do believe I'm
09:15 19   entitled to it.
09:15 20        MR. HOARE: I don't agree with you.
09:15 21        MR. GORE: Okay.
09:15 22   Q   Did you -- other than your time line and
09:15 23   the legal correspondence, you don't remember
09:15 24   anything else you reviewed in preparation for your
09:15 25   deposition?

---

Page 16

09:15 1    A   No.
09:15 2        (Exhibit No. 1 was marked.)
09:15 3        MR. GORE: I'm going to mark what has been
09:15 4    now identified as Exhibit Number 1. And just so you
09:15 5    know, since you've not been in a deposition before,
09:15 6    these little blue stickers here are exhibit tabs.
09:15 7    We're going to identify exhibits by their name
09:15 8    because we're going to be introducing a lot of
09:15 9    documents today. And I'll give a copy to Mr. Hoare
09:15 10   and then for myself. So this is Exhibit 1 to your
09:16 11   deposition.
09:16 12   Q   I'd like for you to take a look at the
09:16 13   document, Ms. Scott, and tell me when you've
09:16 14   finished.
09:16 15   A   Okay.
09:16 16   Q   Have you finished looking at Exhibit 1?
09:16 17   A   Yes.
09:16 18   Q   Do you see that document?
09:16 19   A   Yes.
09:16 20   Q   What -- what is that?
09:16 21   A   I don't know what you would call it.
09:16 22   Q   Okay. Is that your signature on the
09:16 23   document?
09:16 24   A   Yes.
09:16 25   Q   Okay. And is that the date of May 18,

---

Page 17

09:16 1    2007?
09:16 2    A   Yes.
09:16 3    Q   That was this last Friday, right?
09:16 4    A   Yes.
09:16 5    Q   Okay. Are you aware that your counsel
09:16 6    submitted supplemental responses to the first set of
09:16 7    interrogatories to us on Friday?
09:16 8    A   Yes.
09:16 9    Q   And are you aware that -- did you review
09:16 10   those documents before they were submitted to us?
09:17 11   A   I don't recall.
09:17 12   Q   Did you review them at some point before
09:17 13   you signed this statement under penalty of perjury?
09:17 14   A   Yes, briefly.
09:17 15   Q   Okay. When you reviewed them and then you
09:17 16   signed this, were you being truthful?
09:17 17   A   Yes.
09:17 18   Q   Is this -- so this document, Exhibit 1, is
09:17 19   a truthful statement?
09:17 20   A   Yes.
09:17 21        (Exhibit No. 2 was marked.)
09:17 22   Q   I'm now handing you what I'm going to mark
09:17 23   as Exhibit Number 2. This is a blank calendar which
09:17 24   may come in handy, given the issues of recalling
09:17 25   time frames. So I'd like you to just take a look at

---

5 (Pages 14 to 17)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

Page 18

09:17  1    it because we're going to be using this throughout
09:17  2    the day today. But this is starting with
09:17  3    November 2005 and goes through June of 2006. Do you
09:17  4    see that?
09:18  5        A   Yes.
09:18  6        Q   Okay. So that we can orient ourselves as
09:18  7    to time, do you remember about when it was that you
09:18  8    began working in the office of Representative
09:18  9    Alexander?
09:18 10        A   Mid October. Around mid October.
09:18 11        Q   Of what year?
09:18 12        A   2005.
09:18 13        Q   So it was the month before the first month
09:18 14    in Exhibit Number 2?
09:18 15        A   Yes.
09:18 16        Q   Okay. And looking at the last page, which
09:18 17    is June 2006, do you recall filing a complaint with
09:18 18    the Office of Compliance at that point sometime in
09:18 19    that month?
09:18 20        A   I don't recall the exact date.
09:18 21        Q   I understand. Do you recall that you did
09:18 22    that in June 2006?
09:18 23        A   I don't remember.
09:19 24        Q   You don't remember when you filed your
09:19 25    complaint with the Office of Compliance? Again I

Page 19

09:19  1    remind you you are under oath.
09:19  2            MR. HOARE:  Asked and answered,
09:19  3    argumentative.
09:19  4        Q   You can answer.
09:19  5        A   I remember filing it. I don't remember
09:19  6    when I filed it.
09:19  7        Q   Okay.
09:19  8            (Exhibit No. 3 was marked.)
09:19  9        Q   Exhibit Number 3, please take a look at
09:19 10    it. I'm going to ask you some questions about it.
09:19 11    Let me know when you finish, Ms. Scott.
09:19 12            I'll direct you -- just so you know, I'm
09:19 13    going to direct you to the specific points when I
09:19 14    have questions, but I just want you generally
09:19 15    familiarize yourself with the document at this
09:19 16    point.
09:20 17        A   Okay.
09:20 18        Q   Okay. For the record, these are
09:20 19    Plaintiff's Responses to Defendant's Requests for
09:20 20    Admissions. Do you see that on the front page in
09:20 21    the middle on the caption?
09:20 22        A   Yes.
09:20 23        Q   Okay. If you look at the fifth page,
09:20 24    you'll see that they are signed by your attorney.
09:20 25    Do you see that?

Page 20

09:20  1        A   Yes.
09:20  2        Q   And if you look at the sixth page, you'll
09:20  3    see they were served on us on May 3rd about three
09:21  4    weeks ago.
09:21  5        A   Yes.
09:21  6        Q   Do you see that?
09:21  7        A   Yes.
09:21  8        Q   Did you review this Exhibit Number 3 at
09:21  9    any point prior to today?
09:21 10        A   I don't recall.
09:21 11        Q   Okay. Let me direct your attention to
09:21 12    page 2, request 2. The May 14, 2006, e-mail, was
09:21 13    the first time you informed Representative Alexander
09:21 14    personally that you believe Royal Alexander was
09:21 15    engaging in sexually harassing behavior. Do you see
09:21 16    that?
09:21 17        A   Yes.
09:21 18        Q   Do you see where it says "admitted" under
09:21 19    "response"?
09:21 20        A   Yes.
09:21 21        Q   Is that true?
09:21 22        A   I'm not certain.
09:21 23        Q   How are you not certain?
09:21 24        A   I don't know if that's the exact date. I
09:21 25    don't recall.

Page 21

09:21  1        Q   Okay. Do you know what e-mail I'm
09:22  2    referring to or what this request is referring to?
09:22  3        A   I'd have to look at the document.
09:22  4        Q   Okay. Do you remember sending an e-mail
09:22  5    to Congressman Alexander in May relating to the
09:22  6    issues you had with Royal Alexander?
09:22  7        A   Yes.
09:22  8        Q   And that was the first time that you
09:22  9    advised Representative Alexander that you believed
09:22 10    that Royal Alexander was engaging in sexually
09:22 11    harassing behavior, is that correct?
09:22 12        A   Can you rephrase the question, please?
09:22 13        Q   The e-mail that you sent to Representative
09:22 14    Alexander in May. With me so far?
09:22 15        A   Uh-huh.
09:22 16        Q   That was the first time that you had
09:22 17    advised Representative Alexander that you believed
09:22 18    Royal was engaging in sexually harassing behavior?
09:22 19    Yes or no.
09:22 20        A   I'm not sure if I understand if you mean
09:22 21    him personally or individuals in his office.
09:22 22        Q   Him personally.
09:23 23        A   Yes.
09:23 24        Q   Okay. So I'll show you the e-mail at some
09:23 25    point, but with the idea that you need to look at it

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 30

09:46 1 minutes which start with the letter P. P means
09:46 2 plaintiff, means that you produced that. Do you
09:46 3 understand that?
09:46 4     A  Yes.
09:46 5     MR. HOARE: Let the record reflect that
09:46 6 Exhibit 5 consists of 18 pages.
09:46 7     MR. GORE: The record will reflect what
09:46 8 Exhibit 5 consists of.
09:46 9     MR. HOARE: 18 pages.
09:46 10     MR. GORE: Michael, that's the second
09:46 11 time. The third time, I'm getting Judge Kay on the
09:46 12 phone.
09:46 13     MR. HOARE: What are you talking about?
09:46 14     MR. GORE: These are improper statements
09:46 15 at a deposition. Do you want me to read Judge Kay's
09:46 16 letter to you?
09:46 17     MR. HOARE: You object that I make a
09:46 18 record of the number of pages in an exhibit?
09:47 19     MR. GORE: Michael, second time, okay?
09:47 20     Q  Ms. Scott, if you'd look at 1051 --
09:47 21     MR. HOARE: Excuse me, Mr. Gore. I asked
09:47 22 a question. Do you object to that?
09:47 23     Q  Ms. Scott, if you'd look at 1051, please.
09:47 24     MR. HOARE: Now you're being intentionally
09:47 25 rude.

---

Page 31

09:47 1     Q  That e-mail, Ms. Scott. Do you see it's
09:47 2 from you to Royal?
09:47 3     A  Yes.
09:47 4     Q  And it's dated May 15th, 2006, correct?
09:47 5     A  Yes.
09:47 6     Q  At 8:09 a.m., correct?
09:47 7     A  Yes
09:47 8     Q  Okay. And you say in there, "I will be
09:47 9 out sick today." Do you see that?
09:47 10     A  Yes.
09:47 11     Q  Okay. Is that a truthful statement?
09:47 12     A  I don't recall. I can't recall. I don't
09:47 13 have reason to believe I was -- it was not true.
09:47 14     Q  Okay. Do you agree with me that on
09:47 15 Monday, May 15, at 8:09 a.m., you sent Royal
09:47 16 Alexander an e-mail saying that you were sick?
09:47 17     A  Yes.
09:47 18     Q  All right. And you don't believe you were
09:47 19 lying to your supervisor, do you?
09:47 20     A  No.
09:47 21     Q  Okay. Look at the next page. Oh,
09:47 22 actually, before we do that, if you go back to our
09:47 23 calendar on May 15, in the green pen, if you would
09:47 24 write, and leave space, because we're going to put
09:47 25 more on this, but if you would write "sick," please

---

Page 32

09:47 1     And just so the record is abundantly
09:47 2 clear, your writing that reflects for purposes of
09:47 3 our discussion here the e-mail that we just talked
09:47 4 about. Do you understand that?
09:47 5     A  Yes.
09:47 6     Q  If you look at the next page, which is
09:47 7 DEF01050, do you see that?
09:47 8     A  Yes.
09:47 9     Q  If you look at the top e-mail, the one
09:47 10 from you to Danielle Savoy, do you see that?
09:47 11     A  Yes.
09:47 12     Q  Do you see you sent an e-mail to Danielle
09:47 13 Monday, May 15, at 9:50 a.m.?
09:47 14     A  Yes.
09:47 15     Q  And do you see that you say in the e-mail
09:47 16 to Danielle, quote, I will be out sick today, close
09:47 17 quote?
09:47 18     A  Yes.
09:47 19     Q  Were you being truthful when you said that
09:47 20 to Danielle?
09:47 21     A  No reason to believe I wouldn't
09:47 22     Q  So at this point, we have two e-mails from
09:47 23 you on Monday morning, May 15th, saying you were
09:47 24 sick to two different people, is that correct?
09:47 25     A  Yes.

---

Page 33

09:47 1     Q  If you'd look at the next page, it's
09:47 2 DEF0837. Do you see that?
09:47 3     A  Yes.
09:47 4     Q  Okay. It is an e-mail at the bottom from
09:47 5 you to Royal, cc'ing Danielle. Do you see that?
09:47 6     A  Yes.
09:47 7     Q  And it is Tuesday, May 16, at 8:07 a.m.
09:47 8 Is that correct?
09:47 9     A  Yes.
09:47 10     Q  And you're saying, quote, taking a sick
09:47 11 day, close quote?
09:47 12     A  Yes.
09:47 13     Q  So -- and then you see the response from
09:47 14 Royal was, "All right. Hope you feel better." Do
09:47 15 you see that?
09:47 16     A  Yes.
09:47 17     Q  So were you representing on May 16 to your
09:47 18 employer you were sick?
09:47 19     A  Yes.
09:47 20     Q  Okay. If you would write "sick" on May 16
09:47 21 on the calendar, please.
09:52 22     (Discussion held off the record.)
09:56 23     Q  Just going back to the calendar for a
09:56 24 second, this is Exhibit 5. You mentioned that you
09:56 25 had some confusion about the Saturday and Sunday

---

9 (Pages 30 to 33)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                          Taken on May 21, 2007

| Page 38 | Page 40 |
|---|---|

**Page 38**

10:01 1 account to Royal and to the Congressman dated
10:01 2 Thursday, May 18, at 9:12 a.m. Do you see that?
10:01 3     A  Yes.
10:01 4     Q  And do you see that you say, "I will not
10:01 5 be in today. I am seeing my counselor today to
10:01 6 discuss my returning to work next week." Do you see
10:01 7 that?
10:01 8     A  Yes.
10:01 9     Q  Is that a true -- were you being truthful
10:01 10 when you sent this e-mail?
10:01 11     A  Yes.
10:01 12     Q  And this e-mail was sent on May 18th in
10:01 13 the morning, correct?
10:01 14     A  At 9:12.
10:01 15     Q  Okay. Why don't we put -- now, were you
10:01 16 sick on this day?
10:01 17     A  I don't recall.
10:01 18     Q  Okay. Let's go back to the calendar and
10:01 19 let's write in green "counselor" on May 18th.
10:02 20     Okay, if you'd look at the next page,
10:02 21 which is P0261, it's an e-mail from your personal
10:02 22 AOL account, correct?
10:02 23     A  Yes.
10:02 24     Q  And it's Friday, May 19th, correct?
10:02 25     A  Yes.

**Page 40**

10:03 1     A  Okay. Thank you.
10:03 2     On the days in which e-mails were sent
10:03 3 that said that I was sick, I was emotionally
10:03 4 distraught and physically ill from everything that
10:03 5 had been going on, most everything being that I was
10:03 6 working and having to work in a very hostile
10:03 7 environment.
10:03 8     Q  Okay. On Friday, May 19, would you please
10:03 9 write "ill" on the calendar?
10:03 10     Were you ill on Thursday as well?
10:03 11     A  I don't recall.
10:03 12     Q  Were you ill on Wednesday?
10:03 13     A  I don't recall.
10:03 14     Q  Okay. Now if you'd look at the next page,
10:03 15 it's P0262, do you see that?
10:03 16     A  Yes.
10:03 17     Q  And it's an e-mail from your personal
10:03 18 account again to Royal. Do you see that?
10:04 19     A  Yes.
10:04 20     Q  And it's Wednesday, May 24th, at 3:26. Do
10:04 21 you see that?
10:04 22     A  Yes.
10:04 23     Q  And it says, quote, please call me so we
10:04 24 can arrange for my return to the office tomorrow.
10:04 25 Thank you, Elizabeth. Close quote. Did you write

**Page 39**

10:02 1     Q  At 5:12 p.m.?
10:02 2     A  Yes.
10:02 3     Q  And it's to Royal, and it's also to the
10:02 4 Congressman's personal House account, correct?
10:02 5     A  Yes.
10:02 6     Q  And you're resending something that you
10:02 7 had sent at 9:24 that morning, correct?
10:02 8     A  Correct.
10:02 9     Q  And you're saying, quote, I am not yet
10:02 10 feeling well enough to come to the office, close
10:02 11 quote?
10:02 12     A  Yes.
10:02 13     Q  Were you being truthful to the Congressman
10:02 14 and to Royal when you wrote that to them?
10:02 15     A  Yes. I had been very emotionally
10:02 16 distraught and physically ill all week.
10:02 17     Q  Oh, all right. Well then let's write
10:02 18 "ill," or "sick."
10:02 19     A  On the days that you have the e-mails --
10:03 20     Q  Ms. Scott, you can clarify if you need to,
10:03 21 but you just said you were physically ill all week
10:03 22 so what I'd like you to write is "sick for the rest
10:03 23 of the week of --"
10:03 24     A  I'd like to clarify.
10:03 25     Q  Oh, please do.

**Page 41**

10:04 1 that?
10:04 2     A  Yes.
10:04 3     Q  Okay. So I take it you were no longer
10:04 4 feeling ill, is that correct, as of May 24th?
10:04 5     A  I don't recall at this time.
10:04 6     Q  Okay. Why don't you write on the calendar
10:04 7 on May 24th "request to return to work."
10:04 8     MR. HOARE:  That's not what it says.
10:04 9 You're misstating the witness's testimony.
10:04 10     Q  "Called Royal to request to return to
10:04 11 work." Why don't you put that?
10:04 12     A  I didn't call Royal.
10:04 13     Q  "E-mail Royal to request to return to
10:04 14 work."
10:04 15     MR. HOARE:  Same objection.
10:04 16     A  I called to ask -- to arrange for my
10:04 17 return to work.
10:04 18     Q  All right. Well, why don't you write
10:05 19 that? But write it small again because we're going
10:05 20 to put more on it. And say what you just said right
10:05 21 there, which was -- you said called to ask, but it
10:05 22 was obviously e-mail, to arrange for my return to
10:05 23 work is what you just testified to.
10:05 24     A  What do you want me to write?
10:05 25     Q  What you testified to, which was to

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                              Taken on May 21, 2007

---

Page 42

10:05 1  arrange for my return to work. And that's what you
10:05 2  testified to, so when you asked me what I want to
10:05 3  you write, you don't dispute that, do you?
10:05 4      MR. HOARE: Objection, vague and
10:05 5  ambiguous.
10:05 6      Q  Do you dispute the characterization of
10:05 7  what occurred on May 24th as has now been written on
10:05 8  that calendar?
10:06 9      A  Can you please rephrase the question?
10:06 10     Q  What did you just write on the calendar
10:06 11  for May 24th?
10:06 12     A  "E-mail to arrange for my return to work."
10:06 13     Q  Okay. Is that a truthful -- is that
10:06 14  truthful? Is that what you did on that day?
10:06 15     A  Based on the e-mail from May 24th.
10:06 16     Q  Yes. Yes or no?
10:06 17     A  Yes.
10:06 18     Q  Okay. Then if you'd look at 263, P263,
10:06 19  which is the next page, and that's an e-mail from
10:06 20  Adam Terry to your AOL account of Wednesday,
10:06 21  May 24th. Do you see that?
10:06 22     A  Yes.
10:06 23     Q  And it says, quote -- why don't you read
10:06 24  what it says, actually, aloud?
10:06 25     A  Elizabeth, the Congressman told me to tell

---

Page 43

10:06 1  you that you will be on two-week paid administrative
10:07 2  leave. This is just to allow the attorneys to
10:07 3  complete the investigation, interview Jonathan and
10:07 4  wrap up any other loose ends. See in you two weeks.
10:07 5  AT.
10:07 6      Q  Did you receive that?
10:07 7      A  It was e-mailed to my account.
10:07 8      Q  Did you receive it?
10:07 9      A  I don't recall.
10:07 10     Q  Okay. If you look at the bottom here, it
10:07 11  says PO263. P means that you produced this to us.
10:07 12  So now that I've reminded you of that, Ms. Scott,
10:07 13  did you receive this e-mail?
10:07 14     MR. HOARE: Objection, argumentative.
10:07 15     Q  You can answer the question.
10:07 16     A  It appears so.
10:07 17     Q  Okay. Now I'd like you to look at P290.
10:07 18  Oh, wait, I'm sorry. On May 24th, why don't we do
10:07 19  this just for clarity? Write "Adam Terry e-mailed
10:08 20  me." Why don't you write that? "Adam Terry mailed
10:08 21  re: Return to work" or "regarding return to work."
10:08 22     MR. HOARE: That's not what the document
10:08 23  reflects.
10:08 24     MR. GORE: Wait a second, Michael.
10:08 25     Q  Let me know when you finish, Ms. Scott.

---

Page 44

10:08 1      A  He e-mailed me about paid administrative
10:08 2  leave.
10:08 3      Q  And is it your testimony that this e-mail
10:08 4  doesn't relate in any way to your returning to work?
10:08 5      A  I'm not disagreeing, but he didn't mention
10:08 6  anything about my return to work. He said I would
10:08 7  be on two weeks' paid administrative leave.
10:08 8      Q  What did you take "see in you two weeks"
10:08 9  to mean, Ms. Scott?
10:08 10     A  Don't recall.
10:08 11     Q  Is it your testimony under oath that you
10:08 12  dispute that "see you in two weeks" means anything
10:08 13  other than were you expected to be back at work in
10:08 14  two weeks?
10:08 15     MR. HOARE: Argumentative.
10:09 16     A  I didn't know what to expect in two weeks.
10:09 17     Q  Okay. Well, I think the -- what did you
10:09 18  write there on the calendar?
10:09 19     A  "Adam Terry e-mailed."
10:09 20     Q  Let's do this. "Re," quote, "see in you
10:09 21  two weeks. " We'll do that. That way, there's no
10:09 22  dispute.
10:09 23     Okay, now, if you'd look at the next page,
10:09 24  which is P290, you mentioned earlier that you saw
10:09 25  e-mail between counsel in preparing for your

---

Page 45

10:09 1  deposition. Did you see this e-mail?
10:09 2      MR. HOARE: Objection, misstates the
10:09 3  witness's testimony.
10:09 4      MR. GORE: I think the testimony will --
10:09 5      A  The testimony will say that I -- will not
10:10 6  say that I saw an e-mail.
10:10 7      Q  Hold on a second. Ms. Scott, I asked
10:10 8  asked you: Do you recall anything else other than
10:10 9  your time line as far as what you reviewed? And you
10:10 10  said maybe some of the legal correspondence
10:11 11  between -- depend the counsels. That was your
10:11 12  testimony?
10:11 13     MR. HOARE: Repeat that, please.
10:11 14     THE REPORTER: It's "between."
10:11 15     Q  Maybe some of the legal correspondence
10:11 16  between the counsels.
10:11 17     A  Okay.
10:11 18     Q  Do you want to change your testimony? Was
10:11 19  that truthful?
10:11 20     A  I'm uncertain as to all the documents that
10:11 21  I reviewed.
10:11 22     Q  Okay. This is my question: You testified
10:11 23  that you reviewed legal correspondence between the
10:11 24  counsels. Is that true?
10:11 25     A  Yes.

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 62

10:33 1     A   What I don't recall is the exact date.
10:34 2     Q   Do you believe it was in June?
10:34 3     A   I believe it to be June. I don't know the
10:34 4   exact date.
10:34 5         (Exhibit No. 6 was marked.)
10:34 6     Q   Exhibit Number 6. Ms. Scott, these are
10:34 7   the Supplemental Responses to Interrogatories that
10:34 8   your counsel served on Friday, three days ago.
10:34 9   These are the -- these are the responses that you
10:34 10  verified as being true under penalty of perjury at
10:34 11  the beginning of your deposition with Exhibit 1. Do
10:34 12  you recall that?
10:34 13    A   Yes.
10:34 14    Q   Okay. I'm going to direct you to the
10:34 15  specific interrogatory in a moment, because I'm not
10:34 16  going to ask you about every single one of these.
10:34 17  But I would like to just give you an opportunity to
10:34 18  quickly look at the document and see if you
10:34 19  recognize this document that you verified was true
10:35 20  under penalty of perjury.
10:35 21        THE WITNESS: May I have some more water?
10:35 22        MR. HOARE: Ms. Lett, may we get some more
10:35 23  water for the witness, please?
10:35 24        MS. LETT: Sure.
10:36 25        MR. GORE: Mr. Gore, is there a part on

---

Page 63

10:36 1   which she should focus?
10:36 2         MR. GORE: I was just waiting until she
10:36 3   was finished. I'm going to direct her to the exact
10:36 4   point.
10:36 5     Q   Before we do that, though, can you go back
10:36 6   for a second, Ms. Scott, to Exhibit Number 5 and to
10:36 7   P0292? This is that e-mail, the June 5th, 4:26 p.m.
10:36 8   e-mail.
10:36 9         MR. HOARE: Page number?
10:36 10        MR. GORE: P0262, just so that the record
10:36 11  is clear on this.
10:36 12    Q   We were focusing on Mr. Hoare's e-mail to
10:36 13  Gloria Lett, but if you look up at the next one, do
10:36 14  you see where it says from Gloria to Mr. Hoare,
10:36 15  Wednesday, June 7, and it says "Please advise
10:36 16  Elizabeth she will be expected back in the office on
10:36 17  Monday, June 12 and not this Thursday"? Do you see
10:37 18  that?
10:37 19    A   Yes.
10:37 20    Q   Were you aware at the time that your
10:37 21  return date was moved to June 12th?
10:37 22    A   I don't recall.
10:37 23    Q   You don't recall that? Okay.
10:37 24        And then if you look up above that, the
10:37 25  e-mail is from Mr. Hoare to Ms. Lett, June 8, at

---

Page 64

10:37 1   3:33 p.m. Do you see that?
10:37 2     A   Yes.
10:37 3     Q   It says, "Gloria, can you please explain
10:37 4   to me so I can explain it to my client why
10:37 5   Ms. Scott's return date was switched from June 8 to
10:37 6   June 12? Thanks." Do you see that?
10:37 7     A   Yes.
10:37 8     Q   Do you recall whether the office was ever
10:37 9   asked why your return date was changed?
10:37 10        MR. HOARE: Objection, vague and
10:37 11  ambiguous.
10:37 12    A   Can you please rephrase?
10:37 13    Q   Okay. Prior to sitting here today, were
10:37 14  you aware of this e-mail?
10:37 15    A   It's possible.
10:37 16    Q   But you don't recall?
10:37 17    A   No.
10:37 18    Q   Okay. Were you aware that -- at any time
10:38 19  prior to today that the return date was changed from
10:38 20  June 8 to June 12?
10:38 21    A   I recall that it was changed. I don't
10:38 22  recall if I knew that these were the dates.
10:38 23    Q   Okay. When do you recall being aware that
10:38 24  it was changed?
10:38 25    A   I'm not certain at this time. I don't

---

Page 65

10:38 1   remember.
10:38 2     Q   Okay. If you go now back to
10:38 3   Exhibit Number 6, this is the supplemental
10:38 4   interrogatories. I'd like to have you take a look
10:38 5   down at page number -- actually, start off at page
10:38 6   numbered 12. And interrogatory number 12 asks you
10:38 7   to identify each job you've had and each employer
10:38 8   you worked for at any time within the last ten
10:39 9   years. Do you see that?
10:39 10    A   Yes.
10:39 11    Q   I'd like you now to look at page 14, which
10:39 12  is the end of your response to that. This was
10:39 13  something that was supplemented on Friday at the
10:39 14  direction of the Court. Do you see where it says
10:39 15  the JGB Companies, 4445 Willard Avenue?
10:39 16    A   Yes.
10:39 17    Q   And do you see where it says June 18,
10:39 18  2006, to mid February, 2007?
10:39 19    A   Yes.
10:39 20    Q   Okay. Is that correct that your first day
10:39 21  at JBG was June 18 as represented on this
10:39 22  interrogatory that you verified a few moments ago?
10:39 23    A   I don't recall. I would have to look at a
10:39 24  document from them in regard to what my exact first
10:39 25  day was.

17 (Pages 62 to 65)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

**Page 66**

10:39 1    Q  Now, do you see above that, though, where
10:39 2  you have December, 2005, to May, 2006, for the
10:39 3  office of Congressman Rodney Alexander?
10:39 4    A  Yes.
10:39 5    Q  You don't give an exact date there, do
10:39 6  you?
10:39 7    A  No.
10:39 8    Q  And do you see for RD Trattoria where you
10:40 9  give mid February 2007 to the present?  You don't
10:40 10  give an exact date there, did you?
10:40 11    A  I didn't write this.
10:40 12    Q  But you verified under penalty of perjury
10:40 13  it is correct, correct?
10:40 14    A  To the best of my knowledge.
10:40 15    Q  Okay.  So you see that the items above and
10:40 16  below do not have a specific date?
10:40 17    A  It's possible that they're typos.
10:40 18    Q  So is it your testimony that there's a
10:40 19  typo?
10:40 20    A  No.  I'm saying that if, in fact, some of
10:40 21  the dates are not correct, this --
10:40 22    MR. HOARE:  Excuse me.  They wouldn't call
10:40 23  me unless it was important.
10:40 24    MR. GORE:  Okay, let's go off the record.
10:40 25    (Discussion held off the record.)

