## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELIZABETH SCOTT      )
           )
    Plaintiff,    )
           )
           )
  v.        )
           ) Civil Action No. 1:06CV01661
           ) (CKK) (AK)
OFFICE OF RODNEY ALEXANDER, )
Member, U.S. House of Representatives )
           )
    Defendant.   )
           )
           )

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I AND IV OF PLAINTIFF'S SUPPLEMENTAL COMPLAINT

Defendant Office of Congressman Rodney Alexander, Member, United States

House of Representatives ("the Office" or "Defendant"), through undersigned counsel,

hereby files its Reply Brief in support of its Motion for Summary Judgment.[1]

---

[1] On July 12, 2007, Defendant filed a single motion which sought dismissal of Count III and summary judgment as to Counts I and IV of Plaintiff's Supplemental Complaint. Plaintiff filed two oppositions, addressing these arguments independently. Accordingly, Defendant files two reply briefs. Defendant recognizes that, if the Court considers its two Reply briefs as one, the total page count exceeds the 25 page limit in the Local Rules. Should the Court consider both briefs as one, Defendant respectfully requests that the Court allow it to exceed the page limit. Much of Plaintiff's brief misconstrues Plaintiff's deposition testimony, and thus requires Defendant to quote extensively from Plaintiff's deposition in this Reply. Additionally, the Speech or Debate issue presented by this case is one of first impression in light of the decision of the D.C. Circuit in *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006). Plaintiff's conclusory statements regarding the Clause and the need for this Constitutional issue to be appropriately briefed justify Defendant's request to exceed the page limit. Should the Court deem it necessary, Defendant will file a formal motion requesting an enlargement of the page limit.

## I.    **Defendant's Request For Summary Judgment Is Proper And Timely**

As explained in Defendant's Reply brief in support of its motion to dismiss, courts should eschew Constitutional adjudication when there is a non-Constitutional basis for resolving a claim. That principle has particular application here and strongly militates in favor of this Court's considering Defendant's request for summary judgment. Furthermore, Rule 56(b) provides that a party may move for summary judgment "at any time" and that judgment shall be granted "forthwith" when warranted. *See Johnson v. United States*, 460 F.3d 616, 620 (5th Cir. 2006) (suggesting that local rules and scheduling orders should not be read so as to make Rule 56's "at any time" language superfluous). The rule's reference to "at any time" helps ensure the just, speedy and inexpensive determination of the action, Fed.R.Civ.P. 1, and expressly authorizes a party to avoid having to go through extensive, distracting and harassing discovery when it is crystal clear early on that there is insufficient evidence for a plaintiff to state a claim.

Additionally, and contrary to Plaintiff's assertions, Defendant's request for summary judgment was made after Defendant contacted the Court. Defendant advised the Court on May 25, 2007 by facsimile letter (with a copy to Plaintiff's counsel) and by formal motion on May 31, 2007 that it was requesting a status conference to discuss its filing of a dispositive motion. The Court thereafter requested that the parties submit a proposed briefing schedule, which it adopted as modified, and did not hold a status conference. *See* Minute Orders of May 31, 2007 and June 8, 2007. It is true that the focus of Defendant's May 25 and 31 request was Speech or Debate dismissal. However, as explained in Defendant's moving papers and in its Reply brief, it became clear to Defendant that resolution of the summary judgment issues is central to the orderly

adjudication of the Speech or Debate Clause's impact on this case. Accordingly, in light of all of the foregoing, Defendant reasonably believed that its May 25 and May 31 requests for a status conference had satisfied the Court's directive at the March 16, 2007 scheduling conference that it contact the Court before filing a dispositive motion.[2]

## II.    Plaintiff's Rule 56(f) Declaration Should Be Stricken Because It Directly Contradicts Her Sworn Deposition Testimony

At her seven hour deposition on May 21, 2007, Plaintiff responded repeatedly that she did not "recall" information or facts "at this time." By Defendant's count, she used the response "I do not recall at this time" or its equivalent 503 times in her deposition (which calculates to roughly once every 50 seconds). At one particularly egregious point in the deposition, Defendant's counsel suggested to Plaintiff's counsel that perhaps he might want to have a discussion with his client regarding her supposed inability to recall under oath, but Plaintiff's counsel refused. *See* Pltf's Dep. at 106-107 (excerpts of Plaintiff's May 21, 2007 deposition cited in this Reply brief are located at Exhibit 1[3]).[4]

---

[2]    The Court's June 8, 2007 Scheduling Order granted Plaintiff until August 24, 2007 to file her Opposition. If Plaintiff believed that Defendant's request for summary judgment was not subject to this Scheduling Order, then the default time limits set forth in this Court's local rules would have applied, and her Opposition would have been due a month earlier -- on July 23, 2007. *See* LCvR 7(b). Plaintiff's decision not to file an opposition at that time, but instead to wait until August 24 to oppose Defendant's summary judgment request, makes her arguments in this regard hollow.

[3]    Some deposition pages cited herein were attached to Defendant's moving papers. For ease of reference, Defendant attaches all deposition pages cited in this Reply (even if previously provided) as Exhibit 1 to this brief.

[4]    On Friday, May 18, 2007, Plaintiff signed a verification, swearing under oath that her supplemental interrogatory responses submitted on that same date (supplemented pursuant to a directive from Magistrate Judge Kay) were true and correct. Among the matters that required supplementation were the dates of Plaintiff's new employment. And, accordingly, the May 18 supplemental responses stated explicitly that Plaintiff began work at her new employer on the specific date of June 18, 2006. Pltf's Dep. at

During a teleconference with the Court (Magistrate Judge Kay) while the deposition was proceeding, Defendant's counsel mentioned to the Court (on the record and in the presence of Plaintiff and her counsel) his concerns about his ability to proceed with the deposition in light of the witness's professed inability to recall. Pltf's Dep. at 89-92, 95-96. Nonetheless, Plaintiff's convenient lack of recall persisted throughout the day. Defendant's counsel also explicitly asked Plaintiff on a number of occasions and in a number of different ways whether there was any document, or any other source of information that Plaintiff believed might help her memory. Pltf's Dep. at 159, 348. Plaintiff responded that she did not know or that she was not aware of any such information or documents "at this time." Pltf's Dep. at 348.

Plaintiff was duly sworn prior to the commencement of the deposition. *See* Pltf's Dep. at 6:2-3. Plaintiff testified that she was not under the influence of any medication or other substance at the time of her deposition that would interfere with her ability to recall or testify truthfully. Pltf's Dep. at 10-11. Plaintiff also testified that she had never been diagnosed with any type of memory deficiency or disorder. Pltf's Dep. at 144. Plaintiff thus had ample notice at her deposition of the need to tell the truth fully and accurately and offered no legitimate excuse for not being able to do so. It is clear that Plaintiff

---

101-102. (The exact date Plaintiff began employment with her new employer was relevant to an assessment of the veracity of Plaintiff's claims regarding the circumstances of her resigning from Defendant.) Despite Plaintiff's verified and sworn verification, at her deposition only three days later, Plaintiff expressly disavowed the June 18 date and professed a complete inability to recall when she began work, or to even narrow it down to any specific time in the month of June. (Pltf's Dep. at 105: "Q: You don't have any knowledge. It could have been June 1 or June 30. You can't even narrow it down to a week? A: I don't recall. I – I didn't keep track of it."). This was in addition to Plaintiff's inability to recall even the circumstances of her signing her verification three days earlier. *See* Deft's Initial Memo at 36, n. 29 ("I don't know what I did three days ago.")

apparently viewed her deposition as a "test run," and, now, recognizing that she may

actually be bound by her truly extraordinary 503 instances of failure-to-recall on May 21,

2007, is essentially requesting that the Court grant her a "do-over." As demonstrated in

the chart below, Plaintiff is now *directly and materially* contradicting her prior testimony,

and Plaintiff's "do-over" request should be summarily rejected.

| Plaintiff's May 21, 2007 deposition | Plaintiff's August 24, 2007 declaration |
|---|---|
| A: "At this time, I have no way of knowing what I'll recall in an hour, tomorrow morning, in six months." <br> Q: "Are there any documents out there that you can think of that could possibly help you better recall facts than you've been able to testify today?" <br><br> [Objection by Plaintiff's attorney "Requires speculation."] <br><br> A: "At this time, I don't know." <br> Q: "Is there any document that you think might exist that if I were able to provide you –" <br> A: "At this time –" <br> Q: " - - that might help you understand better?" <br><br> [Objection by Plaintiff's attorney: "Same objection, requires speculation."] <br><br> A: "At this time, I'm not certain." <br> **Q: "Well, you're not certain is different than you don't believe. Are there? Is there? Is there some glimmer somewhere that says, look, if I had that document, maybe I'd be able to remember better?"** <br> **A: "At this time, I don't know."** <br><br> *Pltf's Dep. at 348.* | "It is likely that a meaningful review of that Day Planner would refresh my memory regarding dates and/or events relevant to this lawsuit." ¶ 4. <br><br> *[Plaintiff clearly knew this Day Planner existed at the time of her deposition. See Pltf's Opp. at 4-5; see also Exhibit 2 (copy of Plaintiff's August 4, 2006 letter to Congressman Alexander requesting return of the Day Planner).]* |
| Q: "This is the full extent of what you can recall?" <br> A: "At this time, this is what I remember." <br> Q: "Okay. What do you mean when you say 'at this time'?" <br> A: "Today, this very moment." <br> **Q: "Okay. Is there something that you believe there's some piece of information or some other source out there that would help you remember something differently on another day?"** | "I reasonably expect that were I to review what they [Nancy Alexander, Linda Blount, Tommie Seaton, Danielle Savoy] have to say regarding Royal Alexander and matters relating to his behavior vis a vis me and other females in the office, that review would likely refresh my |

| | |
|---|---|
| A: **"I'm not certain. It's possible**." <br> Q: "Well, what is it that's possible? <br> Mr. Hoare: "Objection, requires speculation." <br> Q: "Just trying to understand your testimony." <br> Mr. Hoare: "Same objection." <br> A: "I could remember something tomorrow." <br> Q: "But you're not remembering it today? <br> A: "At this time, this is what I remember." <br><br> *Pltf's Dep. at 159* <br><br> Q: "Well, do you believe that with the passage of time that your recollection is somehow going to get better?" <br> A: "At this time, I'm uncertain as to what I'll be able to recall tomorrow or six months from now." <br> Q: "Is it typical, though, that with more time that passes that your memory gets better?" <br> A: "I suppose its always possible. I don't know." <br> Q: "Is it typical for you?" <br> A: "At this time, I don't know." <br> Q **"I know at this time you don't know. I'm asking, though, in your life, in your experience, is it typical that you get a better memory of events as time elapses?"** <br> Mr. Hoare: "Objection." <br> A: **"At this time, I can't speak to what's typical."** <br><br> *Pltf's Dep. at 347-348. (emphasis added).* | memory regarding Mr. Alexander's behavior." ¶ 5. <br><br> "I believe it would likely refresh my memory regarding Mr. Royal Alexander's conduct were I to review what he and Congressman Alexander have to say regarding these matters." ¶ 6. |
| Q: "You are aware that the Congressman undertook – retained an outside law firm to undertake an investigation of your allegations, aren't you?" <br> A: "I – at this time, I don't know." <br> Q: "You've heard that before, correct?" <br> A: "I believe so, yes." <br> Q: "Okay. And you didn't participate in the investigation, did you?" <br> A: "Not that I'm aware of." <br> Q: " Do you – why didn't you participate in the investigation?" <br> A: "I would have to speak to my attorney about that." <br><br> *Pltf's Dep. at 320.* | "I understand that Defendant retained the firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo to interview other persons in Congressman Alexander's office regarding my claims and Royal Alexander's behavior. I reasonably expect that were I to review the results of that investigation, including the particulars of witness interviews, that my memory would likely be refreshed about such matters." ¶ 7.[5] |

---

[5]    Plaintiff refused to participate in the Office's investigation of her allegations and refused to be interviewed by the Office's investigators. *See* Pltf's Dep at 320-321. Plaintiff therefore rightly does not allege that the investigator documents contain any statement by her or notes of any interview of her.

A plaintiff may not oppose summary judgment by offering an affidavit that contradicts her prior sworn testimony. A "deposition is the time for the plaintiff to make a record capable of surviving summary judgment - not a later filed affidavit." *Galvin v. Eli Lilly and Co.,* 488 F.3d 1026, 1030 (D.C. Cir. 2007) (internal citation omitted); *Reetz v. Jackson*, 176 F.R.D. 412, 414-415 (D.D.C. 1994) (there is "no reason to allow a plaintiff to effectively erase from the record her sworn deposition testimony with a later-filed affidavit submitted nearly four months after her deposition was taken").

Another district court recently addressed a similar issue in an employment case. Its analysis of what occurred at that plaintiff's deposition and why that plaintiff could not later supplement her faulty recollection to defeat summary judgment is directly, almost eerily, applicable here:

> In the present case, Plaintiff's deposition is a model of obfuscation. Plaintiff answered that she did not remember, did not know, or could not recall in response to, by the court's count, seven hundred questions. In response to Defendant's motion for summary judgment, Plaintiff has attached an affidavit in which she now provides more specific times, new events, and new conversations with supervisors with no explanation of how her memory has been refreshed on these important topics. The affidavit does far more than simply supplement prior answers. [internal citation omitted].
>
> **Seven hundred responses of "I don't remember" or the equivalent is extraordinary. Plaintiff was either coached not to respond to questions or has an incredibly bad memory. If this lack of recall was a result of trial strategy, it cannot be condoned.** On the other hand, if Plaintiff had no recall of the events which underpinned this lawsuit at the time of her deposition, her inability to recall even basic facts deprived the Defendant of the opportunity to conduct a meaningful deposition. It would be unfair to allow Plaintiff to defeat summary judgment by an eleventh hour recollection of events which comes with no explanation of how her memory was refreshed.

*Buchanan v. Heerema Marine Contractors U.S., Inc.,* No. Civ. A. H-04-3885, 2005 WL 2458019, at *4 (S.D. Tex. Oct. 5, 2005) (emphasis added).

Plaintiff Scott's Rule 56(f) declaration, combined with the cavalier attitude she displayed regarding her sworn verification of her interrogatory responses, her obfuscatory responses to questions at her deposition, and her efforts to contradict facts she clearly admitted pursuant to Rule 36 Requests for Admission (*see* n. 14, *infra*), show that Plaintiff is abusing the discovery process. Because Plaintiff's Rule 56(f) declaration contradicts her prior testimony, it should be stricken.[6]

### III.    Plaintiff's Rule 56(f) Affidavit Does Not Meet Even The Lenient Standard Entitling Her To Additional Discovery With Respect To Counts I and IV

Should the Court not strike Plaintiff's Rule 56(f) declaration outright, the affidavit nonetheless is insufficient to meet even the lenient standard under which Rule 56(f) requests are to be evaluated. Defendant's request for summary judgment is very narrowly-tailored to address matters that are exclusively within Plaintiff's knowledge and about which she was questioned at length in her deposition, *i.e.,* the specific conduct that Royal allegedly engaged in that Plaintiff experienced, and which she contends was severe, pervasive or intolerable. Plaintiff asserts that Defendant's motion is premature because additional discovery will "enhance" her memory, and by extension, her deposition testimony. In other words, what Plaintiff appears to be saying is that she needs to be coached by hearsay evidence from others in order to "remember" what happened *to her* that was severe, pervasive, or intolerable. If Plaintiff cannot now remember conduct that *she supposedly experienced* and that she contends is *severe, pervasive or intolerable* without "memory enhancers" from a Day Planner or based on

---

[6]    This is particularly so when at least one of her goals appears to be to embarrass Congressman Alexander (*see, e.g.*, Pltf's Rule 56(f) declaration at ¶ 9) with discovery that has little, if any, relevance to her claims.

8

what others might say, how then, as a matter of law, can she have truly perceived such conduct to be *severe, pervasive, or intolerable?* If Plaintiff contends that this conduct occurred "constantly" and on "numerous occasions," but she also cannot say whether the conduct occurred more than once or more than five times, how can the testimony of others or a Day Planner materially alter her recollection of how frequently or infrequently such allegedly severe, pervasive, or intolerable conduct occurred?[7]

When a plaintiff in an employment or harassment case fails to show how additional discovery will allow him or her to survive summary judgment - such as when the "summary judgment motion . . . relies almost exclusively on [the plaintiff's] deposition testimony" - a Rule 56(f) affidavit will not preclude or delay the grant of summary judgment. *Clay v. District of Columbia,* No. Civ. A. 03-466, 2005 WL 641750, at *5 n.4 (D.D.C. March 17, 2005), *vacated on other grounds*, 208 F. App'x 6 (D.C. Cir. 2006). For example, in *Burton v. Batista,* 339 F. Supp. 2d 97 (D.D.C. 2004), the plaintiff alleged hostile work environment harassment. The court evaluated the plaintiff's allegations (and, apparently, testimony the plaintiff had submitted by declaration) regarding the conduct he alleged was severe or pervasive. In response to the

---

[7]    In her Supplemental Complaint, Plaintiff alleges that Royal "engaged in a course of conduct with respect to Plaintiff that included, among other things, inappropriate sex-based comments, ogling and touching." Compl. ¶¶ 7, 15-19 (emphasis added). Nowhere in the Complaint does Plaintiff allege that Royal's alleged behavior with respect to others is part of her harassment claim. (In Count II, Plaintiff alleges that other women were paid less than men, but this allegation is explicitly pled as a part of her equal pay claim, not her harassment claim, *see* Compl. ¶¶ 8, 20-21. In any event, Defendant is not seeking summary judgment at this time on the equal pay claim.) Thus, the issue before this Court is not apposite to the cases cited in Plaintiff's Opposition where the plaintiff sought to establish her claim based on conduct the harasser engaged in towards others. Furthermore, Plaintiff contends only that <u>one</u> other employee told Plaintiff that she was purportedly being harassed by Royal. *See* Pltf's Dep. at 285; Pltf's Opp. at 8 ("that same co-worker").

plaintiff's Rule 56(f) request that he be given the opportunity to conduct further discovery, the *Burton* court stated: "[t]he grounds upon which the Court has ruled in rejecting the sexual harassment . . . claims would not be impacted by discovery, given that the Court has taken into full account the allegations in plaintiff's Complaint and Declaration . . ." *Id.* at 115 n.2.    This is exactly the rationale and posture of this case.