---

**Page 67**

10:44 1    Q  All right., Ms. Scott, going back to
10:44 2  Exhibit Number 6, my question was:  So it's your
10:44 3  testimony that there's a typo?  And you're saying
10:44 4  no, I'm saying that if, in fact, some of the dates
10:44 5  are not correct -- then we were interrupted.
10:44 6    So my question is:  Is it -- is there a
10:44 7  typo in your interrogatory response that was
10:45 8  submitted to us Friday that you verified under oath
10:45 9  earlier on Friday and then again today this morning?
10:45 10    MR. HOARE:  Objection.  It's
10:45 11  argumentative.
10:45 12    MR. GORE:  I'm asking --
10:45 13    A  I don't know if there is or not.
10:45 14    Q  Sitting here today, do you believe there's
10:45 15  a typo?
10:45 16    A  I don't know.
10:45 17    Q  Okay.  Do you believe it's truthful that
10:45 18  you started work on June 18, 2006, at JBJ
10:45 19  Companies -- JGB Companies?
10:45 20    A  I don't recall what date I started.
10:45 21    Q  I understand there's a lot that you don't
10:45 22  recall.  My question is this:  Do you believe it's
10:45 23  truthful that June 18 was the day you started?
10:45 24    A  I don't know if that's the day I started
10:45 25  or not.

---

**Page 68**

10:45 1    Q  All right.  So you don't know if June 18
10:45 2  was the day you started?  That's your testimony?
10:45 3    MR. HOARE:  Excuse me.
10:45 4    A  I don't recall June 18.
10:45 5    Q  You don't recall if June 18 was the day
10:45 6  you started?
10:45 7    A  No.
10:45 8    Q  Okay.  But you would agree with me that
10:45 9  June 18 is what is listed here on your interrogatory
10:45 10  response, correct?
10:45 11    A  Yes.
10:45 12    Q  And let's go back to Exhibit Number 1, if
10:46 13  you want to take a look at it, Exhibit Number 1,
10:46 14  Ms. Scott.  Would you read that aloud, please?
10:46 15    A  I declare under penalty of perjury that
10:46 16  the information contained in Plaintiff's First
10:46 17  Supplemental Responses to Defendant's First and
10:46 18  Second Interrogatories is true and correct to the
10:46 19  best of my information, knowledge and belief.
10:46 20    Q  Okay.  So now that you've refreshed
10:46 21  yourself -- and you signed this, correct?
10:46 22    A  Yes.
10:46 23    Q  Okay.  And you have an MBA, is that right?
10:46 24    A  Yes.
10:46 25    Q  Okay.  You don't -- let me ask you.  Are

---

**Page 69**

10:46 1  you generally in the practice of signing statements
10:46 2  without reading them?
10:46 3    MR. HOARE:  Objection.  It's
10:46 4  argumentative.
10:46 5    Q  Do you generally -- if you're going to
10:46 6  sign something, do you generally look at it first?
10:46 7    A  Usually.
10:46 8    Q  Okay.  Did you do that in this case?
10:46 9    A  I don't recall.
10:46 10    Q  This was three days ago, Ms. Scott.
10:47 11    A  I don't know what I did three days ago,
10:47 12  I'm sorry.  I don't recall what I did.  I read a lot
10:47 13  of documents every day, so this could have been one
10:47 14  of them.  I don't recall at this time.  To the best
10:47 15  of my knowledge, as signed, it is correct.
10:47 16    Q  Well, let me ask you this, because now I'm
10:47 17  not clear, because you don't even recall what
10:47 18  happened three days ago.  Did you review these
10:47 19  documents in any way, shape or form, meaning -- I'm
10:47 20  talking specifically about Exhibit Number 6.
10:47 21    MR. HOARE:  Objection.  It's vague and
10:47 22  ambiguous.
10:47 23    A  Can you define "review"?
10:47 24    Q  Did you see Exhibit 6 on May 18 or
10:47 25  earlier?

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

| | Page 70 |
|---|---|
| 10:47 1 | A  I may have. |
| 10:48 2 | Q  Do you remember if you did? |
| 10:48 3 | A  They look familiar. |
| 10:48 4 | Q  Do you -- so you do remember, or you |
| 10:48 5 | don't? |
| 10:48 6 | A  It's possible.  At this time, I don't |
| 10:48 7 | recall. |
| 10:48 8 | Q  Okay.  Exhibit Number 1, the one where -- |
| 10:48 9 | that is your signature? |
| 10:48 10 | A  Yes. |
| 10:48 11 | Q  And that's dated May 18, '07, is that |
| 10:48 12 | right? |
| 10:48 13 | A  Yes. |
| 10:48 14 | Q  And that was Friday, three days ago, |
| 10:48 15 | correct? |
| 10:48 16 | A  It was on May 18. |
| 10:48 17 | Q  Three days ago? |
| 10:48 18 | A  Correct. |
| 10:48 19 | Q  Okay.  Where were you when you signed this |
| 10:48 20 | document? |
| 10:48 21 | A  At my desk at work. |
| 10:48 22 | Q  What time of day was it? |
| 10:48 23 | A  I don't recall. |
| 10:48 24 | Q  Was it in the morning or the afternoon? |
| 10:48 25 | A  At this time, I don't know. |

| | Page 72 |
|---|---|
| 10:50 1 | document in this case so I'm asking you to search |
| 10:50 2 | your memory to see if you can remember when you |
| 10:50 3 | signed a document under penalty of perjury when you |
| 10:50 4 | signed it. |
| 10:50 5 | A  I signed it on May 18 of 2007. |
| 10:50 6 | Q  And when during the day?  And what you did |
| 10:50 7 | with it after you signed it? |
| 10:50 8 | A  I don't remember. |
| 10:50 9 | Q  You don't remember? |
| 10:50 10 | A  No. |
| 10:50 11 | Q  You don't remember if it was when you |
| 10:50 12 | first came in or late at night Friday night? |
| 10:50 13 | A  At this time, I don't recall. |
| 10:50 14 | Q  So you don't remember whether it was first |
| 10:50 15 | coming in or late at night? |
| 10:50 16 | MR. HOARE:  Objection, argumentative, and |
| 10:50 17 | asked and answered several times. |
| 10:50 18 | Q  You can answer. |
| 10:50 19 | A  At this time, I don't recall. |
| 10:50 20 | Q  Is there something that would -- you keep |
| 10:51 21 | saying "at this time."  This was only three days |
| 10:51 22 | ago.  Is there something that would help you that -- |
| 10:51 23 | to better recall when it was that you signed this |
| 10:51 24 | document? |
| 10:51 25 | A  At this time, I don't know. |

| | Page 71 |
|---|---|
| 10:48 1 | Q  And this was three days ago, Friday? |
| 10:48 2 | A  Yes. |
| 10:48 3 | Q  Okay.  And you don't remember whether you |
| 10:48 4 | had Exhibit 6 with you at the time that you signed |
| 10:48 5 | Exhibit 1? |
| 10:48 6 | A  I don't recall at this time. |
| 10:49 7 | Q  Do you recall sending this document to |
| 10:49 8 | your attorney after you signed it? |
| 10:49 9 | A  I'm not certain. |
| 10:49 10 | Q  Do you recall handing it to your attorney? |
| 10:49 11 | A  I gave to it my attorney at some point. |
| 10:49 12 | Q  Do you remember when? |
| 10:49 13 | A  No, I'm sorry, I don't. |
| 10:49 14 | Q  But it would have been -- it would have |
| 10:49 15 | had to have been sometime in the last three days, |
| 10:49 16 | wouldn't it? |
| 10:49 17 | A  Yes. |
| 10:49 18 | Q  And you don't remember at all whether it |
| 10:49 19 | was Friday, Saturday, Sunday, or this morning? |
| 10:50 20 | A  No, I honestly don't.  At this time, I |
| 10:50 21 | don't remember.  It could have -- it could have been |
| 10:50 22 | anytime up -- I'm sorry, I don't remember. |
| 10:50 23 | Q  Well, I realize it could have been |
| 10:50 24 | anytime.  But since it occurred three days ago, I'm |
| 10:50 25 | trying to ask you, this is a fairly significant |

| | Page 73 |
|---|---|
| 10:51 1 | (Exhibit No. 7 was marked.) |
| 10:51 2 | Q  Exhibit Number 7.  This is a document that |
| 10:51 3 | we received Friday in response to a subpoena to |
| 10:51 4 | JGB Companies.  Please take a look at it and let me |
| 10:51 5 | know when you're finished.  Go off the record and |
| 10:51 6 | note the time, please. |
| 10:51 7 | (Discussion held off the record.) |
| 10:51 8 | Q  Have you had a chance to look at |
| 10:51 9 | Exhibit Number 7, Ms. Scott? |
| 10:52 10 | A  Yes. |
| 10:52 11 | Q  Okay.  Have you seen this document before? |
| 10:52 12 | A  It doesn't look familiar. |
| 10:52 13 | Q  Okay.  If you look at that bottom e-mail |
| 10:52 14 | there, do you see where it says from Chris Dockson |
| 10:52 15 | at aol.com? |
| 10:52 16 | A  Yes. |
| 10:52 17 | Q  Who is Chris Dockson? |
| 10:52 18 | A  She's a recruiter. |
| 10:52 19 | Q  Recruiter you worked with? |
| 10:52 20 | A  Yes. |
| 10:52 21 | Q  And the recruiter that actually was the |
| 10:52 22 | recruiter you worked with to get the position at |
| 10:52 23 | JBG, correct? |
| 10:52 24 | A  Yes. |
| 10:52 25 | Q  According to this document, it appears |

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 97

11:32  1    objections.  All right, counsel?
11:32  2          MR. HOARE:  Thank you, Judge.
11:32  3          MR. GORE:  Thank you.
11:32  4          THE COURT:  Thank you.  I have to go back
11:32  5    on the bench.
11:32  6          MR. GORE:  Thank you, Your Honor.
11:32  7          (Note:  The telephone hearing was
11:32  8          concluded.)
11:32  9    BY MR. GORE:
11:32 10    Q    Ms. Scott, going to Exhibit Number 8,
11:32 11    you've already looked at, this is the offer letter
11:32 12    from JBG.
11:32 13          MR. HOARE:  Excuse me.
11:33 14    Q    I believe you already spent some time
11:33 15    reading through this document.  Am I correct?
11:33 16    A    Yes.
11:33 17    Q    If you look at the last page of the
11:33 18    document, it's a FedEx U.S. airbill.  Do you see
11:33 19    that?
11:33 20    A    Yes.
11:33 21    Q    Okay.  Do you recall having seen this
11:33 22    before?
11:33 23    A    It's -- it's possible.  I'm -- at this
11:33 24    time, I don't remember.
11:33 25    Q    Okay.  Do you remember looking at

Page 98

11:33  1    Exhibit 8, the first two pages?  Do you remember
11:33  2    receiving a letter dated June 2 from Ms. Smith
11:33  3    offering you employment at VBG?
11:33  4    A    I remember a letter.  I'm not certain as
11:33  5    to whether it was on June 2nd or not.
11:33  6    Q    Have you seen this letter before,
11:33  7    Exhibit 8?
11:33  8    A    It's possible.  I -- I'm not certain, but
11:34  9    it's possible.
11:34 10    Q    Do you have any reason to dispute that the
11:34 11    letter was sent to you on June 2?
11:34 12          MR. HOARE:  Argumentative.
11:34 13    A    As I said before, I don't recall the --
11:34 14    the specifics as to the date that the letter was
11:34 15    sent.
11:34 16    Q    So am I correct that you don't have any
11:34 17    basis to dispute that it was sent on June 2?
11:34 18          MR. HOARE:  Same objection.
11:34 19    Argumentative.  Counsel's testifying.  Move to
11:34 20    strike.
11:34 21    A    I don't recall at this time.
11:34 22    Q    Okay.  Well, that's really not my
11:34 23    question.  My question is:  Do you have any basis to
11:34 24    dispute that this letter was not sent to you on
11:34 25    June 2?

Page 99

11:34  1          MR. HOARE:  Same objection.
11:34  2    A    Can you please rephrase?
11:34  3    Q    Do you dispute that this letter was sent
11:34  4    to you on June 2?
11:34  5          MR. HOARE:  Asked and answered several
11:34  6    times.
11:34  7    A    I don't recall if it was sent on June 2.
11:35  8    Q    Do you recall if you signed this letter?
11:35  9    A    I'm certain -- I'm not -- I'm not certain.
11:35 10    If I was required to sign it, I probably would have.
11:35 11    Q    Do you have any recollection of having
11:35 12    signed this letter that's dated June 2, Exhibit 8?
11:35 13    A    Not at this time I don't.
11:35 14    Q    Okay.  Let me see if I can help with that.
11:35 15          (Exhibit No. 11 was marked.)
11:35 16    Q    Take a look at Exhibit 11 and let me know
11:35 17    when you're finished, please.
11:35 18          MR. HOARE:  May I have a copy?
11:35 19          Excuse me, Mr. Gore, but the record should
11:35 20    reflect that when we concluded the telephone
11:35 21    conference with the judge, or when we started the
11:35 22    telephone conference with the judge, the
11:35 23    confidential aspect of the deposition concluded.
11:36 24          MR. GORE:  Yes.  I believe that the court
11:36 25    reporter got that.  Well, it didn't conclude, it was

Page 100

11:36  1    suspended.  We're going to go back to it.
11:36  2    Q    Let me know when you're finished,
11:36  3    Ms. Scott.
11:36  4    A    Okay.
11:36  5    Q    Are you finished?
11:36  6    A    Yes.
11:36  7    Q    Okay.  Looking at Exhibit Number 11,
11:36  8    second page, do you see where it says "I, Elizabeth
11:36  9    Scott, accept this offer of employment"?
11:36 10    A    Yes.
11:36 11    Q    Do you see that?  Do you see where it says
11:36 12    you have read, understand and agree to the terms and
11:36 13    conditions contained in the letter?
11:36 14    A    Yes.
11:36 15    Q    Okay.  Is that your signature?
11:36 16    A    Yes.
11:36 17    Q    And what date is there?
11:36 18    A    June 5, 2006.
11:36 19    Q    Does that help refresh your recollection
11:36 20    as to when you signed this letter?
11:36 21    A    It appears I signed it on June 5 of 2006.
11:36 22    Q    And do you usually sign letters and date
11:36 23    them on dates other than which they're signed?
11:37 24    A    Not typically.
11:37 25    Q    Do you have any reason to believe that you

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

| | Page 101 |
|---|---|
| 11:37 1 | signed this on any day other than June 5? |
| 11:37 2 | A  It's possible I could have.  I -- it says |
| 11:37 3 | June 5th, though, so I'm not certain. |
| 11:37 4 | Q  Do you have any reason to believe, though, |
| 11:37 5 | that you, in fact, did sign it on some other day? |
| 11:37 6 | A  I'm not certain. |
| 11:37 7 | Q  You're not certain of what? |
| 11:37 8 | A  It says I signed it June 5, so -- |
| 11:37 9 | Q  So what? |
| 11:37 10 | A  So I believe I probably signed it on June |
| 11:37 11 | the 5th. |
| 11:37 12 | Q  Okay.  Now going back to Exhibit Number 6, |
| 11:37 13 | these are your interrogatory responses, the ones |
| 11:37 14 | that you verified under oath on Friday, three days |
| 11:37 15 | ago. |
| 11:37 16 | A  Uh-huh. |
| 11:37 17 | Q  Looking at page 14, it says again that the |
| 11:37 18 | start date at JBG -- do you need me to let you get |
| 11:38 19 | back to it? |
| 11:38 20 | A  Which exhibit? |
| 11:38 21 | Q  It's Exhibit Number 6, page 14.  It says |
| 11:38 22 | that the start date is June 18, 2006. |
| 11:38 23 | A  Okay. |
| 11:38 24 | Q  Is that correct?  Is that the day you |
| 11:38 25 | started working at JBG? |

| | Page 102 |
|---|---|
| 11:38 1 | A  I don't recall. |
| 11:38 2 | Q  Do you recall when you started working at |
| 11:38 3 | JBG? |
| 11:38 4 | A  Not at this time, no. |
| 11:38 5 | Q  Do you know why it says June 18, 2006, on |
| 11:38 6 | this document that was submitted to us Friday that |
| 11:38 7 | you verified Friday?  Do you know why? |
| 11:38 8 | MR. HOARE:  Let the record reflect my hand |
| 11:38 9 | is in the air. |
| 11:38 10 | MR. GORE:  I understand that.  I'm just |
| 11:38 11 | asking if she knows why, since she did verify them. |
| 11:38 12 | MR. HOARE:  I understand. |
| 11:38 13 | Q  Do you know why it says June 18? |
| 11:38 14 | A  I didn't type it. |
| 11:38 15 | Q  So you don't know why? |
| 11:39 16 | A  I mean, that's -- that's what they typed. |
| 11:39 17 | I didn't type this. |
| 11:39 18 | (Exhibit No. 12 was marked.) |
| 11:39 19 | Q  This is Exhibit 12.  This is another |
| 11:39 20 | document we got on Friday from your -- from JBG. |
| 11:39 21 | Could you take a look at it and let me know verbally |
| 11:39 22 | when you've finished looking at it. |
| 11:40 23 | MR. HOARE:  This is 12? |
| 11:40 24 | MR. GORE:  Yes. |
| 11:40 25 | A  Okay. |

| | Page 103 |
|---|---|
| 11:40 1 | Q  Okay.  Have you seen this document before? |
| 11:40 2 | A  Looks familiar. |
| 11:40 3 | Q  Okay.  When do you recall seeing it |
| 11:40 4 | before? |
| 11:40 5 | A  I'm not certain.  It's a standard form |
| 11:40 6 | from my former company. |
| 11:40 7 | Q  Okay.  It states on here date of |
| 11:40 8 | hire/rehire.  Do you see that in the second box? |
| 11:40 9 | A  Yes. |
| 11:40 10 | Q  June 12, 2006.  Do you see that? |
| 11:40 11 | A  Yes. |
| 11:40 12 | Q  Do you dispute that that's the day that |
| 11:40 13 | you started? |
| 11:40 14 | A  I don't recall if that was the date or |
| 11:40 15 | not.  That was the date specified for me to begin, |
| 11:40 16 | but I'm not certain as to whether or not I did. |
| 11:40 17 | Q  Oh.  So June 12 was the date specified for |
| 11:40 18 | to you begin? |
| 11:40 19 | A  According to this document. |
| 11:40 20 | Q  Do you have any independent recollection |
| 11:40 21 | of whether or not that was the date specified for |
| 11:40 22 | you to begin? |
| 11:40 23 | A  I don't recall.  My company has all the |
| 11:41 24 | documents, which you have, so -- |
| 11:41 25 | Q  All right.  But I guess let me just ask |

| | Page 104 |
|---|---|
| 11:41 1 | this as plainly as I can, because we're here trying |
| 11:41 2 | to get your testimony.  When do you recall in -- |
| 11:41 3 | starting work at JBG? |
| 11:41 4 | A  They would be able to confirm the exact |
| 11:41 5 | date that I started. |
| 11:41 6 | Q  Oh, most definitely.  But I'm asking for |
| 11:41 7 | your testimony. |
| 11:41 8 | A  I don't recall the exact date.  I would |
| 11:41 9 | have to ask them. |
| 11:41 10 | Q  Okay.  Well, looking at the -- let's look |
| 11:41 11 | at calendar for -- on June, 2006.  If you look at |
| 11:41 12 | the calendar -- and we talked in some detail about |
| 11:41 13 | the other things in that time period.  Does that |
| 11:41 14 | help you refresh your recollection as to when you |
| 11:41 15 | started at JBG? |
| 11:41 16 | A  I don't recall the exact date. |
| 11:41 17 | Q  Do you recall what week it was? |
| 11:41 18 | A  No, I do not recall that. |
| 11:41 19 | Q  Do you recall if it was in June? |
| 11:41 20 | A  I'm pretty -- I think it was in June. |
| 11:42 21 | Q  You think it was in June? |
| 11:42 22 | A  Uh-huh. |
| 11:42 23 | Q  But it could have been anytime from June 1 |
| 11:42 24 | to June 30th? |
| 11:42 25 | A  My former company would have the exact |

25 (Pages 101 to 104)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 105

11:42 1   date that I began.
11:42 2      Q  I fully understand that, Ms. Scott.
11:42 3   You've said that now three times. But what I'm
11:42 4   asking is what your testimony is as to what you
11:42 5   remember.
11:42 6      A  I don't recall. I didn't take note as to
11:42 7   the day I started.
11:42 8      Q  Okay. And my question is: You don't have
11:42 9   any knowledge. It could have been June 1 or
11:42 10   June 30. You can't even narrow it down to a week?
11:42 11      A  I don't recall. I — I didn't keep track
11:42 12   of it.
11:42 13      Q  I understand that. But I'm asking you,
11:42 14   can you not even narrow it down to the week in which
11:42 15   you started?
11:42 16      A  I would have -- I would have to ask for
11:42 17   more documents from my company.
11:42 18      Q  What documents would you need?
11:42 19      A  I don't know. Whatever they have.
11:42 20      Q  Okay. So without looking at documents
11:42 21   from your company, you can't even sit here today --
11:42 22      A  I would be --
11:42 23      Q  Excuse me.
11:42 24      Without talking to your company, your
11:42 25   testimony is is that you cannot even identify the

Page 106

11:42 1   general week in which you believe you started at
11:42 2   JBG?
11:42 3      A  I don't recall at this time.
11:43 4      MR. GORE: Mr. Hoare, I will say if you
11:43 5   want to speak with your client, I'd really like to
11:43 6   avoid having to call JBG in here, but I certainly
11:43 7   will. So if you want to have -- let me know if you
11:43 8   want to have a conversation with your client,
11:43 9   because --
11:43 10      MR. HOARE: About what?
11:43 11      MR. GORE: This issue.
11:43 12      MR. HOARE: What's the issue?
11:43 13      MR. GORE: If your client is truly
11:43 14   testifying she cannot even recall the week in which
11:43 15   she started working during this time period.
11:43 16      MR. HOARE: Why don't we have a dialogue
11:43 17   after the deposition?
11:43 18      MR. GORE: I'm mentioning it to you now
11:43 19   because we have been talking about it now. Do you
11:43 20   want to speak to your client or not?
11:43 21      MR. HOARE: We're here for you to ask the
11:43 22   witness questions and then we're going to leave, or
11:43 23   I'll have a conversation with you at that time about
11:43 24   anything you want to talk about.
11:43 25      MR. GORE: All right.

Page 107

11:43 1      MR. HOARE: But right now, we've got some
11:44 2   precious time that's supposed to be devoted to your
11:44 3   interrogating the witness.
11:44 4      MR. GORE: Right. And the witness is not
11:44 5   answering my questions. And I think anyone looking
11:44 6   at --
11:44 7      THE WITNESS: I'm answering them to the
11:44 8   best of my ability.
11:44 9      MR. GORE: I think anyone looking at this
11:44 10   will see that. So what I'm suggesting to you is do
11:44 11   you want to have a conversation with your client?
11:44 12   I'll proceed. I was just giving you the
11:44 13   opportunity.
11:44 14      MR. HOARE: We're going to proceed.
11:44 15      MR. GORE: Okay.
11:44 16      Q  Ms. Scott, help me understand. If I
11:44 17   recall, you don't recall whether you were sick the
11:44 18   week of May 15, 2006, right?
11:44 19      MR. HOARE: Objection.
11:44 20      Q  Or do you recall?
11:44 21      A  I don't recall.
11:44 22      Q  Okay. You don't recall if you were sick
11:44 23   the week of May 15, 2006?
11:44 24      A  No.
11:44 25      MR. HOARE: May 15?

Page 108

11:44 1      MR. GORE: Yeah.
11:44 2      Q  You don't recall what week in the month of
11:44 3   June you started working for your new employer, is
11:44 4   that correct?
11:44 5      A  I don't keep track of those --
11:44 6      Q  Is that correct?
11:44 7      A  I don't recall at this time.
11:44 8      Q  Is it correct, yes or no, that you don't
11:44 9   recall what week you started working for your new
11:45 10   employer in June?
11:45 11      A  Can you please rephrase?
11:45 12      Q  Do you recall, yes or no, what week you
11:45 13   started working for your new employer in June?
11:45 14      A  No, I do not.
11:45 15      MR. HOARE: Argumentative.
11:45 16      Q  Yes or no?
11:45 17      MR. HOARE: Same objection.
11:45 18   Argumentative.
11:45 19      A  No, I do not recall at this time.
11:45 20      Q  Okay. Do you recall whether you were sick
11:45 21   the week of May 15, 2006?
11:45 22      A  No, I do not recall at this time.
11:45 23      Q  Do you recall whether you sent Adam --
11:45 24   excuse me, Royal, a e-mail on May 24th asking about
11:45 25   your return to work the next day?

26 (Pages 105 to 108)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 109

11:45 1    A  I would have to look at the e-mail.
11:45 2    Q  But you have no independent recollection?
11:45 3       MR. HOARE:  Objection, misstates the
11:45 4    witness's testimony.
11:45 5    Q  Is that right?
11:45 6       MR. HOARE:  Same objection.
11:45 7    Q  Is that right?
11:45 8       MR. HOARE:  Same objection.
11:45 9       MR. GORE:  I'll take your answer,
11:45 10   Ms. Scott.
11:46 11   A  Is what right?
11:46 12   Q  That you don't recall whether you sent an
11:46 13   e-mail to Royal Alexander on May 24th asking about
11:46 14   returning to work the next day.
11:46 15   A  I would have to look at an e-mail to
11:46 16   confirm.
11:46 17   Q  Okay.  And you don't recall whether you --
11:46 18   when you received your offer letter from JBG, is
11:46 19   that correct?
11:46 20   A  I do not recall.
11:46 21   Q  And you don't recall what was the specific
11:46 22   day on which you allege you were constructively
11:46 23   discharged by Congressman Alexander, do you?
11:46 24   A  I don't recall at this time.
11:46 25   Q  All right.  And you don't recall the day

---

Page 110

11:46 1    for certain that you signed your offer letter at
11:46 2    JBG, do you?
11:46 3    A  I don't recall at this time.
11:46 4    Q  Is there some reason, Ms. Scott, why
11:46 5    everything that occurred -- seems like most
11:46 6    everything we've talked about that occurred between
11:46 7    May 15 and June of 2006 you don't recall?
11:46 8    A  If there's specific dates and there are
11:46 9    e-mails with the date or documents with the signed
11:46 10   date, then -- then that would be the date.  But I
11:46 11   don't have an independent recollection.
11:46 12   Q  Okay.  Were you preoccupied during that
11:46 13   time period, or were you on some kind of medication
11:47 14   or something that interfered with your ability to
11:47 15   recall these types of facts?
11:47 16   A  No.  It was a very stressful time.  I was
11:47 17   going through a lot of emotional stress.  The entire
11:47 18   situation in the Congressman's office was -- caused
11:47 19   me to be very distraught, and it was a lot to go
11:47 20   through.  A whole lott to go through.
11:47 21   Q  And that's why you can't remember some of
11:47 22   the very basic details from the time period?
11:47 23      MR. HOARE:  Objection.
11:47 24   Q  Is that correct?
11:47 25      MR. HOARE:  It's vague, it's ambiguous,

---

Page 111

11:47 1    it's argumentative.
11:47 2       MR. GORE:  I can go back through all the
11:47 3    basic details that we went through again if we need
11:47 4    .to, but we have gone through a number of details.
11:47 5    Q  Do you know the details we have gone
11:47 6    through?
11:47 7       MR. HOARE:  Objection, calls for
11:47 8    speculation.  You're arguing with her.
11:47 9       MR. GORE:  Mr. Hoare, we will get Judge
11:47 10   Kay on the line.
11:47 11      MR. HOARE:  Of course.  If you want to
11:47 12   call the judge, call the judge, but don't threaten
11:47 13   me to call the judge.
11:48 14      MR. GORE:  He said object with one word.
11:48 15   But engaging in this colloquy, you're disregarding
11:48 16   his order.
11:48 17   Q  Ms. Scott, I will go through this again.
11:48 18   All right, these are the basic facts.  You don't
11:48 19   remember whether you were sick the week of May 15th
11:48 20   correct?
11:48 21      MR. HOARE:  Objection, asked and answered.
11:48 22      MR. GORE:  Oh, I know.
11:48 23   Q  Correct?
11:48 24      MR. HOARE:  Now you're being
11:48 25   argumentative.