In addition to Plaintiff's failure to address Defendant's legal authorities,[8] Plaintiff's Rule 56(f) affidavit does not identify specifically how the additional discovery she seeks would allow her to more effectively oppose Defendant's argument that the conduct she claims to have experienced was not severe, intolerable, or pervasive. Rather,

---

[8]    Defendant discussed *Clay* and *Batista* in its initial memorandum. *See* Deft's Initial Memo at 28 n.26. Plaintiff ignored these cases entirely in her Opposition. Instead, Plaintiff cited three cases that are neither relevant to the posture of this matter, nor are they factually similar. *Lowe v. Winter*, No. Civ. A. 06-1803, 2007 WL 2015389 (D.D.C. July 12, 2007), involved a summary judgment request filed in a FOIA case before any discovery had taken place. The plaintiff adequately articulated that he needed discovery regarding specific factual issues that involved actions and conduct that were not within his knowledge or experience in order to respond to the defendant's motion. To the contrary, whether Plaintiff experienced severe or pervasive harassment by Royal is a matter that is exclusively within Plaintiff's knowledge. *Lowe* is thus inapposite and does not advance Plaintiff's argument. Plaintiff's citation to *Richardson v. Gutierrez*, 477 F. Supp. 2d 22 (D.D.C. 2007) is similarly off the mark. In *Richardson*, the defendant had moved for summary judgment on the plaintiff's retaliation claim. The court agreed with the Rule 56(f) request, noting that discovery regarding the date on which management became aware of the plaintiff's complaint, *inter alia*, was potentially relevant. 477 F. Supp. 2d at 29-30. Such information was within the knowledge of someone other than the plaintiff and was relevant to the plaintiff's ability to establish a causal connection necessary to establish a retaliation claim and thereby defend against the defendant's motion for summary judgment. In this case, contrariwise, Plaintiff is requesting discovery to obtain hearsay information in order to influence her testimony regarding what she experienced. Finally, Plaintiff cites to *Hudert v. Alion Sci. & Tech. Corp.*, 429 F. Supp. 2d 99 (D.D.C. 2006). That case involved a negligence action on a construction site that caused the death of an individual. The Court ruled that the need for additional discovery under Rule 56(f) is "particularly great in negligence actions where facts essential to a negligence claim are exclusively in the possession of the moving party." *Id.* at 109. That rationale is inapposite to Plaintiff's contention.

all Plaintiff testifies to is that she believes reviewing documents and statements of others would "refresh my memory regarding dates and/or events relevant to this lawsuit . . . regarding Mr. Alexander's behavior . . . regarding these matters . . . about such matters." Plaintiff's Declaration at ¶¶ 4, 5, 6, 7. Such vague assertions that the statements of others might somehow affect the Plaintiff's memory do not demonstrate with the requisite degree of particularity how additional discovery would unearth "facts essential to justify [Plaintiff's] opposition." Fed.R.Civ.P. 56(f).[9]

**IV.    Plaintiff's Efforts To Oppose Summary Judgment On Count IV Fail Because They Directly Contradict Her Deposition Testimony, Fail To Meet The High Standard of Intolerability To State A Claim Of Constructive Discharge, And Rely On Information That Is Inadmissible Under Fed.R.Ev. 408**

To establish a claim of constructive discharge, a plaintiff must prove that her "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). Emphasizing the extreme level of intolerability required to state such a claim, the Supreme Court mandates that there be "something more" than actionable harassment. *Id.*; *Valles-Hall v. Ctr. for Nonprofit Advancement,* 481 F. Supp. 2d 118, 144 (D.D.C. 2007) (constructive discharge requires aggravating factors in addition to hostile work environment).

In her discussion of her constructive discharge claim (Count IV), Plaintiff impermissibly merges two distinct issues. First, she unequivocally testified at her

---

[9]    To the extent Plaintiff's Opposition intimates that Defendant has not been forthcoming with its discovery responses, that contention is meritless. In response to Plaintiff's Rule 34 document requests and the six (6) interrogatories she issued, Defendant has produced nearly 1,500 pages of documents, a detailed explanation of its review of electronically-stored information, and a comprehensive 15 page verified response to Plaintiff's six interrogatories.

deposition that the alleged intolerable "working conditions" identified in her
Supplemental Complaint existed on or before May 14, 2006, and that these working
conditions consisted *solely* of Royal's alleged sex-based behavior towards her. She
further testified that these alleged intolerable working conditions were not so severe as to
be intolerable because, on at least two separate occasions after May 14, she "most
definitely" intended to return to work. Since this deposition testimony negates her
constructive discharge claim, Plaintiff attempts now to supplement or enhance her
testimony by arguing that the *different* reasons underlying her decision in June 2006 *not
to return to work* at Congressman Alexander's office were *also* part of the pre-May 14,
2006 "intolerable working conditions." Not only does this conflict with her deposition
testimony, but these additional factors do not, as a matter of law, rise to the high level of
intolerability to state a constructive discharge claim.

     A.     *Plaintiff Testified Unequivocally That It Was Exclusively Royal's Alleged
            Sex-Based Behavior That Constituted The Alleged Intolerable Working
            Conditions Underlying Her Constructive Discharge Claim*

     The constructive discharge claim of Plaintiff's Supplemental Complaint asserts:
"The misconduct referenced above in paragraph 11 constitutes unlawful discharge in
violation of the CAA." Compl. ¶ 23. The incorporated paragraph 11 consists of one
sentence containing a mere twenty-two words: "Defendant made Plaintiff's working
conditions so intolerable after she complained of unlawful discrimination that Plaintiff
reasonably felt compelled to quit her job." Compl. ¶ 11. At Plaintiff's deposition,
Defendant's counsel marked the Supplemental Complaint as an exhibit, handed it to

Plaintiff, asked her to review it, and specifically directed Plaintiff to paragraph 11.[10]

Defendant's counsel asked:

> Q:    Okay.  So looking at paragraph 11 there, is that a true statement?
> A:    Yes.

Pltf's Dep. at 151.   Defendant's counsel then immediately asked:

> Q:    Okay.  What working conditions were made so intolerable after you complained?

Plaintiff did not answer the question, but instead deflected with a question of her

own, *asking* Defendant's counsel to elucidate the meaning of *her* paragraph 11:

> A:    Can you please explain who you are referring to that I complained to?
> Q:    It's your complaint, and I'm asking you.  You say "defendant made plaintiff's working conditions so intolerable after she complained of unlawful discrimination."  It's your complaint, and I'm asking you: What working conditions were made so intolerable after your complaint? [11]

---

[10]    Plaintiff asserts that she "was unable to identify" her Supplemental Complaint when Defendant's counsel introduced it as an exhibit at her deposition and asked her to review it.  Pltf's Opp. at 11.  The transcript illuminates that this assertion is disingenuous. At the deposition, Defendant marked the Supplemental Complaint as Exhibit 16, *see* Pltf's Dep. at 146, and the following exchange ensued.  (It is also worth reminding the Court that English is Plaintiff's native language and that Plaintiff has a Masters Degree in Business Administration).  "Q: . . . This was the supplemental complaint that was filed by your counsel in this case.  Have you seen this before?  A: At the time, I – I don't recall.  Q: Okay.  You don't recall whether you saw your complaint in this lawsuit before?  A: I'm not certain.  Q: . . . do you have a general – what do you think – what do you understand this to be, meaning Exhibit 16?  A: I'm not certain.  Q: Okay.  This is the formal document that has been filed on your behalf in the court setting forth the claims against Congressman Alexander's office.  I believe [Plaintiff's] counsel would agree that that's an accurate statement.  Do you understand that to be the case, Ms. Scott?  A: If that's what you're saying it is.  Q: Okay.  And these are the specific allegations that are being made or the general allegations that are being made in this case, so I'm going to ask you about that."  Pltf's Dep. at 148-149.

[11]    In her Opposition, Plaintiff faults Defendant's counsel for not answering her question "can you explain who you are referring to that I complained to?"  For Plaintiff to ask Defendant's counsel to explain to her what paragraph 11 of her own complaint meant was a non-responsive tautology.

Sitting with her Supplemental Complaint in front of her, having now been asked twice under oath to identify what the twenty two words at paragraph 11 meant, Plaintiff was again non-responsive:

> **A:    I had been complaining for months.**[12]

Defendant's counsel again repeated the question, and again quoted from paragraph 11 of Plaintiff's Supplemental Complaint. The third time was a charm and Plaintiff finally provided a responsive answer.

> **Q:    What working conditions were made so intolerable?**
> **A    The unnecessary comments, the leering that went on day after day, coming behind my desk, trapping me at my desk, kissing my head, putting -- when I make these comments, it's in reference to all from Royal. Touching me up to the point of putting his hands near my breasts and enjoying it, making reference to my being sexy.**

Significantly – and disingenuously omitted from the transcript quotation at page 11 of Plaintiff's Opposition – Defendant's counsel *immediately* followed up by asking:

> **Q    Anything else?**
> **A    Not that I can remember at this time.**
> **Q    Okay. Now, you said those were the working conditions that were made so intolerable after you complained. So I guess the first thing I'm going to say is that you mentioned that this was all engaged in by Royal. Is that your testimony?**
> **A    Yes.**
> **Q    Did anyone else engage in this behavior towards you?**
> **A    No.**

Plaintiff's Opposition asserts that "Defendant's counsel abandoned his pursuit of the rationale for Plaintiff's constructive discharge claim, refocused the witness on Royal Alexander's sex based misconduct, and Plaintiff responded accordingly." Pltf's Opp. at

---

[12]    Plaintiff contends that in the Spring of 2006 she discussed Royal's alleged behavior with two of the Office's Louisiana employees -- Linda Blount and Tommie Seaton. See Pltf's Dep. at 188-189.

11.  The transcript, particularly when it is accurately and completely quoted, does not support the Opposition's characterization.  Rather, it shows that Plaintiff was expressly directed to the twenty-two word sentence constituting paragraph 11 and was asked to identify the entirety of the conduct that she claims supported that allegation.  After deflecting the question twice, she finally answered by identifying Royal's alleged behavior and nothing else.  Defendant's counsel immediately followed up to ask if there was "anything else" and again repeated for clarity exactly what he was referring to:  "you said those were the working conditions that were made so intolerable after you complained."  Plaintiff confirmed that the only conduct she was referring to was Royal's alleged behavior.[13]

Plaintiff also testified that she did not return to Congressman Alexander's office (and was thus not in a position to experience Royal's alleged behavior) *after* May 14, 2006.[14]  As Defendant explained in its moving papers, Plaintiff further testified that after

---

[13]    The twenty-two words of paragraph 11 are not terms of art.  In other words, this is not a medical malpractice case where Plaintiff was directed to her complaint and asked to state all facts supporting the legalistic allegation that a doctor breached a standard of professional care, or a tort case where she was asked to identify all of the specific facts underlying the complaint's allegation that a manufacturer breached an implied legal warranty.  Rather, Plaintiff was asked to read a simple sentence that contained no legalese whatsoever and to identify specific factual behavior that she claims to have personally experienced.

[14]    SMF ¶ 23 of Defendant's July 12, 2007 Statement of Material Facts Not in Dispute states:  "Plaintiff did not return to work after she sent the May 14, 2006 email to Congressman Alexander."  The authority identified for this fact is listed in Defendant's Statement as "Plaintiff's Response to Request for Admission No. 11."  Inexplicably, Plaintiff now disputes SMF ¶ 23.  However, Plaintiff's dispute is without merit and exemplifies her disrespect for the discovery process.  Request for Admission No. 11 states:  "You did not return to work in the Office of Representative Alexander after you sent the May 14, 2006 email to Representative Alexander.  Response:  Admitted."  *See* Attachment 3 to Defendant's SMF filed on July 12, 2007.  Just as Plaintiff cannot contradict her deposition testimony in order to create a material factual dispute, so too

her last day of work she still had a "most definite" intent to return to work.  This testimony absolutely negates her claim that *she perceived* Royal's behavior as being so intolerable that she had no choice but to quit.

      B.       *Alternatively, Plaintiff's Purported Reasons For Her Decision To Resign In June 2006 Do Not Rise To The Extreme Level Required To Support A* <u>*Constructive Discharge Claim*</u>

Plaintiff's apparent argument is that her *subsequent and (until now) separate* decision in June 2006 not to return to work at Defendant was due to allegedly intolerable "working conditions" other than or in addition to Royal's alleged behavior.  While this effort to merge the reasons for her June 2006 decision to resign into her determination that there existed intolerable working conditions based on Royal's alleged behavior contradicts her clear deposition testimony (cited above), even if the Court considers these additional factors, the claim fails.

At her deposition, Plaintiff testified about her reasons for deciding not to return to work in June 2006:

> A: I had intentions of returning to work.
> Q: Oh, you did?
> A: Yes, most definitely.
> Q: And when did those intentions switch to not returning to work?
> A: During the course of the two weeks that I was on paid administrative leave, my return to work date was switched without reason or explanation.  Although we requested to be told, we were not communicated as to why.  There had been no concern from the Congressman's office as to how I was doing or whether or not I would be working with Royal, what was being done with him, was he on paid administrative leave as well, was he going to be removed from the office, who

---

Plaintiff cannot dispute her admission to a properly-propounded Rule 36 Request for Admission to create a factual dispute to avoid summary judgment.  *See* Fed.R.Civ.P. 36(b) ("[a]ny matter admitted under this rule is *conclusively established* unless the court on motion permits withdrawal or amendment of the admission") (emphasis added).  Plaintiff has not moved to amend or withdraw this admission and Defendant submits she has no basis to do so.  Her admission must thus stand.

was going to be my supervisor, what my responsibilities and obligations were. There was no way of knowing whether or not there might be more communicated to me or I might be in a position where I would be made to feel uncomfortable, whether or not it would continue to be a hostile work environment or not.  I wasn't communicated those things by the Congressman's office to myself or my attorney.

. . .

Q: . . . On June 5th, you signed your offer letter and committed to work at JBG Companies at the very latest . . . .  We can go back through them [documents] again, but do you remember that?
A:  Yes.
Q:  June 7 is an e-mail from Gloria to your attorney indicating that your return-to-work-date has changed.  You just testified that it was the change of your return-to-work date that was one of the reasons why you decided not to return.  Correct?
A: Yes
Q: So if you'd already decided two days before you weren't going to return, how could this be a cause of your not wanting to return?
A: Because I could always not show up for the job offer I'd taken [with a $12,000 salary increase and a $5,000 signing bonus] and returned to the Congressman's office.

Pltf's Dep. at 233-234, 238-239 (these reasons were summarized at page 44 of Defendant's initial memorandum).

Even if the Court were to consider Plaintiff's testimony regarding the reasons for her resigning in June 2006 as evidence of intolerable working conditions, this conduct does not state a claim for constructive discharge.  Rather, the conduct she identifies in her testimony is alleged dissatisfaction with the Office's investigation of her allegations and its alleged lack of communication of concern to Plaintiff regarding her and regarding its investigation.  At most, these factors are part and parcel of her hostile environment claim and/or relate to Defendant's ability to argue that it took prompt, effective remedial action when Plaintiff complained.  While such facts may be relevant to any *Faragher* affirmative defense Defendant pursues with respect to Count I, they are not the "something more" or "aggravating factors" that *Suders* requires to convert a hostile work environment claim into a constructive discharge claim.  *See* Defendant's initial motion at

17

39-44 and *Suders; Glenn v. Williams,* No. Civ. A. 98-1278, 2006 WL 401816, at *37

(D.D.C. Feb. 21, 2006); *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 79-80 (D.D.C. 2006).

> C.    *The Remainder of Plaintiff's Purported Reasons For Her June 2006*
> *Decision To Resign Are Inadmissible Under Fed.R.Ev. 408*

Finally, Plaintiff identifies additional reasons she claims contributed to her

decision to resign.

> "When I found out about Congressman Alexander's belief that I had 'pursued,
> propositioned and groped a staffer at an office party' and that he would have fired
> me for that behavior, it was my expectation that should I return to his employ, he
> would fire me. I considered also that the Defendant had already turned off my
> email Blackberry service which I considered an indication of their attitude toward
> my return." Plaintiff's Declaration at ¶ 11.

> "I have a similar view with respect to his determination that I had 'made rather
> forward statements to a married Member of Congress' and that he would have
> fired me for such statements." Plaintiff's Declaration at ¶ 12.

> "I understood from the above circumstances that if I returned to Congressman
> Alexander's office, he would fire me." Plaintiff's Declaration at ¶13.

These reasons, also identified in Plaintiff's Response to Defendant's Statement of

Material Facts Not in Dispute ¶ 21, were not identified in Plaintiff's deposition as a

basis for her constructive discharge claim and should not be considered as relevant to her

claim of intolerable working conditions. Moreover, they should not be considered

because Plaintiff cannot offer ***any admissible evidence*** regarding her purported

knowledge that Defendant had conveyed that it intended to explore her groping of a

staffer at an office party or her forward statements to a married Member of Congress.

This is because these subjects arose as part of settlement discussions between

Defendant's counsel and Plaintiff's counsel.

In other words, in May 2006 (before Plaintiff quit), when Plaintiff's counsel

threatened litigation and demanded money from Defendant, Defendant's counsel

18

identified why it believed Plaintiff would not prevail in the threatened litigation, including identifying a number of weaknesses in Plaintiff's legal arguments and facts. These weaknesses included the impact of Plaintiff's behavior on her ability to establish that Royal's alleged behavior was unwelcome, as well as the significance of this behavior on any damages she might recover under an after-acquired evidence theory. Such settlement discussions are absolutely inadmissible under Fed.R.Ev. 408 ("[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible.")

Plaintiff's declaration indicates that when she "found out" that Defendant was prepared to make this after-acquired evidence argument, she decided to resign. Pltf's Declaration at ¶11-13. Plaintiff carefully avoids stating that Congressman Alexander or anyone affiliated with his office conveyed this information to her. Indeed, she studiously avoids identifying how she "found out" about this alleged information. In so doing, she has made no effort to demonstrate how she can offer any admissible evidence regarding this point. Her deposition, however, provides the answer:

> A: ". . . I took the e-mails and the correspondence from *his [Congressman Alexander's] counsel to my counsel*, especially in the document that stated he had been aware of the allegations about [staffer's name redacted] and the so-called member of Congress that I approached inappropriately, that I would have been fired. That's not an active interest towards my well-being."

Pltf's Dep. at 321 (emphasis added).

Thus, Plaintiff's deposition testimony conclusively establishes that, in order for her to be able to offer evidence of her belief that she would supposedly be fired for this alleged after-acquired evidence if she returned to work, she must rely on inadmissible settlement discussions. Because the settlement discussions are inadmissible, they are not a viable basis for opposing summary judgment. *See* Fed.R.Civ.P. 56(e).

In any case, even if the Court were to consider these factors as well, they do not state a constructive discharge claim. Certainly, a potential defendant's discussion with counsel of the legal defenses it might assert in litigation brought by an employee threatening to sue is not an "intolerable working condition." *See* Deft's Initial Memo at 40, 41, 44.

**V.      Plaintiff's Opposition Does Not Reveal Any Dispute of Material Fact Regarding Her Hostile Environment Claim (Count I) And The Conduct Complained Of Is Not Severe Or Pervasive For The Reasons Set Forth In Defendant's Initial Motion**

Plaintiff makes three primary challenges to Defendant's argument that the undisputed material facts -- evidenced exclusively by Plaintiff's testimony -- show that Royal's alleged conduct was not severe or pervasive as a matter of law. First, in her SMF Response, Plaintiff asserts that there is a factual dispute regarding the conduct Royal allegedly engaged in. Second, she contends that Defendant's "severe" or "pervasive" analysis in its initial memorandum is too compartmentalized and therefore fails. Third, she identifies other "facts" and apparently asserts that they are relevant to whether the alleged conduct is severe or pervasive. For the reasons explained below, these arguments fail.