---

Page 112

11:48 1    Q  Correct?
11:48 2       MR. HOARE:  Same objection.
11:48 3    A  At this time, I don't recall.
11:48 4    Q  Okay.  And you didn't recall whether you
11:48 5    sent the e-mail to Royal on May 24th?
11:48 6       MR. HOARE:  Same objection.
11:48 7    Q  Correct?
11:48 8    A  At this time, I don't recall.
11:48 9       MR. HOARE:  Asked and answered.
11:48 10   Q  And you don't recall whether you accepted
11:48 11   the offer at JBG?
11:48 12   A  At this time, I don't recall.
11:48 13      MR. HOARE:  Asked and answered.
11:48 14   Q  And you don't recall when you started at
11:48 15   JBG?
11:48 16      MR. HOARE:  Asked and answered.
11:48 17   A  At this time, I don't recall.
11:48 18   Q  And you don't recall what date you're
11:48 19   alleging that you were constructively discharged?
11:48 20      MR. HOARE:  Asked and answered.
11:48 21   A  At this time, I don't recall.
11:48 22   Q  Okay.  So all of these five facts that you
11:48 23   don't recall, are you contending that the stress you
11:48 24   were experiencing during this time caused you not to
11:49 25   be able to recall these facts?

---

27 (Pages 109 to 112)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

| | Page 113 |
|---|---|
| 11:49 1 | A   It's possible. |
| 11:49 2 | Q   Are you contending there was anything else |
| 11:49 3 | that made it -- made you unable to recall these |
| 11:49 4 | facts from this time period? |
| 11:49 5 | A   At this time, I'm not certain. |
| 11:49 6 | Q   Was there any medication you were taking |
| 11:49 7 | that was influencing your ability to recall these |
| 11:49 8 | things? |
| 11:49 9 | A   At this time, no, not that I'm aware of. |
| 11:49 10 | Q   Were you under the influence of any other |
| 11:49 11 | substance during this time period that was causing |
| 11:49 12 | you not to be able to remember these things? |
| 11:49 13 | A   At this time, no. |
| 11:49 14 | Q   I'm not asking at this time, I'm asking |
| 11:49 15 | then, were you? |
| 11:49 16 | A   At this time, I don't recall there being. |
| 11:49 17 | Q   I'm not asking whether you're under the |
| 11:49 18 | influence of any substance today. |
| 11:49 19 | A   I understand. |
| 11:49 20 | Q   I'm asking you whether at this time period |
| 11:49 21 | you were under the influence of any substance that |
| 11:49 22 | caused you to be unable to remember these kinds of |
| 11:49 23 | details. |
| 11:49 24 | A   At this time, today, this very moment, I |
| 11:49 25 | do not recall that during that time period there |

| | Page 114 |
|---|---|
| 11:49 1 | was. |
| 11:49 2 | Q   Oh. So you don't even recall whether you |
| 11:49 3 | were on medication during that time period? |
| 11:49 4 | MR. HOARE: Objection, argumentative. |
| 11:50 5 | Q   Is that what you're saying? |
| 11:50 6 | MR. HOARE: Same objection. |
| 11:50 7 | A   It's possible I could have been taking |
| 11:50 8 | prescription medications. I don't know. |
| 11:50 9 | (Exhibit No. 13 was marked.) |
| 11:50 10 | Q   Exhibit 13 I'm going to ask you about, |
| 11:50 11 | Ms. Scott. Note the time she's looking at it. Let |
| 11:50 12 | me know when you're finished. |
| 11:51 13 | A   Okay. |
| 11:51 14 | Q   Okay. This is a two-page document, |
| 11:51 15 | DEF831832 that we produced a few weeks ago to your |
| 11:51 16 | counsel. Have you seen this document before? |
| 11:51 17 | A   I'm not certain. |
| 11:51 18 | Q   Okay. If you look at the second page, |
| 11:51 19 | there's an e-mail from you using your mail.house.gov |
| 11:51 20 | account to Amanda Palmer. Do you see that? |
| 11:51 21 | A   Yes. |
| 11:51 22 | Q   Who's Amanda Palmer? |
| 11:51 23 | A   A friend. |
| 11:51 24 | Q   Okay. You write, "Well, it's just a |
| 11:51 25 | waiting game at this point. Looking at a job with |

| | Page 115 |
|---|---|
| 11:51 1 | the U.S. Chamber of Commerce, so we will see. I |
| 11:51 2 | will call you later. Things were crazy last night |
| 11:52 3 | and I was overstressed so sorry I didn't call." Do |
| 11:52 4 | you see that? |
| 11:52 5 | A   Yes. |
| 11:52 6 | Q   Okay. This was May 16, right? |
| 11:52 7 | A   Yes. |
| 11:52 8 | Q   Actually, can we get out our calendar, |
| 11:52 9 | please? And if you could turn to May, okay, now, |
| 11:52 10 | May 16 was also the day -- a day when you told your |
| 11:52 11 | employer that you were sick, correct? |
| 11:52 12 | A   It appears to be that, right. |
| 11:52 13 | Q   Okay. Do you remember sending this e-mail |
| 11:52 14 | to Ms. Palmer that I just read? |
| 11:52 15 | A   I don't recall. |
| 11:52 16 | Q   Do you know what you were referring to |
| 11:52 17 | when you said "this is a waiting game"? |
| 11:52 18 | A   No, I'm not certain. |
| 11:52 19 | Q   Okay. Then if you look at the next page, |
| 11:53 20 | Tuesday, May 16, e-mail from you to Ms. Palmer, |
| 11:53 21 | 10:31 a.m., do you see that? |
| 11:53 22 | A   Yes. |
| 11:53 23 | Q   You say, "Very cool. Nope, didn't go to |
| 11:53 24 | work. Still working on things." Do you have any |
| 11:53 25 | idea what you're referring to? |

| | Page 116 |
|---|---|
| 11:53 1 | A   No, I'm not certain. |
| 11:53 2 | Q   Do you have any idea? |
| 11:53 3 | A   No, I don't, I'm sorry. |
| 11:53 4 | Q   Was "still working on things" a euphemism |
| 11:53 5 | for "I'm sick"? |
| 11:53 6 | MR. HOARE: Objection, vague and |
| 11:53 7 | ambiguous. |
| 11:53 8 | A   It most likely was in reference to |
| 11:53 9 | something else. |
| 11:53 10 | Q   What else would it have been in reference |
| 11:53 11 | to? |
| 11:53 12 | A   I'm not certain. |
| 11:53 13 | (Exhibit No. 14 was marked.) |
| 11:53 14 | Q   Exhibit 14. Ms. Scott, if you could, take |
| 11:54 15 | a look at it and let me know when you're finished, |
| 11:54 16 | please. Again, just let me know when you're |
| 11:55 17 | finished. I saw you sort of looking at your |
| 11:55 18 | fingers, so I'm waiting for you, just to let you |
| 11:55 19 | know that. |
| 11:55 20 | A   Thank you. Okay. |
| 11:55 21 | Q   Okay, have you seen -- just for the |
| 11:55 22 | record, Exhibit 14 is pages DEF794 through 796, |
| 11:56 23 | which we produced to your counsel several weeks ago. |
| 11:56 24 | Have you seen this document before? |
| 11:56 25 | A   I don't recall. |

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

|  | Page 117 |
|---|---|

11:56 1    Q   Have you seen the e-mails that this
11:56 2    document contains before?
11:56 3    A   I don't -- I don't recall at this time.
11:56 4    Q   Okay.  If you'd look at the last page, you
11:56 5    see an e-mail from you using your mail.house.gov
11:56 6    account to Amanda Palmer.
11:56 7    A   Yes.
11:56 8    Q   And it was May 17 at 11:17 a.m.  Could you
11:56 9    read what you wrote?
11:56 10   A   You are awesome.  I'm up for anything, I
11:56 11   just can't eat seafood or nuts, so we could do
11:56 12   Chinese or pizza or whatever.  And my smile is
11:56 13   already on the day and here to stay.
11:56 14   Q   Okay.  What did you mean by "my smile is
11:56 15   already on the day and here to stay"?
11:56 16   A   I'm not certain at this time.
11:57 17   Q   Have you used that expression before?
11:57 18   A   Sure.
11:57 19   Q   Okay.  Well, when you used it before, what
11:57 20   do you mean generally?
11:57 21   A   I'm not certain.  It could mean I'm in a
11:57 22   good mood.  It could mean -- it could mean a lot of
11:57 23   things.
11:57 24   Q   Okay.  And then you also -- and you said
11:57 25   "my smile is already on the day and here to stay"

|  | Page 118 |
|---|---|

11:57 1    with two exclamation points.  And then you say "I'm
11:57 2    up for anything."  Is that right?
11:57 3    A   Yes.
11:57 4    Q   What does "I am up for anything" mean?
11:57 5    A   I'm not certain.  It appears we were going
11:57 6    to get some food.
11:57 7    Q   And "you are awesome," exclamation point.
11:57 8    What's that all about?
11:57 9    A   She's a great friend, maybe.
11:57 10   Q   Okay.  This was Wednesday, May 17th.
11:57 11   Okay.  You didn't go to work that day, did you?
11:57 12   A   I don't recall at this time.
11:57 13   Q   Okay.  And that was right there in the
11:57 14   middle of that week in which you were ill and unable
11:57 15   to go to work, is that right?
11:57 16       MR. HOARE:  Objection, misstates the
11:57 17   witness's testimony.
11:58 18   Q   Is that right?  If I've misstated it,
11:58 19   please tell me how.
11:58 20   A   I don't recall.  It possibly is.  It
11:58 21   appears to be.
11:58 22   Q   Well -- okay.  So you were being paid for
11:58 23   that day, though, weren't you?
11:58 24       MR. HOARE:  Objection, argumentative.
11:58 25   A   I'm not certain.

|  | Page 119 |
|---|---|

11:58 1    Q   Okay.  Are you contending that you were
11:58 2    not paid for May 17, 2006?
11:58 3    A   I'm not certain if I was or not.  I would
11:58 4    have to look at my bank statements.  I'm not
11:58 5    certain.
11:58 6    Q   Do you have any reason to believe you
11:58 7    weren't paid for every work day in May, 2006?
11:58 8    A   Not that I'm aware of.
11:58 9    Q   Okay.  You mean -- okay.  So you don't
11:58 10   have any reason to believe you weren't paid for
11:58 11   May 17th?
11:58 12   A   Not that I'm aware of, no.
11:58 13   Q   Okay.  But yet you were going out doing --
11:58 14   up for anything with Ms. Palmer on the day you were
11:58 15   supposedly sick.
11:58 16       MR. HOARE:  Objection, argumentative.
11:58 17   Q   Is that right?
11:58 18       MR. HOARE:  Same objection.
11:58 19   A   Not necessarily.  It doesn't specify as to
11:58 20   what date we were making arrangements to -- to do
11:58 21   something.
11:59 22   Q   Okay.  Then turn to page 795 and we will
11:59 23   look at the e-mail that you sent to her at
11:59 24   11:49 a.m.  And you say "I just had that interview
11:59 25   today so I'm trying to stay in a good mood and then

|  | Page 120 |
|---|---|

11:59 1    get to come see you."  Does that refresh your
11:59 2    recollection as to whether you saw her that day?
11:59 3    A   I'm not certain whether we continued with
11:59 4    our plans or not.
11:59 5    Q   Okay.  And did you have an interview that
11:59 6    day?
11:59 7    A   I don't recall at this time.
11:59 8    Q   And then if you look at the top, it's --
11:59 9    of page 794, it's an e-mail from Ms. Palmer to you
11:59 10   dated May 17 to you at 1:02 p.m., "Did you get my
11:59 11   e-mail I sent from my Hotmail to AOL?"  Do you see
11:59 12   that?
11:59 13   A   Yes.
11:59 14   Q   Did Ms. Palmer send you e-mails to your
11:59 15   AOL account?
12:00 16   A   Oh, I don't recall.
12:00 17   Q   Did you -- in responding to our discovery
12:00 18   requests in this case, did you search your AOL
12:00 19   e-mails to see if there were any responsive e-mails?
12:00 20   A   I did.
12:00 21   Q   Did you search your AOL personal filing
12:00 22   cabinet?
12:00 23   A   I -- I don't recall at this time.
12:00 24   Q   What did you do to search for responsive
12:00 25   e-mails in response to our discovery requests in

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 137

12:22 1  grandfather died?
12:22 2      A  I don't recall that being the case.
12:22 3      Q  Did you lose sleep over the fact that your
12:22 4  grandmother died?
12:22 5      A  I don't recall that being the case.
12:22 6      Q  Did you experience a lot of emotion as a
12:23 7  result of any of those events, meaning your
12:23 8  grandparents' deaths or your mother's surgery?
12:23 9      MR. HOARE:  Objection, vague and
12:23 10 ambiguous.
12:23 11     Q  When I say "a lot of emotion," I'm using
12:23 12 the phrase you used earlier, so the way you used it.
12:23 13     MR. HOARE:  Same objection.
12:23 14     A  It's a different kind of emotion than the
12:23 15 emotion that I was suffering as a result of the
12:23 16 hostile work environment and the harassment that
12:23 17 had been undertaking in the workplace.
12:23 18     Q  So the answer to my question is you did
12:23 19 experience a lot of emotion as a result of your
12:23 20 grandparents' death and your mother's surgery?
12:23 21     MR. HOARE:  Vague and ambiguous, assumes
12:23 22 facts not in evidence, misstates the witness's
12:23 23 testimony.
12:23 24     Q  Yes or no?
12:23 25     A  As sad as it may seem, not with my

Page 138

12:23 1  grandfather.  He was a step grandfather.  I didn't
12:23 2  know him that well.
12:23 3      Q  So it's -- your testimony is that you
12:23 4  didn't experience much emotion when your grandfather
12:24 5  died in February?
12:24 6      MR. HOARE:  Argumentative.
12:24 7      MR. GORE:  I just want to make sure I
12:24 8  understand.
12:24 9      A  It was a very sad -- a sad day.  He was
12:24 10 very sick.  And having been raised in the Christian
12:24 11 faith, he was under a lot of pain and suffering and
12:24 12 it was actually a very joyous occasion because he
12:24 13 was now no longer having to suffer, as well as with
12:24 14 my grandmother.  It was a terrible loss, but at the
12:24 15 same time, we were able to rejoice because they no
12:24 16 longer had to suffer.
12:24 17     MR. HOARE:  Take a break?
12:24 18     (Recess taken from 12:24 to 12:35.)
12:35 19     Q  Whenever you're ready, Ms. Scott.
12:35 20     A  Sorry for my appearance.
12:35 21     (Exhibit No. 16 was marked.)
12:35 22     MR. HOARE:  What did you give me?  You
12:35 23 didn't give me anything.
12:35 24     MR. GORE:  Oh, I'm sorry.  It's the
12:35 25 complaint.  I'm sorry, I thought I had an extra, but

Page 139

12:35 1  I didn't.
12:35 2      Q  I'm not going to look at it yet, but I
12:35 3  just wanted to mark it.  Ms. Scott, are you ready to
12:36 4  go forward?
12:36 5      A  Yes.
12:36 6      Q  Again, I'm not going to get to that
12:36 7  document yet.  I just marked it so we'd be ready.
12:36 8  Do you remember when your inability to stay asleep
12:36 9  subsided?
12:36 10     A  I -- I don't.  I'm not certain.
12:36 11     Q  Do you have any idea whether it was a few
12:36 12 weeks after you got your new job, a few months?  Is
12:36 13 it still happening?
12:36 14     A  I -- I don't recall exactly when.
12:36 15     Q  I understand that.  I'm trying to get some
12:36 16 sense in between May of 2006 and May of 2007, today,
12:36 17 if in that time period any sense that you have about
12:36 18 when it stopped.
12:36 19     A  I'm not certain.  Probably sometime --
12:37 20 I -- at this time, I don't recall.
12:37 21     Q  Do you remember if you were still
12:37 22 experiencing lack of or inability to stay asleep in
12:37 23 Christmas of this last past year?
12:37 24     A  I don't believe so.
12:37 25     Q  Thanksgiving?

Page 140

12:37 1      A  Most likely not.
12:37 2      Q  Halloween?
12:37 3      A  As I said before, I don't recall exactly
12:37 4  when.
12:37 5      Q  Okay.  And your appetite, did it return?
12:37 6      A  Slowly.
12:37 7      Q  Okay.  When do you recall it returning?
12:37 8      A  I don't recall exactly.
12:37 9      Q  Christmas, had it returned?
12:37 10     A  It probably had.
12:37 11     Q  Thanksgiving?
12:37 12     A  Most likely.
12:37 13     Q  Do you remember eating a lot at
12:37 14 Thanksgiving?
12:37 15     MR. HOARE:  Objection, vague and
12:37 16 ambiguous.
12:37 17     A  I don't recall what I ate at Thanksgiving.
12:37 18     Q  Did you have turkey?
12:37 19     A  I don't recall.  It's possible.  I don't
12:37 20 recall what I ate at Thanksgiving.
12:37 21     Q  I'm sorry.  Do you recall what the main
12:37 22 course was at your Thanksgiving dinner last year?
12:37 23     A  No, I do not.
12:38 24     Q  You don't know if it was turkey?
12:38 25     A  At this time, I don't know what we had for

34 (Pages 137 to 140)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 141

12:38  1   Thanksgiving.
12:38  2       Q   So you don't know if you had turkey?
12:38  3           MR. HOARE:  Argumentative.
12:38  4       A   At this time, I don't recall.
12:38  5       Q   Okay.  All right, do you remember the last
12:38  6   day you worked in the office, actually were in the
12:38  7   office doing work in the office of Congressman
12:38  8   Rodney Alexander?
12:38  9       A   I don't recall the exact date.
12:38 10       Q   If we look at this calendar here, does
12:38 11   that help?
12:38 12       A   As I said, I don't recall the exact date.
12:38 13       Q   Okay.  See here we have Sunday, May 14th.
12:38 14   Do you see that?
12:38 15       A   Yes.
12:38 16       Q   And you wrote "sent e-mail to RA."  We
12:38 17   talked about that.
12:38 18       A   Yes.
12:38 19       Q   Do you remember that?
12:38 20       A   I remember talking about it, yes.
12:38 21       Q   Okay.  You remember you sent the e-mail to
12:38 22   RA, Congressman Alexander, on May 14th?
12:38 23       A   Yes.
12:38 24       Q   Right?  Okay.  Do you remember if you
12:38 25   returned to -- all right, and we also know that you

---

Page 142

12:38  1   were sick, sick, whatever you were, sick, sick.  And
12:39  2   do you know if you returned to the office after
12:39  3   May 14th?
12:39  4       A   I don't recall at this time.  I don't
12:39  5   believe did I, but I don't recall.
12:39  6       Q   Okay.  Do you remember if you worked on
12:39  7   the 12th?
12:39  8       A   I'm not certain.
12:39  9       Q   Do you remember when it was that it was
12:39 10   conveyed to you that you would be transferred from
12:39 11   scheduler to staff assistant?
12:39 12       A   I don't recall the exact date, no.
12:39 13       Q   Was it the last day you worked in the
12:39 14   office?
12:39 15       A   I'm not certain.  At this time, I don't
12:39 16   recall.
12:39 17       Q   Was it this week here?
12:39 18       A   Not certain.
12:39 19       Q   Meaning the week of May 8th.
12:39 20       A   At this time, I don't know exactly.
12:39 21       Q   Do you keep for any purpose any kind of a
12:39 22   personal journal or personal diary or anything like
12:39 23   that?
12:39 24       A   No, no.
12:39 25       Q   Personal calendar?

---

Page 143

12:39  1       A   No.
12:39  2       Q   Do you have a calendar on your Blackberry
12:39  3   or Palm or anything like that?
12:39  4       A   For work only.
12:39  5       Q   You don't keep any personal events on any
12:39  6   calendar?
12:40  7       A   No.
12:40  8       Q   You just keep those in your head?
12:40  9       A   For the most part.
12:40 10       Q   Do you have difficulty recalling those
12:40 11   events?
12:40 12       A   Not typically.
12:40 13       Q   Look at Exhibit 3.  These are the requests
12:40 14   for admissions that we went through earlier.  Take a
12:40 15   look at page 4.
12:40 16           First of all, do you recall what you had
12:40 17   for dinner last night, Ms. Scott?
12:40 18       A   I'll have to think about it.  That's an
12:40 19   unimportant thing for me to keep track of.
12:40 20       Q   So you don't remember what you had for
12:40 21   dinner last night?
12:41 22       A   Sometime in midafternoon I had some
12:41 23   potatoes and some zucchini.
12:41 24       Q   Did you have anything after that?
12:41 25       A   Not that I recall.

---

Page 144

12:41  1       Q   Have you ever been diagnosed as having any
12:41  2   type of a memory disorder?
12:41  3       A   Memory disorder?
12:41  4       Q   Right.  Inability to remember things,
12:41  5   anything of that nature?
12:41  6       A   Not that I'm aware of.
12:41  7       Q   Has anyone ever conveyed to you in any way
12:41  8   that you have a poor memory?
12:41  9       A   Not that I'm aware of.
12:41 10       Q   Do you remember what you had for breakfast
12:41 11   this morning?
12:41 12       A   Yes.
12:41 13       Q   What did you have?
12:41 14       A   Two hash browns and a Coke.
12:41 15       Q   Do you remember what you had for breakfast
12:41 16   yesterday morning?
12:41 17       A   I typically don't eat breakfast, so it was
12:41 18   rare for me to eat breakfast this morning.
12:41 19       Q   So other than the zucchini and the other
12:42 20   item you mentioned, did you eat anything else the
12:42 21   other day?
12:42 22       A   I believe so.
12:42 23       Q   Do you remember what it was?
12:42 24       A   Not exactly.  It was an asortment of some
12:42 25   Lebanese food and some potato chips.

---

35 (Pages 141 to 144)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 145

12:42 1    Q  Do you remember what you ate for dinner on
12:42 2  Friday, May 18th, the day you signed your
12:42 3  verification?
12:42 4    A  No, I don't recall.
12:42 5    Q  You don't remember what you had for dinner
12:42 6  on Friday?
12:42 7    A  I don't typically sit down and have
12:42 8  dinner.
12:42 9    Q  And by Friday, I mean Friday, May 18,
12:42 10  2007, three days ago.  You didn't have dinner
12:42 11  Friday?
12:42 12    A  I could have.
12:42 13    Q  Do you remember if you did?
12:42 14    A  I work in a restaurant.  We eat all the
12:42 15  time as we work.  I didn't sit down.  I don't recall
12:42 16  if I sat down and ate or if I didn't.
12:42 17    Q  Do you -- okay.  Do you remember anything
12:42 18  that you ingested in terms of food on Friday,
12:42 19  May 18th?
12:43 20    A  I don't recall specifically, no.
12:43 21    Q  Okay.
12:43 22    A  I don't keep track of my -- of what I eat
12:43 23  every day.
12:43 24    Q  Okay.  Going back to Exhibit Number 3,
12:43 25  request number 11, Exhibit Number 3 is the one you

Page 146

12:43 1  opened up before, before I started asking you those
12:43 2  questions.  I'm sorry, page number 4.  All right, as
12:43 3  we referred to earlier, these are the requests for
12:43 4  admissions and the responses that your counsel
12:43 5  submitted on May 3rd to us.  Request number 11 says
12:43 6  did you not return to work in the office of
12:43 7  Representative Alexander after you sent the May 14th
12:43 8  e-mail, and it's admitted.  So that's correct, is
12:43 9  that right?
12:43 10    A  I assume so.
12:43 11    Q  Okay.  If you could take a look at
12:44 12  Exhibit 16, which I marked, the complaint, I'll
12:44 13  direct you to the paragraph, but certainly if you
12:44 14  want to take the time to look at the whole thing,
12:44 15  that's fine.  Actually, let me ask you a question.
12:44 16  You said that you don't generally write down what
12:44 17  you eat, so is it your testimony that unless you
12:44 18  write it down, you don't remember?
12:44 19    A  No.
12:44 20    MR. HOARE:  Objection, argumentative.
12:44 21    Q  Do you need to have things written down in
12:44 22  order to remember them?
12:44 23    A  Not necessarily.
12:44 24    Q  But you don't remember what you ate on
12:44 25  Friday and you didn't write that down, is that

Page 147

12:44 1  correct?
12:44 2    MR. HOARE:  Asked and answered.
12:44 3    A  I don't recall what I ate on Friday.
12:44 4    Q  And you didn't write it down?
12:44 5    A  Most likely not.
12:44 6    Q  Okay.  Do you remember if you wrote it
12:44 7  down?
12:44 8    A  I would not have written down what I ate.
12:45 9    Q  Do you have any independent recollection
12:45 10  of not doing it or doing it?
12:45 11    MR. HOARE:  Objection, compound question.
12:45 12    A  No, I do not recall writing down what I
12:45 13  ate.
12:45 14    Q  Okay.  All right.  Okay, continue to look
12:45 15  at Exhibit 16 and let me know when you've finished.
12:45 16  And again, I'm going to direct you to the specific
12:45 17  paragraph, but --
12:46 18    MR. HOARE:  Is there a particular portion?
12:46 19    MR. GORE:  I said I was going to direct
12:46 20  her to.  You've been having her read the entire
12:46 21  document, but I'm going to direct her to a specific
12:46 22  paragraph.
12:46 23  BY MR. GORE:
12:46 24    Q  Are you ready, Ms. Scott, or do you want
12:46 25  more time to look at the document?

Page 148

12:46 1    A  Okay.
12:46 2    Q  Okay.  I'd like for to you look at --
12:46 3  well, let me ask you this first.  This was the
12:46 4  supplemental complaint that was filed by your
12:46 5  counsel in this case.  Have you seen this before?
12:46 6    A  At the time, I -- I don't recall.
12:46 7    Q  Okay.  You don't recall whether you saw
12:46 8  your complaint in this lawsuit before?
12:46 9    A  I'm not certain.
12:46 10    Q  Okay.  Look at page 2 and let me ask you
12:46 11  this:  Do you know what a complaint is, just
12:46 12  generally?
12:47 13    A  I would imagine I would know what it is.
12:47 14    Q  Okay.  Because you don't remember whether
12:47 15  you've ever seen this before, before I started
12:47 16  asking you about it, do you have a general -- what
12:47 17  do you think -- what do you understand this to be,
12:47 18  meaning Exhibit 16?
12:47 19    A  I'm not certain.
12:47 20    Q  Okay.  This is the formal document that
12:47 21  has been filed on your behalf in the court setting
12:47 22  forth the claims against Congressman Alexander's
12:47 23  office.  I believe counsel would agree that that's
12:47 24  an accurate statement.  Do you understand that to be
12:47 25  the case, Ms. Scott?