> A.      *Plaintiff's Effort To Create A Dispute Of Fact Regarding The Evidence Of Royal's Behavior Toward Her Fails*

Defendant identified the sexually-harassing conduct that Plaintiff testified Royal allegedly engaged in at Paragraphs 8(a)-8(e) and 9 of its Statement of Material Facts Not in Dispute. Apparently, in an effort to give the impression of a dispute, Plaintiff's Response to paragraph 8 of Defendant's Statement contains many more subparagraphs – 8(a)-8(u). This is smoke and mirrors. When the smoke is cleared, and the assertions

Plaintiff's counsel makes that are not supported by evidence are discarded, it becomes clear that there is no dispute regarding the universe of conduct Plaintiff testified Royal allegedly engaged in that Plaintiff claims is severe or pervasive.

First, the same conduct is repeated and re-repeated in separate subparagraphs -- sometimes using slightly different words, or sometimes with different modifiers or phraseology, but it still describes the same conduct -- in order to give the appearance of pervasiveness. For instance, in subparagraph 8(e) of *Defendant's* Statement of Material Facts Not in Dispute, Defendant identified one category of Royal's alleged conduct (according to Plaintiff's testimony) as Royal's alleged commenting to Plaintiff regarding her, her sisters' and a co-worker's appearance as "sexy." Plaintiff however, repeats the same allegation four times in four separate paragraphs. *See, e.g.,* Plaintiff's SMF Response at paragraphs 8(c), 8(d), 8(e), 8(s). That Royal may have commented on Plaintiff's, her sisters' and/or her co-worker's sexiness does not become pervasive simply because Plaintiff's counsel repeats it in four separate subparagraphs.

Second, several of Plaintiff's separate subparagraphs generically refer to Royal's "conduct," "sexual behavior" or "advances," *see* SMF Response at 8(j), 8(l), 8(m), but do not identify the "conduct" or "behavior" or "advances," nor do they even identify whether they are referring to any behavior other than that already identified more specifically in the other subparagraphs. Restating allegations generically to increase the number of subparagraphs also does not create pervasiveness.

Third, subparagraphs 8(j), 8(k), 8(n), 8(o), 8(p), 8(t), and 8(u), do not describe conduct that Royal allegedly engaged in, but, rather have to do with other issues – such as whether Plaintiff complained, Defendant's *Faragher* affirmative defense, who else

Plaintiff allegedly talked to regarding Royal, the fact that Plaintiff visited the Employee

Assistance Program, that Plaintiff was "emotional [sic] distraught," and similar matters.

While these may be relevant to other issues should this case proceed, they do not consist

of what Plaintiff's Paragraph 8 purports to be – the "conduct Royal Alexander allegedly

engaged in that Plaintiff contends was sexual harassment." *See* SMF ¶ 8, initial sentence.

Plaintiff's apparent inclusion of these extraneous points in paragraph 8 in order to create

the appearance that there is evidence that Royal engaged in more conduct than Plaintiff

identified should be rejected.[15]

B.    *The Conduct Plaintiff Alleges Royal Engaged In, Taken As A Whole, Is*
      *Not Severe Or Pervasive As A Matter Of Law*

Plaintiff contends that Defendant's analysis of the conduct Royal allegedly

engaged in is flawed because it considered both the "severe" and "pervasive" aspects of

the hostile environment analysis under separate headings.  Plaintiff's argument is

superficial in that Defendant's analysis and the extensive case law discussion in its

motion did address the alleged conduct *in toto*.  However, for purposes of providing a

methodical, thorough analysis, Defendant *began* by discussing whether the two incidents

which occurred only once were *severe* (the chair incident and the computer screen

incident).  This is because an incident that occurs only once cannot, by definition, be

---

[15]    Plaintiff alleges at subparagraph 8(q) that "[a]fter Plaintiff complained . . . she
was subjected to a tangible employment act by Royal Alexander who removed Plaintiff
from her position as Scheduler."  This is a regurgitation of her retaliation claim.   This
Court has made clear that a plaintiff "cannot simply regurgitate her . . . retaliat[ion] . . .
claims in an effort to flesh out her hostile work environment claim." *Wada v. Tomlinson*,
No. 03-1488, 2007 WL 1378516, at *58 (D.D.C. May 9, 2007).  Moreover, the attempt to
add this "tangible employment act" element to Count I is new and not part of the
Supplemental Complaint.  Indeed, Count I expressly does not include this alleged
tangible employment action. *See* Compl., at ¶¶ 15-19 (expressly incorporating ¶ 7, but
not incorporating ¶ 10).

*pervasive.* *See* Deft's Initial Memo at 31-33.[16]  Defendant then addressed the category of

alleged "frequent" comments and behavior Plaintiff testified to and highlighted that, for

these, Plaintiff was unable to recall specifics as to when they occurred, whether they

occurred more than once, and the like.  Defendant then discussed a number of cases, from

this Circuit and elsewhere, that have addressed similar circumstances and found such

non-specific recollection of alleged harassing conduct to be insufficient to establish

pervasiveness.  *Id.* at 33-38.  Contrary to Plaintiff's suggestion, the majority of cases

Defendant cited under both the severe and pervasive subheadings of its brief considered

the totality of the circumstances to find that the conduct at issue was not severe or

pervasive.  Plaintiff's superficial critique of Defendant's analysis is especially misplaced

considering that, of the *fourteen* severe or pervasive cases Defendant substantively

---

[16]     In her SMF Response, Plaintiff challenges Defendant's statement that the
computer screen incident occurred only once.  Instead she asserts (but offers no
declaration or evidence to support the assertion) that the computer screen incident was a
"practice."  She attempts to avoid her deposition testimony by asserting that the
testimony that the incident occurred only once was actually in reference to how often she
had discussed the computer screen incident with Tommie Seaton, not that the incident
itself had only occurred one time.  *See* Pltf's SMF Response at 5, subparagraph 8(i).
Plaintiff's actual testimony, however, does not support this revisionism.  "A: . . . I also
spoke with her [Tommie Seaton] regarding the situation where he trapped me at my desk
. . . . Q: . . . So the two incidents that you shared with Tommie Seaton were the touching
incident and this one you're now mentioning about where he trapped you and kissed you
on the forehead, is that correct?  Were there any others?  A: I don't recall at this time.  Q:
So these are the only ones you recall?  A: At this particular moment in time, yes.  Q:
Okay.  Were these two separate times that you spoke with Tommie? A: Yes."  Pltf's Dep.
at 269-271 (emphasis added).  Plaintiff's use of the words "the situation where he trapped
me" indicates a singular event, not an ongoing event (or else she would have said the
situations where he would trap me, or she would have referred to a "practice" of his
allegedly trapping her).  Defendant's counsel confirmed the singularity of the incident
with the follow-up question: "Were there any others" (to which Plaintiff responded she
could not "recall at this time").  It was not until after Plaintiff confirmed that she did not
recall whether the computer incident occurred more than once that Defendant's counsel
then proceeded to ask how many times Plaintiff had spoken with Ms. Seaton regarding
the issue.

discussed, Plaintiff addressed only *three* of them in her Opposition. Defendant rests on its discussion at pages 31-38 of its initial memorandum that the conduct Plaintiff testified to, is not, as a matter of law, severe or pervasive.

Defendant also notes that its initial memorandum identified numerous cases holding that a plaintiff's usage of vague mantras such as "frequently" and "on numerous occasions" in testimony to describe the frequency of alleged harassing conduct – when juxtaposed with an inability to state specifically how often the conduct occurred, when it occurred, or whether the alleged conduct occurred more than one time or less than five times – is plainly insufficient to state a hostile environment claim. *See* Deft's Initial Memo at 34-38. In addition to ignoring these cases entirely in her Opposition, Plaintiff goes one step further and continues to use such nondescript mantras in paragraph 8 of her SMF Response -- paragraph 8(a) ("frequently"), 8(c) ("often"), 8(d) (on "numerous occasions"), 8(g) ("frequently"), 8(i) ("had a practice"), and 8(l) ("very, very frequent"). Plaintiff's failure to address these arguments or legal authorities should be treated as a concession that she cannot establish pervasiveness.

    C.    *Plaintiff's Identification of Extraneous Issues Is Irrelevant To An Assessment Of Whether Royal's Alleged Conduct Is Severe Or Pervasive*

Plaintiff identifies other alleged facts to support her hostile environment claim, *e.g.*, that others, including Congressman Alexander's wife, allegedly knew of Royal's alleged harassment, that Congressman Alexander allegedly did not address the issue when, supposedly, Plaintiff told a co-worker that another Member of Congress had allegedly asked her out on a date, and that Plaintiff's concerns about the alleged harassment were not considered in a timely fashion due to the Congressman's "busy schedule." *See* Pltf's Opp. at 9. While some of these allegations may be relevant to

Defendant's affirmative defense, its vicarious liability, and/or whether Plaintiff unreasonably failed to utilize a complaint procedure, they are not relevant to the issue upon which Defendant seeks summary judgment – whether Royal's behavior that Plaintiff experienced was severe or pervasive.  Plaintiff's efforts to create a factual dispute regarding the evidence of Royal's alleged conduct towards her, and a legal dispute regarding whether that conduct is severe or pervasive, fail and summary judgment should be granted to Defendant on Count I.

## VI.    Conclusion

For the reasons set forth herein and in Defendant's moving papers, Defendant respectfully requests that the Court grant summary judgment to Defendant with respect to Counts I and IV.

Respectfully Submitted,

By _Russell H. Gore_____

Russell H. Gore, D.C. Bar # 449231
Gloria J. Lett, D.C. Bar # 293365
Kimberly Carey Williams, VSB # 41325[17]
U.S. House of Representatives
Office of House Employment Counsel
1036 Longworth House Office Building
Washington, D.C.  20515
(202) 225-7075

DATED:  September 18, 2007      Attorneys for Defendant

---

[17]     Appearing by LCvR 83.2(e) and 2 U.S.C. § 1408(d).

25

# TABLE OF CONTENTS

I.    Defendant's Request For Summary Judgment Is Proper And Timely .......................2

II.   Plaintiff's Rule 56(f) Declaration Should Be Stricken Because It Directly
      Contradicts Her Sworn Deposition Testimony.............................................3

III.  Plaintiff's Rule 56(f) Affidavit Does Not Meet Even the Lenient
      Standard Entitling Her to Additional Discovery With Respect
      To Counts I and IV ...............................................................8

IV.   Plaintiff's Efforts To Oppose Summary Judgment On
      Count IV Fail Because They Directly Contradict Her Deposition
      Testimony, Fail To Meet the High Standard Of Intolerability
      To State A Claim Of Constructive Discharge, And Rely On
      Information That Is Inadmissible Under Fed.R.Ev. 408 ...........................11

      A.   *Plaintiff Testified Unequivocally That It Was Exclusively
           Royal's Alleged Sex-Based Behavior That Constituted The
           Alleged Intolerable Working Conditions Underlying Her
           Constructive Discharge Claim* ...........................................12

      B.   *Alternatively, Plaintiff's Purported Reasons For Her
           Decision To Resign In June 2006 Do Not Rise To The
           Extreme Level Required To Support A Constructive
           Discharge Claim*.........................................................16

      C.   *The Remainder of Plaintiff's Purported Reasons For
           Her June 2006 Decision To Resign Are Inadmissible
           Under Fed.R.Ev. 408* ....................................................18

V.    Plaintiff's Opposition Does Not Reveal Any Dispute of Material
      Fact Regarding Her Hostile Environment Claim (Count I) And The
      Conduct Complained Of Is Not Severe Or Pervasive For The Reasons
      Set Forth In Defendant's Initial Motion .......................................20

      A.   *Plaintiff's Effort To Create A Dispute Of Fact Regarding
           The Evidence Of Royal's Behavior Toward Her Fails*.......................20

      B.   *The Conduct Plaintiff Alleges Royal Engaged In, Taken
           As A Whole, Is Not Severe Or Pervasive As A Matter Of Law*..............22

      C.   *Plaintiff's Identification of Extraneous Issues Is Irrelevant
           To An Assessment of Whether Royal's Alleged Conduct Is
           Severe Or Pervasive* ....................................................24

VI.  Conclusion..........................................................................................................25

# TABLE OF AUTHORITIES

### *Cases*

*Buchanan v. Heerema Marine Contractors U.S., Inc.,*
 No. Civ. A. H-04-3885, 2005 WL 2458019
 (S.D. Tex. Oct. 5, 2005) ....................................................................7

*Burton v. Batista,* 339 F. Supp. 2d 97 (D.D.C. 2004) ...................................9, 10

*Clay v. District of Columbia,* No. Civ. A. 03-466,
 2005 WL 641750 (D.D.C. March 17, 2005),
 *vacated on other grounds*, 208 F. App'x 6 (D.C. Cir. 2006) ....................9, 10

*Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006)...........................1

*Galvin v. Eli Lilly and Co.,* 488 F.3d 1026 (D.C. Cir. 2007) ..............................7

*Glenn v. Williams,* No. Civ. A. 98-1278, 2006 WL 401816 (D.D.C. Feb. 21, 2006) ......18

*Hudert v. Alion Sci. & Tech. Corp.*, 429 F. Supp. 2d 99 (D.D.C. 2006)..........................10

*Johnson v. United States*, 460 F.3d 616 (5th Cir. 2006)......................................................2

*Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55 (D.D.C. 2006) ................................18

*Lowe v. Winter*, No. Civ. A. 06-1803,
 2007 WL 2015389 (D.D.C. July 12, 2007) ....................................................10

*Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).....................................11, 17, 18

*Reetz v. Jackson*, 176 F.R.D. 412 (D.D.C. 1994) ...........................................7

*Richardson v. Gutierrez*, 477 F. Supp. 2d 22 (D.D.C. 2007) ...........................................10

*Valles-Hall v. Ctr. for Nonprofit Advancement,*
 481 F. Supp. 2d 118 (D.D.C. 2007)................................................................11

*Wada v. Tomlinson,* No. 03-1488,
 2007 WL 1378516 (D.D.C. May 9, 2007)....................................................22

***Statutes***

2 U.S.C. § 1408(d)...........................................................................................25

***Rules***

Fed.R.Civ.P. 1.................................................................................................2

Fed.R.Civ.P. 36(b)........................................................................................16

Fed.R.Civ.P. 56(e)........................................................................................19

Fed.R.Civ.P. 56(f).........................................................................................11

Fed.R.Ev. 408.................................................................................11, 18, 19

LCvR  7(b)........................................................................................................3

LCvR 83.2(e)..................................................................................................25

# EXHIBIT 1

Plaintiff's Deposition Excerpts

Deposition of Elizabeth Scott                    Taken on May 21, 2007

Page 6

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | PROCEEDINGS                                        |
| 08:49 | 2  | ELIZABETH SCOTT                                    |
| 08:49 | 3  | was sworn and testified as follows:               |
| 09:02 | 4  | EXAMINATION                                        |
| 09:02 | 5  | BY MR. GORE:                                       |
| 09:03 | 6  | Q   Good morning, Ms. Scott.  My name is          |
| 09:03 | 7  | Russell Gore, and I'm an attorney with the Office of |
| 09:03 | 8  | House Employment Counsel.  And with me is Gloria  |
| 09:03 | 9  | Lett, who is the counsel for the Office of        |
| 09:03 | 10 | Employment Counsel, House Employment Counsel.  W  |
| 09:03 | 11 | represent the Office of Representative Alexander in |
| 09:03 | 12 | the lawsuit of Elizabeth Scott versus the Office of |
| 09:03 | 13 | Representative Alexander.                          |
| 09:04 | 14 | You're here today for your deposition.            |
| 09:03 | 15 | Let me introduce who's in the room.  We have      |
| 09:03 | 16 | Congressman Alexander.  We have Adam Terry.  Then, |
| 09:03 | 17 | of course, we have the court reporter and your    |
| 09:03 | 18 | attorney.                                          |
| 09:03 | 19 | Before we begin, let me ask you, have you         |
| 09:03 | 20 | ever had your deposition taken before?            |
| 09:03 | 21 | A   No.                                           |
| 09:03 | 22 | Q   Have you ever testified in a court            |
| 09:03 | 23 | proceeding before?                                |
| 09:03 | 24 | A   No.                                           |
| 09:03 | 25 | Q   Let me talk to you a little bit about the     |

Page 7

|       |    |                                                    |
|-------|----|----------------------------------------------------|
| 09:03 | 1  | ground rules here.  First of all, most importantly, |
| 09:03 | 2  | the court reporter just swore you in, which meant  |
| 09:03 | 3  | that you are testifying here under oath, which means |
| 09:03 | 4  | that you have an obligation to tell the truth and  |
| 09:03 | 5  | that today's proceeding is just like we were in    |
| 09:04 | 6  | court.                                             |
| 09:04 | 7  | Your testimony -- excuse me.  Anything I          |
| 09:04 | 8  | say while we're on the record is being transcribed. |
| 09:04 | 9  | Anything you say while on the record or your       |
| 09:04 | 10 | attorney says while we're on the record is being   |
| 09:04 | 11 | transcribed.  It will be placed into a transcript  |
| 09:04 | 12 | format which you will then see, which will then be |
| 09:04 | 13 | used as evidence in this case.  But it is important |
| 09:04 | 14 | you understand that this is for purposes of this   |
| 09:04 | 15 | testimony, it's just like you're in court today.  Do |
| 09:04 | 16 | you understand that?                               |
| 09:04 | 17 | A   Yes.  I'm a little nervous, so --             |
| 09:04 | 18 | Q   I can appreciate that, and it's              |
| 09:04 | 19 | understandable.  I think anytime someone's in a    |
| 09:04 | 20 | deposition, that's an understandable feeling.      |
| 09:04 | 21 | A   I'll do my best to remember all that.         |
| 09:04 | 22 | Q   And I appreciate that.                        |
| 09:04 | 23 | If there's anything that I say today that         |
| 09:04 | 24 | you don't understand or is unclear to you, please  |
| 09:05 | 25 | ask me to rephrase it.                             |

Page 8

|       |    |                                                    |
|-------|----|----------------------------------------------------|
| 09:05 | 1  | It's my goal to ask clear, concise               |
| 09:05 | 2  | questions.  I don't always succeed at that, but I |
| 09:05 | 3  | try.  But if you don't understand something I say, |
| 09:05 | 4  | before you answer, I'd ask that you would ask me to |
| 09:05 | 5  | rephrase it.  Will you agree to do that?          |
| 09:05 | 6  | A   I'll do my best.                              |
| 09:05 | 7  | Q   And if I ask you a question and you answer    |
| 09:05 | 8  | it and haven't asked me to rephrase it, I will    |
| 09:05 | 9  | assume that that means you understood the question. |
| 09:05 | 10 | Are you agreeable with that?                       |
| 09:05 | 11 | A   I'm nervous, so I can't -- I can't say        |
| 09:05 | 12 | what I might say or what I might not say.          |
| 09:05 | 13 | Q   Okay.  And I understand that you're           |
| 09:05 | 14 | nervous, and -- but with that, I want to just      |
| 09:05 | 15 | emphasize how important it is for you to listen to |
| 09:05 | 16 | what I say and answer my questions.               |
| 09:05 | 17 | A   I'm going to do my best.                      |
| 09:05 | 18 | Q   And despite being nervous, it's important     |
| 09:05 | 19 | if you need to take some time to think about a    |
| 09:05 | 20 | response or think about my question that you do    |
| 09:05 | 21 | that, because it's extremely important, because the |
| 09:06 | 22 | purpose of our being here today is to get your     |
| 09:06 | 23 | testimony under oath in this lawsuit.  So it's     |
| 09:06 | 24 | extremely important that you listen and that you   |
| 09:06 | 25 | respond.                                          |