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 149

12:47 1    A   If that's what you're saying it is.
12:47 2    Q   Okay.  And these are the specific
12:47 3    allegations that are being made or the general
12:47 4    allegations that are being made in this case, so I'm
12:47 5    going to ask you about that.  If you look at page 2,
12:47 6    it says, paragraph 10, defendant removed plaintiff
12:47 7    from her position as scheduler and transferred her
12:48 8    to a lesser position as staff assistant with lesser
12:48 9    duties and responsibilities at least in part because
12:48 10   she resisted the misconduct referenced above and
12:48 11   complained of possible sex discrimination.  Do you
12:48 12   see that?
12:48 13   A   Yes.
12:48 14   Q   Okay.  Let me just ask you right now, do
12:48 15   you -- do you agree that that's a -- do you believe
12:48 16   that's a true statement?
12:48 17   A   For the most part, yes.
12:48 18   Q   How is it untrue?
12:48 19   A   I'm not certain.  I --
12:49 20   Q   Let me just be clear.  I'm waiting for a
12:49 21   response because you said, "For the most part, yes."
12:49 22   Typically, when somebody says "for the most part,"
12:49 23   that means that there's something about it that is
12:49 24   untrue.  Is that your testimony?
12:49 25        MR. HOARE:  Objection, misstates the

---

Page 150

12:49 1    witness's testimony.  It's argumentative.
12:49 2    Q   Ms. Scott?
12:49 3    A   I believe it to be true.
12:49 4    Q   In whole?  Totally?
12:49 5    A   Yes.
12:49 6    Q   Okay.  So why did you say, quote, for the
12:49 7    most part, yes, close quote, before?
12:49 8    A   I'm not certain.
12:49 9    Q   Do you recall saying "for the most part"?
12:49 10   A   Yes.
12:49 11   Q   Okay.  But you don't know why you said it?
12:49 12   A   No.
12:49 13        MR. HOARE:  Objection, argumentative.
12:49 14   Q   Okay.  Now, if you'd look at paragraph 11,
12:49 15   it says defendant made plaintiff's working
12:49 16   conditions so intolerable after she complained of
12:49 17   unlawful discrimination that plaintiff reasonably
12:49 18   felt compelled to quit her job.  Do you see that?
12:50 19   A   Yes.
12:50 20   Q   And, by the way, do you know who the
12:50 21   defendant is?
12:50 22   A   Yes.
12:50 23   Q   Who is the defendant?
12:50 24   A   Congressman Alexander.
12:50 25   Q   It's actually the office of Congressman

---

Page 151

12:50 1    Alexander.  Do you know who the plaintiff is?
12:50 2    A   Yes.
12:50 3    Q   Who is the plaintiff?
12:50 4    A   Me.
12:50 5    Q   Okay.  So looking at paragraph 11 there,
12:50 6    is that a true statement?
12:50 7    A   Yes.
12:50 8    Q   Okay.  What working conditions were made
12:50 9    so intolerable after you complained?
12:50 10   A   Can you please explain who you are
12:50 11   referring to that I complained to?
12:50 12   Q   It's your complaint, and I'm asking you.
12:50 13   You say "defendant made plaintiff's working
12:50 14   conditions so intolerable after she complained of
12:50 15   unlawful discrimination."  It's your complaint, and
12:50 16   I'm asking you:  What working conditions were made
12:51 17   so intolerable after you complained of your complaint?
12:51 18   A   I had been complaining for months.
12:51 19   Q   What working conditions were made so
12:51 20   intolerable?
12:51 21   A   The unnecessary comments, the leering that
12:51 22   went on day after day, coming behind my desk,
12:51 23   trapping me at my desk, kissing my head, putting --
12:51 24   when I make these comments, it's in reference to all
12:51 25   from Royal.  Touching me up to the point of putting

---

Page 152

12:52 1    his hands near my breasts and enjoying it, making
12:52 2    reference to my being sexy.
12:52 3    Q   Anything else?
12:52 4    A   Not that I can remember at this time.
12:52 5    Q   Okay.  Now, you said those were the
12:52 6    working conditions that were made so intolerable
12:53 7    after you complained.  So I guess the first thing
12:53 8    I'm going to say is that you mentioned that this was
12:53 9    all engaged in by Royal.  Is that your testimony?
12:53 10   A   Yes.
12:53 11   Q   Did anyone else engage in this behavior
12:53 12   towards you?
12:53 13   A   No.
12:53 14   Q   Okay.  Was Royal -- is it your testimony
12:53 15   that Royal was aware you had complained at any
12:53 16   point?
12:53 17   A   I'm not certain if he was aware or not.
12:53 18   Q   Okay.  So is it your testimony that after
12:53 19   you complained, he intentionally made your work
12:53 20   conditions intolerable because you had complained?
12:53 21        MR. HOARE:  Argumentative.
12:53 22   A   The working conditions were intolerable, I
12:53 23   felt, because I resisted his sexual advances.
12:53 24   Q   And when you say "sexual advances," are
12:53 25   you referring to that sort of block of items that

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 153

12:53 1    you just testified to?
12:53 2        A   I at times would ask him to stop staring
12:53 3    at me, ask him if he needed anything, could I
12:54 4    help -- could I help him with any work needed in the
12:54 5    office. I refused to go to lunch with him when he
12:54 6    asked on occasions. I told him his comments of my
12:54 7    sexy legs and touching me were inappropriate. He
12:54 8    didn't understand why.
12:54 9        Q   Do you think it was -- withint conceding
12:54 10   that that's what occurred, do you think it was
12:54 11   appropriate -- it is appropriate for one employee to
12:54 12   touch another employee's legs?
12:54 13       A   No, especially when they're your
12:54 14   supervisor.
12:54 15       Q   Okay. Anything else that constitutes
12:54 16   these what you call sexual advances by Royal? I
12:54 17   want the full extent of everything that you claim
12:54 18   Royal did.
12:55 19       A   Not that I can recall at this time.
12:55 20       Q   Okay. So I'm going to go through this,
12:55 21   because this is real important, all right? I'm
12:55 22   going to read each one, and I want you to tell me if
12:55 23   there's anything else you remember that Royal did
12:55 24   that you claimed was inappropriate.
12:55 25           Unnecessary comments, leering, coming

Page 154

12:55 1    behind your desk, trapping me at my desk, kissing me
12:55 2    on my head, touching me up to the point of putting
12:55 3    his hands near my breast and enjoying it, making
12:55 4    reference to my being sexy. I would ask him to stop
12:55 5    staring at me. Could I help him with anything, any
12:55 6    work if he needed it in the office. Refused to go
12:55 7    to lunch when him when he'd ask you, and comments
12:55 8    regarding your sexy legs. Is there anything else
12:55 9    you remember other than those that we've just --
12:55 10   I've just repeated?
12:56 11       A   There were times in my absence when he
12:56 12   said the office wasn't the same without me. He
12:56 13   called me Sweet Elizabeth frequently and on numerous
12:56 14   occasions.
12:56 15       Q   And you claim that both of those were
12:56 16   sexual advances?
12:56 17       A   Yes.
12:56 18       Q   Okay. Anything else?
12:56 19       A   He would often call me from his office and
12:56 20   ask me to pick up his papers off the printer or get
12:56 21   him a cup of coffee, and when I would go into his
12:56 22   office he would always most likely and typlcally
12:57 23   make a sexual comment about my legs or my being
12:57 24   sexy. On one occasion, he -- it could have been on
12:57 25   several occasions, actually -- he acknowledged that

Page 155

12:57 1    he knew some of his behavior could be constituted as
12:57 2    sexual harassment but that he didn't feel like it
12:57 3    would be taken that way.
12:57 4        Q   How'd you respond when he told you that?
12:57 5        A   I said it was, that it was inappropriate.
12:57 6        Q   Your testimony is that Royal told you that
12:57 7    he recognized that some of his behavior could be
12:57 8    taken as sexual harassment?
12:57 9        A   Yes.
12:57 10       Q   And your testimony is that you told him
12:57 11   that you thought it was --
12:57 12       A   It --
12:57 13       Q   -- at the time? That's your testimony?
12:57 14       A   As far as I can recall, at this time, it
12:58 15   was something he said in front of myself and
12:58 16   Danielle. He knew that a lot of his comments could
12:58 17   be construed as sexual harassment and that he didn't
12:58 18   feel like it would be taken that way. And it was
12:58 19   agreed by myself and Danielle that, yes, his
12:58 20   comments were sexual harassment.
12:58 21       Q   My testimony -- or my question is this,
12:58 22   though, Ms. Scott, did you tell Royal that?
12:58 23       A   It was --
12:58 24       Q   Not was it agreed.
12:58 25       A   It was said.

Page 156

12:58 1        Q   Did you, you, Elizabeth Scott, tell Royal
12:58 2    that?
12:58 3        A   It was said, yes.
12:58 4        Q   Did you -- I'm going to repeat the
12:58 5    question, because it was nonresponsive. Did you,
12:58 6    Elizabeth Scott, tell Royal that?
12:58 7            MR. HOARE:  Objection to counsel's
12:58 8    statement. It's argumentative. You may answer.
12:58 9        Q   Did you, Elizabeth Scott, tell Royal that?
12:58 10   I want to know your testimony under oath.
12:59 11       A   Yes.
12:59 12           MR. HOARE:  Argumentative.
12:59 13       Q   You did? What specifically did you say?
12:59 14       A   At this time, I don't recall specifics.
12:59 15       Q   When was this?
12:59 16       A   I don't recall specifically exactly when.
12:59 17       Q   Can you explain to me how we have gone
12:59 18   through three hours with not recalling everything
12:59 19   and now we're back to not recalling everything but
12:59 20   all of a sudden you recall these details?
12:59 21           MR. HOARE:  Objection, argumentative.
12:59 22       A   I don't recall specific dates and times.
12:59 23   I do recall a lot of the details.
12:59 24       Q   And my question is:  What specifically did
12:59 25   you say to Royal in response to his alleged commen

38 (Pages 153 to 156)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 157

12:59 1 about his comments being attributable or construed
12:59 2 as sexual harassment?
12:59 3     A   I don't recall word for word.
12:59 4     Q   Do you recall any of the words you
12:59 5 uttered?
12:59 6     A   I don't recall word for word, or any of
12:59 7 the words.
12:59 8     Q   Do you recall any other behavior that
12:59 9 Royal engaged in other than what you've testified to
01:00 10 that you claim is inappropriate towards you?
01:00 11     A   He commented to myself and my sisters at
01:00 12 the Christmas party in Louisiana that we were the
01:00 13 sexiest sisters he had ever seen, that we must have
01:00 14 come from good genes, and he persisted to follow us
01:00 15 back to the hotel, and which we told him it wasn't
01:00 16 necessary, but he still -- he still persisted and
01:00 17 refused to let us go back ourselves.
01:00 18     Q   And so you're saying he went to your hotel
01:00 19 with you?  Is that your testimony?
01:00 20     A   To the driveway of the hotel.
01:00 21     Q   And then left?
01:00 22     A   He lingered for a while and then left.
01:00 23     Q   Did he do anything at the driveway of the
01:01 24 hotel other than linger?
01:01 25     A   He continued to say that we were -- my

---

Page 158

01:01 1 sisters and I were very sexy and to have a safe trip
01:01 2 to Alabama.
01:01 3     Q   How long was this trip from where the
01:01 4 party was to the driveway of the hotel?
01:01 5     A   I don't recall specifically.
01:01 6     Q   But you do recall specifically what he
01:01 7 said, and you do recall specifically that he was in
01:01 8 the driveway?
01:01 9     MR. HOARE:  Objection, argumentative.
01:01 10     Q   Is that correct?
01:01 11     MR. HOARE:  Same objection.
01:01 12     Q   Is that correct?
01:01 13     MR. HOARE:  Same objection.
01:01 14     Q   Answer my question.
01:01 15     A   I don't recall word for word exactly what
01:01 16 was said.  What I have told you is what I remember
01:01 17 him saying.
01:01 18     Q   When was this?
01:01 19     A   On the night of the company or the office
01:01 20 Christmas party in Alexandria.
01:01 21     Q   What date?
01:01 22     A   I don't recall the date.
01:01 23     Q   Was it in December?
01:01 24     A   I believe so.
01:02 25     Q   Anything else that Royal allegedly engaged

---

Page 159

01:02 1 in that you contend -- towards you that you contend
01:02 2 is inappropriate?
01:02 3     A   Not that I can recall at this time.
01:02 4     Q   So this is the full extent of it?
01:02 5     A   At this time.
01:02 6     MR. HOARE:  Objection, argumentative.
01:02 7     Q   This is the full extent of what you can
01:02 8 recall?
01:02 9     A   At this time, this is what I remember.
01:02 10     Q   Okay.  What do you mean when you say "at
01:02 11 this time"?
01:02 12     A   Today, this very moment.
01:02 13     Q   Okay.  Is there something that you believe
01:02 14 there's some piece of information or some other
01:02 15 source out there that would help you remember
01:02 16 something differently on another day?
01:02 17     A   I'm not certain.  It's possible.
01:02 18     Q   Well, what is it that's possible?
01:02 19     MR. HOARE:  Objection, requires
01:02 20 speculation.
01:02 21     Q   Just trying to understand your testimony.
01:02 22     MR. HOARE:  Same objection.
01:02 23     A   I could remember something tomorrow.
01:02 24     Q   But you're not remembering it today?
01:02 25     A   At this time, this is what I remember.

---

Page 160

01:02 1     Q   Okay.  What I want to do and when we take
01:03 2 our lunch break is I want to you think.  Obviously
01:03 3 you won't be speaking to your counsel about it,
01:03 4 because that's not appropriate.  But I want to you
01:03 5 think during the lunch break about anything else
01:03 6 that Royal may have done, anything at all, because
01:03 7 this is very important.  I want to you search your
01:03 8 memory for anything else you think Royal would have
01:03 9 done.
01:03 10     MR. HOARE:  She's not supposed to have
01:03 11 lunch?
01:03 12     MR. GORE:  When we take our break.
01:03 13     Q   And when I come back, I'm going to ask you
01:03 14 again, because I do, I really think it's important
01:03 15 when I get answers like "at this time," it's really
01:03 16 important because this is -- this is your
01:03 17 opportunity to tell us what you remember.
01:03 18     So did anyone else -- let me go back to
01:03 19 paragraph number 11 of Exhibit 16.  Defendant made
01:03 20 plaintiff's working conditions so intolerable after
01:03 21 she complained.  Do you have any knowledge of Royal
01:03 22 being aware that you had complained?
01:03 23     A   I'm not certain if he was aware or not.
01:03 24     Q   Okay.  Have you ever lived in the
01:04 25 Congressman's district?

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 161

01:04 1    A    No.
01:04 2    Q    What district does he represent?
01:04 3    A    The 5th district.
01:04 4    Q    Okay. How many parishes in his district?
01:04 5    A    I don't recall exactly.
01:04 6    Q    Do you have any sense for how many there
01:04 7    were?
01:04 8    A    I don't recall at this time.
01:04 9    Q    Do you know what the largest district is
01:04 10   in terms of population?
01:04 11   A    I don't recall at this time.
01:04 12   Q    Do you recall what the second largest is?
01:04 13   A    I don't recall at this time.
01:04 14   Q    Third largest?
01:04 15   A    I don't recall at this time.
01:04 16   Q    Do you know who the mayor of Monroe was
01:04 17   when you were working as a scheduler?
01:04 18   A    I don't recall.
01:04 19   Q    Do you know how to spell Watchitaw?
01:04 20       MR. HOARE: Could you spell that for me,
01:04 21   please?
01:04 22       MR. GORE: I'm asking your client. This
01:04 23   is the largest district in the Congressman's --
01:04 24   largest parish in the Congressman's district. I
01:04 25   want to know.

---

Page 162

01:04 1    A    I don't remember spelling it.
01:04 2    Q    Can you spell it now?
01:04 3    A    I don't recall at this time how to spell
01:05 4    it. I haven't had to spell it for a very long time.
01:05 5    Q    Have you ever heard of Rapides?
01:05 6    A    Yes.
01:05 7    Q    What is Rapides?
01:05 8    A    It's a parish.
01:05 9    Q    Do you know how to spell that?
01:05 10   A    I believe so.
01:05 11   Q    Okay. Please spell it. I don't know why
01:05 12   this is funny.
01:05 13       MR. HOARE: Maybe it's your presentation.
01:05 14   Q    Could you spell it, please?
01:05 15   A    R-A-P-I-D-E-S.
01:05 16   Q    What about Avoyelles? Do you know what
01:05 17   that is?
01:05 18   A    Yes.
01:05 19   Q    What is that?
01:05 20   A    A parish.
01:05 21   Q    Do you know how to spell that?
01:05 22   A    I don't recall at this time.
01:05 23   Q    Okay. Do you know how many district
01:05 24   offices Congressman Alexander had when you were a
01:05 25   scheduler?

---

Page 163

01:05 1    A    Two.
01:05 2    Q    Do you know where they were?
01:05 3    A    Alexandria and Monroe.
01:05 4    Q    Do you know what parishes they were in?
01:06 5    A    I don't recall at this time.
01:06 6    Q    What about Royal's telling you and your
01:06 7    sisters that they were the sexiest sisters he had
01:06 8    seen and that they must have come -- that you must
01:06 9    have come from good genes did you find offensive?
01:06 10   A    It was an inappropriate comment.
01:06 11   Q    Why? How?
01:06 12   A    Because he was my supervisor.
01:06 13   Q    Did he touch you when he said this?
01:06 14   A    I don't recall.
01:06 15   Q    Did he comment on any specific body part
01:06 16   when he said this?
01:06 17   A    I don't recall.
01:06 18   Q    How many times did he tell you that you
01:06 19   and your sisters were the sexiest girls and you must
01:06 20   have come from good genes?
01:07 21   A    I don't recall at this time.
01:07 22   Q    Was it more than once?
01:07 23   A    I don't recall at this time.
01:07 24   Q    Okay. Was there anything else other than
01:07 25   him making that comment and walking you to the

---

Page 164

01:07 1    driveway of the hotel in Alexandria that you thought
01:07 2    was inappropriate that he did that night?
01:07 3        MR. HOARE: Misstates the witness's
01:07 4    testimony.
01:07 5    Q    You can let me know if I've misstated it.
01:07 6    A    I don't recall at this time.
01:07 7    Q    So the only things, if I'm right, that he
01:07 8    did was he commented on being the sexiest
01:07 9    sisters that must have come from good genes and
01:07 10   followed you to the driveway, where he lingered.
01:07 11   That's it, right?
01:07 12   A    At this time, that's what I remember.
01:07 13   Q    Okay. Did you tell him at that point that
01:07 14   you didn't appreciate it?
01:07 15   A    I don't recall at this time.
01:07 16   Q    Had you been drinking that evening?
01:07 17   A    I don't recall.
01:07 18   Q    Had your sisters been drinking?
01:07 19   A    I don't recall at this time.
01:07 20   Q    Had Royal been drinking?
01:07 21   A    I don't recall at this time.
01:08 22   Q    Okay. How many times did he comment about
01:08 23   your legs?
01:08 24   A    I don't recall at this time.
01:08 25   Q    Was it more than once?

---

40 (Pages 161 to 164)

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 165

01:08 1    A  I don't recall at this time.
01:08 2    Q  Do you believe that it was more than once?
01:08 3    A  I'm not certain.
01:08 4    Q  Okay.  How many times did he tell you you
01:08 5  were sexy?
01:08 6    A  At this time, I don't recall.
01:08 7    Q  Was it more than once?
01:08 8    MR. HOARE:  Excuse me?
01:08 9    Q  Ms. Scott?
01:08 10   A  Can you repeat the question, please?
01:08 11   Q  I said how many times did he tell you you
01:08 12  were sexy?  And you said, "I don't recall."  I said,
01:08 13  "Was it more than once?"
01:08 14   A  It was on numerous occasions.
01:08 15   Q  When you say "numerous," are we talking
01:08 16  two, three, four?  Are we talking a hundred or 200?
01:09 17  Give me some range.
01:09 18   A  I don't recall specific how many times.  I
01:09 19  didn't count.
01:09 20   Q  Was it more than five?
01:09 21   A  It was very frequent.  I don't recall.
01:09 22   Q  But do you believe that it was more than
01:09 23  five times?
01:09 24   A  I don't recall at this time.
01:09 25   Q  So it could have been less than five

Page 166

01:09 1  times?
01:09 2    A  I don't recall at this time.
01:09 3    MR. HOARE:  Objection, argumentative.
01:09 4    Q  Now, you also said he called you Sweet
01:09 5  Elizabeth.
01:09 6    A  Yes.
01:09 7    Q  What is inappropriate about that from your
01:09 8  perspective?
01:09 9    A  Given the other behavior up -- it made me
01:09 10  feel very uncomfortable.
01:09 11   Q  Did you ever tell him that it made you
01:09 12  feel uncomfortable that he called you Sweet
01:09 13  Elizabeth?
01:09 14   A  I told him it wasn't necessary.
01:09 15   Q  And what did he say?
01:09 16   A  I don't recall.
01:09 17   Q  When did you make this comment to him?
01:09 18   A  I don't recall at this time.
01:09 19   Q  How many times did you tell him it wasn't
01:09 20  necessary?
01:09 21   A  I don't recall at this time.
01:09 22   Q  More than once?
01:10 23   A  I don't recall.
01:10 24   Q  Are you aware that he called other women,
01:10 25  whether they were in the office or otherwise,

Page 167

01:10 1  "Sweet" before when he referred to them?
01:10 2    MR. HOARE:  Objection, assumes facts not
01:10 3  in evidence.
01:10 4    Q  I'm just asking you if you know.
01:10 5    A  I -- I don't know.
01:10 6    Q  Have you ever heard him refer to other
01:10 7  women as "Sweet"?
01:10 8    A  Not that I recall.
01:10 9    Q  Okay.  Now did, he call you Sweet
01:10 10  Elizabeth when you told him that your grandfather
01:10 11  had died and he said he was sorry and wanted to give
01:10 12  you a hug?
01:10 13   A  I don't recall.
01:10 14   Q  Would you think it would be inappropriate
01:10 15  if he said it in that context?
01:10 16   MR. HOARE:  If he said Sweet Elizabeth in
01:10 17  the context of her --
01:10 18   MR. GORE:  Trying to console her after her
01:10 19  grandfather died.
01:10 20   A  I'm uncertain.
01:10 21   Q  Do you recall him trying to console you?
01:10 22   A  I -- he may have.  I don't recall.
01:11 23   Q  Do you think that was inappropriate?
01:11 24   A  Everybody relayed their condolences.
01:11 25   Q  But it was only inappropriate if Royal did

Page 168

01:11 1  it?
01:11 2    A  No.  Given that a family member had just
01:11 3  passed away, I was -- condolence is from anyone.
01:11 4    Q  So are you contending that if Royal wants
01:11 5  to give you a hug and called you Sweet Elizabeth in
01:11 6  response to your -- his learning your grandfather
01:11 7  had died that that would be inappropriate?
01:11 8    A  Given that on the occasions where he said
01:11 9  or insinuated he wanted or needed to give me a big
01:11 10  hug, he enjoyed the hugs well beyond the hug of
01:11 11  passing on condolences, or being a friend.
01:12 12   Q  How?
01:12 13   A  He pulled me very close to his body.  He
01:12 14  would oftentimes kiss me on the head or the
01:12 15  forehead, wrap his arms around my body, give me a
01:12 16  big squeeze.
01:12 17   Q  How many times did he do that?
01:12 18   A  I don't recall.
01:12 19   Q  More than once?
01:12 20   A  I don't recall at this time.
01:12 21   Q  So you don't recall if it happened more
01:12 22  than one time?
01:12 23   A  It was frequent.
01:12 24   Q  Was it more than five times?
01:12 25   A  I don't recall the exact number.

41 (Pages 165 to 168)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                   Taken on May 21, 2007

---

**Page 169**

01:12 1    Q  Do you recall if it was more than five?
01:12 2    A  I don't recall at this time.
01:12 3    Q  So it could have been less than five?
01:12 4    A  I didn't count.
01:12 5    Q  Okay.  So it could have been less than
01:12 6  five?
01:12 7    A  It was very frequent.
01:12 8    Q  So it could have been less than five?
01:12 9    A  I don't recall at this time.
01:12 10    Q  Okay.  Did you ever tell him that you
01:12 11  didn't like when he hugged you?
01:13 12    A  I would try to pull away.  I would
01:13 13  oftentimes try to avoid a hug.
01:13 14    Q  Did you think your trying to pull away was
01:13 15  evidence that you didn't like it?
01:13 16    A  It was nonverbal communicative behavior.
01:13 17    Q  So somebody trying to pull away when
01:13 18  another one makes a physical advance is nonverbal
01:13 19  communicative behavior that they are rejecting the
01:13 20  advance?
01:13 21    A  In this particular case, my pulling away
01:13 22  was my way of telling him I -- it made me feel very
01:13 23  uncomfortable.
01:13 24    Q  Okay.  My question was:  So somebody
01:14 25  trying to pull away when another one makes a

---

**Page 170**

01:14 1  physical advance is nonverbal communicative behavior
01:14 2  that they are rejecting the advance, in your mind?
01:14 3  Is that your testimony?
01:14 4    A  Not necessarily.
01:14 5    Q  How?  How is it not?  Explain that.
01:14 6      MR. HOARE:  Vague and ambiguous, requires
01:14 7  definition.
01:14 8    Q  What do you mean when you say "not
01:14 9  necessarily"?
01:14 10    A  Specifically, when it was Royal, yes, my
01:14 11  pulling away, I did, because I felt very
01:14 12  uncomfortable with him pulling me close to him,
01:14 13  touching me, moving his hands around me when he was
01:15 14  hugging me.  He didn't need to do that.  That's very
01:15 15  different from a hug you would receive from a
01:15 16  father, a friend.
01:15 17    Q  So do you believe that someone's pulling
01:15 18  away is a nonverbal way of expressing that they
01:15 19  don't like someone hugging them?
01:15 20      MR. HOARE:  Argumentative.
01:15 21    A  Please define "someone."
01:15 22    Q  Do you -- anyone.
01:15 23      MR. HOARE:  I'm sorry, I think she was
01:15 24  answering your question.
01:15 25      MR. GORE:  I thought she was finished.

---

**Page 171**

01:15 1  She asked me to define something.  But I'll be
01:15 2  happy -- please continue.
01:15 3      MR. HOARE:  Well then maybe I
01:15 4  misunderstood.
01:15 5      THE WITNESS:  Please define "someone."
01:15 6    Q  Okay.  Do you believe that when one human
01:15 7  being pulls away from another who is engaging in a
01:15 8  physical approach that that is evidence that they
01:15 9  are rejecting and uncomfortable with the physical
01:15 10  approach?
01:15 11    A  It can.
01:16 12    Q  Did Royal ever ask you to have sex with
01:16 13  him?
01:16 14    A  No.
01:16 15    Q  Did Royal ever ask you to marry him?
01:16 16    A  No.
01:16 17    Q  Did Royal ever touch your breasts?
01:16 18    A  His hands at one point were on the sides,
01:16 19  very, very close to if not touching the underwire of
01:16 20  my bra.
01:16 21    Q  Is this when he was helping you down from
01:16 22  the chair?
01:16 23    A  That's an occasion.
01:16 24    Q  Did he touch the underwire of your bra on
01:16 25  any other occasion?