Page 9

|       |    |                                                    |
|-------|----|----------------------------------------------------|
| 09:06 | 1  | MR. HOARE:  Let me interrupt you.                |
| 09:06 | 2  | (Discussion held off the record.)                |
| 09:06 | 3  | Q   Another thing that's important is that we     |
| 09:06 | 4  | try to -- it's been fine so far -- that we try not |
| 09:06 | 5  | to speak over one another when we are in this     |
| 09:06 | 6  | process.  And the reason I say that is in everyday |
| 09:07 | 7  | conversation, it's typical when human beings      |
| 09:07 | 8  | interact that someone will use part of a sentence or |
| 09:07 | 9  | will start a sentence and somebody else may think |
| 09:07 | 10 | they know what they're saying and will go on to   |
| 09:07 | 11 | finish the way they thought the other person would |
| 09:07 | 12 | finish.  That's the typical way human beings      |
| 09:07 | 13 | communicate on a day-to-day basis, but that doesn't |
| 09:07 | 14 | work for this process.  I ask that you allow me to |
| 09:07 | 15 | finish my question before you answer.  Even if you |
| 09:07 | 16 | think you know what I might be saying, wait and   |
| 09:07 | 17 | allow me to finish before you answer.  And I will |
| 09:07 | 18 | try to do the same with you.  I will try to wait and |
| 09:07 | 19 | allow you to finish your response before I ask my |
| 09:07 | 20 | next question.                                    |
| 09:07 | 21 | I'd also say that it's important that you         |
| 09:07 | 22 | speak verbally.  Again, in everyday conversation  |
| 09:07 | 23 | there are times when we're having communications  |
| 09:07 | 24 | with one another and we might respond by nodding the |
| 09:07 | 25 | head one way or the other to indicate agreement or |

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 10

09:07 1 disagreement. That doesn't work in this process
09:07 2 because it's difficult for the court reporter to
09:07 3 take down those kinds of gestures, so I would ask
09:08 4 that you respond verbally to each of my questions.
09:08 5 That would include saying "yes" as opposed to
09:08 6 "yeah," or "no" as opposed to something that is less
09:08 7 definitive.
09:08 8      With that, I would also say that if you
09:08 9 need breaks throughout the day, we will be taking
09:08 10 breaks, and if you need a break, I'm more than happy
09:08 11 to accommodate you. The only thing that I would say
09:08 12 is that if I've asked you a question and you ask for
09:08 13 a break, I would ask that you answer my question
09:08 14 before we go on the -- we take the break. But if
09:08 15 you need a break, I would encourage to do that at
09:08 16 the end of a question before I ask the next
09:08 17 question.
09:08 18      Are you taking any medication or any other
09:08 19 substance that would interfere with your ability to
09:08 20 hear and understand my questions today?
09:08 21      A No.
09:08 22      Q Is there any reason why you would be
09:08 23 unable to hear and understand my questions today?
09:08 24      A Not that I can think of.
09:09 25      Q Okay.

---

Page 11

09:09 1      MR. HOARE: Have you asked Mary Ann to
09:09 2 record our time as we proceed?
09:09 3      MR. GORE: Yes.
09:09 4      MR. HOARE: Okay.
09:09 5      Q Are you taking any medication or other
09:09 6 substance that would interfere with your ability to
09:09 7 testify truthfully and fully to my questions today?
09:09 8      A No.
09:09 9      Q And is there any other reason you're aware
09:09 10 of that would interfere with your ability to testify
09:09 11 truthfully and fully to my questions today?
09:09 12      A I'm just nervous, so I'm going to do the
09:09 13 best I can.
09:09 14      Q Okay. Did you -- also, I will try to make
09:09 15 this clear when it happens, but throughout the day I
09:09 16 will be asking questions such as to identify or
09:09 17 discuss communications that you may have had. When
09:09 18 I talk about your communications with others, I just
09:09 19 want to make it clear -- and I will attempt to do
09:09 20 this in the individual circumstance, but when I ask
09:09 21 if you communicated with someone, I'm talking about
09:09 22 verbally, I'm talking about in writing, I'm talking
09:09 23 about IM, I'm talking about e-mail, nonverbally.
09:10 24 Any way that we as human beings in the modern 21st
09:10 25 century communicate is what I mean when I ask about

---

Page 12

09:10 1 communications. So I will try to be precise when I
09:10 2 get to those questions, but I just want you to keep
09:10 3 in your mind that when I ask if you communicated
09:10 4 with someone or convey information to someone or
09:10 5 someone conveyed information to you, I mean that in
09:10 6 the broad sense. Do you understand that?
09:10 7      A Yes.
09:10 8      Q Okay. Did you review any documents in
09:10 9 preparation for your deposition today?
09:10 10      A Yes, just my -- my time line. I can't
09:10 11 recall all of what I reviewed.
09:10 12      Q I understand you can't recall all of what
09:10 13 you reviewed. Do you recall anything else other
09:10 14 than your time line?
09:11 15      A Maybe some of the legal correspondence
09:11 16 between the counsels.
09:11 17      Q Do you recall anything else other than
09:11 18 those two items?
09:11 19      A There's a lot of information, so --
09:11 20      Q That, I understand. But do you recall
09:11 21 sitting here today?
09:11 22      A Not specifics.
09:11 23      Q Did you review any e-mails?
09:11 24      A It's possible, yes.
09:11 25      Q Okay. When you said "my time line," what

---

Page 13

09:11 1 are you referring to?
09:11 2      A I said -- I don't know how to describe it.
09:11 3      MR. HOARE: This would be calling for a
09:11 4 privileged communication. Let me confer with her
09:11 5 and tell you whether or not it does.
09:11 6      MR. GORE: All right. Let's go off the
09:11 7 record.
09:11 8      (Discussion held off the record.)
09:13 9      MR. GORE: Back on the record.
09:13 10      MR. HOARE: You'll find it's a privileged
09:13 11 communication, the time line is, from her to me.
09:13 12      MR. GORE: I'm going to explore that.
09:13 13      Q Without at this point asking you for the
09:13 14 substance of what's in this time line, can you tell
09:13 15 me how many pages this document is?
09:13 16      A I don't recall.
09:13 17      Q Was it more than one page?
09:13 18      A I'm not certain.
09:13 19      Q And did you generate this?
09:13 20      A Yes.
09:13 21      Q Did you generate it with the assistance of
09:13 22 anyone?
09:13 23      A No.
09:13 24      Q When did you generate it?
09:13 25      A I don't recall the exact time.

---

4 (Pages 10 to 13)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

Page 89

11:23 1  (Note: The following is a telephone
11:23 2  conference call before Judge Kay, held
11:23 3  during the deposition.)
11:23 4  MR. GORE: All right, Your Honor.
11:23 5  THE COURT: Yes, sir?
11:23 6  MR. GORE: This is Russ Gore. I'm here
11:23 7  with Michael Hoare and actually other attorneys, and
11:23 8  we're in the middle of Ms. Scott's deposition. And
11:23 9  we are having a bit of a dispute, so I'd like to be
11:23 10  able to address it if I could go first, and then
11:23 11  Mr. Hoare can state what his position is, if that
11:23 12  would be acceptable to Your Honor.
11:24 13  THE COURT: Go ahead. I've got a few
11:24 14  minutes. I took a ten-minute break from a hearing.
11:24 15  MR. GORE: We tried to start the
11:24 16  deposition at 9 o'clock; however, we're having some
11:24 17  difficulty with the witness in terms of not
11:24 18  recalling things that are very difficult. For
11:24 19  instance, she signed verifications to her
11:24 20  interrogatory responses last Friday but she doesn't
11:24 21  remember if she did or not, or when she did, or how
11:24 22  she did it, or how she conveyed it.
11:24 23  THE COURT: Were they signed?
11:24 24  MR. GORE: They were signed, but she
11:24 25  doesn't remember. Doesn't remember anything about

Page 90

11:24 1  it.
11:24 2  THE COURT: I can't force her to remember
11:24 3  something.
11:24 4  MR. GORE: No, I agree. And I'm just
11:24 5  telling you that so we understand. We're getting "I
11:24 6  don't recall." We had it 37 times already. But
11:24 7  it's in response to --
11:24 8  THE COURT: If this goes to trial,
11:24 9  Mr. Gore, it will come out before a jury as to
11:24 10  whether she has a convenient memory or not.
11:24 11  MR. GORE: I'm certain of that. But the
11:24 12  reason I'm mentioning it, Your Honor, is what we
11:24 13  have tried to do is because of this, and every time
11:25 14  we have to refer back to an exhibit, we spend many
11:25 15  minutes looking at an exhibit that we already looked
11:25 16  at.
11:25 17  THE COURT: Right.
11:25 18  MR. GORE: I have a blank calendar, and
11:25 19  I've asked the witness when we go through an exhibit
11:25 20  to write certain things down on the calendar because
11:25 21  of her memory so that at least when we go back to
11:25 22  it, we can follow along in a procedure or path that
11:25 23  allows us to avoid having to go through every
11:25 24  exhibit we talked about again. And initially
11:25 25  Mr. Hoare did not object, and now he is objecting to

Page 91

11:25 1  that.
11:25 2  And I believe that I'm trying to make this
11:25 3  deposition go more quickly. It's going very slowly
11:25 4  in light of this. And I believe that having the
11:25 5  witness using this document and having her write
11:26 6  down what these things are so when we refer back to
11:26 7  remember what happened on this date, at least we
11:26 8  have an exhibit that she's preparing here.
11:26 9  THE COURT: Make a note of it, Mr. Gore,
11:26 10  or one of your colleagues, and you can remind her
11:26 11  that she had said that certain things happened on
11:26 12  this particular date. And you keep the calendar.
11:26 13  If she doesn't want to keep it, you can't force her
11:26 14  to keep it.
11:26 15  MR. GORE: I would agree with that. But
11:26 16  what I would tell you is that every time we would
11:26 17  get an objection I mischaracterized the testimony so
11:26 18  we spend five minutes going through the testimony
11:26 19  and we will lose the whole point.
11:26 20  THE COURT: Mr. Hoare, you will say if you
11:26 21  have an objection to the mischaracterization and the
11:26 22  witness will answer. At the end of the deposition,
11:26 23  you can rehabilitate your question, your witness,
11:26 24  the way you want. But, in other words, this
11:26 25  deposition's going to have to go forward, and you're

Page 92

11:26 1  going to have to act in a responsible fashion. If
11:26 2  Mr. Gore mischaracterizes, you can note your
11:26 3  objection, mischaracterization, then have Ms. Scott
11:26 4  answer the question.
11:26 5  MR. HOARE: And that's -- Judge?
11:26 6  THE COURT: I am not going to play games
11:26 7  with counsel where if someone doesn't remember,
11:26 8  that's fine, they have a right not to remember. If
11:26 9  they, in fact, don't remember, if they don't want to
11:26 10  take notes, that's their prerogative. But the
11:27 11  deposition should go forward. And it seems that it
11:27 12  doesn't inure to the benefit of both sides for you
11:27 13  to come back or to me when Mr. Gore says, "Guess
11:27 14  what? We need an additional four or five hours
11:27 15  because things got slowed down." So the sooner you
11:27 16  get this thing over with, the sooner you can move on
11:27 17  and get the rest of the discovery completed. All
11:27 18  right?
11:27 19  MR. HOARE: May I be heard? Judge, may I
11:27 20  be heard?
11:27 21  THE COURT: Yes, you may.
11:27 22  MR. HOARE: There has not been a single
11:27 23  instance when I objected to a question as
11:27 24  mischaracterization and did anything but state that
11:27 25  one single word, and we moved on.

22 (Pages 89 to 92)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                              Taken on May 21, 2007

---

Page 93

11:27 1    THE COURT: All right. Well, that's the
11:27 2  way it should be. And I hope that's the way it will
11:27 3  go. You have a right to object, state the nature of
11:27 4  your objection without -- obviously, sometimes
11:27 5  people go on for ten minutes elaborating on the
11:28 6  objection. State your objection, and if it's
11:28 7  mischaracterization, so be it. Then the witness
11:28 8  will answer the question. You do have a right to do
11:28 9  that. Mr. Gore, there's nothing wrong with him
11:28 10  doing that if that's the way he believes, your
11:28 11  statement was not characterized correctly.
11:28 12    MR. GORE: Your Honor, I completely
11:28 13  appreciate that.
11:28 14    THE COURT: If you-all agree with one
11:28 15  another, what's the problem?
11:28 16    MR. HOARE: The problem here --
11:28 17    THE COURT: One at a time. You've got a
11:28 18  reporter there.
11:28 19    MR. HOARE: The problem is that they
11:28 20  insisted on the witness making notes on this
11:28 21  calendar, and the witness is making notes on this
11:28 22  calendar about things she doesn't know anything
11:28 23  about.
11:28 24    THE COURT: I indicated that Mr. Gore
11:28 25  cannot compel your client to make notes on a

Page 94

11:28 1  calendar if she doesn't want to.
11:28 2    MR. HOARE: That's the only issue.
11:28 3    THE COURT: You can make notes on the
11:28 4  calendar and if there is -- you don't believe that
11:28 5  he's stating it accurately as to what she said
11:29 6  earlier, then that can be all fleshed out at trial.
11:29 7    MR. GORE: Your Honor, if I could just
11:29 8  respond, I understand your ruling and we will
11:29 9  certainly comply with that. I don't think I want to
11:29 10  spend the time on this, but I think that the record
11:29 11  would reflect that Mr. Hoare's characterization of
11:29 12  his behavior in this deposition is not accurate.
11:29 13  That having been said, I'd like to get on with the
11:29 14  deposition.
11:29 15    THE COURT: Well, you want to spend the
11:29 16  deposition and have a videotaped deposition, we can
11:29 17  see exactly how each party acts. I'm prepared to do
11:29 18  that if you want to do that.
11:29 19    MR. GORE: I really don't, because I
11:29 20  really want to continue with this deposition.
11:29 21    THE COURT: All right.
11:29 22    MR. GORE: But do I want to say that it's
11:29 23  becoming clear now in light of this that I fully
11:29 24  expect I'm going to try to move forward, but I fully
11:29 25  expect we're going to need to have more time.

Page 95

11:29 1    THE COURT: Fine. Well, if that occurs,
11:29 2  you can get back to me. What's your next -- that's
11:29 3  it?
11:29 4    MR. HOARE: That's it.
11:29 5    MR. GORE: That's it.
11:29 6    THE COURT: All right. Well, hopefully
11:29 7  you can work that through. I would hope you can
11:29 8  work through this. Clearly, each side has a right
11:29 9  to inquire of the witnesses, certainly. The
11:30 10  plaintiff brought the suit. You have a right -- the
11:30 11  defense has a right to inquire of Ms. Scott.
11:30 12  Similarly, Mr. Hoare has the right to inquire of
11:30 13  Mr. Alexander, the defendant. So get it out. How
11:30 14  much of what is developed during the deposition gets
11:30 15  into trial by way of relevance, that's the call of
11:30 16  the trial court, Judge Kolar-Kotelly. But both of
11:30 17  you are experienced. You've taken many depositions
11:30 18  before. There's no reason why you can't pursue this
11:30 19  one efficiently without necessarily slowing down the
11:30 20  process when I'm sure both of would you like to get
11:30 21  it completed as soon as possible.
11:30 22    If you have more problems, give me a call.
11:30 23  Hopefully you won't, but I will try to make myself
11:30 24  available. Thank you, counsel.
11:30 25    MR. GORE: Your Honor, one other point. I

Page 96

11:30 1  would like to ask, because I am trying to move as
11:30 2  quickly as possible. And you may not be able to do
11:31 3  this, but I will ask. I'm getting a lot of
11:31 4  nonresponsive questions. I'll ask if, you know, if
11:31 5  you recall something and I'm -- said, well, it's
11:31 6  possible someone might. And I'm getting a lot of
11:31 7  nonresponsive answers where I have to ask the
11:31 8  question three or four times. Again, I would ask if
11:31 9  you could encourage the witness to respond to the
11:31 10  questions that are asked --
11:31 11    MR. HOARE: That's totally unnecessary,
11:31 12  Your Honor. She has been responsive to his
11:31 13  questions. His questions have been redundant. They
11:31 14  have been repetitive and sometimes very confusing,
11:31 15  but she's doing the best she can.
11:31 16    THE COURT: All right. Well, I hope --
11:31 17  you're there. Counsel is with her. Mr. Gore,
11:31 18  you're an experienced lawyer. If there's any
11:31 19  problems in terms of delaying or extending the time
11:31 20  that the deposition -- you know, there's always
11:31 21  motions to have part of the deposition cost
11:31 22  defrayed, so that could be looked at by getting a
11:32 23  copy of the transcript. But I would hope that
11:32 24  doesn't occur. And I think clearly it behooves both
11:32 25  counsel to be very precise in their questions and

23 (Pages 93 to 96)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 101

11:37  1    signed this on any day other than June 5?
11:37  2    A  It's possible I could have.  I -- it says
11:37  3    June 5th, though, so I'm not certain.
11:37  4    Q  Do you have any reason to believe, though,
11:37  5    that you, in fact, did sign it on some other day?
11:37  6    A  I'm not certain.
11:37  7    Q  You're not certain of what?
11:37  8    A  It says I signed it June 5, so --
11:37  9    Q  So what?
11:37 10    A  So I believe I probably signed it on June
11:37 11    the 5th.
11:37 12    Q  Okay.  Now going back to Exhibit Number 6,
11:37 13    these are your interrogatory responses, the ones
11:37 14    that you verified under oath on Friday, three days
11:37 15    ago.
11:37 16    A  Uh-huh.
11:37 17    Q  Looking at page 14, it says again that the
11:37 18    start date at JBG -- do you need me to let you get
11:38 19    back to it?
11:38 20    A  Which exhibit?
11:38 21    Q  It's Exhibit Number 6, page 14.  It says
11:38 22    that the start date is June 18, 2006.
11:38 23    A  Okay.
11:38 24    Q  Is that correct?  Is that the day you
11:38 25    started working at JBG?

Page 102

11:38  1    A  I don't recall.
11:38  2    Q  Do you recall when you started working at
11:38  3    JBG?
11:38  4    A  Not at this time, no.
11:38  5    Q  Do you know why it says June 18, 2006, on
11:38  6    this document that was submitted to us Friday that
11:38  7    you verified Friday?  Do you know why?
11:38  8    MR. HOARE:  Let the record reflect my hand
11:38  9    is in the air.
11:38 10    MR. GORE:  I understand that.  I'm just
11:38 11    asking if she knows why, since she did verify them.
11:38 12    MR. HOARE:  I understand.
11:38 13    Q  Do you know why it says June 18?
11:38 14    A  I didn't type it.
11:38 15    Q  So you don't know why?
11:39 16    A  I mean, that's -- that's what they typed.
11:39 17    I didn't type this.
11:39 18    (Exhibit No. 12 was marked.)
11:39 19    Q  This is Exhibit 12.  This is another
11:39 20    document we got on Friday from your -- from JBG.
11:39 21    Could you take a look at it and let me know verbally
11:39 22    when you've finished looking at it.
11:40 23    MR. HOARE:  This is 12?
11:40 24    MR. GORE:  Yes.
11:40 25    A  Okay.