---

**Page 172**

01:16 1    A  I don't recall at this time.
01:16 2    Q  So he did -- he never touched your
01:16 3  breasts, is that true?
01:16 4      MR. HOARE:  Objection, argumentative.
01:16 5      MR. GORE:  I want to know if the person
01:16 6  she's claiming is the harasser ever touched her
01:16 7  breasts.  I think it's a fairly simple question.
01:16 8      MR. HOARE:  Don't argue with me.
01:16 9    Q  Elizabeth -- excuse me.  Ms. Scott.
01:16 10    A  The underwire of my bra touched my
01:16 11  breasts.  His hands were there.
01:16 12    Q  Ms. Scott, did Royal Alexander ever touch
01:17 13  your breasts?  Yes or no?
01:17 14      MR. HOARE:  Objection, it's argumentative.
01:17 15    A  Define the area of the breast you're
01:17 16  referring to, please.
01:17 17    Q  What do you think of when I say "breasts"?
01:17 18  How do you define it?
01:17 19    A  He was touching the underwire of my bra,
01:17 20  which touches my breasts.  His hands were in an
01:17 21  inappropriate location.
01:17 22    Q  Where were his hands?  Show me physically
01:17 23  on yourself.
01:17 24      And that's when he was helping you down
01:17 25  from the chair?

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 173

01:17 1    A    Yes.
01:17 2    Q    And you only remember him doing that one
01:17 3    time?
01:17 4    A    At this time, that's what I recall.
01:17 5    Q    Did you tell him that you didn't think it
01:17 6    was appropriate when he did that?
01:18 7    A    Yes.
01:18 8    Q    What did he say?
01:18 9    A    He said he was trying to help me down from
01:18 10   the chair.
01:18 11   Q    And what did you say?
01:18 12   A    I said, "You could have extended your
01:18 13   hand. That was all I needed."
01:18 14   Q    And what did he say?
01:18 15   A    I don't recall at this time.
01:18 16   Q    Did he ever do it again?
01:18 17   A    I don't recall at this time.
01:18 18   Q    You don't remember him ever doing it
01:18 19   again?
01:18 20   A    At this time, that's what I recall.
01:18 21   Q    Do you ever remember him touching you
01:18 22   other than when he gave you a hug at any other time?
01:18 23       MR. HOARE:  Other than what she's already
01:18 24   testified to?
01:18 25   A    Any times other than what I've already

Page 174

01:18 1    told you there?
01:18 2    Q    Yes.
01:18 3    A    At this time, my testimony there is what I
01:18 4    remember.
01:18 5    Q    And then my last couple of questions, then
01:18 6    we will go for lunch, is do you believe that it's --
01:18 7    let me ask you this:  Do you know Brent Leatherwood?
01:18 8    A    Yes.
01:18 9    Q    Who is he?
01:18 10   A    He was a friend.
01:18 11   Q    Let me back up.  Did Royal hug men?
01:18 12   A    I don't recall.
01:18 13   Q    You don't ever recall seeing Royal hug
01:18 14   Adam?
01:18 15   A    I'm sure he did.
01:19 16   Q    Do you ever recall seeing Royal hug Jack?
01:19 17   A    He possibly could have.
01:19 18   Q    Do you recall seeing him hug Congressman
01:19 19   Alexander?
01:19 20   A    I'm sure he may have on occasion.
01:19 21   Q    Did you ever hug Congressman Alexander?
01:19 22   A    I don't recall.
01:19 23   Q    Did you ever hug Adam?
01:19 24   A    I don't recall at this time.

Page 175

Redacted

Redacted

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 181

02:06 1          - AFTERNOON SESSION -
02:06 2    BY MR. GORE:
02:13 3        Q    Ms. Scott, I will remind you that you're
02:13 4    still under oath, and that means, just like before,
02:13 5    that you're obligated to testify truthfully.  Do you
02:13 6    understand that?
02:13 7        A    Yes.
02:13 8        Q    And all the same rules from this morning
02:13 9    still apply.
02:13 10        Let's go back to a couple of things to
02:13 11    just clarify.  When I asked you before we took a
02:13 12    lunch break to show me how Royal touched you that
02:13 13    time when he was helping you down from the chair
02:13 14    when you said that he touched close to your breast,
02:14 15    do you remember that?
02:14 16        A    Yes.
02:14 17        Q    Okay.  I neglected to describe on the
02:14 18    record how you did that, so I'd like for you to show
02:14 19    me again.  And then I'm going to describe it and you
02:14 20    can ask if it's accurate.
02:14 21        A    Okay.  So --
02:14 22        Q    Just do that again and I'm going to
02:14 23    describe for you and your counsel and for the
02:14 24    record what -- how he touched you.  Physically show
02:14 25    us.

---

Page 182

02:14 1        A    All right.  He put his hands on my waist
02:14 2    or mid.  He moved them up to be parallel with my
02:14 3    breast, touching the underwire, and continued to
02:14 4    caress my sides and moving his hands up and down
02:14 5    until I -- my feet were on the ground.
02:14 6        Q    Okay.  Now, when you did that, you said
02:14 7    his hands were parallel to your breasts, but your
02:14 8    hands went -- didn't go parallel, they went up to
02:14 9    your breasts but not parallel to them.
02:14 10        A    This is parallel.
02:15 11        Q    Okay.
02:15 12        A    Maybe you don't know where my breasts are,
02:15 13    but this is parallel.
02:15 14        Q    I want to make sure it's clear for the
02:15 15    record.  And how long was it that this occurred that
02:15 16    he was having his hands in this area of your body?
02:15 17        A    I don't recall exactly.
02:15 18        Q    And where were you when this happened?
02:15 19        A    Meaning location?
02:15 20        Q    Yeah.
02:15 21        A    In -- standing on a chair next to where
02:15 22    the supplies were kept in our office.
02:15 23        Q    And where was that?
02:15 24        A    In a corner of the office where we all had
02:15 25    our desks.

---

Page 183

02:15 1        Q    Okay.  So just so that I understand what
02:15 2    you're saying, when you walk into the -- the -- when
02:15 3    you walk into the office -- and follow me here, all
02:15 4    right?  You walk into the office, the front door.
02:15 5    You go to your left.  There's a -- sort of a place
02:15 6    where a receptionist or somebody can sit.  To the
02:16 7    right, there's another place.  Do you follow me so
02:16 8    far?
02:16 9        A    Yes.
02:16 10        Q    You look straight ahead.  There's a wall
02:16 11    with a couch.
02:16 12        A    Yes.
02:16 13        Q    Okay.  You look back that way, the wall,
02:16 14    there's a door, and that goes into the office that
02:16 15    Royal had, correct?
02:16 16        A    Yes.
02:16 17        Q    And you look towards the left and it goes
02:16 18    into the Congressman's office.  And you look towards
02:16 19    the right and it goes into this other area where all
02:16 20    the desks were.  Okay, is that correct?
02:16 21        A    Correct.
02:16 22        Q    Okay.  And so was the supply closet that
02:16 23    you're talking about, was it back in that area
02:16 24    towards the right where all the desks were?
02:16 25        A    Yes.

---

Page 184

02:16 1        Q    Okay.  Who else was present?
02:16 2        A    I don't recall at the time.
02:16 3        Q    Was it during the day?
02:16 4        A    Most likely.
02:16 5        Q    And were there other people there?
02:16 6        A    Yes.
02:16 7        Q    Did anyone else see Royal's helping you
02:16 8    down off the chair?
02:16 9        A    I don't recall at this time.
02:16 10        Q    Did you comment to anyone about it at the
02:16 11    time?
02:16 12        A    Yes.
02:16 13        Q    Who?
02:17 14        A    I spoke with Linda and Jodee about it.
02:17 15        Q    We will get to that in a minute.
02:17 16        When this occurred, just so I understand,
02:17 17    you were standing up on a chair to get something.
02:17 18    Is that what happened?
02:17 19        A    Yes.
02:17 20        Q    Okay.  Do you remember what it was you
02:17 21    were getting?
02:17 22        A    I don't recall.
02:17 23        Q    Okay.  Do you remember if it was one of
02:17 24    those chairs that -- one of those chairs that had
02:17 25    wheels on it?

---

45 (Pages 181 to 184)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 185

02:17 1    A  I don't recall at this time.
02:17 2    Q  Okay.  And do you remember when you got
02:17 3  down if you were holding something in your hands?
02:17 4    A  I don't recall at this time.
02:17 5    Q  So you don't remember whether you got it
02:17 6  or not, whatever you were getting, when you got
02:17 7  down?
02:17 8    A  I don't recall.
02:17 9    Q  Okay.  But you do remember Royal putting
02:17 10  his hands to help you down?
02:17 11    A  Yes.
02:17 12    Q  Okay.  Just -- I understand that you don't
02:17 13  recall.  Let's try this, because this is an
02:17 14  important point.  Was it -- when you think of
02:17 15  somebody getting up to pick something up off a shelf
02:17 16  or wherever it might be on a chair and getting down,
02:18 17  that's a process once they're getting down that
02:18 18  normally takes a few seconds.  Would you agree with
02:18 19  that?
02:18 20    A  Maybe.
02:18 21    Q  So, I mean, I'm just trying to imagine how
02:18 22  long it was that you felt Royal's hands were you on
02:18 23  you in an inappropriate way.
02:18 24    A  I don't recall at this time.
02:18 25    Q  Do you think it was more than two or three

Page 186

02:18 1  seconds?
02:18 2    A  I don't recall at this time.
02:18 3    Q  What do you recall about how long it
02:18 4  lasted?
02:18 5    A  It was long enough for him to move his
02:18 6  hands all down my midriff and feel the area around
02:18 7  my bra where my breasts are.
02:18 8    Q  And how do you know that his doing this
02:19 9  was not actually to help you down off the chair?
02:19 10  Let me rephrase that.  Strike that.
02:19 11        He was helping you off the chair, is that
02:19 12  correct?
02:19 13    A  That's what he said he was doing.
02:19 14    Q  And regardless of what he may have done
02:19 15  during that process, do you dispute that he was
02:19 16  helping you off the chair?
02:19 17        MR. HOARE:  Objection, vague and
02:19 18  ambiguous.
02:19 19    Q  Is it your contention in this case that he
02:19 20  never helped you off the chair?
02:19 21    A  I didn't consider it to be helping me.
02:19 22    Q  Explain.
02:19 23    A  I didn't need help getting off the chair.
02:19 24  I didn't ask for it.
02:19 25    Q  Did you believe that he thought he was

Page 187

02:19 1  helping you off the chair?
02:19 2        MR. HOARE:  Requires speculation.
02:19 3    A  I don't know what he thought.
02:19 4    Q  You may not have asked for help, but --
02:20 5  and what did you do after this -- this occurred
02:20 6  after you spoke with him?  What did you go to do
02:20 7  next?
02:20 8    A  Explain what you mean.  In regards to what
02:20 9  I spoke with him about.
02:20 10    Q  Well, you -- you said you got up to get
02:20 11  something, you were on the chair, and he put his
02:20 12  hands around you in helping you down.  What did you
02:20 13  do next?
02:20 14        MR. HOARE:  Mischaracterizes the witness's
02:20 15  testimony.  You may answer.
02:20 16    Q  What did you do after he helped you down
02:20 17  the chair, whatever the case was?
02:20 18        MR. GORE:  Michael, please do not testify
02:20 19  for the witness.
02:20 20        MR. HOARE:  Well, you're putting words in
02:20 21  her mouth.
02:20 22        MR. GORE:  If I'm saying it incorrectly,
02:20 23  she can help me.  You don't have to testify for her.
02:20 24        MR. HOARE:  I can object, and that's my
02:20 25  purpose here, and that's what I'm doing.  I think

Page 188

02:20 1  your question is inartful, but apart from that, it's
02:20 2  also objectionable.
02:20 3    Q  What was the next action you took after
02:20 4  you got down from him helping you off the chair?
02:20 5    A  I don't recall exactly.  I told him he did
02:21 6  not -- I did not need help getting down from the
02:21 7  chair.
02:21 8    Q  We have been through that.  But what else
02:21 9  did you do?
02:21 10    A  I don't recall exactly.
02:21 11    Q  Do you recall anything else about the rest
02:21 12  of the day?
02:21 13    A  I know I -- if I recall correctly, I later
02:21 14  on spoke with Linda and Tommie about what had
02:21 15  happened.
02:21 16    Q  Okay.  Other than talking to Linda and
02:21 17  Tommie, because we will get into this, this day when
02:21 18  this occurred -- and when was this again?
02:21 19    A  I don't recall exactly.
02:21 20    Q  Oh, you don't recall.  Do you remember
02:21 21  what month?
02:21 22    A  Not at this time, no.
02:21 23    Q  Was it when you were a scheduler or an
02:21 24  intern?
02:21 25    A  A scheduler.

Reported by:
Mary Ann Payonk, CRR-RDR

Page 189

| | | |
|---|---|---|
| 02:21 | 1 | Q   Okay.  Was it in 2005 or 2006? |
| 02:21 | 2 | A   It would have been in 2006. |
| 02:21 | 3 | Q   Was it in the winter or the spring? |
| 02:21 | 4 | A   I was only employed in the spring and |
| 02:21 | 5 | early summer. |
| 02:21 | 6 | Q   And the winter? |
| 02:21 | 7 | A   Define "winter." |
| 02:22 | 8 | Q   December, January, February of -- December |
| 02:22 | 9 | of '05, January and February of '06 I consider the |
| 02:22 | 10 | winter.  Do you not? |
| 02:22 | 11 | A   What's the question? |
| 02:22 | 12 | Q   Ms. Scott, I'm trying to find out for you |
| 02:22 | 13 | to narrow down somewhere in this six-month -- |
| 02:22 | 14 | A   I don't recall exactly when it happened. |
| 02:22 | 15 | Q   I understand you don't recall exactly. |
| 02:22 | 16 | That's perfectly clear from your testimony.  What |
| 02:22 | 17 | I'm trying to find out is during this entire |
| 02:22 | 18 | six-month period when you worked there, do you have |
| 02:22 | 19 | any sense when in that period it was? |
| 02:22 | 20 | A   Most likely sometime in the spring of '06. |
| 02:22 | 21 | Q   Spring of '06?  Okay. |
| 02:22 | 22 | And on this day in the spring of '06 when |
| 02:22 | 23 | this occurred, you've talked to us -- you've told us |
| 02:22 | 24 | about what happened, meaning his touching you, and |
| 02:22 | 25 | you've told us that you talked to Linda and Tommie, |

Page 190

| | | |
|---|---|---|
| 02:22 | 1 | which we will get to.  You don't remember what you |
| 02:22 | 2 | were getting when you got in the chair, correct? |
| 02:22 | 3 | A   No. |
| 02:22 | 4 | Q   You don't remember whether you actually |
| 02:23 | 5 | picked it up or not and brought it down with you, do |
| 02:23 | 6 | you? |
| 02:23 | 7 | A   I don't recall at this time. |
| 02:23 | 8 | Q   Other than him touching you, you talking |
| 02:23 | 9 | to him about it and then you talking to Linda and |
| 02:23 | 10 | Tommie, what else do you remember occurring on this |
| 02:23 | 11 | day? |
| 02:23 | 12 | A   I don't recall at this time. |
| 02:23 | 13 | Q   Nothing else about the day you remember? |
| 02:23 | 14 | A   Not at this time, no. |
| 02:23 | 15 | Q   Okay.  Do you remember what time of day it |
| 02:23 | 16 | was in this day in the spring of '06 that he touched |
| 02:23 | 17 | you -- |
| 02:23 | 18 | A   No, not at this time. |
| 02:23 | 19 | Q   -- when you were getting down off the |
| 02:23 | 20 | chair? |
| 02:23 | 21 | A   Not at this time, no. |
| 02:23 | 22 | Q   Okay.  So you said that you called Linda |
| 02:23 | 23 | and Tommie, is that what your testimony was? |
| 02:23 | 24 | A   I believe so. |
| 02:23 | 25 | Q   Well, tell me -- let's start with Linda. |

Page 191

| | | |
|---|---|---|
| 02:23 | 1 | Who did you call first? |
| 02:23 | 2 | A   I don't recall. |
| 02:23 | 3 | Q   Okay.  Did you telephone them? |
| 02:23 | 4 | A   Most likely, yes. |
| 02:23 | 5 | Q   Were they in the office?  Were they in |
| 02:23 | 6 | D.C.? |
| 02:23 | 7 | A   No.  They were -- most likely would not |
| 02:23 | 8 | have been. |
| 02:23 | 9 | Q   Okay.  So how else would you have been |
| 02:23 | 10 | able to speak with them other than by telephone? |
| 02:23 | 11 | A   If I recall correctly, I spoke with them |
| 02:23 | 12 | by telephone. |
| 02:23 | 13 | Q   Okay. |
| 02:23 | 14 | A   There are other forms of communication, |
| 02:24 | 15 | but I typically did not use them for this sort of |
| 02:24 | 16 | matter. |
| 02:24 | 17 | Q   You say you typically did not use them for |
| 02:24 | 18 | this sort of matter.  What kind of matter? |
| 02:24 | 19 | A   Anything I might have shared with them in |
| 02:24 | 20 | regards to Royal's behavior or things he may have |
| 02:24 | 21 | said or done. |
| 02:24 | 22 | Q   Okay.  So on this day in the spring of '06 |
| 02:24 | 23 | you said that you -- did you call Linda or did she |
| 02:24 | 24 | call you and you mentioned it in part of the |
| 02:24 | 25 | conversation? |

Page 192

| | | |
|---|---|---|
| 02:24 | 1 | A   I most likely would have called her. |
| 02:24 | 2 | Q   Okay.  What do you -- tell me everything |
| 02:24 | 3 | you remember about that conversation with Linda. |
| 02:24 | 4 | A   I don't recall specifics. |
| 02:24 | 5 | Q   Tell me everything you remember. |
| 02:24 | 6 | A   I know I specifically would have told |
| 02:24 | 7 | her -- |
| 02:24 | 8 | Q   Ms. Scott, I don't want to know what you |
| 02:24 | 9 | would have told her.  I want to know what you recall |
| 02:24 | 10 | telling her.  That's very important.  What do you |
| 02:24 | 11 | sitting here today under oath recall saying to her? |
| 02:24 | 12 | A   I recall telling her about him trying to |
| 02:25 | 13 | help me down from the chair, and instead of |
| 02:25 | 14 | extending a hand to help me down, he caressed my |
| 02:25 | 15 | body. |
| 02:25 | 16 | Q   Did you use the word "caress my body"? |
| 02:25 | 17 | A   I don't recall exactly what my terminology |
| 02:25 | 18 | was. |
| 02:25 | 19 | Q   That's what I want to know because I'm |
| 02:25 | 20 | asking you what you said to her. |
| 02:25 | 21 | A   I don't recall word for word what I said |
| 02:25 | 22 | to her. |
| 02:25 | 23 | Q   So you may not have said "caressed my |
| 02:25 | 24 | body"? |
| 02:25 | 25 | MR. HOARE:  Objection, argumentative. |

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                      Taken on May 21, 2007

Page 193

02:25  1    A  I would have described --
02:25  2    Q  I want to make very clear here, Ms. Scott.
02:25  3  I'm not asking for your characterization today.  I'm
02:25  4  asking for what you remember verbally saying to
02:25  5  Ms. -- to Linda.  That's what I'm asking for.  So
02:25  6  let's start again.  What is it that you told -- that
02:25  7  you remember telling Linda?
02:25  8    A  I remember what I've told you so far
02:26  9  telling her and that he inappropriately touched me,
02:26 10  that -- I remember referring to the manner in which
02:26 11  his hands moved up and down my body as being that of
02:26 12  caressing or enjoying, that all he needed to do was
02:26 13  extend a hand to help me down, as a gentleman.
02:26 14  There was no need for him to touch me in that
02:26 15  manner.
02:26 16    Q  Anything else you remember saying to Linda
02:26 17  on this day?
02:27 18    A  I don't recall at this time.
02:27 19    Q  Okay.  Do you remember Linda's response?
02:27 20    A  I remember her saying that it was disgusting
02:27 21  and very inappropriate and that he was disgusting.
02:27 22    Q  So she used the word "gross"?  That's your
02:27 23  testimony?
02:27 24    A  If I recall correctly.
02:27 25    Q  And it's your testimony that she used the

Page 194

02:27  1  word "very inappropriate"?
02:27  2    A  I don't recall exactly word for word
02:27  3  exactly what she said.
02:27  4    Q  Okay.  Well, that's what I want to know.
02:27  5  What words do you recall?
02:27  6    A  She related to me that it was
02:27  7  inappropriate that, it was gross, and -- and our
02:28  8  conversation that -- and I took it to mean in her
02:28  9  opinion, he was disgusting and he shouldn't have
02:28 10  done that.
02:28 11    Q  What was it about what he did that you
02:28 12  understood to be gross and disgusting?
02:28 13    A  Touching a woman inappropriately without
02:28 14  her consent, even despite her asking him to take his
02:28 15  hands off of her.
02:28 16    Q  Okay.  Two things there I want to go over.
02:28 17  But am I correct, though, that you didn't tell him
02:28 18  to take your [sic] hands off you until after you got
02:28 19  down when your -- his hands were already off of you,
02:29 20  isn't that right?
02:29 21    A  I don't know exactly when I asked him to
02:29 22  do that.
02:29 23    Q  Okay.  So what about what he did was
02:29 24  inappropriate?  You said touching a woman
02:29 25  inappropriately.  I want to understand why you

Page 195

02:29  1  believe that that was inappropriate.
02:29  2    A  Because he was my supervisor, for one.
02:29  3  And he put his hands on my middle and moved them up,
02:29  4  upwards of my body, caressing me, touching the
02:29  5  underwire of my bra where my breasts are located.
02:29  6  It's an inappropriate behavior to a woman.
02:29  7    Q  But by your own testimony am I not right
02:29  8  that while he was doing this, he was helping you get
02:29  9  down from the chair?  Isn't that correct?
02:29 10      MR. HOARE:  Argumentative.
02:29 11    Q  Isn't that correct?
02:29 12      MR. HOARE:  Same objection.
02:29 13    A  In my opinion, he was not helping me.  I
02:29 14  was getting down from the chair.
02:30 15    Q  So that we're clear, I understand there's
02:30 16  a distinction between your believing the manner in
02:30 17  which he did it was appropriate, but I thought from
02:30 18  what you said earlier -- and I'm just asking you
02:30 19  now.  I thought that you didn't dispute that, in
02:30 20  fact, he was helping you down off the chair, you
02:30 21  just disagreed with the manner.  Am I wrong?
02:30 22      MR. HOARE:  Calls for speculation.
02:30 23      MR. GORE:  I'm asking.
02:30 24      MR. HOARE:  I know.  And I'm objecting.
02:30 25  Same objection.

Page 196

02:30  1    A  He communicated to me that he was helping
02:30  2  me down.  I told him I didn't need help, that I
02:30  3  could get down on my own.
02:30  4    Q  And you told him that after he had taken
02:30  5  his hands off of you, correct?
02:30  6    A  I don't recall where told him that.  It's
02:31  7  very possible I told him while he had his hands on
02:31  8  me.
02:31  9    Q  And did he then take his hands off?
02:31 10    A  I don't recall exactly when I told him.
02:31 11    Q  Could you take a look at Exhibit Number 4,
02:31 12  please?  While you're getting it, for the record,
02:31 13  this is your May 14, 2006, e-mail to Congressman
02:31 14  Alexander that you've already read in detail
02:31 15  earlier.
02:31 16      If you look at page 2, which is DEF01360,
02:31 17  the first paragraph, the last sentence says, quote,
02:31 18  in another instance, he -- and you're referring to
02:31 19  Royal -- placed his hands around my middle and
02:31 20  proceeded to move them up and down while helping me
02:31 21  step down off of a chair.  Do you see that?
02:31 22    A  Yes.
02:31 23    Q  Okay.  So when you conveyed to Congressman
02:31 24  Alexander what had occurred, you specifically
02:31 25  understood it to be while you were being helped down

48 (Pages 193 to 196)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

| | Page 197 |
|---|---|
| 02:32 1 | off a chair, isn't that true? |
| 02:32 2 | A   At that time, it appears so. |
| 02:32 3 | Q   But since that time, you've |
| 02:32 4 | subsequently -- you've changed your impression of |
| 02:32 5 | what Royal was doing? |
| 02:32 6 | A   I wrote this letter when I was very |
| 02:32 7 | emotionally distraught, and that's what I believed |
| 02:32 8 | to be the case at that time. I also didn't include |
| 02:32 9 | every bit of detail in this letter. |
| 02:32 10 | Q   Did you -- because you don't mention |
| 02:32 11 | anything about him touching your breasts or |
| 02:32 12 | underwire in this letter, do you? |
| 02:32 13 | A   No. |
| 02:32 14 | Q   Did you ever see Royal again after you |
| 02:32 15 | sent this e-mail? |
| 02:32 16 | A   I don't recall. |
| 02:32 17 | Q   Okay. So you spoke with Linda and she |
| 02:32 18 | conveyed to you what you interpreted as her agreeing |
| 02:32 19 | that Royal's helping you get down off the chair and |
| 02:32 20 | the way he touched you was gross and inappropriate. |
| 02:32 21 | Correct so far? |
| 02:32 22 | A   Yes. |
| 02:32 23 | Q   What was said in that conversation? |
| 02:33 24 | A   I don't recall at this time. |
| 02:33 25 | Q   You don't recall if anything else was |

| | Page 199 |
|---|---|
| 02:34 1 | conclusion, and I object to counsel testifying. |
| 02:34 2 | A   Can you repeat the question, please? |
| 02:34 3 | Q   Would you agree with me that it's pretty |
| 02:34 4 | close quarters? |
| 02:34 5 | MR. HOARE:  Same objection. |
| 02:34 6 | A   Define "close quarters." |
| 02:34 7 | Q   The area where -- between Congressman |
| 02:34 8 | Alexander's office on the left in our discussion |
| 02:34 9 | before and the area where all the desks were on the |
| 02:34 10 | right is no more than the area from the length of |
| 02:34 11 | that wall to this wall, wouldn't you agree? |
| 02:34 12 | MR. HOARE:  Objection, it's argumentative, |
| 02:34 13 | calls for a conclusion. It's vague and ambiguous. |
| 02:34 14 | Q   Would you agree? |
| 02:34 15 | A   I can't agree. I don't know the exact |
| 02:34 16 | measurement. |
| 02:34 17 | Q   You would agree it's about the same, |
| 02:34 18 | though, wouldn't you? |
| 02:34 19 | A   I can't agree. I don't know the exact |
| 02:34 20 | measurement. |
| 02:34 21 | MR. HOARE:  Let the record reflect that |
| 02:34 22 | counsel's laughing at the witness, turning away, |
| 02:34 23 | rolling his eyes. |
| 02:34 24 | MR. GORE:  Counsel's not laughing at the |
| 02:34 25 | witness, counsel is smiling because of the fact that |

| | Page 198 |
|---|---|
| 02:33 1 | said? That was it? Or you just don't recall what |
| 02:33 2 | was said? |
| 02:33 3 | A   I don't recall. I don't recall at this |
| 02:33 4 | time. Linda and I spoke on the phone on many |
| 02:33 5 | occasions so I don't recall specifics as to what we |
| 02:33 6 | talked about along with that. |
| 02:33 7 | Q   You're absolutely positive that you don't |
| 02:33 8 | recall any more specifics? |
| 02:33 9 | MR. HOARE:  Objection, argumentative, |
| 02:33 10 | calls for -- |
| 02:33 11 | Q   I -- because I just want to make sure. |
| 02:33 12 | A   At this time, I don't recall any more |
| 02:33 13 | specifics. |
| 02:33 14 | Q   So you don't remember whether she told you |
| 02:33 15 | to go talk to Congressman Alexander about it? |
| 02:33 16 | A   I don't recall at this time. |
| 02:33 17 | Q   How big would you describe Congressman |
| 02:33 18 | Alexander's office to be? |
| 02:33 19 | A   Define "big." |
| 02:33 20 | Q   Describe how -- the dimensions as best you |
| 02:33 21 | can. |
| 02:33 22 | A   I -- I have no idea. |
| 02:33 23 | Q   Would you agree with me that it's pretty |
| 02:33 24 | close quarters? |
| 02:33 25 | MR. HOARE:  Objection, calls for a |

| | Page 200 |
|---|---|
| 02:35 1 | I can't get a simple answer out of a simple question |
| 02:35 2 | from this witness and I'm frustrated. |
| 02:35 3 | BY MR. GORE: |
| 02:35 4 | Q   Would -- is it your testimony that there's |
| 02:35 5 | more than 10 feet between the door to Congressman |
| 02:35 6 | Alexander's office and the door to where the desks |
| 02:35 7 | are? |
| 02:35 8 | A   I can't agree to that. I don't know the |
| 02:35 9 | exact measurement. |
| 02:35 10 | Q   Do you believe it to be more than 10 feet, |
| 02:35 11 | Ms. Scott? |
| 02:35 12 | A   I don't -- I don't know. |
| 02:35 13 | Q   Do you honestly believe it to be more than |
| 02:35 14 | 10 feet? |
| 02:35 15 | MR. HOARE:  Objection, argumentative. |
| 02:35 16 | Q   Do you? |
| 02:35 17 | MR. HOARE:  Same objection. |
| 02:35 18 | Q   Do you? |
| 02:35 19 | A   I don't know. |
| 02:35 20 | MR. HOARE:  Counsel, please curtail your |
| 02:35 21 | behavior. |
| 02:35 22 | MR. GORE:  You know, your representations |
| 02:35 23 | are not going to get you anywhere when they're |
| 02:35 24 | inaccurate, Mr. Hoare. |
| 02:35 25 | Q   Ms. Scott, do you honestly believe that it |