Page 103

11:40  1    Q  Okay.  Have you seen this document before?
11:40  2    A  Looks familiar.
11:40  3    Q  Okay.  When do you recall seeing it
11:40  4    before?
11:40  5    A  I'm not certain.  It's a standard form
11:40  6    from my former company.
11:40  7    Q  Okay.  It states on here date of
11:40  8    hire/rehire.  Do you see that in the second box?
11:40  9    A  Yes.
11:40 10    Q  June 12, 2006.  Do you see that?
11:40 11    A  Yes.
11:40 12    Q  Do you dispute that that's the day that
11:40 13    you started?
11:40 14    A  I don't recall if that was the date or
11:40 15    not.  That was the date specified for me to begin,
11:40 16    but I'm not certain as to whether or not I did.
11:40 17    Q  Oh.  So June 12 was the date specified for
11:40 18    to you begin?
11:40 19    A  According to this document.
11:40 20    Q  Do you have any independent recollection
11:40 21    of whether or not that was the date specified for
11:40 22    you to begin?
11:40 23    A  I don't recall.  My company has all the
11:41 24    documents, which you have, so --
11:41 25    Q  All right.  But I guess let me just ask

Page 104

11:41  1    this as plainly as I can, because we're here trying
11:41  2    to get your testimony.  When do you recall in --
11:41  3    starting work at JBG?
11:41  4    A  They would be able to confirm the exact
11:41  5    date that I started.
11:41  6    Q  Oh, most definitely.  But I'm asking for
11:41  7    your testimony.
11:41  8    A  I don't recall the exact date.  I would
11:41  9    have to ask them.
11:41 10    Q  Okay.  Well, looking at the -- let's look
11:41 11    at calendar for -- on June, 2006.  If you look at
11:41 12    the calendar -- and we talked in some detail about
11:41 13    the other things in that time period.  Does that
11:41 14    help you refresh your recollection as to when you
11:41 15    started at JBG?
11:41 16    A  I don't recall the exact date.
11:41 17    Q  Do you recall what week it was?
11:41 18    A  No, I do not recall that.
11:41 19    Q  Do you recall if it was in June?
11:41 20    A  I'm pretty -- I think it was in June.
11:42 21    Q  You think it was in June?
11:42 22    A  Uh-huh.
11:42 23    Q  But it could have been anytime from June 1
11:42 24    to June 30th?
11:42 25    A  My former company would have the exact

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 105

11:42 1  date that I began.
11:42 2      Q  I fully understand that, Ms. Scott.
11:42 3  You've said that now three times. But what I'm
11:42 4  asking is what your testimony is as to what you
11:42 5  remember.
11:42 6      A  I don't recall. I didn't take note as to
11:42 7  the day I started.
11:42 8      Q  Okay. And my question is: You don't have
11:42 9  any knowledge. It could have been June 1 or
11:42 10  June 30. You can't even narrow it down to a week?
11:42 11     A  I don't recall. I -- I didn't keep track
11:42 12  of it.
11:42 13     Q  I understand that. But I'm asking you,
11:42 14  can you not even narrow it down to the week in which
11:42 15  you started?
11:42 16     A  I would have -- I would have to ask for
11:42 17  more documents from my company.
11:42 18     Q  What documents would you need?
11:42 19     A  I don't know. Whatever they have.
11:42 20     Q  Okay. So without looking at documents
11:42 21  from your company, you can't even sit here today --
11:42 22     A  I would be --
11:42 23     Q  Excuse me.
11:42 24         Without talking to your company, your
11:42 25  testimony is is that you cannot even identify the

Page 106

11:42 1  general week in which you believe you started at
11:42 2  JBG?
11:42 3      A  I don't recall at this time.
11:43 4         MR. GORE: Mr. Hoare, I will say if you
11:43 5  want to speak with your client, I'd really like to
11:43 6  avoid having to call JBG in here, but I certainly
11:43 7  will. So if you want to have -- let me know if you
11:43 8  want to have a conversation with your client,
11:43 9  because --
11:43 10         MR. HOARE: About what?
11:43 11         MR. GORE: This issue.
11:43 12         MR. HOARE: What's the issue?
11:43 13         MR. GORE: If your client is truly
11:43 14  testifying she cannot even recall the week in which
11:43 15  she started working during this time period.
11:43 16         MR. HOARE: Why don't we have a dialogue
11:43 17  after the deposition?
11:43 18         MR. GORE: I'm mentioning it to you now
11:43 19  because we have been talking about it now. Do you
11:43 20  want to speak to your client or not?
11:43 21         MR. HOARE: We're here for you to ask the
11:43 22  witness questions and then we're going to leave, or
11:43 23  I'll have a conversation with you at that time about
11:43 24  anything you want to talk about.
11:43 25         MR. GORE: All right.

Page 107

11:43 1         MR. HOARE: But right now, we've got some
11:44 2  precious time that's supposed to be devoted to your
11:44 3  interrogating the witness.
11:44 4         MR. GORE: Right. And the witness is not
11:44 5  answering my questions. And I think anyone looking
11:44 6  at --
11:44 7         THE WITNESS: I'm answering them to the
11:44 8  best of my ability.
11:44 9         MR. GORE: I think anyone looking at this
11:44 10  will see that. So what I'm suggesting to you is do
11:44 11  you want to have a conversation with your client?
11:44 12  I'll proceed. I was just giving you the
11:44 13  opportunity.
11:44 14         MR. HOARE: We're going to proceed.
11:44 15         MR. GORE: Okay.
11:44 16     Q  Ms. Scott, help me understand. If I
11:44 17  recall, you don't recall whether you were sick the
11:44 18  week of May 15, 2006, right?
11:44 19         MR. HOARE: Objection.
11:44 20     Q  Or do you recall?
11:44 21     A  I don't recall.
11:44 22     Q  Okay. You don't recall if you were sick
11:44 23  the week of May 15, 2006?
11:44 24     A  No.
11:44 25         MR. HOARE: May 15?

Page 108

11:44 1         MR. GORE: Yeah.
11:44 2      Q  You don't recall what week in the month of
11:44 3  June you started working for your new employer, is
11:44 4  that correct?
11:44 5      A  I don't keep track of those --
11:44 6      Q  Is that correct?
11:44 7      A  I don't recall at this time.
11:44 8      Q  Is it correct, yes or no, that you don't
11:44 9  recall what week you started working for your new
11:45 10  employer in June?
11:45 11     A  Can you please rephrase?
11:45 12     Q  Do you recall, yes or no, what week you
11:45 13  started working for your new employer in June?
11:45 14     A  No, I do not.
11:45 15         MR. HOARE: Argumentative.
11:45 16     Q  Yes or no?
11:45 17         MR. HOARE: Same objection.
11:45 18  Argumentative.
11:45 19     A  No, I do not recall at this time.
11:45 20     Q  Okay. Do you recall whether you were sick
11:45 21  the week of May 15, 2006?
11:45 22     A  No, I do not recall at this time.
11:45 23     Q  Do you recall whether you sent Adam --
11:45 24  excuse me, Royal, a e-mail on May 24th asking about
11:45 25  your return to work the next day?

26 (Pages 105 to 108)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

|  | Page 141 |
|---|---|

12:38  1    Thanksgiving.
12:38  2        Q   So you don't know if you had turkey?
12:38  3        MR. HOARE:  Argumentative.
12:38  4        A   At this time, I don't recall.
12:38  5        Q   Okay.  All right, do you remember the last
12:38  6    day you worked in the office, actually were in the
12:38  7    office doing work in the office of Congressman
12:38  8    Rodney Alexander?
12:38  9        A   I don't recall the exact date.
12:38 10        Q   If we look at this calendar here, does
12:38 11    that help?
12:38 12        A   As I said, I don't recall the exact date.
12:38 13        Q   Okay.  See here we have Sunday, May 14th.
12:38 14    Do you see that?
12:38 15        A   Yes.
12:38 16        Q   And you wrote "sent e-mail to RA."  We
12:38 17    talked about that.
12:38 18        A   Yes.
12:38 19        Q   Do you remember that?
12:38 20        A   I remember talking about it, yes.
12:38 21        Q   Okay.  You remember you sent the e-mail to
12:38 22    RA, Congressman Alexander, on May 14th?
12:38 23        A   Yes.
12:38 24        Q   Right?  Okay.  Do you remember if you
12:38 25    returned to -- all right, and we also know that you

|  | Page 142 |
|---|---|

12:38  1    were sick, sick, whatever you were, sick, sick.  And
12:39  2    do you know if you returned to the office after
12:39  3    May 14th?
12:39  4        A   I don't recall at this time.  I don't
12:39  5    believe did I, but I don't recall.
12:39  6        Q   Okay.  Do you remember if you worked on
12:39  7    the 12th?
12:39  8        A   I'm not certain.
12:39  9        Q   Do you remember when it was that it was
12:39 10    conveyed to you that you would be transferred from
12:39 11    scheduler to staff assistant?
12:39 12        A   I don't recall the exact date, no.
12:39 13        Q   Was it the last day you worked in the
12:39 14    office?
12:39 15        A   I'm not certain.  At this time, I don't
12:39 16    recall.
12:39 17        Q   Was it this week here?
12:39 18        A   Not certain.
12:39 19        Q   Meaning the week of May 8th.
12:39 20        A   At this time, I don't know exactly.
12:39 21        Q   Do you keep for any purpose any kind of a
12:39 22    personal journal or personal diary or anything like
12:39 23    that?
12:39 24        A   No, no.
12:39 25        Q   Personal calendar?

|  | Page 143 |
|---|---|

12:39  1        A   No.
12:39  2        Q   Do you have a calendar on your Blackberry
12:39  3    or Palm or anything like that?
12:39  4        A   For work only.
12:39  5        Q   You don't keep any personal events on any
12:39  6    calendar?
12:40  7        A   No.
12:40  8        Q   You just keep those in your head?
12:40  9        A   For the most part.
12:40 10        Q   Do you have difficulty recalling those
12:40 11    events?
12:40 12        A   Not typically.
12:40 13        Q   Look at Exhibit 3.  These are the requests
12:40 14    for admissions that we went through earlier.  Take a
12:40 15    look at page 4.
12:40 16        First of all, do you recall what you had
12:40 17    for dinner last night, Ms. Scott?
12:40 18        A   I'll have to think about it.  That's an
12:40 19    unimportant thing for me to keep track of.
12:40 20        Q   So you don't remember what you had for
12:40 21    dinner last night?
12:41 22        A   Sometime in midafternoon I had some
12:41 23    potatoes and some zucchini.
12:41 24        Q   Did you have anything after that?
12:41 25        A   Not that I recall.

|  | Page 144 |
|---|---|

12:41  1        Q   Have you ever been diagnosed as having any
12:41  2    type of a memory disorder?
12:41  3        A   Memory disorder?
12:41  4        Q   Right.  Inability to remember things,
12:41  5    anything of that nature?
12:41  6        A   Not that I'm aware of.
12:41  7        Q   Has anyone ever conveyed to you in any way
12:41  8    that you have a poor memory?
12:41  9        A   Not that I'm aware of.
12:41 10        Q   Do you remember what you had for breakfast
12:41 11    this morning?
12:41 12        A   Yes.
12:41 13        Q   What did you have?
12:41 14        A   Two hash browns and a Coke.
12:41 15        Q   Do you remember what you had for breakfast
12:41 16    yesterday morning?
12:41 17        A   I typically don't eat breakfast, so it was
12:41 18    rare for me to eat breakfast this morning.
12:41 19        Q   So other than the zucchini and the other
12:42 20    item you mentioned, did you eat anything else the
12:42 21    other day?
12:42 22        A   I believe so.
12:42 23        Q   Do you remember what it was?
12:42 24        A   Not exactly.  It was an assortment of some
12:42 25    Lebanese food and some potato chips.

35 (Pages 141 to 144)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

**Page 145**

12:42 1    Q  Do you remember what you ate for dinner on
12:42 2  Friday, May 18th, the day you signed your
12:42 3  verification?
12:42 4    A  No, I don't recall.
12:42 5    Q  You don't remember what you had for dinner
12:42 6  on Friday?
12:42 7    A  I don't typically sit down and have
12:42 8  dinner.
12:42 9    Q  And by Friday, I mean Friday, May 18,
12:42 10  2007, three days ago.  You didn't have dinner
12:42 11  Friday?
12:42 12    A  I could have.
12:42 13    Q  Do you remember if you did?
12:42 14    A  I work in a restaurant.  We eat all the
12:42 15  time as we work.  I didn't sit down.  I don't recall
12:42 16  if I sat down and ate or if I didn't.
12:42 17    Q  Do you -- okay.  Do you remember anything
12:42 18  that you ingested in terms of food on Friday,
12:42 19  May 18th?
12:43 20    A  I don't recall specifically, no.
12:43 21    Q  Okay.
12:43 22    A  I don't keep track of my -- of what I eat
12:43 23  every day.
12:43 24    Q  Okay.  Going back to Exhibit Number 3,
12:43 25  request number 11, Exhibit Number 3 is the one you

---

**Page 146**

12:43 1  opened up before, before I started asking you those
12:43 2  questions.  I'm sorry, page number 4.  All right, as
12:43 3  we referred to earlier, these are the requests for
12:43 4  admissions and the responses that your counsel
12:43 5  submitted on May 3rd to us.  Request number 11 says
12:43 6  did you not return to work in the office of
12:43 7  Representative Alexander after you sent the May 14th
12:43 8  e-mail, and it's admitted.  So that's correct, is
12:43 9  that right?
12:43 10    A  I assume so.
12:43 11    Q  Okay.  If you could take a look at
12:44 12  Exhibit 16, which I marked, the complaint, I'll
12:44 13  direct you to the paragraph, but certainly if you
12:44 14  want to take the time to look at the whole thing,
12:44 15  that's fine.  Actually, let me ask you a question.
12:44 16  You said that you don't generally write down what
12:44 17  you eat, so is it your testimony that unless you
12:44 18  write it down, you don't remember?
12:44 19    A  No.
12:44 20    MR. HOARE:  Objection, argumentative.
12:44 21    Q  Do you need to have things written down in
12:44 22  order to remember them?
12:44 23    A  Not necessarily.
12:44 24    Q  But you don't remember what you ate on
12:44 25  Friday and you didn't write that down, is that

---

**Page 147**

12:44 1  correct?
12:44 2    MR. HOARE:  Asked and answered.
12:44 3    A  I don't recall what I ate on Friday.
12:44 4    Q  And you didn't write it down?
12:44 5    A  Most likely not.
12:44 6    Q  Okay.  Do you remember if you wrote it
12:44 7  down?
12:44 8    A  I would not have written down what I ate.
12:45 9    Q  Do you have any independent recollection
12:45 10  of not doing it or doing it?
12:45 11    MR. HOARE:  Objection, compound question.
12:45 12    A  No, I do not recall writing down what I
12:45 13  ate.
12:45 14    Q  Okay.  All right.  Okay, continue to look
12:45 15  at Exhibit 16 and let me know when you've finished.
12:45 16  And again, I'm going to direct you to the specific
12:45 17  paragraph, but --
12:46 18    MR. HOARE:  Is there a particular portion?
12:46 19    MR. GORE:  I said I was going to direct
12:46 20  her.  You've been having her read the entire
12:46 21  document, but I'm going to direct her to a specific
12:46 22  paragraph.
12:46 23  BY MR. GORE:
12:46 24    Q  Are you ready, Ms. Scott, or do you want
12:46 25  more time to look at the document?

---

**Page 148**

12:46 1    A  Okay.
12:46 2    Q  Okay.  I'd like for to you look at --
12:46 3  well, let me ask you this first.  This was the
12:46 4  supplemental complaint that was filed by your
12:46 5  counsel in this case.  Have you seen this before?
12:46 6    A  At the time, I -- I don't recall.
12:46 7    Q  Okay.  You don't recall whether you saw
12:46 8  your complaint in this lawsuit before?
12:46 9    A  I'm not certain.
12:46 10    Q  Okay.  Look at page 2 and let me ask you
12:46 11  this:  Do you know what a complaint is, just
12:46 12  generally?
12:47 13    A  I would imagine I would know what it is.
12:47 14    Q  Okay.  Because you don't remember whether
12:47 15  you've ever seen this before, before I started
12:47 16  asking you about it, do you have a general -- what
12:47 17  do you think -- what do you understand this to be,
12:47 18  meaning Exhibit 16?
12:47 19    A  I'm not certain.
12:47 20    Q  Okay.  This is the formal document that
12:47 21  has been filed on your behalf in the court setting
12:47 22  forth the claims against Congressman Alexander's
12:47 23  office.  I believe counsel would agree that that's
12:47 24  an accurate statement.  Do you understand that to be
12:47 25  the case, Ms. Scott?