49 (Pages 197 to 200)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 233

03:35 1    Q    Could you read that and let me know when
03:35 2    you're finished, please?
03:35 3    A    Okay.
03:35 4    Q    Do you recall sending that e-mail?
03:35 5    A    It looks familiar.
03:36 6    Q    In it, you're talking about deleting
03:36 7    folders, and that you deleted files but you didn't
03:36 8    mean to. What files did you delete that you didn't
03:36 9    mean to delete?
03:36 10    A    I don't recall.
03:36 11    Q    And why did you want to know whether they
03:36 12    could be recovered?
03:36 13    A    I don't recall specifically.
03:36 14    Q    Now, you never returned to work after this
03:36 15    e-mail, though, did you?
03:36 16    A    I don't believe so.
03:36 17    Q    So why were you interested at this time in
03:36 18    knowing about folders you had deleted from your --
03:36 19    A    I had intentions of returning to work.
03:36 20    Q    Oh, you did?
03:36 21    A    Yes, most definitely.
03:36 22    Q    And when did those intentions switch to
03:36 23    not returning to work?
03:36 24    A    During the course of the two weeks that I
03:36 25    was on paid administrative leave, my return to work

---

Page 234

03:36 1    date was switched without reason or explanation.
03:37 2    Although we requested to be told, we were not
03:37 3    communicated as to why.
03:37 4        There had been no concern from the
03:37 5    Congressman's office as to how I was doing or
03:37 6    whether or not I would be working with Royal, what
03:37 7    was being done with him, was he on paid
03:37 8    administrative leave as well, how was he going to be
03:37 9    removed from the office, who was going to be my
03:37 10    supervisor, what my responsibilities and obligations
03:37 11    were.
03:37 12        There was no way of knowing whether or not
03:37 13    there might be more communicated to me or I might be
03:37 14    in a position where I would be made to feel
03:37 15    uncomfortable, whether or not it would continue to
03:38 16    be a hostile work environment or not. I wasn't
03:38 17    communicated those things by the Congressman's
03:38 18    office to myself or my attorney.
03:38 19    Q    And, of course, you didn't call the
03:38 20    Congressman back so you never had a chance to talk
03:38 21    to him about it?
03:38 22        MR. HOARE: Objection, assumes facts not
03:38 23    in evidence. It's argumentative.
03:38 24    Q    Did you call the Congressman back?
03:38 25    A    My attorney did.

---

Page 235

03:38 1    Q    Your attorney spoke to the Congressman?
03:38 2    A    Yes.
03:38 3    Q    What's your understanding of what occurred
03:38 4    in that conversation?
03:38 5    A    I wasn't there. I wasn't present.
03:38 6    Q    But you never called the Congressman?
03:38 7    A    I personally never called the Congressman.
03:38 8    Q    And when was it that you allegedly became
03:38 9    aware of this information that you didn't remember
03:38 10    this morning involving that your return-to-work date
03:38 11    was changed?
03:38 12        MR. HOARE: Objection. It's
03:38 13    argumentative.
03:38 14    Q    When was it?
03:38 15    A    Can you repeat the question, please?
03:38 16    Q    Sure. When was it that you became aware
03:39 17    of this information that your return-to-work date
03:39 18    was changing?
03:39 19    A    If I recall, some of these documents right
03:39 20    here indicate that.
03:39 21    Q    And that you just testified was one of the
03:39 22    reasons why you decided not to come back to work,
03:39 23    right?
03:39 24    A    It had something to do with it, yes.
03:39 25    Q    Okay. Look at Exhibit Number 5, please,

---

Page 236

03:39 1    page PO292. It's about halfway through.
03:39 2    A    Okay.
03:39 3    Q    PO292 halfway through. It's right before
03:39 4    that letter. It's the next page. Okay. In the
03:39 5    middle these are the e-mail exchange between your
03:39 6    lawyer and Ms. Lett.
03:39 7        I'd like you to look at the middle line
03:39 8    which is Wednesday, June 7, 10:45, Gloria Lett to
03:39 9    Michael Hoare: Please advise Elizabeth that she
03:39 10    will be expected back in the office on Monday,
03:40 11    June 12, and not Thursday. Elizabeth will remain on
03:40 12    administrative leave until that time. Upon her
03:40 13    return to the office, Elizabeth will be assuming the
03:40 14    position of staff assistant at her current rate of
03:40 15    pay. She will be reporting to Adam Terry.
03:40 16        So I take it, given what you just said,
03:40 17    that this information was not something you were
03:40 18    aware of until right now.
03:40 19        MR. HOARE: Objection. It's
03:40 20    argumentative.
03:40 21    Q    Is that correct?
03:40 22    A    I was not aware of it at the point in
03:40 23    reference you were referring to on May 15 in
03:40 24    Exhibit 18.
03:40 25    Q    I asked you, however, when it was that

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 237

03:40  1    you --
03:40  2       A  I don't recall.
03:40  3       Q  -- decided -- excuse me. I asked it when
03:40  4    it was that you decided that you weren't going to
03:40  5    come back to the office, and you said that it was
03:40  6    after the two-week administrative leave period when
03:40  7    certain things became aware to you. The record will
03:40  8    reflect what you said.
03:40  9          MR. HOARE: I think you misstated the
03:40 10    witness's testimony. And in doing so, you're going
03:40 11    to mislead the witness. What she testified was
03:40 12    during --
03:40 13          MR. GORE: Is that a one- or two-word
03:40 14    objection, Mr. Hoare?
03:41 15          MR. HOARE: I didn't count the words.
03:41 16       Q  So the question for you is: You said that
03:41 17    one of the factors that caused you to decide not to
03:41 18    return to work was that your work date was changed
03:41 19    inexplicably.
03:41 20       A  Define "inexplicably."
03:41 21       Q  I think that was the word you used.
03:41 22       A  I don't believe I used it.
03:41 23       Q  Or without explanation, something of that
03:41 24    nature.
03:41 25       A  At some point, it was changed.

---

Page 238

03:41  1       Q  And that was, according to your testimony,
03:41  2    one of the reasons why you decided not to come back
03:41  3    to work. Is that true?
03:41  4       A  Yes.
03:41  5       Q  Okay. Now, on June 7 when this e-mail
03:41  6    came out, this was two days after you had signed the
03:41  7    offer letter at JGB Companies, wasn't it?
03:41  8       A  It's possible. I don't recall the date
03:41  9    that I signed the offer letter.
03:41 10       Q  We spent a lot of time on it this morning.
03:41 11    Do you remember that?
03:41 12       A  Yes.
03:41 13       Q  Tell me something. How is it possible for
03:41 14    it to be truthful that you signed an offer letter to
03:42 15    go work somewhere else on June 5 but yet didn't make
03:42 16    a decision until information was conveyed to you on
03:42 17    June 7?
03:42 18          MR. HOARE: Misstates witness's testimony.
03:42 19    It's argumentative.
03:42 20       Q  How can both of those be the case?
03:42 21       A  Can you repeat, please?
03:42 22       Q  Sure. On June 5th, you signed your offer
03:42 23    letter and committed to work at JGB Companies at the
03:42 24    very latest. It looks like it may have been earlier
03:42 25    than that according to Chris Dockson's e-mail, but

---

Page 239

03:42  1    you'll remember we looked at all those documents
03:42  2    that showed June 5th being that date. We can go
03:42  3    back through them again, but do you remember that?
03:42  4       A  Yes.
03:42  5       Q  June 7 is an e-mail from Gloria to your
03:42  6    attorney indicating that your return-to-work date
03:42  7    has changed. You just testified that it was the
03:42  8    change of your return-to-work date that was one of
03:42  9    the reasons why you decided not to return. Correct?
03:42 10       A  Yes.
03:42 11       Q  So if you'd already decided two days
03:42 12    before you weren't going to return, how could this
03:42 13    be a cause of your not wanting to return?
03:43 14       A  Because I could always not show up for the
03:43 15    job offer I'd taken and returned to the
03:43 16    Congressman's office.
03:43 17       Q  And how much were you going to be making
03:43 18    at this job?
03:43 19       A  A lot more.
03:43 20       Q  And a $5,000 bonus?
03:43 21       A  Yes. But I don't accept any position
03:43 22    based on money. I'm interested in opportunity.
03:43 23       Q  Well, let's actually talk about that.
03:43 24    When you initially became scheduler, what was your
03:43 25    salary?

---

Page 240

03:43  1       A  30,000.
03:43  2       Q  Did you believe at that time that that was
03:43  3    inappropriate?
03:43  4       A  Based on conversations I had had with
03:43  5    other chief of staffs from other offices and from
03:43  6    the research I had done, I felt like it was
03:43  7    deserving of more; however, I felt like this was a
03:43  8    great opportunity to work for a U.S. Congressman and
03:43  9    I was willing to accept a position at a lower salary
03:44 10    range with the expectation and communication by
03:44 11    Royal that upon graduation with my MBA when I was no
03:44 12    longer receiving financial aid for school that I
03:44 13    would be getting a pay raise.
03:44 14       Q  When did Royal convey that to you?
03:44 15       A  When I was hired.
03:44 16       Q  As scheduler?
03:44 17       A  As scheduler.
03:44 18       Q  And that was in late November, early
03:44 19    December of '05?
03:44 20       A  I believe it was sometime in November.
03:44 21    I -- I don't recall exactly.
03:44 22       Q  So in November of '05 did you believe your
03:44 23    $30,000 pay was discriminatory based upon your
03:44 24    gender?
03:44 25       A  I'm not certain what I believed at that

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 241

03:44 1    time.
03:44 2    Q    But you knew at that point you were
03:44 3    getting paid $30,000?
03:44 4    A    Yes.
03:44 5    Q    And I think what you testified was that
03:44 6    once you graduated, Royal told you that your salary
03:44 7    would be increased. Is that right?
03:45 8    A    Yes.
03:45 9    Q    What did he say? When was this
03:45 10   conversation, by the way?
03:45 11   A    When I was hired.
03:45 12   Q    And when? What day?
03:45 13   A    I don't recall specifically.
03:45 14   Q    And --
03:45 15   A    The date that the Congressman offered me
03:45 16   the job in his office.
03:45 17   Q    Oh. So who offered you the 30,000, the
03:45 18   Congressman or Royal?
03:45 19   A    The Congressman offered me the job and
03:45 20   said Royal would let me know how much the job would
03:45 21   pay, but he didn't feel like they could probably pay
03:45 22   me what I was worth, but they would do their best
03:45 23   and hopefully, that I would accept the position.
03:45 24   Q    And is it your contention that your being
03:45 25   paid $30,000 in this lawsuit was discriminatory

Page 242

03:45 1    based on your gender?
03:46 2    A    At what point are you asking when I
03:46 3    believed that?
03:46 4    Q    I'll ask you when in a moment. Right now,
03:46 5    is it your contention that your being paid $30,000
03:46 6    is discriminatory based on your gender?
03:46 7    A    I believe so, yes.
03:46 8    Q    And why?
03:46 9    A    I'm uncertain specifically.
03:46 10   Q    I'm sorry?
03:46 11   A    I'm uncertain specifically.
03:46 12   Q    You're uncertain? What does that mean?
03:46 13   A    I'm uncertain.
03:46 14   Q    Okay. And then was the idea that once you
03:46 15   graduated, you understood that you would be being
03:46 16   paid more because of graduating?
03:47 17   A    I don't know if it was because I was going
03:47 18   to have an MBA or not, but I was told that in the
03:47 19   following year, because we were at the end of a
03:47 20   year, that there were less funds available and that
03:47 21   the following year, there would be more funds
03:47 22   available and they would be able to pay me more.
03:47 23   Q    And that didn't happen?
03:47 24   A    No.
03:47 25   Q    Okay. Did you discuss it with anyone?

Page 243

03:47 1    A    Royal.
03:47 2    Q    When?
03:47 3    A    I don't recall specifically.
03:47 4    Q    Was it in 2006?
03:47 5    A    Yes.
03:47 6    Q    Was it before you quit?
03:47 7    A    Yes.
03:47 8    Q    Okay. How many times did you discuss it
03:47 9    with him?
03:47 10   A    I don't recall.
03:47 11   Q    More than once?
03:47 12   A    I'm uncertain at this time.
03:47 13   Q    Did you ever discuss it with the
03:47 14   Congressman?
03:47 15   A    I don't recall.
03:47 16   Q    What specifically did you say to Royal?
03:47 17   A    I don't recall at this time.
03:47 18   Q    What did Royal say to you?
03:47 19   A    I -- I don't recall.
03:47 20   Q    Okay. When did you graduate?
03:47 21   A    In May of '06.
03:48 22       (Exhibit No. 19 was marked.)
03:48 23   Q    This is 19. Do you recognize this
03:48 24   document, Ms. Scott, Exhibit 19?
03:48 25   A    Yes.

Page 244

03:48 1    Q    What is it?
03:48 2    A    It's my diploma.
03:48 3    Q    What date does it say it was given to you?
03:48 4    A    July 31.
03:48 5    Q    Do you want to change your prior
03:48 6    testimony?
03:48 7    A    No.
03:48 8    Q    When did you receive your degree?
03:48 9    A    I went to graduation ceremonies in May of
03:48 10   2006.
03:48 11   Q    But you didn't complete the program and
03:48 12   get your degree until the end of July, isn't that
03:48 13   true?
03:48 14   A    I -- I don't recall. The course work was
03:48 15   completed. That's when they distributed the
03:48 16   diplomas. Because of the hurricane, everything had
03:48 17   been pushed back.
03:48 18   Q    But you hadn't completed your course work
03:48 19   by the time you went to New Orleans for the
03:48 20   graduation, had you?
03:48 21   A    For the most part, it had been completed.
03:48 22   Q    But it wasn't completely done, was it?
03:49 23   A    I don't know if grades had been turned in
03:49 24   or not.
03:49 25   Q    But you hadn't completed the project. In

60 (Pages 241 to 244)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

Page 251

```
03:56  1   harassment?
03:56  2         MR. HOARE:  Objection.  Calls for a legal
03:56  3   conclusion.
03:56  4   Q   Ms. Scott?
03:56  5   A   If it's consensual between both parties,
03:56  6   then it's consensual --
03:56  7   Q   So it's not -- I'm sorry.
03:56  8   A   -- meaning sexual harassment is when it's
03:56  9   unconsensual, and that's -- I've never consented to
03:56 10   anything that was said to me by Royal.  The times
03:56 11   where he touched me, the -- the times where he
03:56 12   stared at me and leered, focused his eyes on me.
03:56 13   None of that was consensual.
03:56 14   Q   Okay.  But you and Royal didn't have a
03:56 15   sexual relationship, did you?
03:56 16   A   Define "sexual."
03:56 17   Q   What do you understand "sexual
03:56 18   relationship" to mean, Ms. Scott?
03:57 19   A   Depends on if it's consensual or
03:57 20   unconsensual.
03:57 21   Q   Did you and Royal have a sexual
03:57 22   relationship, consensual or nonconsensual or
03:57 23   otherwise?
03:57 24   A   Any sex-based behavior on Royal's part
03:57 25   towards me was not consensual.
```

Redacted

Redacted

```
03:58 23   Q   Did you and Royal ever have sexual
03:58 24   intercourse?
03:58 25   A   No.
```

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

| Page 261 |
| --- |

04:07 1    Q   So my question is this: After March 7,
04:07 2  2006, when you said you weren't planning on it
04:07 3  anyway because you had obviously more important
04:07 4  things, which we all understand, to attend to, but
04:07 5  we will talk about it later, did you ever follow up
04:07 6  after that with Linda to discuss you and Danielle
04:07 7  going to speak to the Congressman?
04:07 8    A   At this time, I don't recall.
04:07 9    Q   Okay.
04:07 10      (Exhibit No. 21 was marked.)
04:07 11    Q   This is a document you produced. I'm
04:07 12  going to focus you just on something. I'll focus
04:07 13  you where I need for you to go. I don't think you
04:07 14  need to read the whole thing. If you want to, we
04:07 15  can, but I don't believe it's necessary.
04:07 16      For the record, this is number 21, and
04:07 17  this is a four-page, five-page document you
04:07 18  produced, P0253 consecutively through P0257. Do you
04:08 19  recognize this, Ms. Scott?
04:08 20    A   I believe so.
04:08 21    Q   Okay. I'd like for you to look at the
04:08 22  second page, 0254. And it says that it's an instant
04:08 23  message received on 4-10-12006 from Danielle Savoy.
04:08 24  Is that what it is?
04:08 25    A   It appears to be, yes.

| Page 262 |
| --- |

04:08 1    Q   You produced it, so I'm asking you.
04:08 2    A   Yes.
04:08 3    Q   Was that the date on which it was
04:08 4  received?
04:08 5    A   I believe so, yes.
04:08 6    Q   Okay. Then I'd like to look up to about
04:08 7  eight lines up from the bottom where it says
04:08 8  "EBScott47." Do you see that?
04:08 9    A   Uh-huh.
04:08 10    Q   That's you, correct?
04:08 11    A   Yes.
04:08 12    Q   You say, "He's a pervert"?
04:08 13    A   Yes.
04:08 14    Q   Okay. You're referring to Royal?
04:08 15    A   Yes.
04:08 16    Q   And then you state, "Danielle, did he ever
04:08 17  say anything to you about the leave thing and having
04:08 18  to fax to Linda?"
04:08 19    A   Yes.
04:08 20    Q   Do you know what that was referring to?
04:08 21    A   We had been told that we had to fax our
04:09 22  leave requests to Linda instead of giving them to
04:09 23  Royal. Linda had told us to do that.
04:09 24    Q   And then you say, "We need to get out of
04:09 25  that. There is no need for us to have to fax them

| Page 263 |
| --- |

04:09 1  to her." Is that what you said?
04:09 2    A   Yes.
04:09 3    Q   Why did you say that?
04:09 4    A   I mean, if she wanted them, she could have
04:09 5  them, but Royal also needed to have them too. He
04:09 6  was our supervisor in D.C.
04:09 7    Q   And then Danielle says, "No. He said he
04:09 8  didn't know what we'd do." Then she says, "I don't
04:09 9  give a fuck." Do you know what she's talking about
04:09 10  there?
04:09 11    A   I can't speak for her.
04:09 12    Q   What do you -- okay. Then she says,
04:09 13  "She's not my COS." Is COS the acronym for Chief of
04:09 14  Staff?
04:09 15    A   Yes.
04:09 16    Q   Is that what you understood she was
04:09 17  saying?
04:09 18    A   Yes.
04:09 19    Q   Referring to Linda?
04:09 20    A   Yes.
04:09 21    Q   And what was your response?
04:09 22    A   "Agreed."
04:09 23    Q   So you agreed with Danielle when she said
04:09 24  that Linda wasn't her Chief of Staff?
04:10 25    A   Yes, because she wasn't.

| Page 264 |
| --- |

04:10 1    Q   Okay.
04:10 2    A   She was a district supervisor.
04:10 3    Q   Now, do you recall Linda coming up to D.C.
04:10 4  last year for the First Ladies Luncheon?
04:10 5    A   I believe so, yes.
04:10 6    Q   And do you remember her coming up to you
04:10 7  and -- let me refresh this for a second. Were any
04:10 8  of your conversations with Linda about Royal
04:10 9  concerns you were expressing about his management
04:10 10  style that were not related to sex?
04:10 11    A   I think they could have -- there could
04:10 12  have been some discussion.
04:10 13    Q   About just micromanaging and
04:10 14  scatterbrained management style?
04:10 15    A   Possibly.
04:10 16    Q   Let me ask you. Did you have
04:10 17  conversations with Linda about your belief that
04:10 18  Royal's management style was micromanaging and
04:10 19  scatterbrained?
04:10 20    A   At this time, I don't recall specifically
04:10 21  the context of our conversations regarding that.
04:10 22    Q   I understand you don't recall specifically
04:10 23  the context of your conversations regarding that.
04:10 24  My question is this: Did you have conversations
04:10 25  with Linda in which that general topic was

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 265

04:11 1  expressed?

04:11 2  A  I don't recall specifically.

04:11 3  Q  Was that your belief?

04:11 4  A  I'm not certain what I believed at the

04:11 5  time. I can't speak today as to what I believed at

04:11 6  the time in regards to his management style.

04:11 7  Q  But you can speak today as to what you

04:11 8  believed at the time regarding the motivations

04:11 9  behind his behavior?

04:11 10  A  Yes.

04:11 11  Q  Why can you speak to one but not the

04:11 12  other?

04:11 13  A  Because if he was a poor manager, he was a

04:11 14  poor manager. There wasn't much I could do about

04:11 15  that. But his sexual behavior was nonconsensual and

04:11 16  so frequent that it made working very intolerable.

04:11 17  Q  How frequent was it?

04:11 18  A  Very, very frequent.

04:11 19  Q  How often did it happen?

04:11 20  A  I don't recall specifically.

04:11 21  Q  More than once?

04:12 22  A  I don't recall specifically.

04:12 23  Q  Less than five times?

04:12 24  A  I don't -- I didn't count.

04:12 25  Q  Was it less than five times?

Page 266

04:12 1  A  I didn't count.

04:12 2  Q  Was it more than five times?

04:12 3  A  I didn't count.

04:12 4  Q  Do you know, sitting here today, whether

04:12 5  it was more than five times?

04:12 6  A  At this time, I don't remember.

04:12 7  Q  So at the First Ladies Luncheon do you

04:12 8  remember Linda coming up to you and saying, "How are

04:12 9  things with Royal?"

04:12 10  A  I don't recall.

04:12 11  Q  Do you recall you saying, "Oh, it's

04:12 12  wonderful. He's really stepped up to the plate"?

04:12 13  A  I don't recall our conversation.

04:12 14  Q  So you don't deny that's what you said?

04:12 15  A  At this time, I don't recall what our

04:12 16  conversation was.

04:12 17  Q  Okay. I think you also said that you

04:12 18  spoke with Tommie about your concerns about Royal.

04:12 19  Is that true?

04:12 20  A  Yes.

04:12 21  Q  When did you speak with Tommie?

04:12 22  A  I don't recall specifically.

04:13 23  Q  How many times did you speak with Tommie?

04:13 24  A  I don't know.

04:13 25  Q  More than once?

Page 267

04:13 1  A  I don't recall specifically.

04:13 2  Q  What did you say to Tommie?

04:13 3  A  I shared with her my concerns of his

04:13 4  sexual behavior and its inappropriateness, and --

04:13 5  Q  What specifically did you say?

04:13 6  A  I told her about the incident of him

04:13 7  touching me and moving his hands up and down my

04:13 8  body.

04:13 9  Q  Excuse me. Was that up and down your

04:13 10  body, or was -- are you talking about the incident

04:13 11  where he grabbed you around the midsection to help

04:13 12  up down from the chair and you felt he kept his

04:13 13  hands too long?

04:13 14  A  It --

04:13 15  Q  Is that the incident?

04:13 16       MR. HOARE: Objection, misstates the

04:13 17  witnesses testimony.

04:13 18  Q  Ms. Scott, if you want to speak to your

04:13 19  attorney, that's fine.

04:13 20  A  I would --

04:13 21  Q  If it's --

04:13 22  A  -- like the opportunity to finish

04:13 23  answering my questions before you interrupt me, if

04:13 24  you would like the same respect from me.

04:13 25  Q  I would. But I'm going to tell you that

Page 268

04:13 1  you keep looking at your attorney, and I don't think

04:14 2  that's appropriate unless you have to discuss a

04:14 3  privilege issue.

04:14 4  A  Then would I like to discuss a privilege

04:14 5  issue.

04:14 6  Q  Mr. Hoare is not testifying.

04:14 7  A  I understand.

04:14 8  Q  So if you believe there's an

04:14 9  attorney-client privilege issue, you can discuss it

04:14 10  with him, but that's it. Do you believe I'm going

04:14 11  into an attorney-client privileged area?

04:14 12  A  I would like the opportunity to finish

04:14 13  answering my questions before you interrupt me, just

04:14 14  like you would like the same opportunity.

04:14 15  Q  Ms. Scott, do you want to speak with your

04:14 16  attorney about believing that you're going into a

04:14 17  privileged area?

04:14 18  A  I would like to continue the line of

04:14 19  questioning --

04:14 20  Q  That's all right.

04:14 21  A  -- and I would like the opportunity to

04:14 22  fully answer my question before you ask me another

04:14 23  question.

04:14 24  Q  Okay.

04:14 25  A  Ask your question, please.

66 (Pages 265 to 268)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 269

04:14 1    Q   Well, you said you weren't finished.

04:14 2    A   Ask your question, please.

04:14 3    Q   What was it that you said to Tommie about

04:14 4 Royal's behavior?

04:14 5    A   At this time, I don't recall all of the

04:14 6 specifics of our conversations. I do recall

04:15 7 speaking with her about the incident where Royal put

04:15 8 his hands on my body and caressed my sides up to the

04:15 9 point where his hands were touching the area of my

04:15 10 breasts around the underwire of my bra.

04:15 11    I also spoke with her regarding the

04:15 12 situation where he trapped me at my desk, wrapping

04:15 13 his arms on both sides of me, cornering me at my

04:15 14 computer while he looked at the schedule in regards

04:15 15 to something on the Congressman's schedule, and he

04:15 16 kissed me on the head. And I immediately picked up

04:15 17 the phone and called her and told her about it, and

04:15 18 she commented that it was inappropriate, it was

04:15 19 disgusting, it was gross.

04:15 20    I said I felt uncomfortable working for

04:15 21 him, that I shouldn't be forced to work in an

04:16 22 environment where I have to put up with that. And I

04:16 23 don't -- at this time don't recall the rest of what

04:16 24 we might have talked about.

04:16 25    Q   You said that Ms. Seaton said it was

Page 270

04:16 1 inappropriate, disgusting and gross. You used those

04:16 2 three words. Those are the same three words to say

04:16 3 what Linda Blount had said. So they used the

04:16 4 identical words?