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 149

12:47 1    A  If that's what you're saying it is.
12:47 2    Q  Okay. And these are the specific
12:47 3 allegations that are being made or the general
12:47 4 allegations that are being made in this case, so I'm
12:47 5 going to ask you about that. If you look at page 2,
12:47 6 it says, paragraph 10, defendant removed plaintiff
12:47 7 from her position as scheduler and transferred her
12:48 8 to a lesser position as staff assistant with lesser
12:48 9 duties and responsibilities at least in part because
12:48 10 she resisted the misconduct referenced above and
12:48 11 complained of possible sex discrimination. Do you
12:48 12 see that?
12:48 13    A  Yes.
12:48 14    Q  Okay. Let me just ask you right now, do
12:48 15 you -- do you agree that that's a -- do you believe
12:48 16 that's a true statement?
12:48 17    A  For the most part, yes.
12:48 18    Q  How is it untrue?
12:48 19    A  I'm not certain. I --
12:49 20    Q  Let me just be clear. I'm waiting for a
12:49 21 response because you said, "For the most part, yes."
12:49 22 Typically, when somebody says "for the most part,"
12:49 23 that means that there's something about it that is
12:49 24 untrue. Is that your testimony?
12:49 25        MR. HOARE: Objection, misstates the

Page 150

12:49 1 witness's testimony. It's argumentative.
12:49 2    Q  Ms. Scott?
12:49 3    A  I believe it to be true.
12:49 4    Q  In whole? Totally?
12:49 5    A  Yes.
12:49 6    Q  Okay. So why did you say, quote, for the
12:49 7 most part, yes, close quote, before?
12:49 8    A  I'm not certain.
12:49 9    Q  Do you recall saying "for the most part"?
12:49 10    A  Yes.
12:49 11    Q  Okay. But you don't know why you said it?
12:49 12    A  No.
12:49 13        MR. HOARE: Objection, argumentative.
12:49 14    Q  Okay. Now, if you'd look at paragraph 11,
12:49 15 it says defendant made plaintiff's working
12:49 16 conditions so intolerable after she complained of
12:49 17 unlawful discrimination that plaintiff reasonably
12:49 18 felt compelled to quit her job. Do you see that?
12:50 19    A  Yes.
12:50 20    Q  And, by the way, do you know who the
12:50 21 defendant is?
12:50 22    A  Yes.
12:50 23    Q  Who is the defendant?
12:50 24    A  Congressman Alexander.
12:50 25    Q  It's actually the office of Congressman

Page 151

12:50 1 Alexander. Do you know who the plaintiff is?
12:50 2    A  Yes.
12:50 3    Q  Who is the plaintiff?
12:50 4    A  Me.
12:50 5    Q  Okay. So looking at paragraph 11 there,
12:50 6 is that a true statement?
12:50 7    A  Yes.
12:50 8    Q  Okay. What working conditions were made
12:50 9 so intolerable after you complained?
12:50 10    A  Can you please explain who you are
12:50 11 referring to that I'm complaining?
12:50 12    Q  It's your complaint, and I'm asking you.
12:50 13 You say "defendant made plaintiff's working
12:50 14 conditions so intolerable after she complained of
12:50 15 unlawful discrimination." It's your complaint, and
12:50 16 I'm asking you: What working conditions were made
12:51 17 so intolerable after your complaint?
12:51 18    A  I had been complaining for months.
12:51 19    Q  What working conditions were made so
12:51 20 intolerable?
12:51 21    A  The unnecessary comments, the leering that
12:51 22 went on day after day, coming behind my desk,
12:51 23 trapping me at my desk, kissing my head, putting --
12:51 24 when I make these comments, it's in reference to all
12:51 25 from Royal. Touching me up to the point of putting

Page 152

12:52 1 his hands near my breasts and enjoying it, making
12:52 2 reference to my being sexy.
12:52 3    Q  Anything else?
12:52 4    A  Not that I can remember at this time.
12:52 5    Q  Okay. Now, you said those were the
12:52 6 working conditions that were made so intolerable
12:53 7 after you complained. So I guess the first thing
12:53 8 I'm going to say is that you mentioned that this was
12:53 9 all engaged in by Royal. Is that your testimony?
12:53 10    A  Yes.
12:53 11    Q  Did anyone else engage in this behavior
12:53 12 towards you?
12:53 13    A  No.
12:53 14    Q  Okay. Was Royal -- is it your testimony
12:53 15 that Royal was aware you had complained at any
12:53 16 point?
12:53 17    A  I'm not certain if he was aware or not.
12:53 18    Q  Okay. So is it your testimony that after
12:53 19 you complained, he intentionally made your work
12:53 20 conditions intolerable because you had complained?
12:53 21        MR. HOARE: Argumentative.
12:53 22    A  The working conditions were intolerable, I
12:53 23 felt, because I resisted his sexual advances.
12:53 24    Q  And when you say "sexual advances," are
12:53 25 you referring to that sort of block of items that

37 (Pages 149 to 152)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

**Page 157**

12:59 1   about his comments being attributable or construed
12:59 2   as sexual harassment?
12:59 3      A   I don't recall word for word.
12:59 4      Q   Do you recall any of the words you
12:59 5   uttered?
12:59 6      A   I don't recall word for word, or any of
12:59 7   the words.
12:59 8      Q   Do you recall any other behavior that
12:59 9   Royal engaged in other than what you've testified to
01:00 10   that you claim is inappropriate towards you?
01:00 11      A   He commented to myself and my sisters at
01:00 12   the Christmas party in Louisiana that we were the
01:00 13   sexiest sisters he had ever seen, that we must have
01:00 14   come from good genes, and he persisted to follow us
01:00 15   back to the hotel, and which we told him it wasn't
01:00 16   necessary, but he still -- he still persisted and
01:00 17   refused to let us go back ourselves.
01:00 18      Q   And so you're saying he went to your hotel
01:00 19   with you? Is that your testimony?
01:00 20      A   To the driveway of the hotel.
01:00 21      Q   And then left?
01:00 22      A   He lingered for a while and then left.
01:00 23      Q   Did he do anything at the driveway of the
01:01 24   hotel other than linger?
01:01 25      A   He continued to say that we were -- my

---

**Page 158**

01:01 1   sisters and I were very sexy and to have a safe trip
01:01 2   to Alabama.
01:01 3      Q   How long was this trip from where the
01:01 4   party was to the driveway of the hotel?
01:01 5      A   I don't recall specifically.
01:01 6      Q   But you do recall specifically what he
01:01 7   said, and you do recall specifically that he was in
01:01 8   the driveway?
01:01 9      MR. HOARE: Objection, argumentative.
01:01 10      Q   Is that correct?
01:01 11      MR. HOARE: Same objection.
01:01 12      Q   Is that correct?
01:01 13      MR. HOARE: Same objection.
01:01 14      Q   Answer my question.
01:01 15      A   I don't recall word for word exactly what
01:01 16   was said. What I have told you is what I remember
01:01 17   him saying.
01:01 18      Q   When was this?
01:01 19      A   On the night of the company or the office
01:01 20   Christmas party in Alexandria.
01:01 21      Q   What date?
01:01 22      A   I don't recall the date.
01:01 23      Q   Was it in December?
01:01 24      A   I believe so.
01:02 25      Q   Anything else that Royal allegedly engaged

---

**Page 159**

01:02 1   in that you contend -- towards you that you contend
01:02 2   is inappropriate?
01:02 3      A   Not that I can recall at this time.
01:02 4      Q   So this is the full extent of it?
01:02 5      A   At this time.
01:02 6      MR. HOARE: Objection, argumentative.
01:02 7      Q   This is the full extent of what you can
01:02 8   recall?
01:02 9      A   At this time, this is what I remember.
01:02 10      Q   Okay. What do you mean when you say "at
01:02 11   this time"?
01:02 12      A   Today, this very moment.
01:02 13      Q   Okay. Is there something that you believe
01:02 14   there's some piece of information or some other
01:02 15   source out there that would help you remember
01:02 16   something differently on another day?
01:02 17      A   I'm not certain. It's possible.
01:02 18      Q   Well, what is it that's possible?
01:02 19      MR. HOARE: Objection, requires
01:02 20   speculation.
01:02 21      Q   Just trying to understand your testimony.
01:02 22      MR. HOARE: Same objection.
01:02 23      A   I could remember something tomorrow.
01:02 24      Q   But you're not remembering it today?
01:02 25      A   At this time, this is what I remember.

---

**Page 160**

01:02 1      Q   Okay. What I want to do and when we take
01:03 2   our lunch break is I want to you think. Obviously
01:03 3   you won't be speaking to your counsel about it,
01:03 4   because that's not appropriate. But I want to you
01:03 5   think during the lunch break about anything else
01:03 6   that Royal may have done, anything at all, because
01:03 7   this is very important. I want to you search your
01:03 8   memory for anything else you think Royal would have
01:03 9   done.
01:03 10      MR. HOARE: She's not supposed to have
01:03 11   lunch?
01:03 12      MR. GORE: When we take our break.
01:03 13      Q   And when I come back, I'm going to ask you
01:03 14   again, because I do, I really think it's important
01:03 15   when I get answers like "at this time," it's really
01:03 16   important because this is -- this is your
01:03 17   opportunity to tell us what you remember.
01:03 18      So did anyone else -- let me go back to
01:03 19   paragraph number 11 of Exhibit 16. Defendant made
01:03 20   plaintiff's working conditions so intolerable after
01:03 21   she complained. Do you have any knowledge of Royal
01:03 22   being aware that you had complained?
01:03 23      A   I'm not certain if he was aware or not.
01:03 24      Q   Okay. Have you ever lived in the
01:04 25   Congressman's district?

---

39 (Pages 157 to 160)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 185

02:17 1    A  I don't recall at this time.

02:17 2    Q  Okay.  And do you remember when you got

02:17 3  down if you were holding something in your hands?

02:17 4    A  I don't recall at this time.

02:17 5    Q  So you don't remember whether you got it

02:17 6  or not, whatever you were getting, when you got

02:17 7  down?

02:17 8    A  I don't recall.

02:17 9    Q  Okay.  But you do remember Royal putting

02:17 10  his hands to help you down?

02:17 11    A  Yes.

02:17 12    Q  Okay.  Just -- I understand that you don't

02:17 13  recall.  Let's try this, because this is an

02:17 14  important point.  Was it -- when you think of

02:17 15  somebody getting up to pick something up off a shelf

02:17 16  or wherever it might be on a chair and getting down,

02:18 17  that's a process once they're getting down that

02:18 18  normally takes a few seconds.  Would you agree with

02:18 19  that?

02:18 20    A  Maybe.

02:18 21    Q  So, I mean, I'm just trying to imagine how

02:18 22  long it was that you felt Royal's hands were you on

02:18 23  you in an inappropriate way.

02:18 24    A  I don't recall at this time.

02:18 25    Q  Do you think it was more than two or three

Page 186

02:18 1  seconds?

02:18 2    A  I don't recall at this time.

02:18 3    Q  What do you recall about how long it

02:18 4  lasted?

02:18 5    A  It was long enough for him to move his

02:18 6  hands all down my midriff and feel the area around

02:18 7  my bra where my breasts are.

02:18 8    Q  And how do you know that his doing this

02:19 9  was not actually to help you down off the chair?

02:19 10  Let me rephrase that.  Strike that.

02:19 11       He was helping you off the chair, is that

02:19 12  correct?

02:19 13    A  That's what he said he was doing.

02:19 14    Q  And regardless of what he may have done

02:19 15  during that process, do you dispute that he was

02:19 16  helping you off the chair?

02:19 17       MR. HOARE:  Objection, vague and

02:19 18  ambiguous.

02:19 19    Q  Is it your contention in this case that he

02:19 20  never helped you off the chair?

02:19 21    A  I didn't consider it to be helping me.

02:19 22    Q  Explain.

02:19 23    A  I didn't need help getting off the chair.

02:19 24  I didn't ask for it.

02:19 25    Q  Did you believe that he thought he was

Page 187

02:19 1  helping you off the chair?

02:19 2       MR. HOARE:  Requires speculation.

02:19 3    A  I don't know what he thought.

02:19 4    Q  You may not have asked for help, but --

02:20 5  and what did you do after this -- this occurred

02:20 6  after you spoke with him?  What did you go to do

02:20 7  next?

02:20 8    A  Explain what you mean.  In regards to what

02:20 9  I spoke with him about.

02:20 10    Q  Well, you -- you said you got up to get

02:20 11  something, you were on the chair, and he put his

02:20 12  hands around you in helping you down.  What did you

02:20 13  do next?

02:20 14       MR. HOARE:  Mischaracterizes the witness's

02:20 15  testimony.  You may answer.

02:20 16    Q  What did you do after he helped you down

02:20 17  the chair, whatever the case was?

02:20 18       MR. GORE:  Michael, please do not testify

02:20 19  for the witness.

02:20 20       MR. HOARE:  Well, you're putting words in

02:20 21  her mouth.

02:20 22       MR. GORE:  If I'm saying it incorrectly,

02:20 23  she can help me.  You don't have to testify for her.

02:20 24       MR. HOARE:  I can object, and that's my

02:20 25  purpose here, and that's what I'm doing.  I think

Page 188

02:20 1  your question is inartful, but apart from that, it's

02:20 2  also objectionable.

02:20 3    Q  What was the next action you took after

02:20 4  you got down from him helping you off the chair?

02:20 5    A  I don't recall exactly.  I told him he did

02:21 6  not -- I did not need help getting down from the

02:21 7  chair.

02:21 8    Q  We have been through that.  But what else

02:21 9  did you do?

02:21 10    A  I don't recall exactly.

02:21 11    Q  Do you recall anything else about the rest

02:21 12  of the day?

02:21 13    A  I know I -- if I recall correctly, I later

02:21 14  on spoke with Linda and Tommie about what had

02:21 15  happened.

02:21 16    Q  Okay.  Other than talking to Linda and

02:21 17  Tommie, because we will get into this, this day when

02:21 18  this occurred -- and when was this again?

02:21 19    A  I don't recall exactly.

02:21 20    Q  Oh, you don't recall.  Do you remember

02:21 21  what month?

02:21 22    A  Not at this time, no.

02:21 23    Q  Was it when you were a scheduler or an

02:21 24  intern?

02:21 25    A  A scheduler.

46 (Pages 185 to 188)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                              Taken on May 21, 2007

| Page 189 | Page 191 |
|---|---|

**Page 189**

02:21 1    Q    Okay. Was it in 2005 or 2006?
02:21 2    A    It would have been in 2006.
02:21 3    Q    Was it in the winter or the spring?
02:21 4    A    I was only employed in the spring and
02:21 5    early summer.
02:21 6    Q    And the winter?
02:21 7    A    Define "winter."
02:22 8    Q    December, January, February of -- December
02:22 9    of '05, January and February of '06 I consider the
02:22 10   winter. Do you not?
02:22 11   A    What's the question?
02:22 12   Q    Ms. Scott, I'm trying to find out for you
02:22 13   to narrow down somewhere in this six-month --
02:22 14   A    I don't recall exactly when it happened.
02:22 15   Q    I understand you don't recall exactly.
02:22 16   That's perfectly clear from your testimony. What
02:22 17   I'm trying to find out is during this entire
02:22 18   six-month period when you worked there, do you have
02:22 19   any sense when in that period it was?
02:22 20   A    Most likely sometime in the spring of '06.
02:22 21   Q    Spring of '06? Okay.
02:22 22        And on this day in the spring of '06 when
02:22 23   this occurred, you've talked to us -- you've told us
02:22 24   about what happened, meaning his touching you, and
02:22 25   you've told us that you talked to Linda and Tommie,

**Page 190**

02:22 1    which we will get to. You don't remember what you
02:22 2    were getting when you got in the chair, correct?
02:22 3    A    No.
02:22 4    Q    You don't remember whether you actually
02:22 5    picked it up or not and brought it down with you, do
02:23 6    you?
02:23 7    A    I don't recall at this time.
02:23 8    Q    Other than him touching you, you talking
02:23 9    to him about it and then you talking to Linda and
02:23 10   Tommie, what else do you remember occurring on this
02:23 11   day?
02:23 12   A    I don't recall at this time.
02:23 13   Q    Nothing else about the day you remember?
02:23 14   A    Not at this time, no.
02:23 15   Q    Okay. Do you remember what time of day it
02:23 16   was in this day in the spring of '06 that he touched
02:23 17   you --
02:23 18   A    No, not at this time.
02:23 19   Q    -- when you were getting down off the
02:23 20   chair?
02:23 21   A    Not at this time, no.
02:23 22   Q    Okay. So you said that you called Linda
02:23 23   and Tommie, is that what your testimony was?
02:23 24   A    I believe so.
02:23 25   Q    Well, tell me -- let's start with Linda.

**Page 191**

02:23 1    Who did you call first?
02:23 2    A    I don't recall.
02:23 3    Q    Okay. Did you telephone them?
02:23 4    A    Most likely, yes.
02:23 5    Q    Were they in the office? Were they in
02:23 6    D.C.?
02:23 7    A    No. They were -- most likely would not
02:23 8    have been.
02:23 9    Q    Okay. So how else would you have been
02:23 10   able to speak with them other than by telephone?
02:23 11   A    If I recall correctly, I spoke with them
02:23 12   by telephone.
02:23 13   Q    Okay.
02:24 14   A    There are other forms of communication,
02:24 15   but I typically did not use them for this sort of
02:24 16   matter.
02:24 17   Q    You say you typically did not use them for
02:24 18   this sort of matter. What kind of matter?
02:24 19   A    Anything I might have shared with them in
02:24 20   regards to Royal's behavior or things he may have
02:24 21   said or done.
02:24 22   Q    Okay. So on this day in the spring of '06
02:24 23   you said that you -- did you call Linda or did she
02:24 24   call you and you mentioned it in part of the
02:24 25   conversation?

**Page 192**

02:24 1    A    I most likely would have called her.
02:24 2    Q    Okay. What do you -- tell me everything
02:24 3    you remember about that conversation with Linda.
02:24 4    A    I don't recall specifics.
02:24 5    Q    Tell me everything you remember.
02:24 6    A    I know I specifically would have told
02:24 7    her --
02:24 8    Q    Ms. Scott, I don't want to know what you
02:24 9    would have told her. I want to know what you recall
02:24 10   telling her. That's very important. What do you
02:24 11   sitting here today under oath recall saying to her?
02:24 12   A    I recall telling her about him trying to
02:25 13   help me down from the chair, and instead of
02:25 14   extending a hand to help me down, he caressed my
02:25 15   body.
02:25 16   Q    Did you use the word "caress my body"?
02:25 17   A    I don't recall exactly what my terminology
02:25 18   was.
02:25 19   Q    That's what I want to know because I'm
02:25 20   asking you what you said to her.
02:25 21   A    I don't recall word for word what I said
02:25 22   to her.
02:25 23   Q    So you may not have said "caressed my
02:25 24   body"?
02:25 25        MR. HOARE: Objection, argumentative.

47 (Pages 189 to 192)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

**Page 233**

03:35 1   Q   Could you read that and let me know when
03:35 2  you're finished, please?
03:35 3   A   Okay.
03:35 4   Q   Do you recall sending that e-mail?
03:35 5   A   It looks familiar.
03:36 6   Q   In it, you're talking about deleting
03:36 7  folders, and that you deleted files but you didn't
03:36 8  mean to. What files did you delete that you didn't
03:36 9  mean to delete?
03:36 10   A   I don't recall.
03:36 11   Q   And why did you want to know whether they
03:36 12  could be recovered?
03:36 13   A   I don't recall specifically.
03:36 14   Q   Now, you never returned to work after this
03:36 15  e-mail, though, did you?
03:36 16   A   I don't believe so.
03:36 17   Q   So why were you interested at this time in
03:36 18  knowing about folders you had deleted from your --
03:36 19   A   I had intentions of returning to work.
03:36 20   Q   Oh, you did?
03:36 21   A   Yes, most definitely.
03:36 22   Q   And when did those intentions switch to
03:36 23  not returning to work?
03:36 24   A   During the course of the two weeks that I
03:36 25  was on paid administrative leave, my return to work

---

**Page 234**

03:36 1  date was switched without reason or explanation.
03:37 2  Although we requested to be told, we were not
03:37 3  communicated as to why.
03:37 4     There had been no concern from the
03:37 5  Congressman's office as to how I was doing or
03:37 6  whether or not I would be working with Royal, what
03:37 7  was being done with him, was he on paid
03:37 8  administrative leave as well, was he going to be
03:37 9  removed from the office, who was going to be my
03:37 10  supervisor, what my responsibilities and obligations
03:37 11  were.
03:37 12     There was no way of knowing whether or not
03:37 13  there might be more communicated to me or I might be
03:37 14  in a position where I would be made to feel
03:37 15  uncomfortable, whether or not it would continue to
03:38 16  be a hostile work environment or not. I wasn't
03:38 17  communicated those things by the Congressman's
03:38 18  office to myself or my attorney.
03:38 19   Q   And, of course, you didn't call the
03:38 20  Congressman back so you never had a chance to talk
03:38 21  to him about it?
03:38 22     MR. HOARE: Objection, assumes facts not
03:38 23  in evidence. It's argumentative.
03:38 24   Q   Did you call the Congressman back?
03:38 25   A   My attorney did.