04:16 5    A   I'm not putting words in either one of

04:16 6 their mouths.

04:16 7    Q   That's what I'm asking you for. I'm

04:16 8 asking what they said, not --

04:16 9    A   I can't quote word for word.

04:16 10    Q   Did Ms. Seaton use the word

04:16 11 "inappropriate"?

04:16 12    A   Our conversation -- in our conversation,

04:16 13 her communication to me, whether it was word for

04:16 14 word "inappropriate" or "disgusting" or "gross," was

04:16 15 that that was what his behavior was.

04:16 16    Q   Did she use the word "inappropriate"?

04:16 17    A   I don't recall specifically.

04:16 18    Q   Did she use the word "gross"?

04:16 19    A   I don't recall specifically at this time.

04:16 20    Q   Did she use the word "disgusting"?

04:16 21    A   I don't recall specifically at this time.

04:16 22    Q   Okay. So the two incidents that you

04:16 23 shared with Tommie Seaton were the touching incident

04:17 24 and this one you're now mentioning about where he

04:17 25 trapped you and cornered you and kissed you on the

Page 271

04:17 1 forehead, is that correct? Were there any others?

04:17 2    A   I don't recall at this time.

04:17 3    Q   So these are the only ones you recall?

04:17 4    A   At this particular moment in time, yes.

04:17 5    Q   Okay. Were these two separate times that

04:17 6 you spoke with Tommie?

04:17 7    A   Yes.

04:17 8    Q   Okay. And when were they?

04:17 9    A   I don't recall specifically at this time.

04:17 10    Q   How far apart in time were they?

04:17 11    A   I have no idea.

04:17 12    Q   Which occurred first?

04:17 13    A   I have no idea.

04:17 14    Q   Okay. And, by the way, when you were

04:17 15 talking about the hand incident, you kept going back

04:17 16 to the breast. I want to make sure I'm quite clear

04:17 17 on this. Did Royal touch your breast?

04:17 18       MR. HOARE: Asked and answered.

04:17 19       MR. GORE: And I've gotten another foray

04:17 20 into that area which suggests I'm not clear that I

04:17 21 understand the witness's testimony on this.

04:17 22    Q   Did Royal touch your breast, Ms. Scott?

04:18 23       MR. HOARE: Asked and answered.

04:18 24    Q   I'm waiting. I'm waiting, Ms. Scott.

04:18 25       MR. GORE: Mr. Hoare, would you direct

Page 272

04:18 1 your client to answer my question, please?

04:18 2    A   I'm allowed to take time to answer the

04:18 3 question. This is a very emotional and sensitive

04:18 4 matter. Yes, he touched my breast. What else do

04:18 5 you want to know?

04:18 6    Q   When did he touch your breast?

04:18 7       MR. HOARE: Let's take a break. The

04:18 8 witnesses is teary.

04:18 9       MR. GORE: There's a question pending.

04:18 10    Q   When did he touch your breast?

04:18 11    A   When he was moving his hands up and down

04:18 12 my sides as he so-called told me he was helping me

04:18 13 off of the chair.

04:18 14    Q   Is it your testimony --

04:18 15    A   I'd like to take a break right now.

04:18 16    Q   No, no, no, ma'am. I'm in a line of

04:18 17 questioning.

04:18 18    A   There's no question pending.

04:18 19    Q   Is it your testimony that he actually

04:18 20 touched your breast?

04:18 21       MR. HOARE: She is in tears.

04:18 22       THE WITNESS: There is no question. I

04:18 23 want to take a break.

04:31 24       (Recess taken from 4:18 to 4:31.)

04:31 25    Q   Ms. Scott, is it your testimony that Royal

67 (Pages 269 to 272)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 273

| 04:31 | 1 | actually touched your breast? |
| 04:32 | 2 | A   Yes. |
| 04:32 | 3 | Q   Okay.  Did his fingers touch your breast, |
| 04:32 | 4 | or did his fingers touch the underwire that touched |
| 04:32 | 5 | your breast? |
| 04:32 | 6 | Are you thinking?  I don't hear a |
| 04:32 | 7 | response, so do you need more time to think about my |
| 04:32 | 8 | question? |
| 04:32 | 9 | A   I just need time to answer. |
| 04:32 | 10 | Q   Okay. |
| 04:33 | 11 | A   Can you please repeat the question? |
| 04:33 | 12 | Q   Did his fingers touch your breast, or did |
| 04:33 | 13 | his fingers touch the underwire that touched your |
| 04:33 | 14 | breast? |
| 04:33 | 15 | MR. HOARE:  Let me object to the question |
| 04:33 | 16 | to the extent it limits her options. |
| 04:34 | 17 | A   His fingers, his hands, went up and down |
| 04:34 | 18 | my sides, the sides of my body, left and right, |
| 04:34 | 19 | touching the underwire of my bra as well as the |
| 04:34 | 20 | sides of my breasts. |
| 04:34 | 21 | Q   His fingers touched the sides of your |
| 04:34 | 22 | breast?  Is that your testimony? |
| 04:34 | 23 | A   I don't recall exactly if it was his |
| 04:34 | 24 | fingers or his hands, but one or the other. |
| 04:34 | 25 | Regardless, his hand and his fingers caressed my |

Page 274

| 04:34 | 1 | body up and down my sides and my -- and the sides of |
| 04:35 | 2 | my breasts. |
| 04:35 | 3 | Q   Just because we are going to have an issue |
| 04:35 | 4 | with this, I want to note that I asked the question |
| 04:35 | 5 | at 4:31 and 52 seconds and I got my response at 4:34 |
| 04:35 | 6 | and 24 seconds because I don't think the record will |
| 04:35 | 7 | reflect that.  Since there was so many minutes |
| 04:35 | 8 | elapsed, I think that's important. |
| 04:35 | 9 | MR. HOARE:  Let me respond. |
| 04:35 | 10 | MR. GORE:  Sure. |
| 04:35 | 11 | MR. HOARE:  The record should also reflect |
| 04:35 | 12 | that it's also a very emotional issue, that last |
| 04:35 | 13 | time you asked that question or a similar question, |
| 04:35 | 14 | the client broke -- the witness broke into tears and |
| 04:35 | 15 | had to take a break.  Now, I think under those |
| 04:35 | 16 | circumstances, the delay is understandable. |
| 04:35 | 17 | Q   Ms. Scott, when we talked about this |
| 04:35 | 18 | before lunch, the -- in some detail, you did not |
| 04:35 | 19 | recall his hands or fingers, whatever it was, |
| 04:36 | 20 | touching the sides of your breasts.  What has |
| 04:36 | 21 | happened that has caused your memory to change since |
| 04:36 | 22 | lunchtime? |
| 04:36 | 23 | MR. HOARE:  Objection.  I think you're |
| 04:36 | 24 | misstating the witness' testimony, and it's |
| 04:36 | 25 | argumentative. |

Page 275

| 04:36 | 1 | Q   You can answer. |
| 04:36 | 2 | A   At that particular time, I didn't recall. |
| 04:36 | 3 | At this particular time, I recall that happened. |
| 04:36 | 4 | Q   All right.  So what occurred between |
| 04:36 | 5 | around 1 o'clock when you didn't recall it and |
| 04:36 | 6 | around 4:30 when you do recall it? |
| 04:36 | 7 | A   There's a lot of information to remember, |
| 04:36 | 8 | and at that particular time, I did not remember that |
| 04:36 | 9 | specific fact.  Now, I do. |
| 04:36 | 10 | Q   Did you review anything that caused you to |
| 04:36 | 11 | remember it? |
| 04:36 | 12 | A   No. |
| 04:36 | 13 | Q   Did you have any conversations with anyone |
| 04:36 | 14 | that caused to you remember this? |
| 04:36 | 15 | A   No. |
| 04:36 | 16 | Q   Okay.  Just to wrap up on who you talked |
| 04:37 | 17 | to, you talked to Linda about Royal's behavior.  We |
| 04:37 | 18 | talked about that.  But you can't remember anything |
| 04:37 | 19 | specific that she said to you as far as specific |
| 04:37 | 20 | words, correct? |
| 04:37 | 21 | MR. HOARE:  Asked and answered. |
| 04:37 | 22 | A   Can you repeat the question, please? |
| 04:37 | 23 | Q   Right.  I'm just trying to wrap up here. |
| 04:37 | 24 | You -- talking about the people that you claim you |
| 04:37 | 25 | spoke to regarding Royal's behavior in an effort to |

Page 276

| 04:37 | 1 | complain, we first talked about Linda, correct? |
| 04:37 | 2 | A   I believe so. |
| 04:37 | 3 | Q   And you mentioned that you spoke to Linda, |
| 04:37 | 4 | but you couldn't remember any of the specific words |
| 04:37 | 5 | that she uttered to you. |
| 04:37 | 6 | MR. HOARE:  Asked and answered. |
| 04:37 | 7 | Q   Correct? |
| 04:37 | 8 | A   I don't recall word for word at this time |
| 04:37 | 9 | what Linda said. |
| 04:37 | 10 | Q   Okay.  And you also spoke to Tommie, but |
| 04:37 | 11 | you also don't remember the words, specific words |
| 04:38 | 12 | she used in responding to your comments, do you? |
| 04:38 | 13 | A   At this time, I don't recall. |
| 04:38 | 14 | Q   And you don't recall how many times you |
| 04:38 | 15 | spoke to Linda about Royal's behavior, do you? |
| 04:38 | 16 | A   Numerous times. |
| 04:38 | 17 | Q   More than once? |
| 04:38 | 18 | A   Yes. |
| 04:38 | 19 | Q   More than five times? |
| 04:38 | 20 | A   Yes. |
| 04:38 | 21 | Q   Oh, do you recall that -- more than five |
| 04:38 | 22 | times? |
| 04:38 | 23 | A   I didn't count, but I am almost certain. |
| 04:38 | 24 | Q   And specifically about sexually oriented |
| 04:38 | 25 | behavior? |

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 281

04:44 1 give me any sense in that time frame when this
04:44 2 conversation occurred?
04:44 3     MR. HOARE: Argumentative.
04:44 4     A   At this time, I don't recall. Quite
04:44 5 possibly in December or January.
04:44 6     Q   And when you talk about concerns about
04:44 7 Royal, did you specifically mention any behavior
04:45 8 that Royal was -- to Mrs. Alexander any behavior
04:45 9 that Royal was engaging in that you believed was of
04:45 10 a sexual nature?
04:45 11     A   I don't believe so.
04:45 12     Q   And did Mrs. Alexander -- other than the
04:45 13 comment that you referred to regarding Danielle, did
04:45 14 Mrs. Alexander convey anything to you about
04:45 15 inappropriate behavior by Royal of a sexual nature?
04:45 16     A   She told me to watch out.
04:45 17     Q   And did she -- those were the words she
04:45 18 used?
04:45 19     A   I'm not going to put words in her mouth.
04:45 20 I word for word don't know, don't remember exactly
04:45 21 what she said.
04:45 22     Q   What do you -- did she -- you don't recall
04:45 23 if she used the words "watch out"?
04:45 24     A   I don't recall specifically if those were
04:45 25 her exact words.

Page 282

04:45 1     Q   What did she say that -- that caused you
04:45 2 to believe that she was conveying that you should
04:45 3 watch out?
04:45 4     A   That there possibly was a relationship
04:45 5 between Royal and Danielle, that she felt like a lot
04:46 6 of the staff members in the office had their own
04:46 7 agendas and weren't there with the best interest of
04:46 8 the Congressman in mind, and she conveyed to me that
04:46 9 I should watch my back.
04:46 10     Q   So it wasn't limited to any type of
04:46 11 specific sexual issue, it was overall?
04:46 12     A   It was suggestive of either sexual and/or
04:46 13 nonsexual.
04:46 14     Q   But you don't remember anything specific
04:46 15 she said that caused you to believe that it was
04:46 16 sexual?
04:46 17     MR. HOARE: Objection, misstates the
04:46 18 witness' testimony.
04:46 19     Q   Or do you remember anything she said that
04:46 20 caused you to believe --
04:46 21     A   At this time --
04:46 22     Q   -- that it was --
04:46 23     A   -- I don't recall.
04:46 24     Q   Again, let's try to not speak over one
04:46 25 another.

Page 283

04:46 1     Do you remember anything at this time
04:46 2 that -- excuse me. Let me rephrase that.
04:46 3     Do you remember anything that
04:46 4 Mrs. Alexander said in that conversation that caused
04:46 5 you to believe that her caution to you to watch out
04:47 6 was somehow based on a concern about sexual behavior
04:47 7 involving Royal?
04:47 8     A   The fact that she mentioned Royal and
04:47 9 Danielle.
04:47 10     Q   Other than that, anything else you
04:47 11 remember?
04:47 12     A   At this time, I don't remember.
04:47 13     Q   What was the context in which she
04:47 14 mentioned Royal and Danielle?
04:47 15     A   At this time, I don't recall.
04:47 16     Q   Okay. So other than Nancy Alexander,
04:47 17 Linda Blount, Tommie Seaton, and Danielle, did you
04:47 18 discuss Royal's alleged inappropriate behavior of a
04:47 19 sexual nature with anyone else, not your attorney?
04:47 20     A   Will you define "anyone else"?
04:47 21     Q   Anyone else affiliated with the office of
04:47 22 Representative Alexander.
04:47 23     A   At this time, I don't recall that.
04:47 24     Q   When you were hired for scheduler, what is
04:47 25 your understanding of what a scheduler does?

Page 284

04:48 1     A   Well, I didn't really have any formal
04:48 2 training. I was brought in as -- Jonathan was
04:48 3 leaving to go back to the district, and during that
04:48 4 time period, he wasn't always there to see to it
04:48 5 that I gained a full understanding of what it was.
04:48 6     Based on the conversations I had with
04:48 7 Jonathan and the help from Danielle that I got,
04:48 8 because Danielle had helped with scheduling before,
04:48 9 it was my responsibility to ensure that the meetings
04:49 10 for the Congressman in D.C. and in the district were
04:49 11 on his calendar and that he was kept informed of
04:49 12 where he needed to be in session and out of session.
04:49 13     Q   I'm sorry, are you finished, or are you
04:49 14 still thinking?
04:49 15     A   I'm thinking.
04:49 16     To provide him with information and
04:49 17 requests for appointments, to let him decide if he
04:50 18 wanted to attend or have an appointment, to make
04:50 19 travel arrangements when necessary. At this time,
04:50 20 that's -- at this time, that's all I can recall.
04:50 21     Q   Let me go back for a second. I just want
04:50 22 to ask you a couple of questions. Did you ever
04:50 23 observe Royal engage in inappropriate behavior of a
04:50 24 sexual nature with anybody else in the office?
04:50 25     A   Can you repeat the question, please?

70 (Pages 281 to 284)

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 285

04:50 1   Q   Sure. Did you ever observe Royal engage
04:50 2  in inappropriate behavior of a sexual nature with
04:50 3  anybody else affiliated with the office?
04:50 4       MR. HOARE:  Vague and ambiguous.
04:51 5       A   He commented to me and Danielle in my
04:51 6  presence and her presence that we both had very sexy
04:51 7  legs.
04:51 8       Q   Other than that, any other behavior that
04:51 9  you observed by Royal of a sexual nature that wasn't
04:51 10  directed at you?
04:51 11       MR. HOARE:  Same objection.
04:51 12       A   At this time, that's all I can recall.
04:51 13       Q   And if I did ask this before, I apologize.
04:51 14  Do you contend that anyone else in the office other
04:51 15  than Royal engaged in inappropriate behavior towards
04:51 16  you of a sexual nature?
04:51 17       MR. HOARE:  Asked and answered.
04:51 18       A   Can you repeat the question, please?
04:51 19       Q   Sure. Do you contend that anyone else in
04:51 20  the office other than Royal engaged in inappropriate
04:51 21  behavior towards you of a sexual nature?
04:51 22       MR. HOARE:  Asked and answered.
04:52 23       A   Royal was the only one.
04:52 24       Q   Okay.
04:52 25       A   That was nonconsensual.

Page 286

04:52 1       Q   And in your complaint you refer to ogling
04:52 2  and touching. Are you aware of those words being
04:52 3  used?
04:52 4       A   Yes.
04:52 5       Q   Is ogling and touching anything else other
04:52 6  than the specific incidents that you've identified
04:52 7  here today?
04:52 8       MR. HOARE:  Objection, calls for a
04:52 9  conclusion. It's vague and ambiguous.
04:52 10       Q   Let me rephrase it. In your complaint,
04:52 11  you alleged that Royal ogled and touched you. Are
04:52 12  you aware of that?
04:52 13       A   Yes.
04:52 14       Q   You testified at some length at what it
04:52 15  was that you believe is Royal -- the inappropriate
04:52 16  behavior Royal has engaged in. My question is: Do
04:52 17  you mean anything other than what you've already
04:52 18  talked about when you say that he ogled and touched
04:52 19  you?
04:52 20       MR. HOARE:  Same objection.
04:53 21       A   It's possible. It was --
04:53 22       Q   Are you finished? I'm sorry.
04:53 23       A   I'm thinking.
04:53 24       MR. HOARE:  Object to the question because
04:53 25  it requires that the witness review the transcript

Page 287

04:53 1  in this case and do an inventory of everything
04:53 2  that's been suggested so far --
04:53 3       MR. GORE:  Objection noted.
04:53 4       MR. HOARE:  -- and then make a decision as
04:53 5  to whether or not it was all-inclusive.
04:53 6       MR. GORE:  Objection noted.
04:53 7       Q   Ms. Scott, whenever you're ready.
04:53 8       A   Can you please repeat the question?
04:53 9       Q   Sure. When you contend that Royal ogled
04:53 10  and touched you, is there anything you can think of
04:53 11  other than what you have testified here today that
04:54 12  supports that contention?
04:54 13       MR. HOARE:  Same objections.
04:54 14       A   Other than what I've already stated, it
04:54 15  was very frequent, very habitual. And at this time
04:54 16  that's -- that's all I can remember.
04:54 17       Q   Okay. But you don't recall any specific
04:54 18  day on which any of it occurred?
04:54 19       A   At this time, that's what I remember.
04:54 20       Q   Okay. And you don't recall whether some
04:54 21  of it occurred more than once or not?
04:54 22       A   It was very frequent.
04:54 23       Q   Do you recall whether it occurred more
04:54 24  than five times?
04:54 25       A   I didn't count, but it was very frequent,

Page 288

04:54 1  yes.
04:54 2       Q   You do believe that the behavior occurred
04:54 3  more than five times?
04:54 4       MR. HOARE:  Objection.
04:54 5       A   I believe --
04:54 6       MR. HOARE:  Let me object to the question
04:54 7  as vague and ambiguous.
04:54 8       Q   You can answer.
04:55 9       A   I believe it did, yes. I didn't count.
04:55 10  At this time, I don't recall exact numbers.
04:55 11       Q   More than ten times?
04:55 12       MR. HOARE:  Same objection, vague and
04:55 13  ambiguous.
04:55 14       Q   You can answer. Are you thinking?
04:55 15       A   Yes. I didn't count the number of times.
04:56 16       Q   Are you finished, or are you still
04:56 17  thinking? It's hard for me to tell. I apologize.
04:56 18       A   I'm thinking. It was very frequent. And
04:56 19  unwelcomed every time.
04:56 20       Q   Is it your testimony that it occurred more
04:56 21  than ten times?
04:56 22       A   At this time, I don't recall specifically.
04:56 23       Q   Okay. Also, why -- you mentioned all
04:56 24  those reasons earlier why -- that support your
04:56 25  contention about why you didn't talk to the

71 (Pages 285 to 288)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 297

05:11 1    Q    And you alerted him to them as well,
05:11 2    right?
05:11 3    A    Yes.
05:11 4    Q    What happens if there was an event to go
05:11 5    to that conflicted with a subcommittee meeting?
05:11 6    What did you do in that case?
05:11 7    A    Let him know about it.
05:12 8    Q    Do you remember -- did you ever
05:12 9    communicate with other member offices regarding
05:12 10   scheduling matters for the Congressman?
05:12 11   A    In what regards?
05:12 12   Q    In any fashion whatsoever.
05:12 13   A    I'm not sure I understand the question.
05:12 14   Q    Did you ever talk to other offices
05:12 15   regarding meetings and attendance at committee
05:12 16   hearings on behalf of the Congressman?
05:12 17   A    I'm not sure I fully understand.
05:12 18   Q    I'm trying to understand whether you
05:12 19   worked in a vacuum in determining and helping to set
05:12 20   his schedule or whether you interacted with other
05:12 21   people on the Hill in doing that.
05:12 22        MR. HOARE:  Wait for the question.
05:12 23   Q    So did you interact with other people on
05:12 24   the Hill in setting the Congressman's schedule?
05:12 25   A    Yes.

---

Page 298

05:12 1    Q    Did you interact with other people in
05:12 2    other member offices?
05:12 3    A    Yes.
05:12 4    Q    Did you interact with committee staff?
05:13 5    A    At this time, I don't recall specifically,
05:13 6    but possibly.
05:13 7    Q    Did you interact with subcommittee staff?
05:13 8    A    At this time, I don't recall specifically,
05:13 9    but possibly.
05:13 10   Q    Did you ever have to interact with the
05:13 11   floor managers when there was going to be a vote on
05:13 12   something in terms of setting his schedule?
05:13 13   A    On occasion.
05:13 14   Q    And do you remember in looking at the
05:13 15   April time frame -- if you want to look at the
05:13 16   calendar, that's great, but I'm talking about the
05:13 17   April time frame. You were busy trying to complete
05:13 18   your project on Argentina to get your degree. Do
05:13 19   you remember that?
05:13 20   A    At this time, I don't recall this specific
05:13 21   time frame.
05:13 22   Q    When did you graduate, again?
05:13 23   A    The ceremony was in May. And according to
05:13 24   my diploma, on July 31 is when they put the date on
05:13 25   for it.

---

Page 299

05:13 1    Q    And the ceremony occurred at the very
05:14 2    beginning of May, didn't it, like around May 1 or 2?
05:14 3    A    I don't recall specifically at this time.
05:14 4    Q    And didn't you go on a cruise after your
05:14 5    graduation ceremony for a week?
05:14 6    A    I don't recall at this time the exact
05:14 7    length of time.
05:14 8    Q    For several days?
05:14 9    A    Yes.
05:14 10   Q    You were gone from the office for about a
05:14 11   week, weren't you?
05:14 12   A    At this time, I don't recall exactly how
05:14 13   long I was gone.
05:14 14   Q    Okay. And before you left to go to your
05:14 15   graduation ceremony and your cruise, you were
05:14 16   working extensively on your Argentina project,
05:14 17   weren't you?
05:14 18   A    At this time, I don't recall exactly what
05:14 19   I was working on.
05:14 20   Q    Do you dispute that you were spending many
05:14 21   hours working on your Argentina project at that
05:14 22   time?
05:14 23        MR. HOARE:  Vague and ambiguous.
05:14 24   A    At this time, I don't recall.
05:14 25   Q    Okay. Do you deny that you did Google

---

Page 300

05:14 1    searches for "Argentina cultural dimensions" during
05:15 2    this time period?
05:15 3    A    I'm --
05:15 4        MR. HOARE:  Argumentative.
05:15 5    A    At this time, I don't recall.
05:15 6    Q    Did you deny you did Google searches for
05:15 7    "Argentina culture profile" during this time period?
05:15 8    A    At this time, I don't recall.
05:15 9    Q    Do you deny that you visited
05:15 10   LatinBusinessChronicle.com again on your work
05:15 11   computer during this time period?
05:15 12   A    At this time, I don't recall.
05:15 13   Q    Did you deny you visited Wikipedia and
05:15 14   searched for "culture of Argentina" during this time
05:15 15   period?
05:15 16   A    At this time, I don't recall.
05:15 17   Q    Do you have any recollection at all,
05:15 18   sitting here today, in that final week before you
05:15 19   left to go for your graduation and your cruise
05:15 20   whether you were busy working on your final project
05:15 21   A    At this time, I don't recall what I was
05:15 22   working on.
05:15 23   Q    That was not my question. My question is:
05:15 24   Do you have any recollection sitting here today
05:15 25   under oath that you were working on that project

---

74 (Pages 297 to 300)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                      Taken on May 21, 2007

Page 301

05:15 1    during that week?
05:15 2         MR. HOARE: Argumentative.
05:15 3    A    At this time, I don't recall when I was
05:15 4    working on a project for Argentina.
05:16 5    Q    What was your final project to graduate?
05:16 6    A    I didn't have a final project to graduate.
05:16 7    Q    You didn't have a final paper for a class
05:16 8    on Argentina?
05:16 9         MR. HOARE: Objection, argumentative.
05:16 10   A    There were several courses. I didn't
05:16 11   have -- there was not one required project for
05:16 12   graduation with an MBA.
05:16 13   Q    One --
05:16 14   A    It was a course I was completing.
05:16 15   Q    You were missing one course, weren't you,
05:16 16   as of January 2006?
05:16 17   A    No.
05:16 18   Q    As of January 2006, you didn't have one
05:16 19   course yet to go?
05:16 20   A    I had about --
05:16 21        MR. HOARE: Argumentative.
05:16 22   Q    You didn't have one course yet to go?
05:16 23   A    I had about two.
05:16 24   Q    And you finished one of them in early
05:16 25   January, didn't you?

Page 302

05:16 1    A    I don't recall exactly when I finished it
05:16 2    at this time.
05:16 3    Q    And do you recall having communications
05:16 4    with people at Loyola and Georgetown and other
05:17 5    places because you were desperately trying to get
05:17 6    your final course in?
05:17 7    A    At this time, I don't recall who I spoke
05:17 8    with.
05:17 9    Q    Do you recall those communications
05:17 10   generally?
05:17 11   A    At this time, I -- I don't recall who I
05:17 12   communicated with.
05:17 13   Q    You were completing one course in April,
05:17 14   weren't you? You had one course left to complete?
05:17 15   A    I don't recall how many courses I had to
05:17 16   complete at this time.
05:17 17   Q    In April of 2006 you only had one course
05:17 18   left to go.
05:17 19   A    I would have to --
05:17 20        MR. HOARE: Asked and answered.
05:17 21   Argumentative.
05:17 22   Q    Is that true?
05:17 23   A    I would have to check with my university
05:17 24   to confirm that. At this time, I don't recall.
05:17 25   Q    Well, that in and of itself is one of the

Page 303

05:17 1    factors why we didn't get what we needed, which is
05:17 2    why we will continue this on another day for that
05:17 3    since you don't remember that.
05:17 4         MR. HOARE: Move to strike.
05:17 5         MR. GORE: I'm sure you do.
05:17 6         MR. HOARE: Move to strike.
05:17 7    Q    I just want this to be crystal clear,
05:17 8    Ms. Scott. It's your testimony that you have no
05:17 9    recollection whatsoever during that final week of
05:17 10   April that you were desperately working until late
05:17 11   hours in the night trying to get your project done
05:17 12   regarding Argentina?
05:18 13        MR. HOARE: Argumentative, vague and
05:18 14   ambiguous, requires definition.
05:18 15   A    I don't recall the amount of time or
05:18 16   length of time that I would have spent. At this
05:18 17   time, I don't recall working on that, because it
05:18 18   wasn't due right then.
05:18 19   Q    Okay. And when you went on your
05:18 20   graduation ceremony and your cruise, that was during
05:18 21   appropriations markup, wasn't it?
05:18 22   A    I don't recall at this time.
05:18 23   Q    And do you know what appropriations markup
05:18 24   is?
05:18 25   A    I -- at this time, I -- I don't recall.