---

**Page 235**

03:38 1   Q   Your attorney spoke to the Congressman?
03:38 2   A   Yes.
03:38 3   Q   What's your understanding of what occurred
03:38 4  in that conversation?
03:38 5   A   I wasn't there. I wasn't present.
03:38 6   Q   But you never called the Congressman?
03:38 7   A   I personally never called the Congressman.
03:38 8   Q   And when was it that you allegedly became
03:38 9  aware of this information that you didn't remember
03:38 10  this morning involving that your return-to-work date
03:38 11  was changed?
03:38 12     MR. HOARE: Objection. It's
03:38 13  argumentative.
03:38 14   Q   When was it?
03:38 15   A   Can you repeat the question, please?
03:38 16   Q   Sure. When was it that you became aware
03:39 17  of this information that your return-to-work date
03:39 18  was changing?
03:39 19   A   If I recall, some of these documents right
03:39 20  here indicate that.
03:39 21   Q   And that you just testified was one of the
03:39 22  reasons why you decided not to come back to work,
03:39 23  right?
03:39 24   A   It had something to do with it, yes.
03:39 25   Q   Okay.  Look at Exhibit Number 5, please,

---

**Page 236**

03:39 1  page PO292. It's about halfway through.
03:39 2   A   Okay.
03:39 3   Q   PO292 halfway through. It's right before
03:39 4  that letter. It's the next page. Okay. In the
03:39 5  middle these are the e-mail exchange between your
03:39 6  lawyer and Ms. Lett.
03:39 7     I'd like you to look at the middle line
03:39 8  which is Wednesday, June 7, 10:45, Gloria Lett to
03:39 9  Michael Hoare: Please advise Elizabeth that she
03:39 10  will be expected back in the office on Monday,
03:40 11  June 12, and not Thursday. Elizabeth will remain on
03:40 12  administrative leave until that time. Upon her
03:40 13  return to the office, Elizabeth will be assuming the
03:40 14  position of staff assistant at her current rate of
03:40 15  pay. She will be reporting to Adam Terry.
03:40 16     So I take it, given what you just said,
03:40 17  that this information was not something you were
03:40 18  aware of until right now.
03:40 19     MR. HOARE: Objection. It's
03:40 20  argumentative.
03:40 21   Q   Is that correct?
03:40 22   A   I was not aware of it at the point in
03:40 23  reference you were referring to on May 15 in
03:40 24  Exhibit 18.
03:40 25   Q   I asked you, however, when it was that

---

58 (Pages 233 to 236)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 237

03:40 1    you --
03:40 2        A    I don't recall.
03:40 3        Q    -- decided -- excuse me. I asked it when
03:40 4    it was that you decided that you weren't going to
03:40 5    come back to the office, and you said that it was
03:40 6    after the two-week administrative leave period when
03:40 7    certain things became aware to you. The record will
03:40 8    reflect what you said.
03:40 9        MR. HOARE: I think you misstated the
03:40 10   witness's testimony. And in doing so, you're going
03:40 11   to mislead the witness. What she testified was
03:40 12   during --
03:40 13       MR. GORE: Is that a one- or two-word
03:40 14   objection, Mr. Hoare?
03:41 15       MR. HOARE: I didn't count the words.
03:41 16       Q    So the question for you is: You said that
03:41 17   one of the factors that caused you to decide not to
03:41 18   return to work was that your work date was changed
03:41 19   inexplicably.
03:41 20       A    Define "inexplicably."
03:41 21       Q    I think that was the word you used.
03:41 22       A    I don't believe I used it.
03:41 23       Q    Or without explanation, something of that
03:41 24   nature.
03:41 25       A    At some point, it was changed.

---

Page 238

03:41 1        Q    And that was, according to your testimony,
03:41 2    one of the reasons why you decided not to come back
03:41 3    to work. Is that true?
03:41 4        A    Yes.
03:41 5        Q    Okay. Now, on June 7 when this e-mail
03:41 6    came out, this was two days after you had signed the
03:41 7    offer letter at JGB Companies, wasn't it?
03:41 8        A    It's possible. I don't recall the date
03:41 9    that I signed the offer letter.
03:41 10       Q    We spent a lot of time on this morning.
03:41 11   Do you remember that?
03:41 12       A    Yes.
03:41 13       Q    Tell me something. How is it possible for
03:41 14   it to be truthful that you signed an offer letter to
03:42 15   go work somewhere else on June 5 but yet didn't make
03:42 16   a decision until information was conveyed to you on
03:42 17   June 7?
03:42 18       MR. HOARE: Misstates witness's testimony.
03:42 19   It's argumentative.
03:42 20       Q    How can both of those be the case?
03:42 21       A    Can you repeat, please?
03:42 22       Q    Sure. On June 5th, you signed your offer
03:42 23   letter and committed to work at JGB Companies at the
03:42 24   very latest. It looks like it may have been earlier
03:42 25   than that according to Chris Dockson's e-mail, but

---

Page 239

03:42 1    you'll remember we looked at all those documents
03:42 2    that showed June 5th being that date. We can go
03:42 3    back through them again, but do you remember that?
03:42 4        A    Yes.
03:42 5        Q    June 7 is an e-mail from Gloria to your
03:42 6    attorney indicating that your return-to-work date
03:42 7    has changed. You just testified that it was the
03:42 8    change of your return-to-work date that was one of
03:42 9    the reasons why you decided not to return. Correct?
03:42 10       A    Yes.
03:42 11       Q    So if you'd already decided two days
03:42 12   before you weren't going to return, how could this
03:42 13   be a cause of your not wanting to return?
03:43 14       A    Because I could always not show up for the
03:43 15   job offer I'd taken and returned to the
03:43 16   Congressman's office.
03:43 17       Q    And how much were you going to be making
03:43 18   at this job?
03:43 19       A    A lot more.
03:43 20       Q    And a $5,000 bonus?
03:43 21       A    Yes. But I don't accept any position
03:43 22   based on money. I'm interested in opportunity.
03:43 23       Q    Well, let's actually talk about that.
03:43 24   When you initially became scheduler, what was your
03:43 25   salary?

---

Page 240

03:43 1        A    30,000.
03:43 2        Q    Did you believe at that time that that was
03:43 3    inappropriate?
03:43 4        A    Based on conversations I had had with
03:43 5    other chief of staffs from other offices and from
03:43 6    the research I had done, I felt like it was
03:43 7    deserving of more; however, I felt like this was a
03:43 8    great opportunity to work for a U.S. Congressman and
03:43 9    I was willing to accept a position at a lower salary
03:44 10   range with the expectation and communication by
03:44 11   Royal that upon graduation with my MBA when I was no
03:44 12   longer receiving financial aid for school that I
03:44 13   would be getting a pay raise.
03:44 14       Q    When did Royal convey that to you?
03:44 15       A    When I was hired.
03:44 16       Q    As scheduler?
03:44 17       A    As scheduler.
03:44 18       Q    And that was in late November, early
03:44 19   December of '05?
03:44 20       A    I believe it was sometime in November.
03:44 21   I -- I don't recall exactly.
03:44 22       Q    So in November of '05 did you believe your
03:44 23   $30,000 pay was discriminatory based upon your
03:44 24   gender?
03:44 25       A    I'm not certain what I believed at that

---

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

Page 269

04:14 1    Q    Well, you said you weren't finished.

04:14 2    A    Ask your question, please.

04:14 3    Q    What was it that you said to Tommie about

04:14 4  Royal's behavior?

04:14 5    A    At this time, I don't recall all of the

04:14 6  specifics of our conversations. I do recall

04:15 7  speaking with her about the incident where Royal put

04:15 8  his hands on my body and caressed my sides up to the

04:15 9  point where his hands were touching the area of my

04:15 10  breasts around the underwire of my bra.

04:15 11        I also spoke with her regarding the

04:15 12  situation where he trapped me at my desk, wrapping

04:15 13  his arms on both sides of me, cornering me at my

04:15 14  computer while he looked at the schedule in regards

04:15 15  to something on the Congressman's schedule, and he

04:15 16  kissed me on the head. And I immediately picked up

04:15 17  the phone and called her and told her about it, and

04:15 18  she commented that it was inappropriate, it was

04:15 19  gross, it was gross.

04:15 20        I said I felt uncomfortable working for

04:15 21  him, that I shouldn't be forced to work in an

04:16 22  environment where I have to put up with that. And I

04:16 23  don't -- at this time don't recall the rest of what

04:16 24  we might have talked about.

04:16 25    Q    You said that Ms. Seaton said it was

Page 270

04:16 1  inappropriate, disgusting and gross. You used those

04:16 2  three words. Those are the same three words to say

04:16 3  what Linda Blount had said. So they used the

04:16 4  identical words?

04:16 5    A    I'm not putting words in either one of

04:16 6  their mouths.

04:16 7    Q    That's what I'm asking you for. I'm

04:16 8  asking what they said, not --

04:16 9    A    I can't quote word for word.

04:16 10    Q    Did Ms. Seaton use the word

04:16 11  "inappropriate"?

04:16 12    A    Our conversation -- in our conversation,

04:16 13  her communication to me, whether it was word for

04:16 14  word "inappropriate" or "disgusting" or "gross," was

04:16 15  that that was what his behavior was.

04:16 16    Q    Did she use the word "inappropriate"?

04:16 17    A    I don't recall specifically.

04:16 18    Q    Did she use the word "gross"?

04:16 19    A    I don't recall specifically at this time.

04:16 20    Q    Did she use the word "disgusting"?

04:16 21    A    I don't recall specifically at this time.

04:16 22    Q    Okay. So the two incidents that you

04:16 23  shared with Tommie Seaton were the touching incident

04:17 24  and this one you're now mentioning about where he

04:17 25  trapped you and cornered you and kissed you on the

Page 271

04:17 1  forehead, is that correct? Were there any others?

04:17 2    A    I don't recall at this time.

04:17 3    Q    So these are the only ones you recall?

04:17 4    A    At this particular moment in time, yes.

04:17 5    Q    Okay. Were these two separate times that

04:17 6  you spoke with Tommie?

04:17 7    A    Yes.

04:17 8    Q    Okay. And when were they?

04:17 9    A    I don't recall specifically at this time.

04:17 10    Q    How far apart in time were they?

04:17 11    A    I have no idea.

04:17 12    Q    Which occurred first?

04:17 13    A    I have no idea.

04:17 14    Q    Okay. And, by the way, when you were

04:17 15  talking about the hand incident, you kept going back

04:17 16  to the breast. I want to make sure I'm quite clear

04:17 17  on this. Did Royal touch your breast?

04:17 18        MR. HOARE: Asked and answered.

04:17 19        MR. GORE: And I've gotten another foray

04:17 20  into that area which suggests I'm not clear that I

04:17 21  understand the witness's testimony on this.

04:17 22    Q    Did Royal touch your breast, Ms. Scott?

04:18 23        MR. HOARE: Asked and answered.

04:18 24    Q    I'm waiting. I'm waiting, Ms. Scott.

04:18 25        MR. GORE: Mr. Hoare, would you direct

Page 272

04:18 1  your client to answer my question, please?

04:18 2    A    I'm allowed to take time to answer the

04:18 3  question. This is a very emotional and sensitive

04:18 4  matter. Yes, he touched my breast. What else do

04:18 5  you want to know?

04:18 6    Q    When did he touch your breast?

04:18 7        MR. HOARE: Let's take a break. The

04:18 8  witness is teary.

04:18 9        MR. GORE: There's a question pending.

04:18 10    Q    When did he touch your breast?

04:18 11    A    When he was moving his hands up and down

04:18 12  my sides as he so-called told me he was helping me

04:18 13  off of the chair.

04:18 14    Q    Is it your testimony --

04:18 15    A    I'd like to take a break right now.

04:18 16    Q    No, no, no, ma'am. I'm in a line of

04:18 17  questioning.

04:18 18    A    There's no question pending.

04:18 19    Q    Is it your testimony that he actually

04:18 20  touched your breast?

04:18 21        MR. HOARE: She is in tears.

04:18 22        THE WITNESS: There is no question. I

04:18 23  want to take a break.

04:31 24        (Recess taken from 4:18 to 4:31.)

04:31 25    Q    Ms. Scott, is it your testimony that Royal

67 (Pages 269 to 272)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 285

04:50 1    Q. Sure. Did you ever observe Royal engage
04:50 2  in inappropriate behavior of a sexual nature with
04:50 3  anybody else affiliated with the office?
04:50 4        MR. HOARE: Vague and ambiguous.
04:51 5    A He commented to me and Danielle in my
04:51 6  presence and her presence that we both had very sexy
04:51 7  legs.
04:51 8    Q Other than that, any other behavior that
04:51 9  you observed by Royal of a sexual nature that wasn't
04:51 10  directed at you?
04:51 11        MR. HOARE: Same objection.
04:51 12    A At this time, that's all I can recall.
04:51 13    Q And if I did ask this before, I apologize.
04:51 14  Do you contend that anyone else in the office other
04:51 15  than Royal engaged in inappropriate behavior towards
04:51 16  you of a sexual nature?
04:51 17        MR. HOARE: Asked and answered.
04:51 18    A Can you repeat the question, please?
04:51 19    Q Sure. Do you contend that anyone else in
04:51 20  the office other than Royal engaged in inappropriate
04:51 21  behavior towards you of a sexual nature?
04:51 22        MR. HOARE: Asked and answered.
04:52 23    A Royal was the only one.
04:52 24    Q Okay.
04:52 25    A That was nonconsensual.

Page 286

04:52 1    Q And in your complaint you refer to ogling
04:52 2  and touching. Are you aware of those words being
04:52 3  used?
04:52 4    A Yes.
04:52 5    Q Is ogling and touching anything else other
04:52 6  than the specific incidents that you've identified
04:52 7  here today?
04:52 8        MR. HOARE: Objection, calls for a
04:52 9  conclusion. It's vague and ambiguous.
04:52 10    Q Let me rephrase it. In your complaint,
04:52 11  you alleged that Royal ogled and touched you. Are
04:52 12  you aware of that?
04:52 13    A Yes.
04:52 14    Q You testified at some length at what it
04:52 15  was that you believe is Royal -- the inappropriate
04:52 16  behavior Royal has engaged in. My question is: Do
04:52 17  you mean anything other than what you've already
04:52 18  talked about when you say that he ogled and touched
04:52 19  you?
04:52 20        MR. HOARE: Same objection.
04:53 21    A It's possible. It was --
04:53 22    Q Are you finished? I'm sorry.
04:53 23    A I'm thinking.
04:53 24        MR. HOARE: Object to the question because
04:53 25  it requires that the witness review the transcript

Page 287

04:53 1  in this case and do an inventory of everything
04:53 2  that's been suggested so far --
04:53 3        MR. GORE: Objection noted.
04:53 4        MR. HOARE: -- and then make a decision as
04:53 5  to whether or not it was all-inclusive.
04:53 6        MR. GORE: Objection noted.
04:53 7    Q Ms. Scott, whenever you're ready.
04:53 8    A Can you please repeat the question?
04:53 9    Q Sure. When you contend that Royal ogled
04:53 10  and touched you, is there anything you can think of
04:53 11  other than what you have testified here today that
04:54 12  supports that contention?
04:54 13        MR. HOARE: Same objections.
04:54 14    A Other than what I've already stated, it
04:54 15  was very frequent, very habitual. And at this time
04:54 16  that's -- that's all I can remember.
04:54 17    Q Okay. But you don't recall any specific
04:54 18  day on which any of it occurred?
04:54 19    A At this time, that's what I remember.
04:54 20    Q Okay. And you don't recall whether some
04:54 21  of it occurred more than once or not?
04:54 22    A It was very frequent.
04:54 23    Q Do you recall whether it occurred more
04:54 24  than five times?
04:54 25    A I didn't count, but it was very frequent,

Page 288

04:54 1  yes.
04:54 2    Q You do believe that the behavior occurred
04:54 3  more than five times?
04:54 4        MR. HOARE: Objection.
04:54 5    A I believe --
04:54 6        MR. HOARE: Let me object to the question
04:54 7  as vague and ambiguous.
04:54 8    Q You can answer.
04:55 9    A I believe it did, yes. I didn't count.
04:55 10  At this time, I don't recall exact numbers.
04:55 11    Q More than ten times?
04:55 12        MR. HOARE: Same objection, vague and
04:55 13  ambiguous.
04:55 14    Q You can answer. Are you thinking?
04:55 15    A Yes. I didn't count the number of times.
04:56 16    Q Are you finished, or are you still
04:56 17  thinking? It's hard for me to tell. I apologize.
04:56 18    A I'm thinking. It was very frequent. And
04:56 19  unwelcomed every time.
04:56 20    Q Is it your testimony that it occurred more
04:56 21  than ten times?
04:56 22    A At this time, I don't recall specifically.
04:56 23    Q Okay. Also, why -- you mentioned all
04:56 24  those reasons earlier why -- that support your
04:56 25  contention about why you didn't talk to the

---

71 (Pages 285 to 288)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

---

Page 317

05:36 1   fallen at Lindsey Fielders', correct?
05:36 2     A  I don't recall if it was the same day or
05:36 3   not.
05:36 4     Q  But your foot hurt too much to go to work
05:36 5   but not too much to go to the lupus gala, is that
05:36 6   correct?
05:36 7     A  At this time, I don't recall.
05:36 8     Q  Do you remember telling Danielle that once
05:36 9   you called in sick but you just wanted to sleep
05:36 10   late?
05:36 11     A  At this time, I don't recall. I was under
05:36 12   a lot of emotional stress and a very hostile work
05:36 13   environment where I never knew what to expect from
05:36 14   Royal. And oftentimes it made me physically ill to
05:36 15   have to get up in the morning and go to work. And I
05:36 16   lost sleep over it, so on many occasions it was very
05:36 17   difficult for me to get to work. It was -- I was --
05:36 18   I was very emotional.
05:37 19     Q  Define "physically ill."
05:37 20     A  Nauseated, throwing up, unable to eat.
05:37 21     Q  How many times did you throw up because of
05:37 22   what you considered to be a hostile work
05:37 23   environment?
05:37 24     A  At this time, I don't recall.
05:37 25     Q  More than once?

---

Page 318

05:37 1     A  Numerous times.
05:37 2     Q  More than five times?
05:37 3     A  Many times, yes.
05:37 4     Q  Did you ever go see a doctor as a result
05:37 5   of the excessive vomiting?
05:37 6     A  No. I was ashamed. I felt violated.
05:37 7     Q  That you were vomiting?
05:37 8     A  No, that I was undergoing the harassment
05:37 9   and that I was a victim of this abuse that was
05:37 10   unasked for and unwarranted.
05:37 11     Q  But not so ashamed or violated that you
05:37 12   would talk to the Congressman about it?
05:37 13     MR. HOARE: Excuse me. It's
05:38 14   argumentative.
05:38 15     A  Can you repeat the question, please?
05:38 16     Q  I said but not so ashamed or violated that
05:38 17   you would talk to the Congressman about it?
05:38 18     MR. HOARE: Same objection.
05:38 19     A  I'm not sure I understand the question.
05:38 20     Q  What damages are you seeking in this
05:38 21   lawsuit?
05:38 22     A  I haven't even thought about that.
05:38 23     Q  What do you want to get out of this
05:38 24   lawsuit?
05:38 25     A  I -- accountability.