Page 304

05:18 1    Q    You were the scheduler and you don't
05:18 2    recall what appropriations markup is?
05:18 3         MR. HOARE: Argumentative.
05:18 4    A    I have been removed from the office for
05:18 5    over a year now. I have not made an effort to
05:18 6    remember exactly what -- everything that the
05:18 7    Congressman was involved in.
05:19 8    Q    You know who was on the Appropriations
05:19 9    Committee, right?
05:19 10   A    Yes.
05:19 11   Q    And do you recall scheduling him for a
05:19 12   committee meeting while you were on your cruise and
05:19 13   also for a meeting in the capital rotunda?
05:19 14   A    Can you define "scheduling" while I was on
05:19 15   my cruise?
05:19 16   Q    Scheduling to take place while you were on
05:19 17   your cruise.
05:19 18   A    I don't recall at this time.
05:19 19   Q    Do you remember hearing when you got back
05:19 20   from your cruise about the fact that you had
05:19 21   scheduled the Congressman for a meeting in the
05:19 22   capital rotunda but it was the wrong capital a
05:19 23   thousand miles away?
05:19 24   A    I remember hearing about it while I was
05:19 25   away because my Blackberry worked even though I

75 (Pages 301 to 304)

Reported by:
Mary Ann Payonk, CRR-RDR

Page 317

05:36 1 fallen at Lindsey Fielders', correct?
05:36 2     A   I don't recall if it was the same day or
05:36 3 not.
05:36 4     Q   But your foot hurt too much to go to work
05:36 5 but not too much to go to the lupus gala, is that
05:36 6 correct?
05:36 7     A   At this time, I don't recall.
05:36 8     Q   Do you remember telling Danielle that once
05:36 9 you called in sick but you just wanted to sleep
05:36 10 late?
05:36 11     A   At this time, I don't recall. I was under
05:36 12 a lot of emotional stress and a very hostile work
05:36 13 environment where I never knew what to expect from
05:36 14 Royal. And oftentimes it made me physically ill to
05:36 15 have to get up in the morning and go to work. And I
05:36 16 lost sleep over it, so on many occasions it was very
05:36 17 difficult for me to get to work. It was -- I was --
05:36 18 I was very emotional.
05:37 19     Q   Define "physically ill."
05:37 20     A   Nauseated, throwing up, unable to eat.
05:37 21     Q   How many times did you throw up because of
05:37 22 what you considered to be a hostile work
05:37 23 environment?
05:37 24     A   At this time, I don't recall.
05:37 25     Q   More than once?

Page 318

05:37 1     A   Numerous times.
05:37 2     Q   More than five times?
05:37 3     A   Many times, yes.
05:37 4     Q   Did you ever go see a doctor as a result
05:37 5 of the excessive vomiting?
05:37 6     A   No. I was ashamed. I felt violated.
05:37 7     Q   That you were vomiting?
05:37 8     A   No, that I was undergoing the harassment
05:37 9 and that I was a victim of this abuse that was
05:37 10 unasked for and unwarranted.
05:37 11     Q   But not so ashamed or violated that you
05:37 12 would talk to the Congressman about it?
05:37 13     MR. HOARE: Excuse me. It's
05:38 14 argumentative.
05:38 15     A   Can you repeat the question, please?
05:38 16     Q   I said but not so ashamed or violated that
05:38 17 you would talk to the Congressman about it?
05:38 18     MR. HOARE: Same objection.
05:38 19     A   I'm not sure I understand the question.
05:38 20     Q   What damages are you seeking in this
05:38 21 lawsuit?
05:38 22     A   I haven't even thought about that.
05:38 23     Q   What do you want to get out of this
05:38 24 lawsuit?
05:38 25     A   I -- accountability.

Page 319

05:38 1     Q   Are you looking for money?
05:38 2     A   It's -- I -- it's never been about money.
05:38 3     Q   Are you looking for money, though?
05:38 4     A   I need my attorneys' fees paid for, but
05:38 5 I'm happy to pay for that if I have to. It's not
05:38 6 about money.
05:38 7     Q   In your complaint or, excuse me, your
05:38 8 interrogatories, you say that you're looking for
05:38 9 tuition remission. Do you have any idea what that's
05:38 10 referring to?
05:38 11     A   At this time, I don't know.
05:38 12     Q   Are you looking for tuition remission as
05:38 13 part of the benefits or damages in this lawsuit?
05:39 14     A   I would have to speak to my attorney about
05:39 15 that. I'm not certain.
05:39 16     Q   Okay. What do you view as appropriate
05:39 17 accountability?
05:39 18     A   Taking responsibility. Working to make
05:39 19 sure this never happens to somebody else again.
05:39 20 Acknowledging that it occurred. Apologizing
05:39 21 publicly. Apologizing for allowing -- I want
05:39 22 whatever the law will allow, and I want justice to
05:39 23 be served. And I don't want anyone that ever works
05:39 24 for another U.S. Congressman or this Congressman to
05:39 25 ever have to go through this again. It's not fair.

Page 320

05:39 1     Q   So is that why you didn't return the
05:40 2 Congressman's call when he called you after you sent
05:40 3 the e-mail?
05:40 4     MR. HOARE: Objection, assumes facts not
05:40 5 in evidence.
05:40 6     A   At this time, I don't know why I didn't
05:40 7 call. I was very emotionally distraught and at this
05:40 8 time, I -- I don't know.
05:40 9     Q   You are aware that the Congressman
05:40 10 undertook -- retained an outside law firm to
05:40 11 undertake an investigation of your allegations,
05:40 12 aren't you?
05:40 13     A   I -- at this time, I don't know.
05:40 14     Q   You've heard that before, correct?
05:40 15     A   I believe so, yes.
05:40 16     Q   Okay. And you didn't participate in that
05:40 17 investigation, did you?
05:40 18     A   Not that I'm aware of.
05:40 19     Q   Do you -- why didn't you participate in
05:40 20 the investigation?
05:40 21     A   I would have to speak to my attorney about
05:40 22 that.
05:40 23     Q   Are you -- do you understand that not
05:40 24 participating meant there was only certain
05:40 25 information that could be gathered?

79 (Pages 317 to 320)

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 348

06:25 1    A  At this time, I can't speak to what's
06:25 2    typical.
06:25 3    Q  Okay. And you can't speak to what's
06:25 4    typical for yourself?
06:25 5        MR. HOARE:  Argumentative.
06:25 6    A  At this time, I have no way of knowing
06:25 7    what I'll recall in an hour, tomorrow morning, in
06:25 8    six months.
06:25 9    Q  Are there any documents out there that you
06:25 10  can think of that could possibly help you better
06:25 11  recall facts than you've been able to testify today?
06:25 12       MR. HOARE:  Requires speculation.
06:25 13   A  At this time, I don't know.
06:25 14   Q  Is there any document that you think might
06:25 15  exist that if I were able to provide you --
06:25 16   A  At this time --
06:25 17   Q  -- that might help you understand better?
06:25 18       MR. HOARE:  Same objection, requires
06:25 19  speculation.
06:26 20   A  At this time, I'm not certain.
06:26 21   Q  Well, you're not certain is different than
06:26 22  you don't believe. Are there? Is there? Is there
06:26 23  some glimmer somewhere that says, look, if I had
06:26 24  that document, maybe I'd be able to remember better?
06:26 25   A  At this time, I don't know.

Page 349

06:26 1        MR. GORE:  All right. With my objection
06:26 2    on the grounds that I would like to spend more time
06:26 3    with this witness and with the express right to
06:26 4    request time to reopen the deposition once we get
06:26 5    the discovery we haven't gotten, I'm finished.
06:26 6        MR. HOARE:  Thank you. One minute.
06:26 7            EXAMINATION
06:26 8    BY MR. HOARE:
06:27 9    Q  Ms. Scott, let me refer you to
06:28 10  Exhibit Number 6, and particularly to page 14.
06:28 11       MR. GORE:  Which is Exhibit Number 6,
06:28 12  Michael?
06:28 13       MR. HOARE:  Supplemental Responses to
06:28 14  Defendant's First Interrogatories to Plaintiff.
06:28 15       MR. GORE:  Thank you.
06:28 16       MR. HOARE:  Okay.
06:28 17   Q  Page 14, interrogatory 12, top of the
06:28 18  page. There's a reference there to December 2005
06:28 19  through May 2006. Do you see that?
06:28 20   A  Yes.
06:28 21   Q  Okay. And when did you leave the
06:28 22  Congressman's office?
06:28 23       MR. GORE:  Objection, asked and answered
06:28 24  numerous times. The witness cannot recall.
06:28 25   Q  You may answer.

Page 350

06:28 1    A  I believe it was to be sometime in June of
06:28 2    2006.
06:28 3    Q  Okay. And the -- so this would be a
06:28 4    mistake?
06:28 5    A  Yes.
06:28 6        MR. GORE:  What's "this"?
06:28 7    Q  As it appears in the top of page 14,
06:29 8    December 2005 through May 2006.
06:29 9    A  Yes.
06:29 10   Q  Okay. And below that there's a reference
06:29 11  to a June 18th, 2006. Do you see that date?
06:29 12   A  Yes.
06:29 13   Q  And that date seems to suggest that you
06:29 14  started your employment at the JGB Companies on that
06:29 15  date.
06:29 16   A  Yes.
06:29 17   Q  Is that accurate?
06:29 18       MR. GORE:  Objection, asked and answered.
06:29 19   A  To the best of my knowledge, no.
06:29 20   Q  Okay. When did you start with the
06:29 21  JGB Companies, to the best of your present
06:29 22  knowledge?
06:29 23   A  To the best of my knowledge, it was
06:29 24  sometime before then.
06:29 25   Q  Did you type these responses to the First

Page 351

06:29 1    Supplemental Responses to Defendant's First
06:29 2    Interrogatories?
06:29 3    A  No.
06:29 4    Q  Okay. All right. I want you to refer to
06:30 5    Exhibit 11. And I'll hand you a copy of Exhibit 11.
06:30 6        MR. GORE:  It's the JBG letter.
06:31 7    Q  Exhibit 11 is the correspondence
06:31 8    apparently from JGB Companies dated June 2nd, 2006,
06:31 9    a two-page document. And have you seen that
06:31 10  document in connection with this litigation before
06:31 11  today?
06:31 12       MR. GORE:  Objection, asked and answered.
06:31 13   Q  You may answer.
06:31 14   A  Can you define "in connection with this
06:31 15  litigation"?
06:31 16   Q  Sure. Is that a document that you
06:31 17  produced in this litigation?
06:31 18       MR. GORE:  Objection, asked and answered.
06:31 19   A  Not that I'm aware of.
06:31 20   Q  Okay.
06:31 21   A  No.
06:31 22   Q  Indeed, it doesn't have a plaintiff's
06:31 23  Bates stamp number on it, does it, on either of the
06:31 24  two pages?
06:31 25       MR. GORE:  Objection, leading.

Reported by:
Mary Ann Payonk, CRR-RDR

# ATTACHMENT 2

**(Plaintiff's May 14, 2006 Email to Congressman Alexander)**
**(Exhibit 4 to Plaintiff's Deposition)**

Case 1:06-cv-00661-CKK  Document 28-3  Filed 07/12/2007  Page 52 of 72



May 14, 2006

Congressman Alexander,

It has been made clear to me by your Chief of staff, Royal Alexander, that you and he are unhappy with my performance as your scheduler. This is unfortunate for me because I have given 100% to the job and I have never wavered in support of you. I have been a loyal, honest, dependable, capable and trustworthy employee who has diligently tried to satisfy the requirements of the job without any job training whatsoever, (except for the few days Jonathan was here before moving back to Louisiana).

I began my employment as your scheduler back in November of 2005. The first time I was made fully aware of all of my job duties was in an email from Royal on March 10, 2006 outlining things Royal said you expected (such as getting the meetings upon arrival and interrupting the meetings after 30 minutes). The next indication that you might be unhappy with my performance came in the form of an email on May 1 in which Royal outlined a few scheduling problems. At this time, Royal made it clear that I would be replaced if my performance did not improve.

Most recently, this past Friday, May 12th, Royal informed me that I would no longer be the scheduler and was being replaced by Danielle. He offered me the position of Staff Assistant, but that I would have two weeks to demonstrate satisfactory performance or be terminated. The principle reason Royal has offered for making this change is that I was not providing you with sufficient details and made too many mistakes. This was the first time I was ever made aware that you were dissatisfied with the level of detail you were receiving.

1

DEF-01359

My purpose in sending you this email is not just to discuss my job performance. Royal has consistently made sexual advances; unnecessary and unwelcome sexual remarks; physically touching me without my approval in a way that was totally inappropriate, among other things. In one instance, he wrapped his arms around me and kissed me on the head and forehead, telling me that I was wonderful, "the best" and thanked me for my attention to detail. In another instance, he placed his hands around my middle and proceeded to move them up and down while helping me step down off of a chair. All I needed was for him to extend his hand, not use his hands to feel my body.

There are other instances, such as the time he told me that my sisters and I were the sexiest girls he had ever seen. On many occasions at the office I have received comments about my appearance and physique, which were totally inappropriate. Many of his efforts to show me support came in the form of hugs that were far too close for comfort. In one phone conversation, he commented on how sexy and beautiful I was and that I should be a model.

My ability to perform in an office supervised by Royal has been impacted, as he has made me extremely uncomfortable and has created a work environment that I find increasingly hostile. It is no surprise to me and should be no surprise to you that my constant rebuffs of his sexual advances has directly impacted his evaluation of my ability to perform my job. I am not aware of what, if anything, he has communicated to you concerning my job performance, but I can assure you that if it has been negative then it was biased, unfair and for the most part, un-true. I am ready at any time to demonstrate to you how inaccurate Royal's assessment of me is by showing you all the records I have. I can prove to you that I have done the job you hired me to do.

But a far more important reason for this communication is to let you know that I have thoroughly enjoyed working for you. It has been an honor and a privilege. I have the utmost respect for all that you stand for and for the strides you are taking to make a difference in the lives of those you serve. I have no desire to be a detriment to you or your constituents, but I feel that now is the time to let you know about the discriminatory and unfair working conditions in your office. Not only do you have a right to know, you have a need to know.

It is my heartfelt belief that Royal has deliberately set about to discredit my work in order to justify not giving me the raise that was promised to me when I took the position. Upon my graduation, I was to be given a raise. He has made it clear that I will not receive the pay raise he agreed upon as a condition of my employment. Because of this and other negative remarks he has made in the office about women in general and how there are too many women in the office, it is clear that he does not fully appreciate the role of women in the workplace. He has made me feel that because I am a woman I do not have the same value that a man would have in the same position. Perhaps this is why Jonathan's salary was $5000 per year more than mine when he took the position as scheduler, even though he was not as qualified and does not have my educational background. By failing to compensate me properly and by failing to grant me the raise as promised, and by manufacturing bogus mistakes attributed to me, Royal has discriminated against me.

2

DEF-01360

To review; Royal has sexually harassed me; Royal has discriminated against me because I am female; and if he fires me, Royal runs the risk of separation without just cause. I have made every effort to rectify this situation on my own by meeting with Royal and through numerous unreturned phone calls while I have been away from the office. Now that Royal has made it clear to me that he intends to fire me in two weeks and/or demote me, I have sought counseling through the Office of Employee Assistance and the Office of Compliance.  They are in agreement that Royal has created a problem. My purpose and my hope in informing you of these developments is that you will be able to take steps to rectify the situation so that those who work for you presently or in the future are not subjected to this form of harassment and hostility.  Throughout all of this, I have discussed my insecurities and concerns with both Linda and Tommie in detail.  It was my desire and my hope that they would communicate with you since I felt uncomfortable taking up your valuable time with my personal concerns.

Again, I have thoroughly enjoyed working for you and have done so with great pride. Thank you for taking the time to acknowledge me and to recognize my concerns.

Sincerely,

Elizabeth Scott

3

DEF-01361

# ATTACHMENT 3

**(Plaintiff's Responses to Defendant's Requests for Admissions)**
**(Exhibit 3 to Plaintiff's Deposition)**

UNITED STATES DISTRICT COURT
for the District of Columbia

| | |
|---|---|
| ELIZABETH B. SCOTT, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:06CV01661 (CKK) |
| | ) |
| v. | ) |
| | ) |
| Office of Congressman RODNEY ALEXANDER, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S REQUESTS FOR ADMISSIONS

_____Pursuant to Civil Rule 36, Plaintiff, by her undersigned attorneys, responds and objects to Defendant's Requests for Admissions.

### GENERAL OBJECTIONS

Plaintiff objects to Defendant's "Definitions" and "Instructions" to the extent that they attempt to impose requirements and obligations upon her in excess of that provided for in the Rules of Civil Procedure.

By admitting to the authenticity of any document referenced by these requests for admissions, Plaintiff does not concede the admissibility or relevance of the subject documents.

Request No. 1:    The three page document attached hereto as Exhibit A is a complete, true and accurate copy of an email you sent to Representative Rodney Alexander on May 14, 2006.

**Response:**

Admitted

1

Request No. 2:          The May 14, 2006 email was the first time you informed Representative Alexander personally that you believed Royal Alexander was engaging in sexually harassing behavior.

**Response:**

    Admitted

Request No. 3:          The May 14, 2006 email was the first time you informed Representative Alexander personally that you believed Royal Alexander was engaging in sexual discriminatory behavior.

**Response:**

    Admitted

Request No. 4:          The May 14, 2006 email was the first time you informed Representative Alexander personally that you believed Royal Alexander was engaging in retaliatory behavior.

**Response:**

    Admitted

Request No. 5:          You are not seeking back pay or front pay as remedies in this lawsuit.

**Response:**

    Plaintiff objects to Defendant's proposition as compound, vague and ambiguous and denies it except she admits she is not seeking so-called "front pay."

Request No. 6:          You are not seeking reinstatement as a remedy in this lawsuit.

**Response:**

    Admitted

2

<u>Request No. 7</u>:    You did not work for a Congressional office (either as an intern or

employee) prior to commencing service with the Office Representative Alexander in 2005.

**Response:**

     Admitted

<u>Request No. 8</u>:    You have never lived in the Fifth Congressional District of Louisiana.

**Response:**

     Admitted

<u>Request No. 9</u>:    Apart from the work you may have performed in 2005 and 2006 in your

capacity as an intern and/or employee of the Office of Representative Alexander, you have never

performed work in the Fifth Congressional District of Louisiana.

**Response:**

     Admitted

<u>Request No. 10</u>:    In June 2006, the Office of Representative Alexander asked you to return

to work.

**Response:**

     Plaintiff objects to Defendant's proposition as inaccurate and incomplete.  Defendant

placed Plaintiff on administrative leave after May 14, 2006; Defendant's counsel advised

Plaintiff's counsel on June 1, 2006 that Plaintiff was expected to return to work on Thursday,

June 8, 2006; Defendant's counsel, on June 6, 2006, advised Plaintiff's counsel that she would

advise Plaintiff's counsel "shortly on Ms. Scott's exact return date."  Defendant's counsel on

June 7, 2006 advised Plaintiff's counsel that Plaintiff was expected back to work on June 12,

2006.

Request No. 11:        You did not return to work in the Office of Representative Alexander after you sent the May 14, 2006 email to Representative Alexander.

**Response:**

    Admitted

Request No. 12:        On or about June 9, 2006, you authorized that the Office of Representative Alexander be advised that you had "determined that it would not be prudent for [you] to return at this time to Congressman Alexander's office" and that you had "committed instead to alternative employment."

**Response:**

    Admitted

Request No. 13:        As of June 9, 2006 you had in fact committed instead to alternative employment.

**Response:**

    Admitted

Request No. 14:        As of June 9, 2006, you had in fact made a decision not to return to work in the Office of Representative Alexander.

**Response:**

    Admitted

Request No. 15:        At the time you were employed as a Scheduler in the Office of Representative Alexander, the position of Staff Assistant received the same salary as the position of Scheduler.

4

**Response:**

Plaintiff has made reasonable inquiry of Defendant regarding this matter and the information known by her now is insufficient to permit her to admit or deny Defendant's proposition and Plaintiff therefore denies this proposition.

<u>Request No. 16</u>

Redacted

**Response:**

Redacted

Respectfully submitted,

_____s/s_____
Michael J. Hoare, Esq. [D.C. Bar No. 206979]
MICHAEL J. HOARE, P.C.
1101 14th Street, N.W.
Suite 710
Washington, DC 20005
202.408.7901
202.408.7903 (fax)
Attorney for Plaintiff

5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd  day of May, 2007, I caused to be served, by email, a copy of the foregoing Plaintiff's Responses to Defendant's Requests for Admissions:

Russell Gore
Office of the House Employment Counsel
1036 Longworth House Office Building
Washington, DC 20515-5532
Russell.gore@mail.house.gov

<div style="text-align:center">s/s</div>
_____
Michael J.  Hoare

# ATTACHMENT 4

**(May 15, 2006 Email)**
**(Exhibit 18 to Plaintiff's Deposition)**

**Gore, Russell**

| | |
|---|---|
| **From:** | Scott, Elizabeth |
| **Sent:** | Monday, May 15, 2006 11:31 AM |
| **To:** | Sowers, Patrick |
| **Subject:** | deleted files |

Hi Pat.

Quick question....I was deleting some of my folders last week that I no longer use and don't need....and I accidently deleted some in my deleted files that I didn't mean to...can these be recovered?
I'm not at work today, but am happy to give you my password to work on my computer if need me.  Let me know...thanks!!

*Elizabeth Scott*
U.S. Congressman Rodney Alexander (LA-05)
316 Cannon HOB
Washington, D.C. 20515
202.225.8490  office
202.225.5639  fax
www.house.gov/alexander



# ATTACHMENT 5

**(May 24, 2006 Email)**
**(Part of Exhibit 5 to Plaintiff's Deposition)**

| | |
|---|---|
| **From:** | EBScott47@aol.com |
| **Sent:** | Wednesday, May 24, 2006 3:26 PM |
| **To:** | royal.alexander@mail.house.gov |
| **Subject:** | hey |

Please call me so we can arrange for my return to the office tomorrow.

Thank you.

Elizabeth

P. 0262

From:      Terry, Adam [Adam.Terry@mail.house.gov]
Sent:      Wednesday, May 24, 2006 6:17 PM
To:        'EBScott47@aol.com'
Subject:   Elizabeth

Elizabeth:
The Congressman told me to tell you that you will be on two week paid administrative leave. This is just to allow the attorneys to complete the investigation, interview Jonathan, and wrap up any other loose ends.

See you in two weeks.

AT

Adam Terry
Press Secretary/Legislative Assistant
Office of U.S. Rep. Rodney Alexander
202-225-8490

P. 0263

# ATTACHMENT 6

**(Plaintiff's signed offer letter)**
**(Exhibit 11 at Plaintiff's Deposition)**

THE JBG COMPANIES

CONFIDENTIAL

*Personal & Confidential*

June 2, 2006

Ms. Elizabeth Scott
                 Redacted

Dear Ms. Scott:

I am pleased to offer you a non-exempt position of **Administrative Assistant** with JBG Properties, Inc. ("JBG"), effective on the start date indicated below. In this capacity, you will report                Redacted

Further details of this offer of employment are as follows (of course, JBG reserves the right to modify any of its benefit programs at any time):

Your employment at JBG will be "at-will." By executing this letter you agree that you understand and acknowledge that there is no agreement between you and JBG or any of its affiliated companies for any definite period of employment and that JBG has the right to terminate your employment at any time, with or without cause and without prior notice.

By executing this letter you also acknowledge that you will receive an Employee Handbook further outlining the terms of your employment at JBG as well as JBG's policies. Compliance with the Employee Handbook is a condition of employment. In addition, prior to employment with JBG, all employees must review and execute an acknowledgment form indicating that they have read and understood BG's polices as outlined in its Employee Handbook.

This offer is contingent upon the successful completion of a background check.

On your first day of employment you will be required to complete the Employment Eligibility Verification form (I-9). You will need to provide documents verifying your employment eligibility as required by this Federal regulation.

Compensation
Your hourly pay will be $21.54, subject to all applicable deductions and withholdings, payable bi-weekly on JBG's scheduled payroll dates. As a non-exempt employee, you are eligible for overtime pay for hours worked in excess of 37.5 hours per work week. You will be eligible for a performance bonus of up to $5,000 Your actual bonus amount will be primarily based on how well you meet and exceed mutually developed goals and objectives, and is influenced by other factors such as the overall financial performance of JBG.

Start Date
Your intended start date will be June 12, 2006. On your first day of employment, please plan on meeting with Human Resources at 9:30 am to assist you in your orientation and training. Your supervisor will establish your hours thereafter.

Benefits Plan Coverage
Details of JBG's benefits and applicable coverage parameters accompany this offer letter, including necessary enrollment forms for your completion.

JBG allows the employment of relatives of current employees provided that the employment does not, in JBG's opinion, create actual or perceived conflicts of interest. Accordingly, we ask that you disclose any relatives of yours working at JBG to avoid any conflicts of interest. Relatives, for purposes of this policy, include those related by

Redacted

CONFIDENTIAL

blood or marriage, as well as those engaged in a committed relationship such as domestic partners or significant others.

Included with this offer letter, please find a Hiring Package, which includes appropriate personnel and benefits forms. Please sign the enclosed offer letter and return it to Human Resources within seven days of the date of this offer or this offer will terminate. Complete the entire package and bring all documents with you on your first day. Please feel free to contact Human Resources      Redacted      further explain your benefits and to assist you in completing your employment processing.

On behalf of JBG Properties, Inc., we are pleased you have chosen JBG and look forward to working with you.

Welcome to JBG!

Sincerely,


        Redacted


I, Elizabeth Scott:

        * accept this offer of employment;
        * have read, understand and agree to the terms and conditions contained in this letter; and
        * declare that all education, employment and other information provided by me to JBG Properties, Inc. in
          connection with my hire by JBG Properties, Inc. is true.

_____        6-13-06
Signature                               Date


cc:  Personnel File

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ELIZABETH SCOTT                      )
                                     )
                                     )
            Plaintiff,               )
                                     )
    v.                               )
                                     )   Civil Action No. 1:06CV01661
                                     )
                                     )   (CKK/AK)
OFFICE OF RODNEY ALEXANDER,          )
Member, U.S. House of Representatives, )
                                     )
            Defendant.               )
                                     )
_____)

### PROPOSED ORDER

      Having considered Defendant's Motion to Dismiss Count III and for Summary Judgment

As To Counts I and IV of Plaintiff's Supplemental Complaint, the supporting authorities and

documents attached thereto, the affidavit of Congressman Rodney Alexander, Plaintiff's

Opposition and any supporting authorities and documents, and Defendant's Reply, and the entire

record herein, IT IS HEREBY ORDERED:

    1.    Litigation of Count III is barred by Article I, Section 6 of the United States

        Constitution (the Speech or Debate Clause); accordingly, Count III is

        DISMISSED WITH PREJUDICE for lack of subject matter jurisdiction.

    2.    Summary judgment is GRANTED with respect to Count I because the undisputed

        material facts, as evidenced exclusively by Plaintiff's deposition testimony, show

        that the alleged harassing conduct is not severe or pervasive as a matter of law.

    3.    Summary judgment is GRANTED with respect to Count IV because the

        undisputed material facts, as evidenced exclusively by Plaintiff's deposition

testimony, show that Plaintiff cannot establish that her working conditions were so intolerable that she had no choice but to quit employment with Defendant.

4.    IT IS FURTHER ORDERED THAT this case and discovery shall proceed only with respect to Counts II and V.  Further, Plaintiff shall conduct discovery only as to these two remaining claims and not with respect to the issues raised in the now dismissed Counts I, III, and IV.  Additionally, Plaintiff shall not inquire of any witness into any matter, topic, or area that is barred by the Speech or Debate Clause.

SO ORDERED.

_____                    _____
Date                                                          Colleen Kollar Kotelly
                                                               United States District Court Judge