---

Page 319

05:38 1     Q  Are you looking for money?
05:38 2     A  It's -- I -- it's never been about money.
05:38 3     Q  Are you looking for money, though?
05:38 4     A  I need my attorneys' fees paid for, but
05:38 5   I'm happy to pay for that if I have to. It's not
05:38 6   about money.
05:38 7     Q  In your complaint or, excuse me, your
05:38 8   interrogatories, you say that you're looking for
05:38 9   tuition remission. Do you have any idea what that's
05:38 10   referring to?
05:38 11     A  At this time, I don't know.
05:38 12     Q  Are you looking for tuition remission as
05:38 13   part of the benefits or damages in this lawsuit?
05:39 14     A  I would have to speak to my attorney about
05:39 15   that. I'm not certain.
05:39 16     Q  Okay. What do you view as appropriate
05:39 17   accountability?
05:39 18     A  Taking responsibility. Working to make
05:39 19   sure this never happens to somebody else again.
05:39 20   Acknowledging that it occurred. Apologizing
05:39 21   publicly. Apologizing for allowing -- I want
05:39 22   whatever the law will allow, and I want justice to
05:39 23   be served. And I don't want anyone that ever works
05:39 24   for another U.S. Congressman or this Congressman to
05:39 25   ever have to go through this again. It's not fair.

---

Page 320

05:39 1     Q  So is that why you didn't return the
05:40 2   Congressman's call when he called you after you sent
05:40 3   the e-mail?
05:40 4     MR. HOARE: Objection, assumes facts not
05:40 5   in evidence.
05:40 6     A  At this time, I don't know why I didn't
05:40 7   call. I was very emotionally distraught and at this
05:40 8   time, I -- I don't know.
05:40 9     Q  You are aware that the Congressman
05:40 10   undertook -- retained an outside law firm to
05:40 11   undertake an investigation of your allegations,
05:40 12   aren't you?
05:40 13     A  I -- at this time, I don't know.
05:40 14     Q  You've heard that before, correct?
05:40 15     A  I believe so, yes.
05:40 16     Q  Okay. And you didn't participate in that
05:40 17   investigation, did you?
05:40 18     A  Not that I'm aware of.
05:40 19     Q  Do you -- why didn't you participate in
05:40 20   the investigation?
05:40 21     A  I would have to speak to my attorney about
05:40 22   that.
05:40 23     Q  Are you -- do you understand that not
05:40 24   participating meant there was only certain
05:40 25   information that could be gathered?

---

79 (Pages 317 to 320)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

**Page 321**

05:40 1     A  It was never expressed to me by the
05:40 2  Congressman to my attorney or via my attorney that
05:41 3  there was any interest in my well-being or -- I took
05:41 4  the e-mails and the correspondence from his counsel
05:41 5  to my counsel, especially in the document that
05:41 6  stated had he been aware of the allegations about
Redacted 7          and the so-called member of Congress that I
05:41 8  approached inappropriately, that I would have been
05:41 9  fired. That's not an active interest towards my
05:41 10  well-being. If he cared to know what was going on
05:41 11  in my life and to know the truth and what had
05:41 12  happened, he could have asked.
05:41 13     Q  But didn't he try to do that, Ms. Scott?
05:41 14     MR. HOARE: Objection.
05:41 15     A  Not to the best of my knowledge.
05:41 16     MR. HOARE: Argumentative.
05:41 17     MR. GORE: And I will just state for the
05:41 18  record that the letter you're referring to at least
05:41 19  in part was part of settlement discussions and is
05:41 20  inappropriate for purposes of admissibility.
05:41 21     MR. HOARE: I disagree with you.
05:41 22     MR. GORE: Oh, I'm sure you do.
05:41 23     MR. HOARE: Move to strike.
05:41 24     MR. GORE: But I'm making sure that that's
05:41 25  clear on the record.

**Page 322**

05:41 1     MR. HOARE: Move to strike.
05:42 2     MR. GORE: That's fine, Mr. Hoare.
05:42 3     MR. HOARE: May I ask Mary Ann how many
05:42 4  hours we've been on right now?
05:42 5     THE REPORTER: When we came back on the
05:42 6  record, we had five hours and 45 minutes. We were
05:42 7  on the record for five hours and 45 minutes at 5:10,
05:42 8  so add 32 minutes.
05:42 9     MR. GORE: And I have at least I would say
05:42 10  two to three hours more to go, Michael. And so we
05:42 11  can do one of two things. I can either get your
05:42 12  agreement that you will voluntarily make your client
05:42 13  available for another three hours, or I will
05:42 14  continue tonight until I'm finished or until the
05:42 15  deposition is otherwise terminated by the Court and
05:43 16  we will file the motion to have more time.
05:43 17     MR. HOARE: Would you repeat that, please?
05:43 18     MR. GORE: I have at least, I would say,
05:43 19  two to three more hours to go to complete my
05:43 20  examination of your client based upon the documents
05:43 21  that have thus far been provided. We can do one of
05:43 22  two things. I can either get your agreement that
05:43 23  you will voluntarily make your client available for
05:43 24  another three hours at some other point in the near
05:43 25  future, or I will continue tonight until I'm

**Page 323**

05:43 1  finished or until the deposition is otherwise
05:43 2  terminated by the Court and we will file the motion
05:43 3  to have more time.
05:43 4     MR. HOARE: All right. Well, now it's
05:43 5  5:40-something. Let me talk to my client.
05:43 6     MR. GORE: Okay.
05:43 7     (Discussion held off the record.)
05:51 8     MR. GORE: Back on the record. I have
05:51 9  asked Mr. Hoare to agree to allow me to take more
05:51 10  than seven hours of his client's deposition, and he
05:51 11  has refused. It's my belief that the failure to get
05:51 12  responsive discovery in time and the nature of the
05:51 13  responses I have been getting to numerous questions
05:51 14  has prevented me from being able to conduct this
05:51 15  deposition in the full seven hours, so I'm going to
05:51 16  continue, and I told Mr. Hoare that I was prepared
05:51 17  to go tonight and finish it. He has objected to
05:51 18  that, so we will go with the remainder of the time,
05:51 19  then we will be filing a motion for more time.
05:51 20     MR. HOARE: I understood the proposal I
05:52 21  was given to mean that if we did the seven hours and
05:52 22  give you another two and a half hours, three hours,
05:52 23  you could conclude everything without regard to
05:52 24  additional documents or the like.
05:52 25     MR. GORE: Yeah, I'm a little confused.

**Page 324**

05:52 1  What's the level of confusion? Do you believe I
05:52 2  said something inconsistent with that?
05:52 3     MR. HOARE: I don't know. Was that your
05:52 4  proposal to me?
05:52 5     MR. GORE: Yes.
05:52 6     MR. HOARE: Okay.
05:52 7     MR. GORE: That we continue tonight until
05:52 8  I'm finished, which I think is going to be another
05:52 9  two to three hours, which will go beyond the
05:52 10  remaining 45 minutes we have in the seven hours,
05:52 11  then I believe that I will not have any need to ask
05:52 12  for your client to come back absent some
05:52 13  extraordinary document that is provided later on
05:52 14  that would require that.
05:52 15     MR. HOARE: All right. So we will
05:52 16  continue for the 45 minutes.
05:53 17     MR. GORE: Okay.
05:53 18  BY MR. GORE:
05:53 19     Q  Ms. Scott, you were aware as of -- let me
05:53 20  ask you this: Do you know when generally House
05:53 21  employees are paid?
05:53 22     A  If I recall correctly, once a month.
05:53 23     Q  At the end of the month, is that what you
05:53 24  recall?
05:53 25     A  This time, I'm not certain, but I recall

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott                                    Taken on May 21, 2007

| Page 333 | Page 335 |
|---|---|

**Page 333**

06:03 1  ever telling you that you needed to listen to your
06:03 2  voice mails because your voice mail was frequently
06:03 3  full?
06:03 4     A  At this time, I don't recall. My voice
06:03 5  mail was not typically full. I checked it every day
06:03 6  religiously.
06:03 7     Q  Were there times when it was full?
06:03 8     A  Maybe on one occasion. I got a lot of
06:03 9  calls as the scheduler, so --
06:03 10     Q  Any more than once that it was full?
06:03 11     A  At this time, I don't recall.
06:03 12     Q  You produced a list of what looks like a
06:03 13  bill or telephone numbers that you called in this
06:03 14  lawsuit. Are you familiar with that?
06:03 15     A  Yes.
06:03 16     Q  Okay. What was the significance of that
06:03 17  to your case?
06:04 18     A  I would have to speak to my attorney about
06:04 19  that.
06:04 20     Q  Do you have any knowledge as to what that
06:04 21  call log refers to?
06:04 22     A  It's got calls from anyone that I may have
06:04 23  talked to from the office in it as well as family
06:04 24  members, friends.
06:04 25     MR. GORE: Okay. Now what I am going to

**Page 335**

11:23 1  (Note: Confidential portion of this
11:23 2  transcript is bound under separate cover
11:23 3  containing pages 335 through 347.)

**Page 334**

06:04 1  do is in a minute go back into the confidential
06:04 2  section, but I will say that we are designating the
06:04 3  testimony that has been given today regarding these
06:0[ ]
06:0[ ]  *Redacted*
06:04 6  that have been made as confidential.
06:04 7     If, Mr. Hoare, there is a need for those
06:05 8  to be disclosed to anyone, I would request that you
06:05 9  and I talk about it, but we are going to designate
06:05 10  that testimony confidential at least for purposes of
06:05 11  the day and then I'll speak with my client. Do you
06:05 12  have any reaction or comment? If not, we're going
06:05 13  to go into the confidential portion.
06:05 14     MR. HOARE: No, I don't.
06:05 15     MR. GORE: Okay.
06:05 16     MR. HOARE: I'm not going to engage in
06:05 17  dialogue with you.
06:05 18     MR. GORE: All right, we're going back to
06:05 19  the confidential portion.
20
21
22
23
24
25

**Page 347**

06:24 1     MR. GORE: Back on the regular record.
06:24 2  BY MR. GORE:
06:24 3     Q  Ms. Scott, many of my questions today have
4  been answered with a statement such as, "At this
5  time, I don't recall." Do you follow me so far?
06:24 6     A  Okay.
06:24 7     Q  Do you agree?
06:24 8     MR. HOARE: Objection.
06:24 9     Q  Well, do you believe that with the passage
06:24 10  of time that your recollection is somehow going to
06:24 11  get better?
06:24 12     A  At this time, I'm uncertain as to what
06:24 13  I'll be able to recall tomorrow or six months from
06:24 14  now.
06:24 15     Q  Is it typical, though, that with more time
06:24 16  that passes that your memory gets better?
06:24 17     A  I suppose it's always possible. I don't
06:24 18  know.
06:24 19     Q  Is it typical for you?
06:24 20     A  At this time, I don't know.
06:24 21     Q  I know at this time you don't know. I'm
06:25 22  asking, though, in your life, in your experience, is
06:25 23  it typical that you get a better memory of events as
06:25 24  time elapses?
06:25 25     MR. HOARE: Objection.

83 (Pages 333 to 347)

Reported by:
Mary Ann Payonk, CRR-RDR

Deposition of Elizabeth Scott

Taken on May 21, 2007

**Page 348**

06:25 1    A   At this time, I can't speak to what's
06:25 2    typical.
06:25 3    Q   Okay. And you can't speak to what's
06:25 4    typical for yourself?
06:25 5        MR. HOARE: Argumentative.
06:25 6    A   At this time, I have no way of knowing
06:25 7    what I'll recall in an hour, tomorrow morning, in
06:25 8    six months.
06:25 9    Q   Are there any documents out there that you
06:25 10   can think of that could possibly help you better
06:25 11   recall facts than you've been able to testify today?
06:25 12       MR. HOARE: Requires speculation.
06:25 13   A   At this time, I don't know.
06:25 14   Q   Is there any document that you think might
06:25 15   exist that if I were able to provide you --
06:25 16   A   At this time --
06:25 17   Q   -- that might help you understand better?
06:25 18       MR. HOARE: Same objection, requires
06:25 19   speculation.
06:26 20   A   At this time, I'm not certain.
06:26 21   Q   Well, you're not certain is different than
06:26 22   you don't believe. Are there? Is there? Is there
06:26 23   some glimmer somewhere that says, look, if I had
06:26 24   that document, maybe I'd be able to remember better?
06:26 25   A   At this time, I don't know.

**Page 349**

06:26 1        MR. GORE: All right. With my objection
06:26 2    on the grounds that I would like to spend more time
06:26 3    with this witness and with the express right to
06:26 4    request time to reopen the deposition once we get
06:26 5    the discovery we haven't gotten, I'm finished.
06:26 6        MR. HOARE: Thank you. One minute.
06:26 7        EXAMINATION
06:26 8    BY MR. GORE:
06:27 9    Q   Ms. Scott, let me refer you to
06:28 10   Exhibit Number 6, and particularly to page 14.
06:28 11       MR. GORE: Which is Exhibit Number 6,
06:28 12   Michael?
06:28 13       MR. HOARE: Supplemental Responses to
06:28 14   Defendant's First Interrogatories to Plaintiff.
06:28 15       MR. GORE: Thank you.
06:28 16       MR. HOARE: Okay.
06:28 17   Q   Page 14, interrogatory 12, top of the
06:28 18   page. There's a reference there to December 2005
06:28 19   through May 2006. Do you see that?
06:28 20   A   Yes.
06:28 21   Q   Okay. And when did you leave the
06:28 22   Congressman's office?
06:28 23       MR. GORE: Objection, asked and answered
06:28 24   numerous times. The witness cannot recall.
06:28 25   Q   You may answer.

**Page 350**

06:28 1    A   I believe it was to be sometime in June of
06:28 2    2006.
06:28 3    Q   Okay. And the -- so this would be a
06:28 4    mistake?
06:28 5    A   Yes.
06:28 6        MR. GORE: What's "this"?
06:28 7    Q   As it appears in the top of page 14,
06:29 8    December 2005 through May 2006.
06:29 9    A   Yes.
06:29 10   Q   Okay. And below that there's a reference
06:29 11   to a June 18th, 2006. Do you see that date?
06:29 12   A   Yes.
06:29 13   Q   And that date seems to suggest that you
06:29 14   started your employment at the JGB Companies on that
06:29 15   date.
06:29 16   A   Yes.
06:29 17   Q   Is that accurate?
06:29 18       MR. GORE: Objection, asked and answered.
06:29 19   A   To the best of my knowledge, no.
06:29 20   Q   Okay. When did you start with the
06:29 21   JGB Companies, to the best of your present
06:29 22   knowledge?
06:29 23   A   To the best of my knowledge, it was
06:29 24   sometime before then.
06:29 25   Q   Did you type these responses to the First

**Page 351**

06:29 1    Supplemental Responses to Defendant's First
06:29 2    Interrogatories?
06:29 3    A   No.
06:29 4    Q   Okay. All right. I want you to refer to
06:30 5    Exhibit 11. And I'll hand you a copy of Exhibit 11.
06:30 6        MR. GORE: It's the JBG letter.
06:31 7    Q   Exhibit 11 is the correspondence
06:31 8    apparently from JGB Companies dated June 2nd, 2006,
06:31 9    a two-page document. And have you seen that
06:31 10   document in connection with this litigation before
06:31 11   today?
06:31 12       MR. GORE: Objection, asked and answered.
06:31 13   Q   You may answer.
06:31 14   A   Can you define "in connection with this
06:31 15   litigation"?
06:31 16   Q   Sure. Is that a document that you
06:31 17   produced in this litigation?
06:31 18       MR. GORE: Objection, asked and answered.
06:31 19   A   Not that I'm aware of.
06:31 20   Q   Okay.
06:31 21   A   No.
06:31 22   Q   Indeed, it doesn't have a plaintiff's
06:31 23   Bates stamp number on it, does it, on either of the
06:31 24   two pages?
06:31 25       MR. GORE: Objection, leading.

Reported by:
Mary Ann Payonk, CRR-RDR

# EXHIBIT 2

Elizabeth Scott
1713 37th Street, NW
Washington, D.C.  20007

August 4, 2006
Via Email: Rodneyhr316@mail.house.gov

The Honorable Rodney Alexander
U.S. House of Representatives
316 Canon House Office Building
Washington, DC 20515

Dear Congressman Alexander:

I have been trying to retrieve my 2006 planner which I left in the office.  Attorney Lett has the planner but refuses to return it.  She claims the planner is "office property" and does not belong to me.

That planner is not government issued.  It does not come from the supply store.  I bought it off the Hill with my own money for my own purposes.

Please advise whether you or Adam can help me with this matter.

Sincerely,

Elizabeth Scott

cc:    Adam Terry
       Via Email: Adam.Terry@mail.house.gov

GLORIA J. LETT
COUNSEL

ANN R. ROGERS
SENIOR ASSOCIATE COUNSEL

# U.S. House of Representatives
## Office of House Employment Counsel

VICTORIA L. BOTVIN
KIMBERLY CAREY WILLIAMS
ASSOCIATE COUNSELS

1036 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6622

PHONE: (202) 225–7075
FAX: (202) 225–7033

August 7, 2006

**_Via Facsimile and Federal Express_**

Michael J. Hoare, Esq.
Michael J. Hoare, P.C.
1101 14th Street, N.W.
Suite 710
Washington, DC 20005

Re: **Day Planner**

Dear Mr. Hoare:

On August 4, 2006, your client, Elizabeth Scott, sent my client a letter via e-mail requesting the return of a 2006 day planner. As stated in a previous letter, the Office of Rep. Alexander has returned all of Ms. Scott's personal belongings. The 2006 day planner will not be returned to Ms. Scott because it contains only Rep. Alexander's congressional calendar and congressional contacts and was kept in the course of Ms. Scott's official duties as Scheduler. Since Ms. Scott claims to have purchased the day planner herself, the office is willing to reimburse her for its expense or give her a new 2006 day planner.

Once again, I ask that your client refrain from contacting my client directly.

Sincerely,

_Kimberly C. Williams /for_

Gloria J. Lett

Attachment

cc: Rep. Rodney Alexander

GLORIA J. LETT
COUNSEL

ANN R. ROGERS
SENIOR ASSOCIATE COUNSEL

# U.S. House of Representatives
# Office of House Employment Counsel

VICTORIA L. BOTVIN
WILLIAM F. ALLEN
KIMBERLY CAREY WILLIAMS
ASSOCIATE COUNSELS

1036 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6622

PHONE:  (202) 225–7075
FAX:  (202) 225–7033

August 1, 2006

**_Via Federal Express_**

Michael J. Hoare, Esq.
Michael J. Hoare, P.C.
1101 14th Street, N.W.
Suite 710
Washington, DC 20005

Re:  **Day Planner**

Dear Mr. Hoare:

I am in receipt of your letter dated July 25, 2006 in which you request that I return Ms. Scott's 2006 day planner.  The Office of Rep. Alexander and I have returned all of Ms. Scott's personal belongings.  The 2006 day planner is office property that contains Rep. Alexander's official schedule.  It does not belong to Ms. Scott.

Sincerely,

Gloria J. Lett